# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Amy J. St. Eve | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 4356 | **DATE** | 5/19/2003 |
| **CASE TITLE** | Johnson vs. Tellabs, Inc. | | |

**MOTION:**  [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____.  Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]  Enter Memorandum Opinion and Order.  Defendants' motion to dismiss (R. 47-1) is granted without prejudice.  Plaintiffs have until June 27, 2003 to file an amended complaint consistent with the court's order.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | 6 number of notices | **Document Number** |
|---|---|---|---|---|
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | MAY 20 2003 date docketed | |
| | Notified counsel by telephone. | | | |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | | 5/19/2003 date mailed notice | |
| | Copy to judge/magistrate judge. | | | |
| TH ✓ | courtroom deputy's initials | FILED FOR DOCKETING | TH6 | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

DOCKETED

MAY 2 0 2003

| | | |
|---|---|---|
| THOMAS JOHNSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| TELLABS, INC., MICHAEL J. BIRCK, | ) | No. 02 C 4356 |
| RICHARD C. NOTEBAERT, JOHN | ) | |
| VAUGHN, ROBERT W. PULLEN, JOAN E. | ) | |
| RYAN, BRIAN JACKMAN, J. THOMAS | ) | |
| GRUENWALD, JOHN C. KOLHER, | ) | |
| WILLIAM F. SOUDERS and CATHERINE | ) | |
| KOZIK, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Plaintiffs allege that Defendants engaged in a scheme to deceive and defraud the investing public as to the true value of Tellabs, Inc.'s ("Tellabs") common stock. Plaintiffs contend that Defendants carried out this scheme, in part, by making misrepresentations about Tellabs' current financial condition and future prospects. According to Plaintiffs, these misrepresentations were false and misleading and resulted in the artificial inflation of Tellabs' stock price. Plaintiffs claim that they were injured when they purchased Tellabs' common stock at these artificially inflated prices.

Defendants seek to dismiss the Consolidated Amended Class Action Complaint (the "Complaint") for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6), for failure to plead fraud with particularity pursuant to Federal Rule of Civil Procedure 9(b), and for failure to meet the pleading standards set forth in the

$6^0$

Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(b) (the "PSLRA"). For the reasons set forth below, Defendants' motion is granted.

**ALLEGATIONS**

**I.    The Parties**

This putative class action lawsuit is brought by various plaintiffs individually and on behalf of persons who purchased common stock of Defendant Tellabs between December 11, 2000 and June 19, 2001 (the "Class Period"). On September 27, 2002, the Court appointed Makor Issues & Rights ("Makor Issues") Lead Plaintiff pursuant to 15 U.S.C. § 78(u)-4. *See Johnson v. Tellabs, Inc.*, No. 01 C 4356, 2002 WL 31163670 (N.D. Ill. Sept. 27, 2002).

Tellabs is a Delaware corporation with its principal place of business in Lisle, Illinois. (R. 40-1, Compl. ¶ 21.) Tellabs designs, manufactures and markets highly specialized optical network and broadband access equipment as well as other hardware for use in fiber-optic cable networks. (*Id.* ¶ 50.) It is a global supplier of networking solutions and services that support the Internet. The Tellabs' products that are relevant to this case are the TITAN 5500, the TITAN 6500 and the SALIX 7600. All of these products are complex transmission systems utilized with optical networking systems. The TITAN 5500 is a digital cross-connect product that is utilized by many of the major telecommunications companies. (*Id.* ¶ 51.) The TITAN 6500 is a multi-service transport switch. (*Id.* ¶ 53.) The SALIX 7600 is a software control suite that helps carriers increase revenue by building low cost networks that deliver innovative new services quickly. (*Id.* ¶ 62.)

Defendants Michael Brick, J. Thomas Gruenwald, Brian Jackman, John Kohler, Catherine Kozik, Richard Notebaert, Robert Pullen, Joan Ryan and William Souders

2

(collectively, the "Individual Defendants") are all officers and/or directors of Tellabs. Michael Birck was a director and served as chairman of Tellabs' board of directors beginning in 2000. (R. 40-1, Compl. ¶ 22.) He also served as chief executive officer and president of Tellabs from 1975 through 2000. (*Id.*) J. Thomas Gruenwald served as a senior vice president and general manager of the broadband access group since 1999 and as a vice president of strategic resources from 1995 through 1999. (*Id.*) Brian Jackman was a director of Tellabs and served as president of global systems and technology. He also was president and an executive vice president of business operations from 1990 through 1998. (*Id.*) John Kohler was a senior vice president of global business operations beginning in 2000 and a vice president of global manufacturing from 1992 through 2000. (*Id.*)

Beginning in 2000, Catherine Kozik served as chief information officer and as a senior vice president of global information services. (R. 40-1, Compl. ¶ 22.) Also that year, Richard Notebaert became a director and served as chief executive officer and president of Tellabs. (*Id.*) Robert Pullen was a senior vice president and general manager of optical networking starting in 2000. Pullen also served as a vice president of engineering and marketing in the digital systems division from 1997 through 2000. (*Id.*) Joan Ryan was an executive vice president and chief financial officer since 2000. (*Id.*) Finally, William Souders served as a director of Tellabs.[1] (*Id.*)

---

[1] Plaintiffs initially included John Vaughn as a defendant in the case, but subsequently voluntarily dismissed him without prejudice. (*See* R. 23-1.)

## II.      Stock Sales

Plaintiffs allege that Birck, Gruenwald, Kohler, Kozik and Souders[2] sold stock during the purported Class Period at an artificially inflated price.[3]  During this period of time, Plaintiffs claim that Birck sold 80,000 shares for $5,183,150; Gruenwald sold 1,500 shares for $93,281; Kohler sold 7,500 shares for $484,968; Kozik sold 3,220 shares for $187,766; and Souders sold 16,000 for $560,074.  (R. 40-1, Comp. ¶ 22.)

## III.      The Telecommunications Industry

Plaintiffs allege that the telecommunications industry suffered a significant decline in demand for its products in early 2000.  (*Id.* ¶¶ 3, 47.)  In addition, Plaintiffs claim that the Internet sector substantially contracted, which "severely constrict[ed] continued access to capital and demand for products to maintain and further develop what had been a rapidly expanding and growing Internet and telecommunications infrastructure." (*Id.* ¶ 47.)  According to Plaintiffs, many of Tellabs' competitors suffered a dramatic decline in earnings.  (*Id.* ¶ 48.)  Plaintiffs maintain that Defendants disguised the impact this decline had on Tellabs and, instead, falsely contended that Tellabs was not affected by the industry slow-down.

## IV.      Allegedly False Statements by Tellabs

Plaintiffs claim that during the purported Class Period, Defendants made a series of false

---

[2] Although the Complaint alleges that Souders sold stock on February 20, 2001, Plaintiffs have acknowledge that the correct date of this sale is April 20, 2001.

[3] The Complaint also refers to trades by "Defendant Suwinski" and "Defendant Gugliemi." (R. 40-1, Compl. ¶¶ 63, 79.)  Neither of these people are named as defendants in the Complaint. Moreover, the Complaint does not contain any additional allegations against these individuals, including what position, if any, they held at Tellabs.  Plaintiffs do not allege that Suwinski or Gugliemi made any misrepresentations or projections.  Accordingly, these allegations do not state a claim against Suwinski or Gugliemi.

statements and omissions that resulted in the artificial inflation of Tellabs' stock price. These purported false statements and omissions related to Tellabs' financial condition, its earnings and operations and its future prospects. Specifically, Plaintiffs maintain that Defendants falsely reported Tellabs' financial condition for fourth quarter of 2000, and provided false "guidance" for 2001. According to Plaintiffs, Defendants also communicated regularly and directly with securities analysts and provided them with these misrepresentations so that the security analysts would unknowingly falsely promote Tellabs, resulting in an artificially inflated price of Tellabs' common stock.

### A. December 2000

On December 11, 2000 – the start of the purported Class Period – Tellabs issued a press release announcing a strategy to deliver an all optical network. The press release noted, "Tellabs is making all-optical networking a reality . . . . We have the strategy and the products that will enable service providers to deliver and manage all-optical services on demand." (R. 40-1, Compl. ¶ 52.) On that same day, Tellabs also announced a multi-year $100 million sales agreement with Sprint for the Titan 6500 multi-service transport switch. The release reported that "[t]he TITAN 6500 helps carriers manage their SONET and SDH-based broadband networks today and protects their investment as we migrate to packet networks tomorrow. The TITAN 6500 system is available now." (*Id.* ¶ 53.)

The next day, securities analysts issued positive research reports on Tellabs. UBS Warburg noted, "Tellabs maintained its guidance for 4Q 2000 and all of 2001. In doing so, the company indicated that the demand for its Titan 5500 product line remain [sic] solid in 4Q and there is visibility for at least two years (if not more) of ongoing good growth for the product."

(*Id.* ¶ 55.) It also estimated thirty-percent growth in sales for 2001. ABN AMRO reported that "the TITAN 5500 remains the workhorse of the group and is expected to see strong growth for the next 2-3 years." (*Id.*) Baird & Co. reported that Tellabs "reiterated its confidence in the telecom-spending environment" and "reconfirmed consensus growth forecasts for fourth quarter 2000 and 2001." (*Id.*)

### B.     January 23, 2001 Press Release

On January 23, 2001, Tellabs reported fourth quarter net income of $232 million. (R. 40-1, Compl. ¶ 58.) Its press release noted that the "strength in Tellabs' core business drove record sales and earnings in the fourth quarter of 2000. Fourth-quarter 2000 sales totaled $1,018 million, up 42% from $716 million in 1999." The press release also stated that fourth quarter net income was up 41% from 1999. (*Id.*) Notebaert explained, "[t]o keep up with robust growth in communications traffic customers are buying more and more Tellabs equipment-fueling our records [sic] results and our first $1 billion quarter." (*Id.*)

During a teleconference with securities analysts that day, Notebaert commented on the TITAN 6500. Specifically, he said that "[o]n the 6500, demand for that product is exceeding our expectations . . . . We had spent . . . a large amount of time working on our ability to create or manufacture enough product to meet customer demand. Demand is just . . . huge for this product." (R. 40-1, Compl. ¶ 59.) In an interview with Eric Schatzker from the Bloomberg News, Notebaert also commented: "I'm a little surprised at the performance of our stock the last few weeks, because last quarter, this quarter, we've been solid and we feel very, very good about the robust growth we're experiencing." (*Id.* ¶ 60.)

Following the press release and teleconference, numerous securities analysts issued

positive research reports for Tellabs. On January 24, 2001, for example, Morgan Stanley reiterated its "outperform" rating and noted that "sales of the TITAN products continued to fuel growth." (*Id.* ¶ 61.)

### C. January 30, 2001 Press Release

Tellabs issued another press release on January 30, 2001, announcing "a new suite of softswitches, the SALIX 7600 softswitch control suite." (R. 40-1, Compl. ¶ 62.) The press release noted, "[t]he SALIX 7600 brings together voice and data technologies to create a set of telepacket service applications that can help carriers grow profitably." (*Id.*) It also stated, "[w]ith the new SALIX 7600 suite, Tellabs has redefined the softswitch market and can now offer integrated, comprehensive solutions to all carriers." (*Id.*)

### D. March 2001

On March 7, 2001, Tellabs issued a press release announcing that it was lowering its revenue and earnings per share expectations for the first quarter 2001. It noted, "Tellabs projects first quarter sales in the range of $830 million to $865 million . . . . The company projects earnings per share in the range of 35 cents to 38 cents, compared with prior guidance of 39 cents per share." (R. 40-1, Compl. ¶ 67.) It also reported that Tellabs could not recognize revenue from TITAN 6500 shipments in the first quarter but expected to do so in the second quarter of 2001. (*Id.*) "Growth in Tellabs' core optical networking business remains strong." (*Id.*) Notebaert went on to project, "[g]iven the strong acceptance of the new TITAN 6500, we continue to target 30 percent growth in revenue and earnings for the year . . . . Demand for our new products is strong, and I am confident we have the right set of solutions to help our customers build tomorrow's converged networks." (*Id.*)

7

During a March 8, 2001 teleconference with securities analysts, Notebaert reiterated that "demand for our core optical products, or our core networking products remains strong . . . . We are as confident as ever – that may be an understatement – about the 6500 . . . . To put this into a bit more perspective, we still expect revenue and EPS growth for the quarter to exceed 30% . . . . Tellabs will meet the adjusted revenue and earnings targets." (R. 40-1, Compl. ¶ 68.) Notebaert also stated that Tellabs had not received "any indication from any of our major clients, major customers, of a downturn in the segment we're in . . . ." (*Id.*) Defendant Jackman added, "[t]here's nothing in the revenue recognition issue that should be construed to imply that the testing and the customer's acceptance of these systems are having difficulty." (*Id.*) That day, various securities analysts issued favorable reports and maintained their buy ratings for Tellabs' stock. (*Id.* ¶ 69.)

On March 29, 2001, Tellabs issued its 10-K for 2000. The "Highlights" section of the financial statement noted: "The Company achieved record levels in sales ($3,387.4), net earnings ($730.8 million) and earnings per share ($1.75) – putting it on track to meet its objective of $6 billion in annual revenues by the year 2003." (R. 40-1, Compl. ¶ 71.) It also stated that "[t]he growth in optical networking product sales was a result of continued strong demand for the Company's TITAN 5500/5500S and TITAN 532L digital cross connect systems." (*Id.*) Tellabs reported that it expected "continued strong sales growth in 2001." (*Id.*)

E.      **April 6, 2001**

On April 6, 2001, Tellabs issued another press release that lowered its first quarter guidance. The press release stated, "[t]he revised guidance stems from reduced and deferred spending by major communications carriers late in the quarter." (R. 40-1, Compl. ¶ 72.)

8

That same day, Notebaert was quoted as saying, "[t]he good news is, orders weren't canceled, they were pushed out into the next quarter." (*Id.* ¶ 73.) In a conference call with analysts that same day, Notebaert stated that "the 6500 is showing strength . . . we should hit our full manufacturing capacity in May or June to accommodate the demand we are seeing. Everything we can build, we are building and shipping. The demand is very strong." (*Id.* ¶ 74.)

**F.  April 18, 2001[4]**

On April 18, 2001, Tellabs issued a press release announcing its first quarter financials for the period ending March 31, 2001 and reducing its revenue projections for 2001. Notebaert stated, "I am as confident as ever in Tellabs' long-term prospects and our ability to deliver strong revenue and earnings growth in the future." (R. 40-1, Compl. ¶ 77.)

**G.  June 2001**

On June 19, 2001, which is the close of the purported Class Period, Tellabs issued a press release revising its second quarter guidance and reducing its revenues by approximately $300 million to $500 million. (*Id.* ¶ 85.) Tellabs common stock fell from a high of $23.01 per share on June 19, 2001 to a low of $15.87 per share on June 20, 2001. (*Id.* ¶ 87.) The June 20, 2001 price reflected a "decline of more than 75% from the Class Period high of $67.125." (*Id.*)

**V.  Tellabs' Accounting Practices**

Plaintiffs allege that Defendants knowingly and recklessly employed improper accounting practices that falsely inflated Tellabs' balance sheet and falsely reported income and expenses in

---

[4] The Complaint also contains allegations regarding a May 9, 2001 article entitled "Tellabs on Deck" that quotes John Vaughn. That article, however, was released on May 9, *2000* – not 2001. This was published before the purported Class Period. Accordingly, it cannot support a cause of action.

the interim quarters and fiscal year during the purported Class Period, in violation of Generally Accepted Accounting Principles ("GAAP"). (R. 40-1, Compl. ¶ 93.) They further contend that Defendants engaged in "channel stuffing" activities to conceal true sales and that Tellabs offered its customers special incentives and the unlimited right of return in order to improperly overstate Tellabs' revenues. (*Id.* ¶ 98.)

## ANALYSIS

The three count Complaint in this case is premised on securities fraud arising out of the purchase of Tellabs' common stock. In count one, Plaintiffs allege that Defendants violated Section 10(b) of the Securities and Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5. Count two alleges that the Individual Defendants violated Section 20(a) of the Exchange Act. Count three alleges that Birck, Kozik, Kohler, Souders and Gruenwald violated Section 20A of the Exchange Act by insider trading. Defendants move to dismiss the Complaint in its entirety for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), for failure to plead fraud with particularity pursuant to Federal Rule of Civil Procedure 9(b), and for failure to meet the pleading standards set forth in the PSLRA.

## I.    Legal Standard

The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test the legal sufficiency of a complaint, not the merits of the case. *See Triad Assocs., Inc. v. Chicago Hous. Auth.*, 892 F.2d 583, 586 (7th Cir. 1989). When considering a motion to dismiss, the Court considers "whether relief is possible under [any] set of facts that could be established consistent with [the] allegations." *Bartholet v. Reishauer A.G. (Zurich)*, 953 F.2d 1073, 1078 (7th Cir. 1992). The Court views all the facts alleged in the Complaint, as well as any reasonable

inferences drawn from those facts, in the light most favorable to Plaintiff. *See Stachon v. United Consumers Club, Inc.*, 229 F.3d 673, 675 (7th Cir. 2000).

Dismissal of a complaint is appropriate only where it appears beyond doubt that under no set of facts would the plaintiff's allegations entitle him to relief. *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999); *Kennedy v. National Juvenile Det. Ass'n*, 187 F.3d 690, 695 (7th Cir. 1999). A plaintiff that solely attaches bare legal conclusions to narrated facts that fail to outline the bases of his claims does not satisfy federal pleading requirements. *Collins v. Snyder*, No. 02 C 4493, 2002 WL 31749173, at *1 (N.D. Ill. Dec. 2, 2002).

## II. Securities Fraud Pleading Requirements

Plaintiffs rely on two general categories of alleged misrepresentations to support their securities fraud claim: (1) Defendants' purportedly false revenue reports for the fourth quarter of 2000, and (2) Defendants' allegedly fraudulent revenue projections. Plaintiffs claim that both categories of misrepresentations artificially inflated the price of Tellabs' stock during the purported Class Period.

### A. Rule 9(b) and the PSLRA

Plaintiffs' allegations are sounded in fraud. Therefore, the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) apply. Rule 9(b) mandates that a plaintiff plead "the circumstances constituting fraud . . . with particularity." *In re HealthCare Compare Corp. Sec. Litig.*, 75 F.3d 276, 281 (7th Cir. 1996). As the Seventh Circuit has explained, "this means the who, what, when, where, and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir. 1990). This particularity requirement is necessary to ensure that the plaintiff "conduct[s] a precomplaint investigation in sufficient depth to assure

that the charge of fraud is responsible and supported, rather than defamatory and extortionate." *Ackerman v. Northwestern Mut. Life Ins. Co.*, 172 F.3d 467, 469 (7th Cir. 1999).

In addition to Rule 9(b), the strict pleading mandates of the PSLRA apply to Plaintiffs' Complaint. In enacting the PSLRA, Congress raised the pleading standards for litigants bringing private securities fraud claims. *See In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 973 (9th Cir. 1999). In order to meet the PSLRA's dictates for a securities fraud claim, "the complaint shall specify each statement alleged to have been misleading, the reasons or reasons why the statement is misleading, and if an allegation regarding the state or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).[5]

## B. Pleading on Information and Belief

Plaintiffs admit that they base many of their allegations on "information and belief." They allege that the information as to Defendants is based upon an investigation by Plaintiffs' counsel that included interviews of former Tellabs' employees and customers and a review and analysis of public filings, news articles, press releases and analysts reports by or relating to Tellabs. Defendants argue that because the allegations are based on information and belief, Plaintiffs must follow the test articulated by the Second Circuit in *Novak v. Kasaks*, 216 F.3d 300, 313-14 (2d Cir. 2000). Plaintiffs contend that Defendants advocate a *per se* rule that a plaintiff must identify the names confidential sources in a complaint that is pled on information

---

[5] The PSLRA also raised a plaintiff's pleading requirement for scienter, *see* 15 U.S.C. § 78u-4(b)(2), as the Court discusses *infra* in Section III.B.

12

and belief.[6] A reading of *Novak*, however, shows that the Second Circuit rejected a *per se* rule. *See id.* at 314 ("we find no requirement in existing law that, in the ordinary course, complaints in securities fraud cases must name confidential sources").

Instead, the Second Circuit concluded that "where plaintiffs rely on confidential sources but also on other facts, they need not name their sources as long as the latter facts provide an adequate basis for believing that the defendants' statements were false." *Novak*, 216 F.3d at 314. The *Novak* court noted that "a complaint can meet the new pleading requirement imposed by paragraph (b)(1) by providing documentary evidence and/or a sufficient general description of the personal sources of the plaintiffs' beliefs." *Id.* This Court agrees with the Second Circuit's approach in *Novak*. Accordingly, the Court will analyze Plaintiffs' allegations consistent with *Novak* and determine the sufficiency of the facts that purport to support the allegations in the Complaint.

## C. Group Pleading

Plaintiffs rely in part on group pleading and group-published documents such as Tellabs' 10-K in order to allege Defendants' misrepresentations and omissions. They allege, for example, that "[i]t is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the materially false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged here are the collective actions of the narrowly defined group of defendants identified above." (R. 40-1, Compl. ¶ 25.) They further allege that each of the Individual Defendants was an officer or director of Tellabs

---

[6] A *per se* requirement is inappropriate because it would have a chilling effect on employees who provide information about "corporate malfeasance." *In re Cabletron Sys., Inc.*, 311 F.3d 11, 30 (1st Cir. 2002).

and, "because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period." (*Id.* ¶ 28.)

The "group pleading" doctrine creates the presumption that senior executives of a corporation may be held liable for misrepresentations or omissions contained in public statements that are attributable to or issued by a corporation. It "allows plaintiffs to rely on the presumption that certain statements of a company, such as financial reports, prospectuses, registration statements, and press releases, are the collective work of those high-level individuals with direct involvement in the everyday business of the company." *Sutton v. Bernard,* No. 00 C 6676, 2001 WL 897593, at *5 n. 5 (N.D. Ill. Aug. 9, 2001).

The group pleading doctrine, however, predates the enactment of the PSLRA. The Seventh Circuit has yet to address whether the doctrine survives the PSLRA, and the courts in this District are split. *Compare Danis v. USN Communications, Inc.,* 73 F.Supp.2d 923, 939 n.9 (N.D. Ill. 1999) (allowing plaintiffs to rely on the group pleading doctrine), with *Chu v. Sabratek Corp.,* 100 F.Supp.2d 827, 835-37 (N.D. Ill. 2000) (disagreeing with *Danis* and concluding that allegations based on an individual's position within the company are insufficient under the PSLRA).

It is not entirely clear what effect the PSLRA has on the group pleading doctrine with respect to holding individual defendants liable for statements by the company.[7] Even if the group pleading doctrine survives the PSLRA in some form, however, it is apparent that the statute

---

[7] It is entirely clear, however, that the PSLRA abolishes the use of the group pleading doctrine to allege defendant's scienter. *See infra,* Section III.B.

14

requires Plaintiffs to allege facts that support an inference that the statement is attributable to individual defendants. The PSLRA obligates a plaintiff to allege specific facts as to each of the defendant's misrepresentations or omissions. 15 U.S.C. § 78u-4(b)(1). A plaintiff is therefore required at least to include allegations in the complaint relating to an individual defendant's duties or legal obligations that create a presumption that the company's statement was somehow caused by or attributable to an individual defendant. Simply alleging an individual defendant's title is not enough. Unfortunately for Plaintiffs, that is all they have done. Plaintiffs have not adequately alleged that any individual defendant is liable for Tellabs' statements, even if some form of the group pleading doctrine is still viable. Accordingly, the Court will not consider Tellabs' alleged misrepresentations or omissions in determining whether Plaintiffs have stated a claim against the Individual Defendants.

## III. Count One – Section 10(b) Violations

In order to state a claim under Section 10(b), Plaintiffs must allege that Defendants: (1) made a false statement or omission; (2) of a material fact;[8] (3) with scienter; (4) in connection with the purchase or sale of securities; (5) upon which Plaintiffs justifiably relied; and (6) the reliance proximately caused Plaintiffs' damages. *In re HealthCare Compare Corp.*, 75 F.3d at 280. Defendants contend that Plaintiffs have failed to satisfy these pleading requirements with respect to any statement by any Defendant.

---

[8] A statement is material if "there is a substantial likelihood that disclosure of the information would have been viewed by the reasonable investor to have significantly altered the total mix of information." *Searls v. Glasser*, 64 F.3d 1061, 1066 (7th Cir. 1995).

## A. False Statement or Omission

### 1. Allegations regarding Ryan and Pullen

Plaintiffs cannot sustain a cause of action against Pullen or Ryan in count one because the Complaint does not allege that any statements, much less any misrepresentations or omissions, are attributable to Ryan and nothing that is even close to a misrepresentation or omission by Pullen.[9] The only allegations particularized to Ryan or Pullen relate to the office that they held at Tellabs. This is not enough.

### 2. Allegations regarding Birck, Gruenwald, Kohler, Souders and Kosik

Similarly, the Complaint does not contain any facts particularized to the Defendants that sold stock – Birck, Gruenwald, Kohler, Souders and Kozik – to support their role in the misrepresentations or omissions. The Court is again left only with the titles of these individuals. Without more, Plaintiffs have not properly alleged that Tellabs' misrepresentations or omissions are attributable to these Defendants. The group pleading allegations that Plaintiffs use to include these Defendants in count one are insufficient to withstand the mandates of the PSLRA. Further, the Plaintiffs' repeated references to "Defendants" or "Individual Defendants" do not satisfy the PSLRA's requirements of pleading with specificity as to each Defendant. Accordingly, count one is dismissed with respect to Defendants Pullen, Ryan, Birck, Gruenwald, Kohler, Souders and Kozik.

---

[9] The only statement from the Complaint that is attributable to Pullen is included in the December 11, 2000 press release. That release quotes Pullen as saying, "Tellabs is making all-optical networking a reality." (R. 40-1, Compl. ¶ 52.) There is nothing in the Complaint, however, that suggests that this statement is a misrepresentation.

### 3. Allegations regarding the Statement by Jackman

Plaintiffs only attribute one allegedly false statement to Jackman. (R. 40-1, Compl. ¶ 68.) In response to a question regarding why revenues were not recognized on the TITAN 6500, Jackman responded: "There's nothing in the revenue recognition issue that should be construed to imply that the testing and the customer's acceptance of these systems are having difficulty." (R. 40-1, Compl. ¶ 68.) Plaintiffs fail to detail what is false or misleading about this statement. Although Plaintiffs allege that the "Defendants" knew or recklessly disregarded that the production of the TITAN 6500 was far behind schedule and inferior to competitors' products, this allegation does not affect the veracity of Jackman's statement. Accordingly, Jackman's statement is not actionable under the allegations in the Complaint.

### 4. Allegations regarding Statements by Tellabs and Notebaert[10]

Plaintiffs base their Section 10(b) allegations against Tellabs and Notebaert primarily on two types of statements: (a) statements regarding Tellabs' fourth quarter 2000 financial results and (b) projections pertaining to Tellabs' future financial performance.

#### a. Fourth Quarter 2000 Financial Results

Plaintiffs allege that Defendants' statements regarding Tellabs' fourth quarter 2000 financial results were false and misleading because Tellabs had inflated its revenue figures for that quarter. Defendants argue that Plaintiffs have failed to plead sufficient facts to support their claims that Tellabs wrongfully inflated its revenues during the fourth quarter of 2000. Plaintiffs counter that they have pled the following activities which rendered Defendants' statements

---

[10] Unlike its treatment of the other Individual Defendants, the Complaint does detail many statements by Notebaert. (*See e.g. id.* ¶¶ 58, 59, 60, 68, 73, 74, 76, 81 & 88.)

regarding Tellabs' fourth quarter false and misleading: (1) Defendants engaged in "channel stuffing" by (a) over-inventorying customers such as Telcobuy.com and SBC with products that the companies did not need to conceal the decline in demand for the TITAN 5500, (b) offering discounts and other incentives to customers and Value Added Resellers ("VARs") in order to increase fourth quarter 2000 sales to the detriment of first quarter 2001, and (c) entering into numerous consignment transactions for products they knew, or recklessly disregarded, would not be needed by customers;[11] and (2) Defendants failed to take the required write down for excess and obsolete inventory which had accumulated since mid-2000. Plaintiffs argue that they have alleged particularized facts to support each of these activities that render Defendants' statements false and misleading.

### (1)     Channel Stuffing

"Channel stuffing" is the inducement of customers to substantially increase their purchases before they would otherwise buy products from the company in the normal course. *Greebel v. FTP Software*, 194 F.3d 185, 202 (1st Cir. 2002). It results in the shifting of earnings into earlier quarters, which likely harms earnings in later quarters. *Id.* Plaintiffs allege on information and belief that Tellabs engaged in three different types of "channel stuffing."

### (a)     Over-Inventorying

Plaintiffs maintain that Tellabs "aggressively and improperly over-supplie[ed] customers with products by 'stuffing' its distribution channels with products that distributors and resellers could not sell. They contend that Defendants knew or recklessly disregarded that Tellabs'

---

[11] Although Defendants contend that all of these categories are not "channel stuffing" activities, but rather separate activities, in viewing the Complaint in the light most favorable to Plaintiffs, the Court disagrees.

18

customers were over inventoried with the TITAN 5500 such that they would be decreasing their orders in the future, thereby causing Tellabs to experience future declines in sales." (R. 40-1, Compl. ¶ 64.) Plaintiffs contend that these "channel stuffing" activities artificially stimulated revenue in the short term for fourth quarter 2000.

Although the Complaint contains numerous conclusory allegations regarding Defendants' "channel stuffing" activities, it includes only one "over inventorying" example to support those conclusions. Specifically, Plaintiffs allege that Tellabs engaged in "channel stuffing" in late 2000 in connection with sales to SBC Communications ("SBC") through Telcobuy.com by "over-inventorying Telcobuy.com during the fourth-quarter." (*Id.* ¶ 64.) Plaintiffs allege that Defendants over-inventoried customers such as Telcobuy.com and SBC with products that these companies did not need. (*Id.* ¶ 64.) Plaintiffs allege that "[a]s a result of the decline in demand, Telcobuy.com could not sell the products to SBC and thereafter requested to return the products to Tellabs in the beginning of 2001." (*Id.*.)

Plaintiffs do not allege these facts with sufficient particularity. Specifically, the Complaint does not identify the particular terms of the "channel stuffing" with Telcobuy.com or any other customers, the individuals involved in the practice, or the documents exchanged in connection with it. Plaintiffs rely almost exclusively on general conclusions to support their proposition that Defendants knew or recklessly disregarded that Telcobuy.com could not sell Tellabs products to SBC after the over-inventorying. Plaintiffs' allegation that Telcobuy.com requested to return the products to Tellabs – rather than relying on an agreement to return them – in the beginning of 2001 undermines their allegations that an agreement was in place to engage in "channel stuffing."

Plaintiffs also allege that Tellabs' product returns were extremely heavy in January and February 2001, causing Tellabs to lease two additional storage facilities. (R. 40-1, Compl. ¶ 101.) Plaintiffs allege that Bell Atlantic, Lexcom and Telcobuy.com were three customers that were returning products.[12]  Plaintiffs, however, fail to support this claim with any facts supporting that Defendants sold products in the fourth quarter of 2000 knowing that they would be returned by Bell Atlantic or Lexcom in 2001.[13]  Without more, Plaintiffs have failed to allege that the statements regarding fourth quarter performance were misleading when made.  Absent more, Plaintiffs are doing nothing more than playing Monday morning quarterbacks.  Plaintiffs have not done enough to satisfy the *Novak* standard of sufficiency of pleading on information and belief.

### (b)    Incentives

Plaintiffs also allege that Tellabs' employees were instructed to offer discounts and other incentives to customers and VARs in order to increase Tellabs' sales for the fourth quarter of 2000. (*Id.* ¶¶ 64, 98.) To induce customers to purchase additional products, Plaintiffs allege that Tellabs offered "bundle opportunities" through payment discounts, offered substantial discounts in amounts of 10 to 20% and offered extensive credit terms.  (*Id.*)  These incentive activities, according to Plaintiffs, enabled Tellabs to improperly recognize revenue and falsely portray

---

[12]  Plaintiffs also allege that the returns were in the "millions" of dollars  (R. 40-1, Compl. ¶ 101.)  Given that Tellabs' fourth quarter 2000 sales were more than a billion dollars, Plaintiffs' allegations of the dollar amount of the returns are not specific enough for the Court to determine whether the "channel stuffing" related to product returns meet the materiality pleading standard.

[13]  The Court recognizes that "channel stuffing" may have occurred regardless of the returns, because Tellabs customers may have been buying in the fourth quarter 2000 what they otherwise would have purchased in the first quarter 2001.  Plaintiffs have not, however, provided any details to support this "channel stuffing" theory relating to these transactions.

Tellabs' fourth quarter financials.

In the business world, there certainly is nothing inherently wrong with offering incentives to customers to purchase products. Plaintiffs allege that customers such as Sprint and SBC were convinced to "take products" because of these incentives. Plaintiffs fail, however, to allege any facts supporting that such incentives were improper. For example, they do not provide specific examples of such practices or explain particular terms of such incentives. Plaintiffs must particularize their facts in order to proceed.

### (c)    Consignment

Plaintiffs also argue that they meet the pleading requirements of the PSLRA for the allegedly false statements regarding Tellabs' fourth quarter 2000 revenues through their allegations of consignment. Plaintiffs allege that Tellabs falsely inflated its fourth quarter revenues through a serious of consignment transactions for products which Defendants knew the customers would not need. (R. 40-1, Compl. ¶ 64, 98.) Plaintiffs also allege this specific example:

> For example, after Tellabs booked a consignment transaction
> entered into with the VAR Lexcom as a sale, it shipped TITAN
> 5500 equipment in the beginning of 2001. Because Tellabs did not
> have a commitment from SBC to purchase all of the equipment,
> and SBC didn't need all of the equipment, Lexcom returned
> approximately $20 million worth of unused unneeded products in
> the second quarter of 2001.

(*Id..*)

Plaintiffs argue that Defendants should not have recognized the revenue from these sales during the fourth quarter of 2000 because they were consignment sales, and that Defendants violated GAAP by doing so. Although Plaintiffs have come close to particularizing this

allegation, they fail to include the terms of the consignment.

### (2) Obsolete Inventory

Finally, Plaintiffs allege that the statements regarding Tellabs' fourth quarter 2000 financial results were false and misleading when made because "defendants had improperly failed to take a required write-down for excess and obsolete inventory which had been accumulating steadily since mid-year 2000." (R. 40-1, Compl. ¶ 64.) Plaintiffs claim that this resulted in Tellabs artificially inflating the value of its assets and stockholders equity. (*Id.*)

In similar situations, the Seventh Circuit has found that these allegations do not amount to fraud. In *DiLeo*, the Seventh Circuit affirmed a dismissal of a complaint where the plaintiffs sought to recover for tardy write-offs of bad loans. 901 F.2d at 627. The Seventh Circuit found that the complaint was deficient because it did not provide "a single concrete example" of how the write-offs were fraudulent. *Id.* The court went on to state, "[i]f all that is involved is a dispute about the timing of the writeoff, based on estimates of the probability that a particular debtor will pay, *we do not have fraud*; we may not even have negligence. *Id.* (emphasis added). In *Grassi v. Information Resources, Inc.*, 63 F.3d 596 (7th Cir. 1995) the Seventh Circuit extended this principle outside of the loan context, to investments overall. *Id.* at 600 ("Plaintiffs essentially claim that IRI should have written off its bad investment sooner--but this is not fraud.").

Based on these cases, a plaintiff must allege more than delinquent write-offs. Instead, a complaint must specifically state how the delinquent write-offs somehow went beyond a bad business decision or negligence, and instead actually constituted fraud. Accordingly, Plaintiffs' write-down allegations fail to support a claim for fraud. The Complaint does not state how the

22

failure to take the write-downs was fraudulent. It does not state the amount of the write-downs, what the obsolete inventory was, or why the write-downs were required to be taken then. Accordingly, Plaintiffs' write-off allegations do not support a cause of action against Defendants. Taking Plaintiffs' allegations of "channel stuffing" and write-off failures as a whole, they have not sufficiently pled a cause of action under the PSLRA.

### b. Other Statements

Many of the other statements by Tellabs and Notebaert that Plaintiffs allege are false cannot support a cause of action in count one. In some instances, Plaintiffs have not alleged what is false about the statements. In other cases, the statements are not actionable because they are merely puffery.

### (1) No allegations of falsity

Plaintiffs have alleged that other statements made by Defendants were false and misleading, including statements in the following press releases: December 11, 2000, May 31, 2001 and June 5, 2001. Defendants correctly note, however, that Plaintiffs fail to allege what, if anything, was false or misleading in Tellabs' December 11, 2000 press release regarding its optical networking strategy or its May 31, 2001 press release announcing a $262 million restructuring charge. Furthermore, the Complaint does not contain facts supporting the falsity of Tellabs' June 5, 2001 announcement of the introduction of a new software system for the TITAN 6500. As such, these statements are not actionable.

### (2) Puffery

"Courts consistently hold that mere puffery and glowing representations of expected boom are not enough to state claims" under the Exchange Act. *Donovan v. ABC-NACO Inc.*, No.

02 C 1951, 2002 WL 1553259, at *7 (N.D. Ill. July 15, 2002) (citations and quotations omitted); *see also Anderson v. Abbott Labs.*, 140 F.Supp.2d 894, 904 (N.D. Ill.), *aff'd sub nom. Gallagher v. Abbott Labs.*, 269 F.3d 806 (7th Cir. 2001). The majority of Plaintiffs' allegations regarding the progress of the TITAN 6500 and the TITAN 6700 are merely "puffery." For example, the January 23, 2001 press release noted that "[w]ith [the TITAN 6700], scheduled for second-quarter field trials and fourth-quarter availability, Tellabs completes a bandwidth management portfolio that scales from a single call to an entire wavelength of light." That same day, Defendant Notebaert stated: "On the 6500, demand for that product is exceeding our expectations . . . ." Notebaert also stated: "We feel very, very good about the robust growth we're experiencing." Later, on March 8, 2001, Notebaert said, "[w]e are as confident as ever – that may be an understatement – about the 6500." These statements are nothing more than puffery and cannot be the basis of a cause of action in count one.

### c. Projections

Plaintiffs also allege that Defendants violated Section 10(b) of the Exchange Act through multiple projections or forward looking statements about Tellabs' financial future. The Seventh Circuit has noted that "cases involving forward-looking statements are unique." *In re HealthCare Compare Corp.*, 75 F.3d at 281. "[A]n inability to foresee the future does not constitute fraud, because '[t]he securities laws approach matters from an *ex ante* perspective.'" *Eckstein v. Balcor Film Investors*, 8 F.3d 1121, 1132 (7th Cir. 1993). In order for projections to be actionable, Plaintiffs must allege that Defendants made them with "the knowledge that they are incorrect or are otherwise without reasonable basis." *Katz v. Household Int'l., Inc.*, 91 F.3d 1036, 1039 (7th Cir. 1996). "Projections which turn out to be inaccurate are not fraudulent

24

simply because subsequent events reveal that a different projection would have been more reasonable." *In re HealthCare Compare*, 75 F.3d at 281. "[A]s long as those statements had a reasonable basis when made, they do not constitute fraud." *Searls v. Glasser*, 64 F.3d 1061, 1066 (7th Cir. 1995) (citing *Wielgos v. Commonwealth Edison Co.*, 892 F.2d 509, 513 (7th Cir. 1989)).

Defendants argue that the Court must dismiss Plaintiffs' claims regarding Tellabs' revenue projections because the projections are protected by the PSLRA's safe harbor, and because Plaintiffs have failed to allege that they were unreasonable when made. Because the Court agrees that the projections are protected by the PSLRA's safe harbor and thus not actionable, the Court need not address the allegations pertaining to the reasonableness of these projections when made.

### (1)     The Allegations

Plaintiffs identify a series of revenue projections made by Tellabs in its press releases, teleconferences with analysts and its 2000 10-K. Each of these projections pertains to Tellabs' financial performance for the year 2001. (*See* R. 40-1, Compl. ¶¶ 55-56, 60-61, 65, 67-69, 71, 77.)

These projections include a December 12, 2000 call with analysts where Tellabs provided revenue guidance for 2001 and estimated 30% sales growth. (R. 40-1, Compl. ¶ 54-55.) They also include a press release and conference call with securities analysts on January 23, 2001 where Tellabs "reassured investors" as to the Company's 2001 projections. (*Id.* ¶ 58.) During that same day in an interview with Eric Schatzker from the Bloomberg News, Notebaert stated "We feel very, very good about the robust growth we're experiencing." (*Id.* ¶ 60.) Furthermore,

Plaintiffs allege that on March 7, 2001, Tellabs updated its guidance for the first quarter reducing its projections of first quarter sales to the range of $830 to $865 million. (*Id.* ¶ 68.) Notebaert then stated, "[w]e still expect revenue and EPS growth for the quarter to exceed 30%. Tellabs will meet the adjusted revenue and earnings targets." Tellabs' 10-K, filed on March 29, 2001, contained similar statements. (*See id.* ¶¶ 71-72.)

### (2) The PSLRA's Safe Harbor for Forward-Looking Statements

Congress explicitly incorporated a "safe harbor" for projections into the PSLRA. That safe harbor provides, in relevant part, that a defendant is not liable with respect to any oral or written forward-looking statement that is identified as such and is either (1) "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement" or (2) immaterial.[14] 15 U.S.C. § 78u-5(c)(1)(A)(i) & (ii). Meaningful cautionary language, however, must be substantive and tailored to the specific predictions made in the allegedly misleading statement. *In re Donald J.Trump Casino Sec. Litig.-Taj Mahal Litig.*, 7 F.3d 357, 371-372 (3d Cir. 1993). "A vague or blanket disclaimer which merely warns the reader that the investment has risks will ordinarily be inadequate to prevent misinformation." *Id.*

### (a) Forward-Looking Statements

As an initial matter, the Complaint alleges and Plaintiffs argue that the statements at issue here are not forward-looking statements, thus the safe harbor does not apply. The Court disagrees.

---

[14] The safe harbor also has a scienter element that the Court discusses *infra* at Section III.B.3.

The statute defines the term "forward looking statement" to include "a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure or other financial items." 15 U.S.C. § 78u-5(i)(1)(A). It also includes "a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission." 15 U.S.C. § 78u-5(i)(1)(C). The above statements clearly constitute revenue projections and statements about Tellabs' future economic performance. Accordingly, they squarely fall within the PSLRA's definition of forward-looking statements.

### (b)    Cautionary Language

Defendants argue that Tellabs' revenue projections are protected by the safe harbor provisions because the revenue projections at issue contained cautionary language.[15] The projections, they argue, explicitly warned investors of the risks and uncertainties associated with the forward-looking statements. Defendants contend that the projections in Tellabs' press releases, teleconferences with analysts and 10-K all contain such safe harbor language.

The January 23, March 7 and April 6, 2001 press releases at issue, for example, contained the following warnings:

> Forward-Looking Statements – This news release contains
> forward-looking statements that involve risks and uncertainties.

---

[15] Plaintiffs argue that the question of whether such language sufficiently "cautionary" or "meaningful" to qualify under the PSLRA's safe harbor is a question of fact that is inappropriate for this Court to decide on a motion to dismiss. This argument directly contradicts the PSLRA, which explicitly provides that "the court shall consider any statement cited in the complaint and any cautionary statement accompanying the forward-looking statement" in deciding a motion to dismiss. 15 U.S.C. § 78u-5(e).

> Actual results may differ from the results discussed in the
> forward-looking statements. Factors that might cause such a
> difference include, but are not limited to, risks associated with
> introducing new products, entering new markets, availability of
> resources, competitive response, and a downturn in the
> telecommunications industry. The company undertakes no
> obligation to revise or update these forward-looking statements to
> reflect events or circumstances after today or to reflect the
> occurrence of unanticipated events. For a more detailed
> description of the risk facts, please refer to the company's SEC
> filings.

(R. 49-1, Defs.' Appx.) Furthermore, the company made a similar disclaimer in its calls with

securities analysts.[16] At the inception of the March 7, 2001 teleconference with the securities

analysts, John Springer specifically noted:

> Before we begin, and in keeping with the safe harbor provision of
> the Securities Litigation Reform Act of 1995, I would like to state
> that except for historical information, the following teleconference
> is based on preliminary financial results which are subject to
> further review and adjustment and contain forward-looking
> statements that involve risks and uncertainties. Actual results may
> differ from the results discussed in the forward-looking statements.
> Factors that might cause such a difference include, but are not
> limited to risks associated with introducing new products, entering
> new markets, availability of resources, competitive response, and
> the economic conditions in the telecommunications industry."

(*Id.*) He further noted that "the Company undertakes no obligation to revise or update these

forward-looking statement to reflect the occurrence of unanticipated events." (*Id.*) Tellabs'

10-K for fiscal year 2000 contained even more detailed safe harbor language. (*Id.*)

The language accompanying these forward-looking statements clearly falls within the

PSLRA's safe harbor for projections. Contrary to Plaintiffs' assertions, this language is not

---

[16] The parties have not provided the Court with the transcript of the December 12, 2000 analyst
call, during which Tellabs projected 30% growth for 2001, so the Court cannot conclude that the
revenue projections in that call fall within the PSLRA's safe harbor.

vague or boilerplate. It specifically identifies risks that could affect the projections. Accordingly, the projections are protected by the PSLRA's safe harbor.[17]

**B.    Scienter**

Defendants also contend that Plaintiffs have failed to plead scienter with particularity for both its alleged misrepresentations and projections. Rule 9(b) does "not require 'particularity' with respect to the defendants' mental state." *DiLeo*, 901 F.2d at 629. The PSLRA, however, does impose heightened pleading requirements for scienter. Specifically, the PSLRA requires that Plaintiffs "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

Under Section 10(b), scienter is either "the intent to deceive, manipulate or defraud," *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), or the "reckless disregard for the truth of the material asserted." *S.E.C. v. Jakubowski*, 150 F.3d 675, 681 (7th Cir. 1998). "Reckless conduct is, at least, conduct which is highly unreasonable and which represents an extreme departure from standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Rehm v. Eagle Fin. Corp.*, 954 F.Supp. 1246, 1255 (N.D. Ill.1997).

The Seventh Circuit has not yet addressed the heightened pleading requirements for scienter under the PSLRA. But as this Court recently noted in *Wafra Leasing Corp. 1999-A-1 v. Prime Capital Corp.*, No. 01 C 4314, 2002 WL 31664480 (N.D. Ill. Nov. 26, 2002), the Second Circuit articulated a standard for scienter allegations that several other courts in this District have

---

[17] Because these projections are protected by the PSLRA's safe harbor, the Court does not need to address Defendants' argument that Plaintiffs have failed to particularize the facts supporting their allegations of false projections.

adopted. Under this Second Circuit standard, a plaintiff is required to allege either: (1) facts

showing that the defendants had both motive and opportunity to commit fraud, or (2) facts

constituting strong circumstantial evidence of conscious misbehavior or recklessness. *Id.* at *8;

*see also Press v. Chemical Investment Servs. Corp.*, 166 F.3d 529, 538 (2d Cir. 1999) (citations

and quotations omitted). The Court rejects the Second Circuit standard because it is inconsistent

with the plain language of the PSLRA. *See Wafra Leasing*, 2002 WL 31664480 at *8. Instead,

Plaintiffs may use "motive and opportunity" or "circumstantial evidence" to establish scienter

under the PSLRA, as long as Plaintiffs' allegations support a strong inference that Defendants

acted recklessly or knowingly. *Id.*

### 1.    Group pleading and scienter

With respect to the alleged material misrepresentations or omissions, Plaintiffs must

allege facts establishing that each individual defendant knew, or recklessly ignored, that the

statements were materially false or misleading, thereby artificially inflating the price of Tellabs'

stock. Group pleading allegations are insufficient under the PSLRA to establish scienter on the

part of each individual Defendant. *See In re Digital Island Sec. Litig.*, 223 F.Supp.2d 546, 553

(D. Del. 2002) ("courts have reasoned that the requirement under the PSLRA that scienter be

pled with particularity as to each defendant would be rendered meaningless should group

pleading survive"); *Chu*, 100 F.Supp.2d at 837 (rejecting the group pleading doctrine and

concluding that "[t]o the extent the plaintiffs plead scienter based exclusively on an individual

defendant's position in Sabratek's hierarchy, their claims must be dismissed."). Accordingly,

Plaintiffs must meet the PSLRA's heightened scienter pleading requirement with respect to each

Defendant.

The Complaint is replete with allegations that "Defendants" or the "Individual Defendants" acted with the requisite scienter. (*See, e.g.*, R. 40-1, Compl. ¶¶ 57, 64, 76, 113.) The Complaint is devoid of any specific allegations as to the scienter of Defendants Pullen, Ryan and Jackman. Accordingly, count one of the Complaint is dismissed without prejudice with respect to these individual defendants.

### 2.     Scienter and Insider Trading

Plaintiffs argue that the stock sales during the purported Class Period by Defendants Birck, Gruenwald, Kohler, Kozik and Souders raise a strong inference of scienter. They contend that these Defendants personally profited from the artificially inflated stock price during the purported Class Period, thus providing a motive for them to make the alleged misrepresentations that allegedly caused the inflated stock price.

Although the Seventh Circuit has not addressed the issue of whether insider trading allegations are sufficient to establish a strong inference of scienter, this Court agrees with the federal appellate courts that have found that mere allegations of insider trading during the purported Class Period alone are not enough to sufficiently allege a strong inference of scienter. *See e.g., In re Navarre Corp. Sec. Litig.*, 299 F.3d 735, 747 (8th Cir. 2002) ("Insider stock sales are not inherently suspicious . . . ."); *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1037 (9th Cir. 2002); *Greebel*, 194 F.3d at 198 ("mere pleading of insider trading, without regard to either context or the strength of the inference to be drawn, is not enough"). It may be possible, however, for "unusual" or "suspicious" stock sales by corporate officers to constitute circumstantial evidence of scienter. *See No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*, 320 F.3d 920, 938 (9th Cir. 2003) ("'unusual' or

31

'suspicious' stock sales by corporate insiders may constitute circumstantial evidence of scienter"); *In re Rockefeller Center Properties, Inc. Sec. Litig.*, 311 F.3d 198, 225 (3d Cir. 2002) ("if the stock sales were unusual in scope or timing, they may support an inference of scienter."); *In re K-tel Intern., Inc. Sec. Litig.*, 300 F.3d 881, 907 (8th Cir. 2002) (same); *In re Nike, Inc. Sec. Litig.*, 181 F.Supp.2d 1160, 1169 (D.Or. 2002). In order to rise to the level of "unusual" or "suspicious," the insider trading must be "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *In re Silicon Graphics, Inc.*, 183 F.3d at 986 (internal quotation omitted). In determining whether the insider trading allegations rise to this level, the Court can consider the amount and percentage of overall shares sold, the profit made, the timing of the stock sales and the consistency of the sales with the insider's prior trading history. *See id.*; *Florida State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 659 (8th Cir. 2001) ("the insider trades have to be unusual, either in the amount of profit made, the amount of stock traded, the portion of stockholdings sold, or the number of insiders involved"); *Oran v. Stafford*, 226 F.3d 275, 290 (3d Cir. 2000).

The Complaint only sets forth the number of shares of common stock that Birck, Gruenwald, Kohler, Kozik and Souders sold and the amount of trading proceeds each person received for his or her sales. Plaintiffs argue that the timing of these sales between January 31, 2001 and February 15, 2001 supports a strong inference of scienter. The Complaint, however, fails to allege the prior history of stock sales for these Defendants, the number of shares held by each Defendant or the percentage of shares each Defendant sold of his or her stock. These bare-bones stock sale allegations do not amount to anything unusual or suspicious. They clearly are insufficient by themselves to create a strong inference of scienter. *See Greebel*, 194 F.3d at

196-97; *In re E Spire*, 127 F.Supp.2d 734, 743 (D.Md. 2001). This is especially true here because Plaintiffs never allege that Birck, Gruenwald, Kohler, Kozik or Souders made any misrepresentations. *See In re Visual Networks, Inc. Sec. Litig.*, 217 F.Supp.2d 662, 668-69 (D.Md. 2002); *E Spire*, 127 F.Supp.2d at 743.

Plaintiffs have attached "stock sale charts" to their memorandum opposing Defendants' motion to dismiss that allegedly demonstrate the trading activity of Birck, Gruenwald, Kohler, Kozik and Souders during an eighteen month period. Not only do Plaintiffs fail to include these allegations in their Complaint, but the charts do not support their contentions. Specifically, the charts reflect that Gruenwald and Birck had stock sales prior to those in the purported Class Period. Furthermore, the charts do not contain any information regarding the total stock holdings of each of these Defendants.

Furthermore, Plaintiffs have alleged that ten Individual Defendants were part of a scheme to defraud in this case. They also allege, however, that only five of these Defendants sold stock during the purported Class Period. Given that only half of the named Defendants sold stock during the purported Class Period, Plaintiffs' motive allegations are weakened. *See San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 814 (2d Cir. 1996) (strong inference of company's scienter not established by significant sale of stock by one company executive); *Rehm*, 954 .Supp. at 125 (finding no strong inference of scienter where two of three individuals defendants did not sell stock during class period). The Court concludes that the sale of stock alone by Birck, Gruenwald, Kohler, Kozik and Souders does not give rise to a strong inference of scienter as mandated under the PSLRA.

### 3. Scienter and Accounting Standards

Plaintiffs further argue that they have satisfied the scienter pleading requirements through their allegations of accounting violations. Standing alone, allegations that a defendant violated GAAP and American Institute Of Certified Public Accountants ("AICPA") accounting standards are generally insufficient to create a strong inference of scienter. *See*, e.g., *84 Employer-Teamster*, 299 F.3d at 745; *Geinko v. Padda*, No. 00 C 5070, 2001 WL 1163728, at *4 (N.D. Ill. Sept. 28, 2001). Instead, to allege a strong inference of scienter, the "complaint must also show facts supporting an inference that defendants recklessly disregarded the deviance or acted with gross indifference to the misrepresentations in its financial statements." *In re System Software Assocs., Inc.*, No. 97 C 177, 2000 WL 283099, at *14 (N.D. Ill. Mar. 8, 2000).

Plaintiffs allege that Defendants violated GAAP by employing improper accounting practices, which falsely inflated Tellabs' balance sheet. Plaintiffs claim that Defendants caused Tellabs to violate GAAP by improperly accelerating revenues through "channel stuffing." The Court addressed the insufficiency of the "channel stuffing" allegations in Section III. Specific to scienter, Plaintiffs have not alleged sufficient facts to show that Defendants knew or recklessly disregarded at the time of making the transactions that customers would be returning products in the first quarter of 2001.

Similarly, Plaintiffs allege that Defendants violated GAAP by neglecting to write-off obsolete inventory until the second quarter of 2001. The Court also addressed the deficiencies in the pleading of this scheme in Section III. As with "channel stuffing" scienter, Plaintiffs have not alleged sufficient facts to show that Plaintiffs had scienter when failing to write-off the obsolete inventory during the fourth quarter of 2001.

### 4. Other Scienter Allegations

Plaintiffs also contend that the Individual Defendants knew facts or recklessly disregarded information at their disposal that contradicted their public statements. As noted above, however, they do not individualize their allegations as to each of these Defendants, as they must. Conclusory allegations of reckless disregard are insufficient to raise a strong inference of scienter. *See In re Azurix Corp. Sec. Litig.*, 198 F. Supp. 2d 862, 891 (S.D. Tex. 2002).

In addition, Plaintiffs rely on the Defendants' positions within Tellabs in support of their scienter argument. "A pleading of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions within the company." *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 432 (5th Cir. 2002). Accordingly, this argument fails as well.

With respect to Tellabs itself, Plaintiffs have not alleged how an individual's knowledge can be imputed to the corporation to find that it had the requisite scienter. This is an important allegation because only the knowledge obtained by corporate employees acting within the scope of their employment can be imputed to the corporation. *United States v. One Parcel of Land*, 965 F.2d 311, 315 (7th Cir. 1992). Although the majority of the allegedly misleading statements were made in company documents, such as press releases and the Company's 10-Ks, Plaintiffs have not alleged with any particularity which officers, directors, or employees acting within their scope of duties had knowledge that the statements were misleading..

### 5. Projections

The PSLRA imposes an even higher pleading burden for projections or forward-looking statements. The PSLRA specifically states that a defendant will be liable for a forward-looking

statement only where it "was made with actual knowledge . . . that the statement was false or misleading." 15 U.S.C. § 78u-5(c)(1)(B)(i). *See also Theoharous v. Fong*, 256 F.3d 1219, 1225 (11th Cir. 2001) (with respect to forward-looking statements, "the plaintiff must prove that the defendant made the statement with 'actual knowledge' that it was 'false or misleading.'"); *In re Comshare, Inc. Sec. Litig.*, 183 F.3d 542, 549 & n. 5 (6th Cir. 1999) (noting that the PSLRA requires plaintiffs to allege facts that raise a strong inference that the defendants had actual knowledge of a forward- looking statement's falsity). Thus, under the plain language of the statute mere allegations of recklessness are insufficient to establish liability for projections. For the reasons discussed above, Plaintiffs' allegations fail to raise a strong inference of actual knowledge on the part of any of the Defendants.

## V.  Count Two – Section 20(a) Liability

Count two seeks liability against the Individual Defendants for violating Section 20(a) of the Exchange Act. Section 20(a) provides: "Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a).

Plaintiffs must allege the following in order to state a Section 20(a) claim: (1) a primary securities violation; (2) each of the Individual Defendants exercised general control over the operations of Tellabs; and (3) each of the Individual Defendants "possessed the power or ability to control the specific transaction or activity upon which the primary violation was predicated,

whether or not that power was exercised." *Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 881 (7th Cir. 1992). Because Plaintiffs' Section 20(a) claim is one of fraud, Plaintiffs must meet the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). Plaintiffs, however, need not meet the heightened pleading requirements of the PSLRA to establish control person liability.

Defendants argue that the Court should dismiss count two for failure to state a claim for control person liability under Section 20(a) on the following grounds: (1) Plaintiffs fail to allege a predicate securities fraud violation; and (2) Plaintiffs fail to allege that Defendants Gruenwald, Kohler, Puller or Souders exercised sufficient control over Tellabs to be held liable as control persons. As discussed above, the Court agrees that Plaintiffs have failed to allege a predicate Section 10(b) violation on the part of the Individual Defendants. Consequently, count two is dismissed without prejudice as to the Individual Defendants.

Moreover, the Court agrees that the Complaint does not provide sufficient allegations to conclude that Defendants Gruenwald, Kohler, Puller or Souders possessed the power or ability to control the alleged misrepresentations and projections. The Complaint does not allege any facts to demonstrate that these Defendants were control persons or served in high-level officer positions. Gruenwald was the senior vice president and general manager of the broadband access group, Kohler was the senior vice president of global business operations, Pullen was the senior vice president and general manager of optical networking and Souders was an outsider director of Tellabs. Although Plaintiffs generally allege that these Individual Defendants "had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to

37

the securities violations," this general allegation as to all the Individual Defendants is insufficient to establish control person liability. *See Donovan*, 2002 WL 1553259 at \*6 (N.D. Ill. July 15, 2002) ("The mere fact that Plaintiff alleges these Defendants are directors is not enough" for control person liability). Accordingly, count two is dismissed without prejudice as to Defendants Gruenwald, Kohler, Puller or Souders.

## VI. Count Three – Insider Trading Claim

Plaintiffs have sued Defendants Birck, Kozik, Kohler, Souders and Gruenwald in count three for insider trading pursuant to Section 20A of the Exchange Act. Section 20A expressly provides for a private cause of action against persons who purchase or sell a security "while in possession of material, nonpublic information." Such an action may be brought by "any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased . . . or sold . . . securities of the same class." *United States v. O'Hagan*, 521 U.S. 642, 666, 117 S.Ct. 2199, 2214, 138 L.Ed.2d 724 (1997) (quoting 15 U.S.C. § 78t-1(a)); *see also Fujisawa Pharmaceutical Co., Ltd. v. Kapoor*, 115 F.3d 1332, 1337 (7th Cir. 1997). Because Plaintiffs have failed to allege that Defendants Birck, Kozik, Kohler, Souders and Gruenwald were in possession of material, nonpublic information when they sold their stock, count three of the Complaint is dismissed without prejudice.

## CONCLUSION

Defendants' motion to dismiss is granted. Plaintiffs have until June 27, 2003 to file a

Second Consolidated Amended Complaint.


Dated: May 19, 2003

AMY J. STEEVE
United States District Court Judge