# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Amy J. St. Eve | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 4356 | **DATE** | 2/19/2004 |
| **CASE TITLE** | | Johnson vs. Tellabs | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendants' motion to dismiss is granted. Status hearing set for 2/25/04 is stricken. Any other pending dates are stricken. Any other pending motions are denied as moot.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | Document Number |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | number of notices | |
| | No notices required. | | | | |
| | Notices mailed by judge's staff. | | FEB 20 2004 | | |
| | Notified counsel by telephone. | | date docketed | | 92 |
| ✓ | Docketing to mail notices. | | docketing deputy initials | | |
| ✓ | Mail AO 450 form. | | | | |
| | Copy to judge/magistrate judge. | | date mailed notice | | |
| TH✓ | courtroom deputy's initials | | Date/time received in central Clerk's Office | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| THOMAS JOHNSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| TELLABS, INC., MICHAEL J. BIRCK, | ) | No. 02 C 4356 |
| RICHARD C. NOTEBAERT, | ) | |
| ROBERT W. PULLEN, JOAN E. | ) | |
| RYAN, BRIAN JACKMAN and | ) | |
| JOHN C. KOLHER, | ) | |
| | ) | |
| Defendants. | ) | |

**DOCKETED**

FEB 2 0 2004

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Defendants have moved to dismiss the Second Amended Complaint pursuant to Federal

Rule of Civil Procedure 12(b)(6) for failure to state a claim. Their motion is granted.

This putative class action lawsuit is brought by various plaintiffs individually and on

behalf of persons who purchased common stock of Defendant Tellabs between December 11,

2000 and June 19, 2001 (the "Class Period"). Plaintiffs[1] brought this purported class action

alleging that Defendants engaged in a scheme to deceive and defraud investors as to the true

value of Tellabs, Inc.'s ("Tellabs") common stock during the Class Period. Plaintiffs contend

that Defendants carried out this scheme, in part, by falsely assuring investors about Tellabs'

performance and prospects, engaging in fraudulent practices to artificially boost Tellabs'

---

[1]   On September 27, 2002, the Court appointed Makor Issues & Rights ("Makor Issues") Lead
Plaintiff pursuant to 15 U.S.C. § 78(u)-4. *See Johnson v. Tellabs, Inc.*, No. 01 C 4356, 2002 WL
31163670 (N.D. Ill. Sept. 27, 2002).

1



revenues and conceal the rapidly falling demand for Tellabs' products, selling shares of Tellabs' common stock at artificially inflated prices, and making false and misleading misrepresentations about Tellabs' current financial condition. Plaintiffs allege that these deceptive actions resulted in the artificial inflation of Tellabs' stock price which reached a high of $67.125 per share on February 5, 2001. Plaintiffs claim that they were injured when they purchased Tellabs' common stock at these artificially inflated prices.

On May 19, 2003, this Court granted Defendants' motion to dismiss Plaintiffs' Consolidated Amended Complaint in its entirely. *See Johnson v. Tellabs, Inc.*, 262 F.Supp.2d 937 (N.D. Ill. 2003) (the "May 19, 2003 Opinion"). Plaintiffs filed their Second Amended Class Action Complaint (the "SAC") on July 11, 2003. Unlike their Amended Complaint, Plaintiffs' SAC identifies 27 confidential sources ("CS") who support various allegations.

In their SAC, Plaintiffs did not name the following individuals who were named in the Consolidated Amended Complaint: J. Thomas Gruenwald, Catherine Kozik, William F. Souders, and John Vaughn. Defendants now seek to dismiss the SAC in its entirety for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6), for failure to plead fraud with particularity pursuant to Federal Rule of Civil Procedure 9(b), and for failure to meet the pleading standards set forth in the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(b) (the "PSLRA"). Given the additional detail added to the SAC and the extended analysis necessary to address this detail, the Court will repeat some of the facts set forth in its May 19, 2003 Opinion.

## ALLEGATIONS

## I.     The Parties

Defendant Tellabs is a Delaware corporation with its principal place of business in Lisle, Illinois. (R. 63-1, SAC ¶ 16.)  Tellabs designs, manufactures, markets, and services highly specialized optical networking, broadband access, and voice quality enhancement solutions. (*Id.* ¶ 2.)  It is a global supplier of networking solutions and services that support the Internet. Tellabs' customers included exchange carriers, telephone companies, local telephone administrations, original equipment manufacturers, cellular and other wireless service companies, cable operators, alternate service providers, internet service providers, system integrators, government agencies, and business end-users. (*Id.* ¶ 2.)  SBC Communications, Inc. ("SBC") and Verizon Communications, Inc. ("Verizon") were two of Tellabs' large customers. (*Id.* ¶ 2.)

The individual Defendants include: Michael Birck, Brian Jackman, John Kohler, Richard Notebaert, Robert Pullen and Joan Ryan (collectively, the "Individual Defendants").  Each of the Individual Defendants was an officer and/or director of Tellabs.  Michael Birck, a founder of the company, was a director and served as chairman of Tellabs' board of directors since September 18, 2000. (*Id.* ¶ 17.)  He also served as chief executive officer and president of Tellabs from 1975 through 2000. (*Id.*)  Brian Jackman was a director of Tellabs and served as president of global systems and technology and executive vice president from 1998 through 2001. (*Id.* ¶ 18.) John Kohler was a senior vice president of global business operations from February 2000 to March 10, 2003, and a vice president of global manufacturing from 1992 through 2000. (*Id.* ¶ 19.)

Richard Notebaert served as a Tellabs' director from April 19, 2000 to June 17, 2002, and served as chief executive officer and president of Tellabs from September 18, 2000 to June 17, 2002. (*Id.* ¶ 20.) Robert Pullen was a senior vice president and general manager of optical networking from August 2000 to February 2, 2002. (*Id.* ¶ 21.) Joan Ryan served as Tellabs' executive vice president and chief financial officer from February 2, 2000 to February 7, 2003. (*Id.* ¶ 22.)

Plaintiffs' SAC focuses on three of Tellabs' products: the TITAN 5500, the TITAN 6500 and the SALIX 7600. All of these products are complex transmission systems utilized with optical networking systems. The TITAN 5500, Tellabs' "flagship" optical networking system, is a digital cross-connect system that "help[s] direct different types of communications traffic across wired and wireless networks." (*Id.* ¶ 30.) The TITAN 6500 is a multi-service transport switch which is "capable of simultaneously transporting a variety of signal types." (*Id.* ¶ 31.) The SALIX 7600 is a switch "that enables service providers to move voice traffic seamlessly onto data networks while supporting voice services such as there-way calling and messaging." (*Id.* ¶ 32.)

## II.     Alleged Problems with Specific Products

Plaintiffs allege that the internet and telecommunications sectors suffered a significant decline in demand for their products in mid-2000. (*Id.* ¶ 3.) As a result, Tellabs' customers "were suffering from a severe deterioration and consolidation of their businesses." (*Id.* ¶ 4.) Given this decline, Plaintiffs allege that demand for Tellabs' products decreased. (*Id.* ¶¶ 3, 4.) Plaintiffs contend, however, that Defendants disguised the impact this decline had on Tellabs and falsely assured investors that Tellabs' performance was strong.

4

Plaintiffs allege that contrary to Defendants' public representations during the Class Period, the demand for the TITAN 5500 – Tellabs' "best seller" -- substantially slowed. (*Id.* ¶¶ 34-45.) Verizon and other clients significantly reduced their orders for the product. (*Id.* ¶¶ 35, 37.) As a result, in late 2000 and early 2001, Tellabs had "tons" of excess TITAN 5500s stored in a warehouse. (*Id.* ¶ 45.)

Similarly, Plaintiffs allege that the TITAN 6500 failed to sell as Tellabs had represented. (*Id.* ¶¶ 46-53.) They contend that Defendants touted a $100 million Sprint deal for the TITAN 6500 in order to foster a false impression that there was a demand for the product. (*Id.* ¶ 54.) Plaintiffs allege that Sprint entered this contract to satisfy an existing $100 million commitment to Tellabs, and that Sprint did not intend to purchase any TITAN 6500s beyond those in the agreement. (*Id.* ¶ 55.) Plaintiffs further contend that the TITAN 6500 was far behind schedule and not ready for release during the Class Period, was failing customer lab evaluations, and was inferior to other products offered by Tellabs' customers. (*Id.* ¶ 74.)

Plaintiffs also allege that the SALIX technology had serious technical defects and thus Tellabs could not commercialize it. (*Id.* ¶¶ 56-61.) They allege that Defendants "glowingly portrayed Tellabs' supposed 'launch' of its new 'leading edge' SALIX technology in 2000 when, in fact, the SALIX technology was both unfinished and outmoded." (*Id.* ¶ 56.) Plaintiffs contend that Defendants' statements regarding the prospects for the SALIX technology were false and misleading because they knew the SALIX technology was outmoded and could not be commercialized.

## III. Allegedly False Statements by Tellabs

Plaintiffs claim that beginning on December 11, 2000 through the purported Class Period,

Defendants made a series of false statements and omissions regarding Tellabs' fourth quarter 2000 financials, Tellabs' products, and its future prospects that resulted in the artificial inflation of Tellabs' stock price. Plaintiffs allege that the Individual Defendants are responsible for each of the statements.

### A.     December 2000

Tellabs issued a press release on December 11, 2000 – the start of the purported Class Period – announcing a multi-year sales agreement with Sprint for the TITAN 6500. "The agreement is expected to be valued at more than $100 million over the life of the contract." (*Id.* ¶ 73.) The press release noted that the "TITAN 6500 system is available now."   On December 11, 2000, Tellabs also held a conference with securities analysts. On December 12, 2000, securities analysts summarized the conference and issued positive research reports on Tellabs. According to UBS Warburg, "Tellabs maintained its guidance for 4Q 2000 and all of 2001. In doing so, the company indicated that the demand for its Titan 5500 product line remain [sic] solid in 4Q and there is visibility for at least two years (if not more) of ongoing good growth for the product." (*Id.* ¶ 77.) It also estimated thirty-percent growth in sales for 2001. ABN AMRO reported Defendant Pullen commenting that "the TITAN 5500 remains the workhorse of the group and is expected to see strong growth for the next 2-3 years." (*Id.*) Baird & Co. reported that Tellabs "reiterated its confidence in the telecom-spending environment" and "reconfirmed consensus growth forecasts for fourth quarter 2000 and 2001." (*Id.* ¶ 76.) Notebaert, according to Baird & Co., "outlined the tremendous opportunity for Tellabs in international markets, as well as the expected continuing growth of the TITAN 5500, as well as its new optical-networking and next-generation switching initiatives." (*Id.* ¶ 76.)

6

**B.    January 23, 2001 Press Release**

On January 23, 2001, Tellabs issued a press release announcing its financial results for the fourth quarter of 2000. (*Id.* ¶ 81.) Tellabs reported that "strength in Tellabs' core business drove record sales and earnings in the fourth quarter of 2000. Fourth-quarter 2000 sales totaled $1,018 million, up 42% from $716 million in 1999." (*Id.*) Notebaert explained, "[t]o keep up with robust growth in communications traffic, customers are buying more and more Tellabs equipment-fueling our records [sic] results and our first $1 billion quarter." (*Id.*) The press release also reiterated Tellabs' $100 million multi-year agreement with Sprint to supply the TITAN 6500 system.

During a teleconference with securities analysts that same day, Notebaert stated: "[t]his was a great quarter and fitting end to a wonderful year.[2] Tellabs not only achieved record sales and profits in the fourth quarter [of 2000], we also set the stage for sustained growth with the successful launches of several products, many of those long anticipated . . . . Customers are embracing our products. We announced a $100 million plus agreement with Sprint for the 6500." (*Id.* ¶ 82.)

Notebaert also commented on the TITAN 6500. Specifically, he said that "[o]n the 6500, demand for that product is exceeding our expectations . . . . Demand is just . . . huge for this product." (*Id.* ¶ 84.) In an interview with Eric Schatzker from the Bloomberg News, Notebaert also commented: "I'm a little surprised at the performance of our stock the last few weeks, because last quarter, this quarter, we've been solid and we feel very, very good about the robust

---

[2]    Defendant Joan Ryan also projected that "Tellabs will continue to sustain our strong record of growth" during the conference call. The Court previously dismissed this projection as protected by the PSLRA's safe harbor. *Tellabs*, 262 F. Supp.2d at 952.

growth we're experiencing." (*Id.* ¶ 60.)

## C.     January 30, 2001 Press Release

Tellabs issued another press release on January 30, 2001, announcing "a new suite of softswitches, the SALIX 7600 softswitch control suite." (*Id.* ¶ 88.) The press release noted, "[w]ith the new SALIX 7600 suite, Tellabs has redefined the softswitch market and can now offer integrated, comprehensive solutions to all carriers." (*Id.*)

## D.     February 14, 2001 – Tellabs' 2000 Annual Report

On February 14, 2001, Tellabs issued its 2000 Annual Report. Notebaert and Birck issued a letter to stockholders in connection with the issuance of the Annual Report. (*Id.* ¶ 90.) In the letter, Notebaert and Birck represented that "Tellabs' growth is robust." (*Id.*) They stated that the TITAN 5500 continued with accelerating growth. They also stated that the TITAN 6500 "emerged from our laboratories in 2000, and customers are embracing it." Notebaert and Birck also stated that the TITAN 5500 is "still going strong," and the SALIX 7750 has a lot of opportunities. (*Id.* ¶ 91.)

The Tellabs' 2000 Annual Report contained a "Management Statement of Financial Responsibility," signed by Birck, Notebaert and Ryan. (*Id.* ¶ 94.) In that Statement, they represented that the "financial statements of Tellabs, Inc. and Subsidiaries have been prepared under the direction of management in conformity with generally accepted accounting principles." (*Id.* ¶ 94.)

## E.     March 2001

On March 7, 2001, Tellabs issued a press release announcing that it was lowering its

revenue and earnings per share expectations for the first quarter 2001.[3] It noted that Tellabs could not recognize revenue from TITAN 6500 shipments in the first quarter but expected to do so in the second quarter of 2001. (*Id.* ¶ 99.) The press release stated that "[g]rowth in Tellabs' core optical networking business remains strong." (*Id.*)

During the conference call with securities analysts on March 8, 2001, Defendant Jackman explained, "[t]here's nothing in the revenue recognition issue that should be construed to imply that the testing and the customer's acceptance of these systems are having difficulty." (*Id.* ¶ 101.) With respect to the TITAN 5500, Notebaert told analysts "[w]e're still seeing that product continue to maintain its growth rate; it's still experiencing strong acceptance." (*Id.* ¶ 102.) When an analyst inquired about Tellabs' reaction regarding the lowered expectations of some of its competitors, Notebaert responded "we haven't gotten any indication, I haven't gotten any indication from any of our major clients, major customers, of a downturn in the segment we're in." (*Id.* ¶ 103.)

On March 29, 2001, Tellabs issued its 10-K for 2000[4], signed by Defendants Birck, Notebaert, Ryan and Jackman. The report noted: "[t]he Company achieved record levels in sales ($3,387.4 million), net earnings ($730.8 million) and earnings per share ($1.75) – putting it on track to meet its objective of $6 billion in annual revenues by the year 2003." (*Id.* ¶ 107.) It also stated that "[t]he growth in optical networking product sales was a result of continued strong

---

[3]  The Court previously dismissed the projections in this press release as not actionable because they are protected by the PSLRA's safe harbor. *Tellabs*, 262 F. Supp.2d at 953. The Court also dismissed Notebaert's March 8, 2001 statement to analysts that "[w]e are as confident as ever – that may be an understatement – about the 6500" as puffery. *Id.* at 951.

[4]  The Court previously held that the projection contained in the 10-K regarding sales growth in 2001 is protected by the PSLRA's safe harbor. *Tellabs*, 262 F.Supp. 2d at 952.

demand for the Company's TITAN 5500/5500S and TITAN 532L digital cross connect systems." (*Id.* ¶ 109.)

The Form 10-K also favorably discussed the SALIX technology. (*Id.* ¶ 108.) "Leading the growth will be the Company's SALIX 7000 family of next-generation switching products." (*Id.* ¶¶ 107, 109.)

### F.    April 6, 2001

On April 6, 2001, Tellabs issued a press release lowering its first quarter earnings guidance. The press release stated, "[t]he revised guidance stems from reduced and deferred spending by major communications carriers late in the quarter." (*Id.* ¶ 113.)

On April 6, 2001, Notebaert and Ryan held a conference call with securities analysts. (*Id.* ¶ 114.) During the call, Notebaert told analysts that "[i]n just the last few weeks" Tellabs had experienced "a more controlled order of flow from our larger customers." (*Id.* ¶ 114.) He noted, however, that "everything we hear from the customers indicates that our in-user demand for services continues to grow." (*Id.* ¶ 114.) Notebaert added, "[t]he good news is, orders weren't canceled, they were pushed out into the next quarter." (*Id.* ¶ 116.) He stated that "the 6500 is showing strength . . . we should hit our full manufacturing capacity in May or June to accommodate the demand we are seeing. Everything we can build, we are building and shipping. The demand is very strong." (*Id.* ¶ 117.) Ryan told analysts that "we see first quarter revenue of approximately $772 million, which represents a 21% year-over-year growth in overall revenue." (*Id.* ¶ 115.)

### G.    April 18, 2001

On April 18, 2001, Tellabs issued a press release announcing its first quarter financial

results for the period ending March 31, 2001, and modified its revenue projections for 2001 from $3.99 billion to within the range of $3.6 billion to $3.7 billion. Tellabs further announced that it would "further reduce discretionary spending, eliminate salary increases this year, institute a pay-cut for all corporate officers, align manufacturing capability with demand expectations, and terminate the SALIX next-generation-switching product effort." (*Id.* ¶ 121.) It also announced that it planned to reduce its workforce by approximately 550 people. (R. 49-1, Defs.' Mot. to Dismiss App. Ex. 18.) Finally, Tellabs stated that it was terminated the SALIX next-generation switching product effort. (R. 63-1, SAC ¶ 121.) Notebaert nevertheless stated, "I am as confident as ever in Tellabs' long-term prospects and our ability to deliver strong revenue and earnings growth in the future." (*Id.* ¶ 121.)

### H.    May 2001

Tellabs filed its Form 10-Q for the period ending March 30, 2001 on May 8, 2001. In the Form 10-Q, Tellabs stated that it had "achieved record first quarter 2001 sales of $772.1 million." Tellabs stated that the TITAN 5500/5500s drove the sales. (*Id.* ¶ 124.)

On May 31, 2001, Tellabs announced that it planned to take a $262 million restructuring charge in the second quarter of 2001. (*Id.* ¶ 128.) $93 million of the charge was related to the Company's termination of the SALIX next-generation switching business. (*Id.* ¶ 128.)

### I.    June 2001[5]

On June 19, 2001, which is the close of the purported Class Period, Tellabs issued a press

---

[5]   The Court previously held that Plaintiff had not alleged anything false about a press release issued on June 5, 2001 regarding the TITAN 6500. *Tellabs*, 262 F.Supp.2d at 951. Plaintiffs still do not particularize anything false about the release which generally discusses the TITAN 6500 and notes that it uses "the most innovative cell-based switching fabric with electrical and optical capabilities for converged services." (R. 63-1, SAC ¶ 129.)

release revising its second quarter guidance and reducing its revenues by approximately $300 million to $500 million. (*Id.* ¶ 131.) The press release explained the following:

> "The dramatic changes affecting the landscape of the telecommunications marketplace have continued to impact Tellabs. Service providers . . . are only buying equipment to meet the immediate needs of their customers. 'While we continue to see caution from our customers in the place of equipment deployment, our market position remains intact, and we are focused on ensuring the most profitable path through the current environment,' said Tellabs President and CEO Richard C. Notebaert."

*Id.* Tellabs common stock fell from a high of $21.20 per share on June 19, 2001 to a low of $15.87 per share on June 20, 2001. (*Id.* ¶ 135.) The stock closed at $16.04 on June 20, 2001. (*Id.* ¶ 135.) The June 20, 2001 price reflected a decline of more than 75% "from the Class Period high of $67.125." (*Id.* ¶ 135.)

## IV.   Stock Sales

Plaintiffs allege that Defendants Birck, Kohler and Kozik sold approximately 150,000 shares Tellabs' common stock at artificially inflated prices during the purported Class Period, and received proceeds in excess of $8,000,000 from their sales. During the Class Period, Plaintiffs claim that Birck sold 80,000 shares for $5,183,150; Kohler sold 7,500 shares for a net profit of $466,218.75; and Kozik sold 3,220 shares for a net profit of $67,783.25. (*Id.* ¶ 144.)

## ANALYSIS

The SAC contains seven counts. Plaintiff "inadvertently" named two unnamed defendants in Counts VI and VII. (R. 78-1, Pls.' Opp. to Motion to Dismiss, p. 39 n.32.) Accordingly, the Court dismisses Counts VI and VII. Count I alleges that Defendants violated Section 10(b) of the Securities and Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5,

which caused Plaintiffs and other class members to suffer damages in connection with the purchase of Tellabs stock during the class period. They allege that Defendants disseminated materially false and misleading statements and concealed material adverse facts about Tellab's financial condition and future prospects in order to deceive the investing public as to the true value of Tellabs' stock and to cause Plaintiffs to purchase Tellabs' stock at artificially inflated prices.

Count II alleges that the Individual Defendants are "control persons" who violated Section 20(a) of the Exchange Act. Count III, brought on behalf of the LeBrun-Leehey Subclass[6], alleges that Birck and Kohler violated Section 20A of the Exchange Act by insider trading. Count IV, brought on behalf of the Broholm Subclass[7], alleges that Birck violated Section 20A of the Exchange Act. Finally, Count V, brought by Plaintiff Morris on behalf of the Morris Subclass[8], also alleges that Birck violated Section 20A of the Exchange Act. Defendants have moved to dismiss the Complaint in its entirety with prejudice.

As an initial matter, Plaintiffs raise multiple arguments in their opposition to Defendants' motion that the Court ruled on in its May 19, 2003 Opinion. To the extent Plaintiffs ask the Court to reconsider its prior rulings, "[m]otions for reconsideration serve a limited function: to

---

[6] The purported LeBrun-Leehey Subclass consists of all Class members who purchased Tellabs common stock contemporaneously with sales of Tellabs common stock by Defendants Birck and Kohler on February 2, 2001 (R. 63-1, SAC ¶ 173a.)

[7] The purported Broholm Subclass consists of all Class members who purchased Tellabs common stock contemporaneously with sales of Tellabs common stock by Defendant Birck on February 5, 2001. (*Id.* ¶ 173b.)

[8] The purported Morris Subclass consists of all Class members who purchased Tellabs common stock contemporaneously with sales of Tellabs common stock by Defendant Birck on February 6, 2001. (*Id.* ¶ 173c.)

correct manifest errors of law or fact or to present newly discovered evidence." *Publishers Resource, Inc. v. Walker Davis Publications, Inc.*, 762 F.2d 557, 561 (7th Cir. 1985) (quotation omitted); *see also In re Oil Spill by "Amoco Cadiz" Off Coast of France on March 16, 1978*, 794 F.Supp. 261, 267 (N.D. Ill. 1992) ("[M]otions to reconsider are not at the disposal of parties who want to 'rehash' old arguments."). Motions to reconsider are not appropriate vehicles to advance arguments already rejected by the Court or new legal theories not argued before the ruling. *Scharlte v. Motorola, Inc.*, No. 93 C 5508, 1994 WL 323281, at *1 (N.D. Ill. June 24, 1994). Plaintiffs have not provided the Court with any reason to revisit its prior rulings here.

## I.      Legal Standard

The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test the legal sufficiency of a complaint, not the merits of the case. *See Triad Assocs., Inc. v. Chicago Hous. Auth.*, 892 F.2d 583, 586 (7th Cir. 1989). When considering a motion to dismiss, the Court considers "whether relief is possible under [any] set of facts that could be established consistent with [the] allegations." *Bartholet v. Reishauer A.G. (Zurich)*, 953 F.2d 1073, 1078 (7th Cir. 1992). The Court views the complaint "in the light most favorable to the plaintiff, taking as true all well-pleaded factual allegations and making all possible inferences from those allegations in his or her favor." *Lee v. City of Chicago*, 330 F.3d 456, 459 (7th Cir. 2003). *See also Thomas v. Law Firm of Simpson & Cybak*, 354 F.3d 696, 697 (7th Cir. 2004). The Court is not, however, "obliged to accept as true legal conclusions or unsupported conclusions of fact." *Hickey v. O'Bannon*, 287 F.3d 656, 658 (7th Cir. 2002).

## II.      Securities Fraud Pleading Requirements

Allegations of securities fraud must meet the heightened pleading requirements of Federal

Rule of Civil Procedure 9(b) as well as the strict pleading mandates of the PSLRA. Rule 9(b) requires Plaintiffs to plead "the circumstances constituting fraud . . . with particularity." *In re HealthCare Compare Corp. Sec. Litig.*, 75 F.3d 276, 281 (7th Cir. 1996). As this Court previously noted, "this means the who, what, when, where, and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir. 1990).

### A. The PSLRA's Heightened Pleading Requirements

In order to meet the PSLRA's dictates for a securities fraud claim, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).[9] The PSLRA also strengthened the pleading requirements for scienter in a securities fraud case: "In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). If a complaint failed to meet either of these requirements under the PSLRA, the Court "shall, on the motion of any defendant, dismiss the complaint." 15 U.S.C. § 78u-4(b)(3)(A). "Congress enacted this more stringent pleading standard 'to curtail the filing of meritless lawsuits' and to create a uniform pleading standard among the circuits." *Ottmann v. Hanger Orthopedic Group, Inc.*, 353 F.3d 338, 343, (4th Cir.

---

[9] The PSLRA also raised a plaintiff's pleading requirement for scienter, *see* 15 U.S.C. § 78u-4(b)(2), as the Court discusses *infra* in Section III.B.

2003), quoting H.R. Conf. Rep. No. 104-369, at 41 (1995), reprinted in 1995 U.S.C.C.A.N. 730, 740.

### B. Pleading on Information and Belief

The PSLRA does not require Plaintiffs to plead all of their evidence or try their case at the pleading stage. The PSLRA requires that where allegations are based on "information and belief," "the complaint shall state with particularity all facts upon which that belief is formed." 15 U.S.C. § 78u-4(b)(1). In its May 19, 2003 Opinion, the Court adopted the Second Circuit's approach articulated in *Novak v. Kasaks*, 216 F.3d 300, 313-14 (2nd Cir. 2000), to information and belief pleading. The Court noted that "where plaintiffs rely on confidential sources but also on other facts, they need not name their sources as long as the latter facts provide an adequate basis for believing that the defendants' statements were false." *Id.*, 216 F.3d at 314. The facts alleged in the complaint must be "sufficient to support a reasonable belief as to the misleading nature of the statement or omission." *Id.* at 314 n. 1. *See also In re Cabletron Sys., Inc.*, 311 F.3d 11, 29 (1st Cir. 2002) ("The approach we take, similar to *Novak*, is to look at all of the facts alleged to see if they provide an adequate basis for believing that the defendants' statements were false.") (internal quotation marks omitted). Thus the Court will evaluate whether the factual allegations particularize and support Plaintiffs' allegations that fraud occurred.

In evaluating the allegations based on confidential sources, the Court will assess the reliability of each source's information based, in part, on the confidential source's position at Tellabs, the time period such he held such a position, his access to information and whether the allegations are based on his personal belief. The disclosure of information regarding confidential sources may be "helpful in distinguishing whether a particular allegation is mere rumor and

16

speculation or whether it is based on concrete information from relevant documents or people who were in a position to know the truth of the allegations." *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1101 (10th Cir. 2003).

Plaintiffs challenge the Court's holding and suggest that because their allegations are "based upon the investigation of Plaintiffs' counsel" – as opposed to based on information and belief – that their complaint need not state with particularity the facts on which their beliefs are formed. (R. 78-1, Opp. p.5 n.10). Plaintiff, however, makes a distinction without a difference, however. Federal Rule of Civil Procedure 11 requires counsel to investigate all claims before filing a complaint, even those based on information and belief. Fed. R. Civ. P. 11(b). This Court rejects Plaintiffs' position and finds that allegations based upon counsel's investigation must state facts with the same particularity as if the claims were based on information and belief. As the Tenth Circuit recently noted, "For this court to rule otherwise would elevate form over substance and allow plaintiffs to avoid the [PSLRA]'s mandate merely by cloaking with a license to practice law the information and belief on which a complaint is based. Rule 11 of the Federal Rules of Civil Procedure provides that, by presenting a pleading, motion, or other paper to a court, an attorney is certifying that he has conducted 'an inquiry reasonable under the circumstances.'" *Adams,* 340 F.3d at 1098.

### C.     Group Pleading

In its May 19, 2003 Opinion, the Court addressed the applicability of the group pleading doctrine since the enactment of the PSLRA. As previously held, the group pleading doctrine does not survive with respect to allegations of scienter. *Tellabs*, 262 F.Supp.2d at 954. Instead, Plaintiffs must make specific allegations regarding each Defendant's scienter. *Id.*

17

With respect to the alleged misrepresentations made by Defendants, the Court noted that "[i]t is not entirely clear what effect the PSLRA has on the group pleading doctrine with respect to holding individual defendants liable for statements by the company. Even if the group pleading doctrine survives the PSLRA in some form, however, it is apparent that the statute requires Plaintiffs to allege facts that support an inference that the statement is attributable to individual defendants. The PSLRA obligates a plaintiff to allege specific facts as to each of the defendant's misrepresentations or omissions. *Id.* at 946 (citing 15 U.S.C. § 78u-4(b)(1)).

## V. Forward-Looking Statements

In its May 19, 2003 Opinion, the Court dismissed the majority of Plaintiffs' claims regarding Tellabs' revenue projections because the PSLRA's safe harbor affords protection to such projections. *Tellabs*, 262 F.Supp.2d at 952-954. Namely, the Court held that these forward-looking statements were "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." *Id.*, citing 15 U.S.C. § 78u-5(c)(1)(A)(i) & (ii). Plaintiffs' attempts to resurrect these same projection allegations in their SAC fail. The Court has already rejected these arguments and Plaintiffs have failed to provide any reason for the Court to reconsider its May 19, 2003 ruling. The Court's prior ruling stands with respect to the forward-looking statements made on January 23, 2001, March 7, 2001, March 29, 2001, April 6, 2001, and April 18, 2001. These claims are protected by the PSLRA's safe harbor and therefore are dismissed with prejudice.[10]

---

[10] Plaintiffs claim that the safe harbor is inapplicable because these statements were made with actual knowledge of their falsity. Other courts have rejected this argument. *See Miller v. Champion Enterprises, Inc.*, 346 F.3d 660, 672 (6th Cir. 2003) (state of mind is "irrelevant" for

### A.     The December 12, 2000 Revenue Projection

The Court, however, did not reach this conclusion with respect to Tellabs' projection of

30% growth for 2001 made during a December 12, 2000 analyst call because the parties did not

provide a transcript of that conversation for the Court to analyze whether any cautionary

statements were made at the time of the projection.  Defendants have still failed to provide such a

transcript.  Defendants argue that the Court nonetheless should dismiss this projection because

Plaintiffs' allegations do not support that the projection was unreasonable when made.[11]  The

Court therefore proceeds to an analysis of scienter with respect to this statement.

### B.     Scienter for Forward-Looking Statements

In order for projections to be actionable, Plaintiffs must allege that Defendants made

them with "the knowledge that they are incorrect or are otherwise without reasonable basis."

*Katz v. Household Int'l., Inc.*, 91 F.3d 1036, 1039 (7th Cir. 1996).  "Projections which turn out to

be inaccurate are not fraudulent simply because subsequent events reveal that a different

projection would have been more reasonable."  *In re HealthCare Compare*, 75 F.3d at 281.

Under the PSLRA, a forward-looking statement is actionable against a person only where it "was

made with actual knowledge by that person that the statement was false or misleading."  15

forward-looking statements accompanied by meaningful cautionary language); *In re Compuware
Sec. Litig.*, No. 02-73793, 2004 WL 231464, at *7 (E.D. Mich. Feb. 3, 2004) (same); *Sandmire v.
Alliant Energy Corp.*, __ F.Supp.2d __, 2003 WL 22989690 (W.D. Wis. Aug. 12, 2003) ("Such
knowledge and the state of mind of the defendants at the time the statement was made are
irrelevant to a safe harbor defense based on cautionary language").  Given that Plaintiffs have
failed to plead a strong inference of actual knowledge, the Court need not decide this issue.

[11]   Defendants do not argue that the "total mix" of information available to investors on
December 12, 2000 included cautionary language that would protect this statement.  *Grossman v.
Novell, Inc.*, 120 F.3d 1112, 1122-23 (10th Cir. 1997); *Stavros v. Exelon Corp.*, 266 F.Supp.2d
833, 844 (N.D. Ill. 2003).

U.S.C. § 78u-5(c)(1)(B)(i); *see also Employers Teamsters Local Nos. 175 and 505 Pension Trust Fund v. Clorox* Co., 353 F.3d 1125, 1133 (9th Cir. 2004) (actual knowledge required for forward-looking statements); *Theoharous v. Fong*, 256 F.3d 1219, 1225 (11th Cir. 2001) (With respect to forward-looking statements, "the plaintiff must prove that the defendant made the statement with 'actual knowledge' that it was 'false or misleading.'"); *Stavros v. Exelon Corp.*, 266 F.Supp. 2d 833, 847 (N.D. Ill. 2003) (Plaintiffs must plead facts that show "a strong inference that Defendants actually knew" their projections were false or misleading.). A forward-looking statement is actionable against a corporation such as Tellabs if it was "made by or with the approval of an executive officer of that entity," and it was "made or approved by such officer with actual knowledge by that officer that the statement was false or misleading." 15 U.S.C. § 78u-5(c)(1)(B)(ii). In order to survive a motion to dismiss the December 11, 2000 forward-looking statement, "[p]laintiff must plead with particularity facts that strongly imply that Defendants actually knew that the projections were false or misleading when they made them." *Stavros*, 266 F.Supp.2d at 847.

Plaintiffs allege that Defendants knew on December 11, 2000 that the projection of 30% sales growth for 2001was false and misleading because Tellabs was experiencing a substantial decline in demand for the TITAN 5500 at the time and was engaging in channel stuffing activities to fraudulently conceal that decline. They further contend the projection was false because the TITAN 6500 was not available, was far behind schedule, and was failing laboratory evaluations.

The December 2000 projection claim is dismissed with respect to Defendants Birck, Ryan, Jackman, and Kohler. Plaintiffs do not specifically allege that these Defendants were even

aware of the December 11, 2000 earnings projection. Plaintiffs do not particularize their allegations of actual knowledge regarding these Defendants, and they fail to link the projection to these Defendants.

Plaintiffs allege that Defendants Notebaert and Pullen attended the December 11, 2000 analyst conference where the projection was made. As discussed in detail below, Plaintiffs do not allege sufficient facts to support a strong inference that Pullen was reckless, much less that he had actual knowledge that the projection was incorrect. Accordingly, the Court dismisses Pullen with respect to this projection.

With respect to Notebaert, Plaintiffs' allegations also fail to support a strong inference of actual knowledge of falsity or baselessness. As discussed below, Plaintiffs' group pleading allegations and conclusory statements do not satisfy the PSLRA's scienter requirements for projections.

Given that Plaintiffs have failed to create a strong inference that the December 11 projection was made by any officer with actual knowledge that the statement was false or misleading, Plaintiffs' claim against Tellabs for the December 11, 2000 projection also fails.

## VI. Alleged Misrepresentations

Plaintiffs allege that Defendants made a series of false and misleading statements regarding their financial performance and the success of their products. Plaintiffs alleged misrepresentations fall into the following categories: 1) statements regarding demand for the TITAN 5500; 2) statements concerning the TITAN 6500; 3) statements regarding the SALIX technology; and 4) statements regarding Tellabs' fourth quarter 2000 financials. The Court will address each of these categories.

## A. Statements Regarding the TITAN 5500

Plaintiffs allege that Defendants made a series of misrepresentations regarding the status of the TITAN 5500. Plaintiffs allege that these statements were false because demand had dropped for the TITAN 5500, Defendants engaged in deceptive practices to disguise the decrease in demand, and Tellabs' internal reports confirmed the decline in demand. The Court will review each of the statements about the TITAN 5500 below.

The Court previously found that Notebaert's general, non-product specific statement that "[w]e feel very, very good about the robust growth we're experiencing" constituted mere puffery. *Tellabs*, 262 F.Supp.2d at 951. Plaintiffs have not provided any argument for the Court to reconsider this ruling. As the Seventh Circuit has noted, "[m]ere sales puffery is not actionable under Rule 10b-5." *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 746 (7th Cir. 1997). *See also Gallaher v. Abbot Labs*, 269 F.3d 806 (7th Cir. 2001) (holding vague statements and statements of puffery, such as general predictions of success are not actionable).

Similarly, the statement "demand for our core optical products, or our core networking products remains strong . . ." is also puffery. That general statement does not specifically refer to any one product, including the products Plaintiffs identify as the backbone of their complaint. *See In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F.Supp.2d 1059, 1077 (N.D. Cal. 2001) (Statements describing "strong" demand, "better than expected," or "robust" results, a growth strategy that "was unfolding as planned," a "well positioned" company, a "solid" company position, and an "improved" product line are nonactionable puffery; further, "statements which used the words 'healthy,' 'strong,' or 'increased awareness' constitute[] vague assessments of past results, on which no reasonable investor would rely."); *Next Century Communications Corp.*

*v. Ellis*, 318 F.3d 1023, 1028 (11ᵗʰ Cir. 2003) ("strong performance" statement was mere puffery); *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 206-07 (1ˢᵗ Cir. 1999) ("upbeat statements of optimism," "excellent performance," and "increased" sales are not actionable); *Asher v. Baxter Intern., Inc.*, No. 02 C 5608, 2003 WL 21825498, *16 (N.D. Ill. July 24, 2003) ("the overall financial dynamic for Baxter is very strong" – is mere puffery); *Kafenbaum v. GTECH Holdings Corp.*, 217 F.Supp.2d 238, 250 (D.R.I. 2002) (statements that a company is "on course to restore growth in the business . . ." and that the company "remains confident that our business is sound" are not actionable); *Simon v. Am. Power Conversion Corp.*, 945 F.Supp. 416, 428 (D.R.I.1996) (statement that "we are gaining market share, we are gaining momentum, and our revenues are strong" is puffery). Pullen's December 2000 statement also falls in this puffery category: "[t]he TITAN 5500 remains the workhorse of the group and is expected to see strong growth for the next 2-3 years." (R. 63-1, SAC ¶ 77.) Likewise, Notebaert's December 2000 statement that the company "expected continuing growth of the TITAN 5500" is also non-actionable puffery. (*Id.* ¶ 76.)

The statement "[a]lthough we introduced this product nearly 10 years ago, it's still going strong because we keep adding new capabilities so it can do more and more for our customers" is also puffery because Plaintiffs have not made any allegations that the TITAN 5500 did not grow and improve over a 10 year period. Plaintiffs' allegations are instead focused primarily on the fourth quarter of 2000.

The more troubling statements based on the allegations in the case are those specifically referring to the success of the TITAN 5500 during the Class Period. On March 8, 2001, in response to a question from a Deutsche Bank analyst as to whether Tellabs was experiencing any

23

weakness in the TITAN 5500 sales, Notebaert responded: "[w]e're still seeing that product continue to maintain its growth rate; it's still experiencing strong acceptance." (*Id.* ¶ 102.)

As discussed in detail below, Plaintiffs allege that Defendants fraudulently misrepresented Tellabs' financial condition. They allege that Defendants engaged in channel stuffing and other deceptive practices to disguise the decrease in demand for the TITAN 5500 in the fourth quarter of 2000. Given these allegations regarding the underlying financials, the Court will not dismiss these alleged statements as mere puffery.

### B. Statements Regarding the TITAN 6500

During the purported Class Period, Defendants made numerous statements regarding the TITAN 6500. Plaintiffs allege that these statements regarding the TITAN 6500 were false and misleading because there was a lack of demand for the product, the TITAN 6500 was significantly behind production schedule, customers did not accept the product, and the TITAN 6500 failed customer and laboratory trials. Plaintiffs support their allegations with information from numerous confidential sources who worked at Tellabs.

The Court previously found that Notebaert's statement, "on the 6500, demand for that product is exceeding our expectations . . . ." is puffery. (*Id.* ¶ 84.) *See In re Allaire Corp. Securities Litig.,* 224 F.Supp.2d 319, 331 (D. Mass. 2002) (statement that product "exceeded our expectations since it became generally available in December" is "clear puffery"). "It is hard to imagine a more subjective or vague statement than 'exceeded our expectations.'" *Id.* The Court's prior ruling stands. Furthermore, the statement "[w]e are as confident as ever – that may be an understatement – about the 6500" is also puffery.

Plaintiffs allege that a series of statements regarding a contract with Sprint for the TITAN

6500 are false and misleading. On December 11, 2000, Defendants issued a press release announcing a multi-year sales agreement with Sprint for the TITAN 6500. The press release announced that the "agreement is expected to be valued at more than $100 million over the life of the contract." (R. 63-1, SAC ¶ 73.) In January 2001, Notebaert stated that the Sprint deal was Tellabs' "first customer success with this new product."

Plaintiffs allege that this press release is misleading because Sprint's purchase of the TITAN 6500 "was merely to satisfy a pre-existing purchase obligation that arose when Sprint canceled another product purchase, and would not result in continued sales." (*Id.* ¶ 74e.) This alleged motivation behind the contract, however, does not make the press release announcing the contract false.

Plaintiffs further allege that the December 11 press release is false because the TITAN 6500 was not available at the time and its production was "far behind schedule." (*Id.* ¶ 74.) The press release specifically noted: "[t]he TITAN 6500 system is available now." (*Id.* ¶ 73.) Plaintiffs have particularized through various confidential sources that the TITAN 6500 was not "available" for release in December 2000. Defendants argue that customers could have purchased the TITAN 6500 through contract at the time, even though the product may not have been available for shipment. The meaning of "available now" is a factual issue that the Court cannot properly decide on this motion to dismiss. The statement is therefore actionable.

Tellabs also made numerous statements during the purported Class Period about the TITAN 6500 sales that were not linked to the Sprint contract. For example, in its 2000 Annual Report, Tellabs said that its customers "are embracing" the TITAN 6500. (*Id.* ¶ 90.) This statement is mere puffery, and is not actionable despite the allegations that certain customers

25

were not satisfied with the TITAN 6500 and it failed their lab tests. *See Scritchfield v. Paolo*, 274 F.Supp.2d 163, 181 (D.R.I. 2003) (holding that defendant's claim of attaining "critical mass" of customers was non-actionable puffery).

On March 8, 2001, Notebaert said "[i]nterest in and demand for the 6500 continues to grow. . . . We continue to ship the . . . 6500 through the first quarter. We are satisfying very strong demand and growing customer demand. (R. 63-1, SAC ¶ 100.) These statements specifically pertain to the TITAN 6500 and the demand for the product. Plaintiffs have provided particularized allegations that contradict Defendants' affirmative representations regarding the demand, acceptance, and development of the TITAN 6500. These statements pertain to a new product and its prospects for growth. Such misrepresentations are actionable. *See In re Allaire*, 224 F.Supp.2d at 331-32 (statements that newly developed product was "fueling growth" were actionable).

On April 6, 2001, an analysts inquired whether Tellabs was still on track to recognize TITAN 6500 revenue in the second quarter. Notebaert responded "we should hit our full manufacturing capacity in May or June to accommodate the demand we are seeing. Everything we can build, we are building and shipping. The demand is very strong." (R. 63-1, SAC ¶ 117.) This statement is actionable for the reasons discussed above.

In a June 5, 2001 press release, Pullen announced that Tellabs was "enhancing [its] broadband networking systems to help service providers capitalize on the global business opportunities of today and tomorrow." He added that "[o]ur TITAN 6500 system is the industry's only carrier-class transport system that uses the most innovative cell-based switching fabric with electrical and optical capabilities for converged services." Plaintiffs fail to

particularize how this statement about the product's characteristics is misleading. This statement is not actionable.

## C. Statements Regarding the SALIX Technology

Plaintiffs have identified several statements regarding Tellabs' SALIX technology that they allege are actionable. Plaintiffs allege that Defendants falsely portrayed the SALIX technology as "leading edge" and successful during the purported Class Period. Plaintiffs allege that such statements were false and misleading because the "SALIX technology was both unfinished and outmoded." (*Id.* ¶ 56.) Plaintiffs contend that Tellabs "did not invest more money and personnel in the product" to commercialize it, as it needed to do. (*Id.* ¶ 57.) They further allege that in late April 2001, at a "town hall" meeting, Defendant Notebaert "conceded that the SALIX technology was not current technology, and that there were other technologies that superceded it," according to a confidential source. (*Id.* ¶ 60.)

Plaintiffs identify four statements made prior to April 18, 2001 regarding the SALIX technology that they contend are false and misleading. First, Plaintiffs point to a January 30, 2001 statement describing the SALIX technology: "The SALIX 7600 suite brings together voice and data technologies to create a set of telepacket service applications that can help carriers grow profitably." (*Id.* ¶ 88.) In the same statement, Tellabs announced that it "can now offer integrated comprehensive solutions to all carriers." (*Id.* ¶ 88.) Even Plaintiffs acknowledge that Tellabs was selling the SALIX technology. (*Id.* ¶ 57.) Plaintiffs have not identified any falsities in this statement regarding the SALIX technology.

Second, Plaintiffs identify a statement in Tellabs' 2000 Annual Report that the "new SALIX 7750 next-generation switch positions Tellabs in a new category where we see a lot of

27

opportunities." This "opportunities" statement is mere puffery. *See In re Peritus Software Services, Inc. Sec. Litig.*, 52 F.Supp.2d 211, 220 (D. Mass. 1999).

The final two statements also appeared in the 2000 Annual Report. Tellabs noted "[o]ur new SALIX next-generation switches have built an enviable track record in this fledgling market." (*Id.* ¶ 92.) This statement is not misleading, especially in light of Tellabs' press release on January 23, 2001 announcing that the SALIX product group "generate $40 million in sales in the fourth quarter of 2000, down from $66 million a year ago." (R. 74-1, Def.'s Mot. to Dismiss SAC App., Ex. 1.) The Annual Report further noted that Tellabs "successfully launched five new products in 2000," including the "SALIX 7750 next-generation." (R. 63-1, SAC ¶ 93.) This reference is again corporate puffery that is not actionable.

Further, on April 18, 2001, *during the Class Period*, Defendants disclosed the very problems that Plaintiffs allege were withheld from the class. Specifically, Tellabs issued a press release announcing that it was "terminat[ing] the SALIX next-generation-switching product effort." (*Id.* ¶ 121; R. 49-1, Def.'s Mot. to Dismiss Comp. App., Ex. 18.) This is precisely what Notebaert disclosed in the "late April 2001" town hall meeting that Plaintiffs use as an example of withholding information from the public. Plaintiff cannot claim that Tellabs' stock price was artificially inflated during the purported Class Period based on alleged misrepresentations when Tellabs actually disclosed the basis of the alleged misrepresentation to the public *during* the Class Period. Materiality exists where "there is a substantial likelihood that disclosure of the information would have been viewed by the reasonable investor to have significantly altered the total mix of information." *Searls v. Glasser*, 64 F.3d 1061, 1066 (7th Cir. 1995). Here, Tellabs disclosed the very information at issue *during* the purported Class Period. Plaintiffs have pled

themselves out of court with respect to any statements made on or after April 18, 2001 pertaining to the SALIX technology.

### D.  Financial Results

Plaintiffs allege that Defendants falsely misrepresented Tellabs' financial results for the fourth quarter 2000 because Defendants were engaged in channel stuffing and other inappropriate activities involving the TITAN 5500[12] which inflated Tellabs' revenue figures and created a false picture of the demand for Tellabs' products.[13] As the Court previously noted, "channel stuffing" is the inducement of customers to substantially increase their purchases before they would otherwise buy products from the company in the normal course of business. *Tellabs*, 262 F.Supp.2d at 948 (citing *Greebel v. FTP Software*, 194 F.3d 185, 202 (1st Cir. 2002)); *see also Pirraglia v. Novell, Inc.*, 339 F.3d 1182, 1184 (10th Cir. 2003). Channel stuffing will "artificially inflate sales, which will then drop in the next quarter as the distributors no longer make orders while they deplete their excess supply." *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1298 (9th Cir. 1998).

Plaintiffs allege that Tellabs' over-inventoried customers with its TITAN 5500 product, knowing that it would result in drastically reduced sales and huge customer returns of unwanted merchandise in early 2001. Plaintiffs further allege that Defendants wrote orders for products that customers did not want, improperly back-dated orders and offered unusual and extraordinary

---

[12]  Plaintiffs do not allege that the TITAN 6500 or the SALIX technology contributed to the allegedly false financial statements.

[13]  Although the SAC references Tellabs' first quarter 2001 financial statements, Plaintiffs do not allege anything false or misleading about these financials. Thus their veracity is not at issue in this lawsuit. Tellabs experienced a 21% increase in year to year growth in the first quarter of 2001.

discounts and incentives to customers to entice them to purchase products during the fourth quarter of 2000.

## 1. Over-Inventorying

Plaintiffs rely heavily on allegations that Tellabs over-inventoried it customers in order to falsely portray growing revenues and demand, and failed to disclose these facts to investors. Plaintiffs back their contentions with allegations supported by at least 8 separate confidential sources with personal knowledge that Tellabs provided customers with products that the customers did not want. (R. 63-1, SAC ¶¶ 63, 64, 65, 66, 67, 68, 69, 72.) These sources corroborate each other and suggest that the information is reliable. Plaintiffs identify specific customers whom Tellabs allegedly over-inventoried, namely Telcobuy and Verizon[14]. They even allege that Verizon's Chairman called Tellabs to complain about the channel stuffing. They also identify the specific time periods of the over-inventorying – the fourth quarter of 2000.

Plaintiffs further allege that the channel stuffing of the TITAN 5500 was of an "extraordinary" magnitude. Plaintiffs allege that Notebaert worked directly with Tellabs' sales personnel to effectuate the channel stuffing. In addition, Plaintiffs allege that Tellabs engaged in these channel stuffing activities when they did not even have an agreement with the ultimate purchaser of the product. They further contend that although customers did not need the products, Tellabs shipped them anyway.

The SAC cures the defects in the Amended Complaint regarding the over-inventoried allegations by particularizing the allegations and naming supporting confidential sources. It

_____

[14]   Although Plaintiffs identify a third customer – Lexcom – they do not particularize any details about the alleged channel stuffing other than to say that Lexcom was "victimized by Tellabs' channel stuffing." (R. 63-1, SAC ¶ 71.)

alleges more than general conclusions.

### 2. Fictitious Sales

Plaintiffs allege that Tellabs engaged in recording fictitious sales of products. In support, Plaintiffs allege that CS-3, a high-level Tellabs sales executive, reported that Tellabs employees actually wrote purchase orders for customers for products that the customers had not ordered. This bare-bones allegation without any particularized facts the who, what, when or where does not meet the mandates of the PSLRA.

### 3. Back Dating Orders

Plaintiffs further allege that Defendants disguised the decline in demand for Tellabs' products by backdating sales. In support, Plaintiffs allege that CS-1 stated that Defendants backdated sales, including pulling sales to larger customer such as SBC and Sprint from the first quarter 2001 into the fourth quarter of 2000 to make the numbers. Plaintiffs have particularized this allegation with support from a confidential source as well as examples.

### 4. Customer Incentives

Plaintiffs allege that Tellabs provided customers with sales incentives which were concealed from the investing public. They further contend that these incentives were excessive, unusual, and out of line with ordinary business practices.

In support of these allegations, Plaintiffs allege that CS-1, a former Tellabs marketing manager, reported that Tellabs got "creative" to make the numbers at the end of the fourth quarter of 2000 by offering customers discounts of as much as 10% to 20% and "other incentives" (*Id.* ¶ 69.) Additionally, CS-3 represented that Tellabs offered Telcobuy very generous credit terms (90 days), rather than the normal 30 days. Plaintiffs also allege that

Tellabs gave "Telcobuy additional discount incentives to buy TITAN 5500 plugs in late 1999 through late 2000."

As previously noted by the Court, customer incentives are a frequent tool of conducting business and are not inherently improper. *Tellabs*, 262 F.Supp.2d at 950. Plaintiffs' allegations do not suggest that these incentives were improper. A 60-day extension of credit terms is not extraordinary in today's business world. Furthermore, Plaintiffs do not particularize the alleged "additional discount incentives."

Although Plaintiffs contend that these undisclosed incentives contradicted Defendants' public statements, they fail to identify any specific public statements that they contradict. Providing sales discounts and incentives, without more, certainly does not contradict statements of growth.

### 5. Allegations Taken as A Whole

It is clear that there may be "legitimate reasons for attempting to achieve sales earlier" by engaging in channel stuffing. *Broudo v. Dura Pharm.'s, Inc.*, 339 F.3d 933, 940 (9th Cir. 2003). Plaintiffs, however, have alleged that Defendants engaged in channel stuffing in order to falsely misrepresent their financial condition. Although several categories of Plaintiffs' allegations fail regarding channel stuffing, when viewing the totality of the SAC's allegations, Plaintiffs have sufficiently particularized their allegations that Defendants engaged in channel stuffing in order to falsely portray Tellabs' financials.

## VII. Scienter

### A. Legal Standard for Scienter

The PSLRA requires that a plaintiff "state with particularity facts giving rise to a strong

inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

Plaintiffs' Amended Complaint failed to allege scienter sufficient to meet the mandates of the

PSLRA. Essentially, Plaintiffs had lumped their scienter allegations together as to all

"Defendants." As the Court held in its May 19, 2003 Opinion, Plaintiffs must allege facts

establishing that each Individual Defendant knew, or recklessly[15] ignored, that the statements

were materially false or misleading. *Tellabs*, 262 F.Supp.2d at 954. This Court has rejected the

Second Circuit's test for scienter where a plaintiff is required to allege either: (1) facts showing

that the defendants had both motive and opportunity to commit fraud, or (2) facts constituting

strong circumstantial evidence of conscious misbehavior or recklessness. *Id.* Instead, Plaintiffs

may use "motive and opportunity" or "circumstantial evidence" to establish scienter under the

PSLRA, only if Plaintiffs' allegations support a strong inference that each Defendant acted

recklessly or knowingly. *Tellabs*, 262 F.Supp.2d at 954; *see also Ottmann v. Hanger Orthopedic

Group, Inc.*, No. 02-2283, 2003 WL 22992292, *5 (4th Cir. 2003) ("[C]ourts should not restrict

their scienter inquiry by focusing on specific categories of facts, such as those relating to motive

and opportunity, but instead should examine all of the allegations in each case to determine

whether they collectively establish a strong inference of scienter.").

**B.      Analysis**

Defendants argue that Plaintiffs have failed to allege scienter under the mandates of the

PSLRA. Plaintiffs claim that they have sufficiently alleged a strong inference that each of the

---

[15] "Reckless conduct is, at least, conduct which is highly unreasonable and which represents an extreme departure from standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Rehm v. Eagle Fin. Corp.*, 954 F.Supp. 1246, 1255 (N.D. Ill. 1997).

Individual Defendants knew or recklessly disregarded the truth.

Plaintiffs again lump many of their scienter allegations together with broad statements regarding "Defendants" or the "Individual Defendants." They allege, for example, that "Defendants also knew or recklessly disregarded that the misleading statements and omissions . . . would adversely affect the integrity of the market for the Company's common stock." (R. 63-1, SAC ¶ 148.) They further allege that "Defendants had a power motive to inflate the price of Tellabs' stock." (*Id.* ¶ 150.) Further, they contend that the "Individual Defendants were senior executive officers and directors of Tellabs and were intimately involved with and had direct responsibility with respect to important issues affecting the Company's business, operations, products, performance, and prospects." (*Id.* ¶ 152.) In its Opinion, the Court clearly noted that "[g]roup pleading allegations are insufficient under the PSLRA to establish scienter on the part of each individual Defendant." *Tellabs*, 262 F.Supp.2d at 955. Thus, these allegations alone are insufficient to establish scienter under the PSLRA.

### C.    Scienter Based on Insider Trading

Plaintiffs again try to support their scienter allegations with contentions regarding the sale of Tellabs' stock by insiders. Specifically, Plaintiffs allege that two of the Defendants – Birck and Kohler – sold stock during the Class Period. They also allege that four other Tellabs' "insiders" sold stock during this time.

As the Court previously held, mere allegations of insider trading during the purported Class Period alone do not support a strong inference of scienter. *Tellabs*, 262 F.Supp. 2d at 954. "Unusual" or "suspicious" stock sales by corporate insiders, however,  may provide circumstantial evidence of scienter. *Id.*; *Broudo*, 339 F.3d at 940 ("[U]nusual stock or suspicious

stock sales can serve as circumstantial inference of scienter."). In order to rise to the level of "unusual" or "suspicious," the insider trading must be "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information." *In re Silicon Graphics, Inc.*, 183 F.3d at 986 (internal quotation omitted).

Plaintiffs fail to allege sufficient facts demonstrating that the sales by Defendants Birck and Kohler were unusual or suspicious. They do not allege the amount or percentage of overall shares sold by either of these Defendants. Indeed, at the time Defendant Birck sold 80,000 shares of common stock, he was the beneficial owner of over 37 *million* shares of Tellabs' common stock. (R. 74-1, Def.'s Mot. to Dismiss SAC App., Ex. 9). Birck's sales during the Class Period thus amount to less than 1% of his holdings. Plaintiffs do not allege the amount of profit Defendant Birck made on his sales. They also do not allege the history of trading on the part of these Individual Defendants.

Furthermore, the SAC focuses on Defendant Notebaert's allegedly fraudulent statements. Plaintiffs do not allege that CEO Notebaert sold stock during the Class Period. The absence of such allegations against him further weakens Plaintiffs' argument that the insider sales support a strong inference of scienter on the part of Notebaert. *See Druskin v. Answerthink, Inc.*, No. 02-23304, __ F. Supp.2d __, 2004 WL 95402 at * 22 (S.D. Fla. Jan. 5, 2004).

Plaintiffs allegations of insider trading by other Tellabs' insiders who are not named as Individual Defendants also fail to support a strong inference of scienter. Plaintiffs assert that these sales "evidence senior management's knowledge of serious undisclosed problems." (R. 78-1, Pl.'s Opp. to Defs.' Motion to Dismiss SAC, p. 32 n.26.) Plaintiffs fail to make any allegations connecting Catherine Kozik, Thomas Gruenwald, William Souders, or Peter

Gugliemi to the fraudulent scheme. It would be a stretch, at best, to conclude based on the allegations in the SAC that the Individual Defendants engaged in the alleged scheme in order to financially benefit other insiders who were not part of that scheme. Thus, their sales do not bear on the issue of scienter.

### D. Hands On Allegations

Plaintiffs also make numerous general statements regarding the "hands on" management at Tellabs in an attempt to establish scienter. They allege that "Tellabs' executives and directors were 'hands on' and knew everything, including the product development cycles, everyday happenings of the Company, and customer expectations." (R. 63-1, SAC ¶¶ 153-57.) Such general "hands on" allegations, however, are insufficient to establish scienter. *See In re The Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1088 (9th Cir. 2002).

### E. Access to Reports

Plaintiffs also contend that a strong inference of scienter is established through the Individual Defendant's access to reports. Tellabs' finance department generated internal quarterly status reports that were available on the company's database system regarding the profitability of Tellabs' products. These reports, according to a confidential source, "showed a decline in customer demand for the TITAN 5500 by March 2001." (R. 63-1, SAC ¶ 153e.) Plaintiffs also allege that the reports "showed declining demand in the third and fourth quarters of 2000 for a variety of Tellabs' products, including the TITAN 5500." (*Id.* ¶ 40.) Tellabs also generated daily reports concerning Tellabs' daily product bookings and revenues. Additionally, Tellabs generated weekly and monthly reports concerning various issues, including the status of product development. (*Id.* ¶ 153f.)

These general allegations alone — that Defendants received daily, weekly, and monthly reports -- are insufficient to create a strong inference of scienter. *See Silicon Graphics*, 183 F.3d at 985. Mere access to internal data does not meet the dictates of the PSLRA. *See Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1035-6 (9th Cir. 2002); *In re Apple Computer, Inc., Sec. Litig.*, 243 F.Supp.2d 1012, 1025 (N.D. Ca. 2002); *Collmer v. United States Liquids, Inc.*, 268 F.Supp.2d 718, 753 (S.D. Tex. 2003) (Mere access to reports was insufficient to plead scienter "without some additional facts such as exposure to content-identified internal corporate documents (and who drafted them, who received them or how plaintiffs learned of them) or specific conversations or attendance at specified management or board meetings dealing with such problems."); *see also Arazie v. Mullane*, 2 F.3d 1456 (7th Cir. 1993) (finding internal documents insufficient to support fraud where the complaint did not indicate who prepared them, when they were prepared or what was precisely in them). Plaintiffs do not describe the contents of these reports or detail what such reports reflected. They do not allege who, other than the "finance department," prepared such reports. They do not allege any particularized facts showing how the information contained in the reports demonstrated the falsity of Tellabs' fourth quarter financial results or sufficient facts regarding how the information supports any inference of knowledge of falsity.

With respect to the quarterly status reports, Plaintiffs contend that they showed a declining demand in the third and fourth quarters of 2000 "for a variety of Tellabs' products, including the TITAN 5500." (R. 63-1, SAC ¶ 40.) Plaintiffs, however, fail to allege what reports showed a decline in the demand and who received such reports. They also do not particularize what information was reflected in this report, how significant the decline in demand was, or how

much of the decline was attributed to the TITAN 5500 as opposed to other products. The source of this information is also unclear. Although Plaintiffs allege that CS-23 "viewed" the quarterly reports, it is unclear that CS-23 provided this information. Moreover, CS-23 is a former Tellabs' engineer, thus it is unclear when or how he had access to the reports.

Additionally, Plaintiffs allege that a confidential source "revealed that these [quarterly] reports showed a decline in customer demand for the TITAN 5500 by March 2001." (*Id.* ¶ 153d.) This information in March of 2001, however, does not have any effect on the allegedly fraudulent fourth quarter 2000 financials and Plaintiffs do not allege that Tellabs' first quarter 2001 financials were fraudulent. Plaintiffs must include detailed information when basing their scienter allegations on a defendant's access to internal company reports. "The reason for requiring such detail [is] that every sophisticated corporation uses some kind of internal reporting system reflecting earlier forecasts, and that allowing a plaintiff to go forward with a case based on general allegations of 'negative internal reports' would expose all those companies to securities litigation whenever their stock prices dropped." *In re Vantive Corp. Sec. Litig.*, 283 F.3d at 1087-88 (citations and quotations omitted).

### F.    Probe Research Study

Plaintiffs allege that Probe Research, an independent research firm, performed a study for Tellabs. The study, according to CS-16, who worked as Tellabs' marketing strategy executive during the purported Class Period, "showed a steep drop in the number of T1 circuits required in the market." (R. 63-1, SAC ¶ 39.) According to CS-16, "T1' s were the main source of demand for Tellabs' TITAN 5500 systems." (*Id.*) Tellabs' marketing strategy department prepared an internal report in or about early 2001 concluding that "as a result of the decline in T1's, Tellabs'

38

revenue from the TITAN 5500 would decline by approximately $400 million." (*Id.*)

This research was not completed until around early 2001 — after Tellabs made its December 11, 2000 revenue projections. Significantly, the SAC does not detail when in 2001 Probe Research completed the study. It also does not state when the marketing strategy department completed and disseminated its report. Moreover, the report does not disclose when Tellabs' revenue would feel the effect of the drop in the T1 circuits and decline. Given the lack of these significant details, the Probe Research study allegations alone cannot support a strong inference of actual knowledge or recklessness.

### G.     Alleged Omission in Company's 2001 Annual Report

Plaintiffs claim that certain "admissions" by Tellabs support a showing of scienter. Specifically, in its 2001 Annual Report, dated January 22, 2002, Tellabs noted:

> Early in 2001, as our customers reduced capital spending and expressed caution about the future, Tellabs began a deep process of self-examination. We faced difficult decisions, the most onerous being our need to match capacity and expenses with demand to preserve profitability.

> Making a company smaller is painful. In April 2001 we began a series of layoffs, a process that continues through March 2002, reducing our worldwide workforce by about 27% to around 6,700 people. We closed manufacturing plants in Ireland and Texas, consolidated product development and other functions from 30 facilities into 20, and cut expenses dramatically.

(*Id.* ¶ 141.)

These post-class statements are completely consistent with statements made during the purported Class Period. On April 18, 2001, as alleged in Plaintiff's SAC, Tellabs issued a press release noting: "[i]n light of reduced and deferred spending by major communications carriers,

Tellabs will realign its cost structure with its current expectations for lower revenue growth."
(*Id.* ¶ 121.) The press release further noted that Tellabs would be "reducing its workforce by
about 550 people . . . [that it had] eliminated 450 temporary or contract positions . . . and will not
fill 1,100 open positions. (R. 85-1, Def.'s Reply Mem., Ex. D.) The Annual Report statements
do not contradict the company's statements in April 2001. Therefore, the statements in the
Annual Report do not support even a weak inference of scienter. *See e.g., In re Read-Rite Corp.,*
335 F.3d 843, 846 (9th Cir. 2003).

### H.    Individual Defendants

The Court will now analyze whether Plaintiffs have alleged sufficient facts to establish
that each Individual Defendant knew, or recklessly ignored, that the allegedly fraudulent
statements were materially false or misleading. The Court will also address in this section
whether each of the Individual Defendants is accountable for those statements remaining in the
case. The PSLRA requires Plaintiffs to particularize the role of each Individual Defendant in the
alleged misrepresentations. Plaintiffs must allege facts sufficient to support an inference that the
misrepresentation was made by or is attributable to a particular Individual Defendant or that the
Individual Defendant had control over the content of the statement.

### 1.    John Kohler

Kohler was the Senior Vice President of Global Business Operations during the Class
Period. Plaintiffs do not allege that Kohler made any of the allegedly false statements at issue in
this case. Instead, they use group pleading to assert that the statements are "the collective actions
of the narrowly defined group of Defendants . . . by virtue of their high-level positions with the
Company and 'hands on' management style." (R. 63-1, SAC ¶ 24.) They allege that

"Defendants were involved in the fraudulent activities herein alleged and were also involved in drafting, producing, reviewing, and disseminating the materially false and misleading statements and information alleged herein; were aware, or recklessly disregarded, that the materially false and misleading statements were being issued regarding the Company; and approved or ratified these statements, in violations of the federal securities laws." (*Id.* ¶ 24.) Plaintiffs further assert that the "Individual Defendants, because of their positions of control and authority as officers and directors of the Company, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period." (*Id.* ¶ 27.) They allege that the Individual Defendants had copies of the documents and had the "ability and opportunity to prevent their issuance or cause them to be corrected." (*Id.* ¶ 27.)

Under the mandates of the PSLRA, the Court must evaluate the allegations concerning each of the Individual Defendants separately. Plaintiffs' broad, general allegations regarding Kohler's responsibility for statements made by other Defendants fall far short of sufficiently attributing the statements to him. Plaintiffs do not set forth sufficiently particularized allegations that Kohler knew about the statements or had any control over them. They do not allege that Kohler controlled, or could have controlled, such statements. Plaintiffs further do not assert that Kohler drafted any of these statements or participated in the approval of such statements. In short, Plaintiffs have not pled specific facts connecting Defendant Kohler to any of the statements that are allegedly false and misleading. Thus, they cannot provide a basis for federal securities fraud liability against Kohler. Accordingly, Kohler is dismissed from Count I.

### 2. Robert Pullen

During the Class Period, Robert Pullen was Tellabs' Senior Vice President and General

Manager of Optical networking. Plaintiffs have identified two allegedly false statements made by Pullen in their SAC. The first statement is one attributed to Pullen by ABN AMRO, Inc., following a December 11, 2000 conference with securities analysts. Pullen allegedly commented that the "TITAN 5500 remains the workhorse of the group and is expected to see strong growth for the next 2-3 years." But Plaintiffs do not particularize any scienter allegations against Pullen pertaining to the TITAN 5500. Plaintiffs only allege that Pullen had knowledge regarding the TITAN 6500. Additionally, as discussed above, the Court dismissed this statement as puffery. Accordingly, Plaintiffs have not met their scienter burden regarding this statement attributed to Pullen.

The second statement in the SAC attributed to Pullen is one made on June 5, 2001 regarding the TITAN 6500. As the Court noted above, however, this statement is mere puffery and thus not actionable.

With respect to those statements not made by Pullen, as with Kohler, Plaintiffs have failed to plead specific facts connecting Pullen to them. They use the same group pleading allegations noted above in an attempt to impose liability on Pullen for such statements. But these group pleading allegations do not meet the mandate of the PSLRA. Plaintiffs have not particularized why or how Pullen should share responsibility for these statements. Accordingly, Count I is dismissed with respect to Defendant Pullen.

### 3.    Joan Ryan

Ryan was Tellabs' Executive Vice President and Chief Financial Officer during the Class Period. Plaintiffs' allegations regarding Ryan's scienter are sparse. Plaintiffs allege that Ryan made quarterly presentations with respect to Tellabs' financial position at the "town hall"

42

meetings. Given her financial position at the company, this duty is not surprising. Plaintiffs do not allege that Ryan did anything fraudulent or questionable at these meetings. They further do not allege that Ryan knew of the alleged problems with the products at issue.

Plaintiffs main allegation against Ryan is that she knew about the channel stuffing. As the Ninth Circuit recently noted, however, "channel stuffing claims may have some probative value insofar as the channel stuffing was done so as to artificially inflate income, but there may also be other legitimate reasons for attempting to achieve sales earlier." *Broudo*, 339 F.3d at 940. Furthermore, Plaintiffs have failed to plead particular facts supporting this general conclusion with respect to Ryan. They do not allege specific channel stuffing activities, when they took place, what customers these activities affected, or when she knew about them. These allegations do not factually link Ryan to any allegedly fraudulent statements. Although allegations regarding channel stuffing may be sufficient to allege a misrepresentation, Plaintiffs' conclusory allegations regarding Defendant Ryan's knowledge of channel stuffing, without more, cannot support a strong inference that she knew or recklessly ignored that the statements were materially false or misleading. *See Greebel*, 194 F.3d at 185 (concluding that channel stuffing allegations "[do] not support a strong inference of scienter"); *In re Splash Tech. Holdings Sec. Litig.*, 160 F.Supp.2d. 1059, 1075-76 (N.D. Cal. 2001); *Pirraglia v. Novell Inc.*, No. 99-995C, 2000 WL 33194748, at *2-3 (D. Utah Nov.2, 2000) (finding that "channel stuffing" does not support a "strong inference" of scienter); *Fitzer v. Security Dynamics Tech., Inc.*, 119 F.Supp.2d 12, 36 (D. Mass. 2000) (same); *In re Dura Pharm., Inc. Sec. Litig.*, No. 99-0151, 2000 WL 33176043, at *8 (S.D. Cal. July 11, 2000) (finding no strong inference of scienter from alleged "channel stuffing"); *In re Trex Co., Inc. Sec. Litig.*, 212 F.Supp.2d 596, 608 (W.D. Va. 2002)

(Allegations of channel stuffing, standing alone, are insufficient to sustain the state of mind requirement in a securities fraud claim because 'there may be a number of legitimate reasons for attempting to achieve sales earlier' than in the normal course").

Plaintiffs suggest that they have alleged scienter because Ryan signed the company's SEC filings and financial statements. While Ryan is certainly accountable for the financial statements and SEC forms that she signed, that accountability alone does not automatically arise to the requisite level of scienter. *See In re Sunterra Corp. Sec. Litig.*, 199 F.Supp.2d 1308, 1330 (M.D. Fla. 2002) (signatures on SEC Forms alone do not raise a strong inference of scienter). Plaintiffs must still meet the mandates of the PSLRA and properly allege a strong inference of scienter. They must provide particularized factual allegations that support a strong inference that Ryan knew or recklessly disregarded that the allegedly fraudulent statements and SEC forms were false or misleading when made. Plaintiffs have failed to do so with respect to Defendant Ryan.

In viewing the totality of the allegations against Ryan, Plaintiffs fall short of meeting their burden regarding scienter. Accordingly, Count I is dismissed with respect to Ryan.

### 4. Michael Birck

During the Class Period, Birck served as Chairman of the Board. Plaintiffs allege that Birck had his "hands on the pulse of everything" at Tellabs. (R. 63-1, SAC ¶ 154.) They contend that Birck communicated with employees at town hall meetings and heard sales personnel briefings concerning product status and other matters. They allege that he "knew the status of each product, how it was working, if the product was selling, and to whom from speaking with sales people . . . ." (*Id.* ¶ 154.) Plaintiffs also allege, according to a confidential source, that Harvey Scull, the head of Tellabs' mergers and acquisition group had conversations

with Defendant Birck. Although Plaintiffs allege that Scull received information regarding market data and research and acquisition targets, they do not allege what information Scull provided to Birck, when he provided it, or the relevance of such information. Birck also signed the SEC Forms.

In essence, Plaintiffs' scienter allegations amount to the argument that Birck knew or recklessly disregarded the falsity of the statements because of his position with the Company, and that he sold less than 1% of his Tellabs' common stock holdings during the Class Period as discussed above. Given the mandates of the PSLRA, these allegations in their totality fall short of providing a strong inference of scienter. *See Advanta,* 180 F.3d 525, 539 (3rd Cir. 1999) ("Generalized imputations of knowledge do not suffice, regardless of the defendants' positions within the company."). Birck is dismissed from Count I.

### 5. Brian Jackman

Jackman was President of Global Systems and Technology and Executive Vice President, as well as a Director, during the Class Period. Jackman had the responsibility for all product divisions worldwide.

Plaintiffs allege that Jackman reviewed daily reports concerning Tellabs' daily product bookings and revenue on a weekly basis. (R. 63-1, SAC ¶ 153e.) They contend that Jackman ran Tellabs prior to Notebaert's appointment as Tellabs' CEO "and all information flowed up" to him. Furthermore, Plaintiffs allege that "[a]s the head of Tellabs' 'Product House,' it was Jackman's responsibility to know what the market was doing so that he could invest in the right products to meet the market. (*Id.* ¶ 157.) Jackman "ran the whole product side of Tellabs' business. Jackman reported directly to Birck." (*Id.* ¶ 158.)

As an initial matter, Plaintiffs fail to allege that Jackman had any involvement with or knowledge regarding the alleged problems with the TITAN 5500. Instead, the scienter allegations regarding Jackman pertain only to the TITAN 6500. Plaintiffs have therefore not established that Jackman is liable for any of the alleged misrepresentations regarding the TITAN 5500.

According to CS-3, Jackman knew that the TITAN 6500 was not ready for development despite Tellabs' public announcements. (*Id.* ¶ 171.) Nonetheless, Tellabs introduced it in 2000 and customers realized that it "was not even close to being ready" when they put the product in their labs. (*Id.* ¶ 171.) CS-3, however, left Tellabs prior to the commencement of the purported Class Period. Plaintiffs fail to state how CS-3, who no longer works for Tellabs, has information about Jackman's knowledge during the purported Class Period. Without this information, the Court cannot distinguish whether the allegations about Jackman are "mere rumor and speculation or whether [they are] based on concrete information from . . . people who were in a position to know the truth of the allegations." *Adams v. Kinder-Morgan*, 340 F.3d at 1101. Plaintiffs have therefore not particularized their allegations with respect to Jackman.

### 6. Richard Notebaert

Notebaert served as Tellabs' Director and its CEO and President during the Class Period. Plaintiffs allege that Notebaert made many of the false and misleading statements complained of in this action. Plaintiffs have alleged that Notebaert knew or recklessly ignored that they were false and misleading because, as CEO, he was informed of the serious problems affecting Tellabs' business, products, and performance. They allege, as with some of the other executives, that Notebaert attended town hall meetings of Tellabs' employees, "had telephone calls every day

and stayed on top of everything," had discussions with Senior Vice Presidents regarding weekly revenue calls and had his "hands on the pulse of everything." (R. 63-1, SAC ¶ 153.) They further allege that Notebaert knew the status of Tellabs' products, including whether or not they were selling. (*Id.* ¶ 154.) These allegations support that Notebaert was active in Tellabs' business as one would expect, but they do not establish scienter. *See Zishka v. American Pad & Paper Co.*, No. 02-10120, 2003 WL 21790103 at *1 (5th Cir. Aug. 4, 2003) (finding defendants' positions within the company insufficient to presume knowledge of the company's alleged false statements). Plaintiffs do not disclose any details regarding what Notebaert allegedly learned during these calls or meetings that support an inference of scienter.

Furthermore, the allegation that Notebaert attended a late April 2001 meeting where he explained that the SALIX technology was not current and was superseded by other technologies is consistent with Tellabs' April 18, 2001 public disclosure announcing termination of its SALIX product line. Given that Tellabs had disclosed this information *before* late April, this allegation does not even support an inference of negligence, much less recklessness.

Plaintiffs also allege that Notebaert attended a meeting in February 2001 with approximately 24 SALIX and Tellabs employees regarding the SALIX product line. (R. 63-1, SAC ¶ 153.) Plaintiffs fail, however, to identify any details about the meeting or the information conveyed to Notebaert.

Plaintiffs also generally allege that "Notebaert knew the status of each product, how it was working, if the product was selling, and to whom from speaking with sales people." (*Id.* ¶ 154.) This general conclusion does not satisfy the scienter requirements under the PSLRA.

The SAC also includes allegations regarding Notebaert and channel stuffing. Plaintiffs

allege that Notebaert worked directly with Tellabs' sales personnel to effect channel stuffing with respect to Tellabs' customer, SBC. Plaintiffs further allege that, according to CS-3, Notebaert knew about the channel stuffing activity relating to the TITAN 5500 and he "pushed and prodded the Company's sales personnel." (*Id.* ¶ 156.) These conclusory statements, however, are not supported with any details. Plaintiffs do not provide details of any specific actions taken by Notebaert to further the channel stuffing. They do not identify what channel stuffing activities he worked on. Such allegations are critical because the Court has concluded that there is nothing inherently wrong with several of Plaintiffs' channel stuffing allegations. It is also significant that CS-3 left Tellabs *prior* to the commencement of the purported Class Period. Without more specific allegations, and without a more reliable source, Plaintiffs have not sufficiently pled a strong inference that Notebaert knew of any actionable channel stuffing activities.

Plaintiffs conclusory allegations regarding Notebaert do not create a strong inference that he acted with the requisite state of mind under the PSLRA. Plaintiffs rely on group pleading allegations about Notebaert's position in the company and general conclusions concerning his knowledge of the allegedly fraudulent activities without providing particulars to reinforce their general conclusions. Such allegations fail to meet the mandates of the PSLRA.

## VIII. Section 20(a) – Control Person Liability

This Court previously dismissed Plaintiffs' Section 20(a) claim for failure to allege specific control as to Defendants Gruenwald, Kohler, Puller, and Souders, and for failure to allege an underlying securities violation. Defendants seek to dismiss Plaintiffs' claim for control person liability under Count II of the SAC on the same grounds.

48

## A.    Rule 9(b) Applies to Section 20(a) Claims

Initially, Plaintiffs suggest that this Court wrongly concluded that the heightened pleading

requirements of Rule 9(b) apply to Section 20(a) control person allegations.  (R. 78-1, Pls. Opp.

to Mot. to Dismiss p. 37 n.28.)  Plaintiffs have cited several cases holding that Rule 9(b) does not

apply to Section 20(a), but those opinions are not binding on this Court, and this Court is not

persuaded by their reasoning.  Section 20(a) claims are sounded in fraud, thus Plaintiffs must

meet the heightened pleading requirements of Rule 9(b).  *See In re Loewen Group Inc.*, No.

Civ.A 98-6740, 2003 WL 22436233, *7 (E.D.Pa. July 16, 2003) ("Section 20(a) claims sound in

fraud and therefore must comply with the pleading requirements of Federal Rule of Civil

Procedure 9(b)");  *Wafra Leasing Corp. 1999-A-I v. Prime Capital Corp.*, 204 F.Supp.2d 1120,

1126 (N.D. Ill. 2002) (same); *Nanopierce Techs., Inc. v. Southridge Capital Mgmt. LLC*, No. 02

Civ. 0767 LBS, 2002 WL 31819207 at *9 (S.D.N.Y. Oct. 10, 2002) (same).

## B.    Control Person Liability

Defendants again seek to dismiss the control person claim on the ground that Plaintiffs

have failed to allege a primary securities fraud violation.  In order to state a Section 20(a) claim,

Plaintiff must allege the following: (1) a primary securities violation; (2) each of the Individual

Defendants exercised general control over the operations of Tellabs; and (3) each of the

Individual Defendants "possessed the power or ability to control the specific transaction or

activity upon which the primary violation was predicated, whether or not that power was

exercised." *Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 881 (7th Cir. 1992).

Because Plaintiffs have failed to plead a primary securities violation, Count II is dismissed.

Furthermore, Plaintiffs have failed to allege that Defendants Kohler or Pullen exercised

the requisite level of control over either the Company or possessed the power or ability to control the alleged misrepresentations and projections.

### 1. Kohler

Plaintiffs have failed to allege sufficient facts to support the conclusion that Defendant Kohler was a control person. Plaintiffs allege that Kohler served as Tellabs' Senior Vice President of Global Business Operations (Global Manufacturing) from February 2000 to March 10, 2003, and as Tellabs' Vice President of Global Manufacturing from 1992 through 2000. (R. 63-1, SAC ¶ 19.) "Kohler was a sales-oriented person." (*Id.* ¶ 158.) Plaintiffs allege that as part of his sales position, Kohler attended meetings with senior level employees of certain Tellabs' customers. (*Id.* ¶ 159.) These allegations fail to support the assertion that Kohler had control over Tellabs or the power or ability to control the alleged misrepresentations at issue in this case. Plaintiffs do not allege that Kohler made any of the statements at issue. Nor do they specifically allege that he was aware of any such statements being made. Kohler did not sign any of the SEC filings at issue. His position as a corporate officer who reports to others, without more, is insufficient to allege Section 20(a) liability. *See generally Starr v. AHey, Inc.*, 2003 WL 21212596, *4 (N.D. Ill. May 23, 2003) ("[A] plaintiff may not premise control person liability solely upon status within the company.").

### 2. Pullen

With respect to Pullen, Plaintiffs allege that he served as Tellabs' Senior Vice President and General Manager of Optical Networking from August 2000 to February 2, 2002. (R. 63-1, SAC ¶ 21.) In that capacity, Plaintiffs allege that Pullen "had responsibility with respect to the TITAN series products at issue in this action." (*Id.*) They allege that Pullen was aware of

TITAN 6500 production problems and that the product was failing evaluations. (*Id.* ¶ 50.)
Plaintiffs further allege that Pullen made numerous visits to TITAN 6500 customers in
connection with failed evaluation problems. (*Id.* ¶ 50.) They allege that Pullen knew that the
TITAN 6500 was not ready for disbursement despite public statements to the contrary. (*Id.* ¶ 53.)

Plaintiffs allege that at the December 11, 2000 securities analysts conference, "ABN
AMRO, Inc. reported Defendant Pullen's comment that the 'TITAN 5500 remains the workhorse
of the group and is expected to see strong growth for the next 2-3 years." (*Id.* ¶ 77d.) They do
not make any other specific allegations regarding Pullen and the TITAN 5500. The only other
statement attributed to Pullen is one on June 5, 2001, in a press release, where Pullen noted
"[o]ur TITAN 6500 system is the industry's only carrier-class transport system that uses the most
innovative cell-based switching fabric with electrical and optical capabilities for converged
services." (*Id.* ¶ 129.) Plaintiffs also allege that Pullen was aware of the TITAN 6500
production problems and that the product was failing evaluations, and that he made numerous
visits to TITAN 6500 customers regarding such failed evaluation problems. (*Id.* ¶ 159.)

As with Kohler, Plaintiffs fail to specifically allege that Pullen signed any of the financial
reports or SEC filings at issue. They fail to specifically allege facts supporting that Kohler had
the ability to control the specific activities at issue. Accordingly, Kohler is dismissed with
prejudice from Count II.

## IX.    Insider Trading

Plaintiffs have sued Defendants Birck (Counts III, IV, and V) and Kohler (Count III) for
insider trading pursuant to Section 20A of the Exchange Act. A private cause of action exists
under Section 20A against persons who purchase or sell a security "while in possession of

material, nonpublic information." Such an action may be brought by "any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased . . . or sold . . . securities of the same class." *United States v. O'Hagan*, 521 U.S. 642, 666, 117 S. Ct. 2199, 2214, 138 L. Ed. 2d 724 (1997) (quoting 15 U.S.C. § 78t-1(a)); *see also Fujisawa Pharmaceutical Co., Ltd. v. Kapoor*, 115 F.3d 1332, 1337 (7th Cir. 1997). Liability under Section 20A is predicated upon an independent violation of "this chapter or of any rules or regulations[s] thereunder." 15 U.S.C. § 78(t)-1(a). Section 20A claims are "derivative, requiring proof of a separate underlying violation of the Exchange Act." *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 541 (3d Cir. 1999); *see also In re Foundry Networks, Inc. Sec. Litig.*, No. C 00-4823 MMC, 2003 WL 22077729, at *16 (N.D. Cal. Aug. 29, 2003). In order to assert a claim for insider trading in violation of Section 20A, a plaintiff must show a predicate violation of the securities laws. Because Plaintiffs have failed to allege a securities fraud violation, Counts III, IV, and V are dismissed.

## CONCLUSION

Defendants' motion to dismiss is granted. Plaintiffs have had three chances to plead their case against Tellabs and the Individual Defendants. In its May 19, 2003 Opinion, the Court provided Plaintiffs with a detailed analysis of the deficiencies in their complaint. The Court also granted Plaintiffs' request for an extension to file their SAC in order to give them more time to conduct their investigation into the allegations at issue. Plaintiffs, however, still have failed to cure these deficiencies, even though they have had more than sufficient time and guidance to do so.

Rule 15(a) provides that a court should freely grant a party leave to amend pleadings "when justice so requires." Fed. R. Civ. P. 15(a). A court, however, need not provide plaintiffs with that opportunity if it finds undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, or futility. *See General Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1085 (7th Cir. 1997). Here, Plaintiffs have had three opportunities to plead their case. They also had fair and detailed notice of their pleading deficiencies. Accordingly, the Court dismisses the SAC with prejudice.

Dated: February 19, 2004

AMY J. ST. EVE
United States District Court Judge