# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| **MAKOR ISSUES & RIGHTS, LTD.,** )<br>**CHRIS BROHOLM, RICHARD LEBRUN,** )<br>*et al.*, )<br>        Plaintiffs, )<br> )<br>    v. )<br> )<br>**TELLABS, INC., MICHAEL J. BIRCK,** )<br>**RICHARD C. NOTEBAERT,** *et al.*, )<br> )<br>        Defendants. ) | No. 02 C 4356 |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Before the Court is Plaintiffs' motion for class certification, appointment of class representatives, and appointment of class counsel. In their Second Consolidated Amended Class Action Complaint ("SAC"), (R. 63-1, Second Am. Compl.), Plaintiffs allege that Defendants Tellabs, Inc. ("Tellabs") and certain officers and board members of Tellabs allegedly violated securities laws by making a series of deceptive statements and offering inflated earnings guidance. (R. 63-1 at ¶ 5.) For the following reasons, the Court, in its discretion, grants Plaintiffs' motion, but disqualifies Alan Mobley from serving as a class representative.

## BACKGROUND

The Court previously set forth the facts of this case extensively in its previous opinions, *see Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, Case No. 02 C 4356, 2008 WL 2178150, * 1 (N.D. Ill. May 22, 2008); *see also Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 705 (7th Cir. 2008); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 437 F.3d 588, 603-05 (7th Cir. 2006), *vacated in part,* 551 U.S. 308, ----, 127 S. Ct. 2499, 2509, 168 L. Ed.2d 179 (2007), and

thus familiarity with those opinions is presumed.  Accordingly, the Court recites only the facts

relevant to resolution of the present issues and additional background facts that provide helpful

context.  Following the Court's prior rulings, Plaintiffs' Section 10(b) and Rule 10b-5 claims

remain pending only against Defendants Tellabs and Richard Notebaert.  15 U.S.C. § 78j(b); 17

C.F.R. §240.10b-5.

## I.    The Parties

Defendant Tellabs is a Delaware corporation with its principal place of business in Lisle,

Illinois. (R. 63-1, SAC ¶ 16.)  Tellabs designs, manufactures, markets, and services optical

networking, broadband access, and voice quality enhancement solutions. (*Id.* ¶ 2.)  Plaintiffs are

current and former holders of Tellabs stock.

The remaining individual Defendants include:  Birck, Jackman, Notebaert, and Ryan

(collectively, the "Individual Defendants").  Each of the Individual Defendants was an officer

and/or director of Tellabs during the Class Period.  Michael Birck, a founder of the company,

served as chief executive officer and president of Tellabs from 1975 through 2000 and served as

chairman of Tellabs's board of directors beginning on September 18, 2000.  (*Id.* ¶ 17.)  Brian

Jackman was a director of Tellabs and served as president of global systems and technology and

executive vice president from 1998 through 2001.  (*Id.* ¶ 18.)  Richard Notebaert served as a

Tellabs's director from April 19, 2000 to June 17, 2002, and served as chief executive officer

and president of Tellabs from September 18, 2000 to June 17, 2002.  (*Id.* ¶ 20.)  Joan Ryan

served as Tellabs's executive vice president and chief financial officer from February 2, 2000 to

February 7, 2003.  (*Id.* ¶ 22.)

## II.    Plaintiffs' Allegations

Plaintiffs bring this putative class action individually and on behalf of persons who purchased common stock of Defendant Tellabs between December 11, 2000 and June 19, 2001 (the "Class Period"). Plaintiffs allege that Defendants engaged in a scheme to deceive and defraud investors as to the true value of Tellabs, Inc.'s common stock during the Class Period. In the pending claims, Plaintiffs contend that Defendants made a series of misrepresentations that fall into four categories: 1) statements regarding Tellabs's financial results for the fourth quarter of 2000; 2) statements regarding demand for Tellabs's TITAN 5500 product; 3) statements regarding the availability of Tellabs's TITAN 6500 system; and 4) projections of Tellabs's earnings and revenues during 2001. Plaintiffs allege that Defendants' deceptive actions resulted in the artificial inflation of Tellabs's stock price which reached a high of $67.125 per share on February 5, 2001, and that Plaintiffs suffered injury when they purchased Tellabs's common stock at these artificially inflated prices.

### A.    Tellabs Products

The surviving claims in Plaintiffs' SAC focus on certain statements Defendants made regarding two of Tellabs's products: the TITAN 5500 and the TITAN 6500. According to the SAC, the internet and telecommunications sectors suffered a significant decline in demand in mid-2000. (*Id*. ¶ 3.) Given this decline, Plaintiffs allege that demand for Tellabs's products also decreased. (*Id*. ¶¶ 3–4.) Plaintiffs contend, however, that Defendants disguised the impact that this decline had on Tellabs and falsely assured investors that Tellabs's performance was strong. Plaintiffs allege that contrary to Defendants' public representations during the Class Period, the demand for the TITAN 5500—Tellabs's "best seller"—substantially slowed. (*Id*. ¶¶ 34–45.) As

a result, in late 2000 and early 2001, Tellabs had "tons" of excess TITAN 5500s stored in a warehouse.  (*Id.* ¶ 45.)

Similarly, Plaintiffs allege that the TITAN 6500 failed to sell as Tellabs had represented.  (*Id.* ¶¶ 46–53.)  Plaintiffs further contend that the TITAN 6500 actually was far behind schedule and not ready for release during the Class Period, was failing customer lab evaluations, and was inferior to other products offered at the time.  (*Id.* ¶ 74.)

B.      **Statements by Tellabs**[1]

Plaintiffs claim that beginning on December 11, 2000 and throughout the purported Class Period, Defendants made a series of false statements and omissions regarding Tellabs's fourth quarter 2000 financials, Tellabs's products, and its future prospects that resulted in the artificial inflation of Tellabs's stock price.  Plaintiffs allege that the Individual Defendants are responsible for each of the statements.

For example, on December 11, 2000—the start of the purported Class Period—Tellabs issued a press release announcing a multi-year sales agreement with Sprint for the TITAN 6500.  (*Id.* ¶ 73.)  The press release noted that the "TITAN 6500 system is available now."  (R. 149-1, Joint Status Rep. at 4.)  Also on December 11, 2000, Tellabs held a conference with securities analysts in which it allegedly "reconfirmed consensus growth forecasts for fourth quarter 2000 and 2001."  (R. 63-1, SAC ¶ 76.)

On March 7, 2001, Tellabs issued a press release announcing that it was lowering its revenue and earnings per share expectations for the first quarter 2001.  It noted that Tellabs

---

[1]  The Court describes specific Tellabs statements only to the extent that they are relevant to the instant motion.

could not recognize revenue from TITAN 6500 shipments in the first quarter but expected to do so in the second quarter of 2001. (*Id.* ¶ 99.) The next day, during a conference call with securities analysts on March 8, 2001, Notebaert told analysts "[w]e're still seeing that product continue to maintain its growth rate; it's still experiencing strong acceptance." (*Id.* ¶ 102.) Notebaert further stated, "Interest in and demand for the 6500 continues to grow . . . . We continue to ship the . . . 6500 through the first quarter. We are satisfying very strong demand and growing customer demand." (R. 149-1 at 4.)

The parties dispute when the tide of Tellabs's positive statements turned. Relevant to the instant motion, on April 6, 2001, Tellabs issued a press release lowering its first quarter earnings guidance. The press release stated, "[t]he revised guidance stems from reduced and deferred spending by major communications carriers late in the quarter." (*Id.* ¶ 113.) In addition, on April 6, 2001, Defendants Notebaert and Ryan held a conference call with securities analysts, during which Notebaert told analysts that "everything we hear from the customers indicates that our in-user demand for services continues to grow." (*Id.* ¶ 114.) He further stated that "the 6500 is showing strength . . . we should hit our full manufacturing capacity in May or June to accommodate the demand we are seeing. Everything we can build, we are building and shipping. The demand is very strong." (*Id.* ¶ 117.)

Shortly thereafter, on April 18, 2001, Tellabs issued a press release announcing its first quarter financial results for the period ending March 31, 2001, and modified its revenue projections for 2001 from $3.99 billion to within the range of $3.6 billion to $3.7 billion. Tellabs further announced that it would "further reduce discretionary spending, eliminate salary increases this year, institute a pay-cut for all corporate officers, align manufacturing capability

with demand expectations..." (*Id*. ¶ 121.)  Although these statements do not form the basis for any of Plaintiffs' surviving claims, Defendants now contend that "[a]fter the April 18 announcement, a reasonable investor could not believe that the TITAN 5500 would continue its long history of substantial year-over-year growth."  (R. 237-1, Defs.' Resp. at 39.)

On June 19, 2001, which is the close of the purported Class Period, Tellabs issued a press release revising its second quarter guidance and reducing its revenues by approximately $300 million to $500 million.  (*Id*. ¶ 131.)  The press release explained:

> The dramatic changes affecting the landscape of the telecommunications marketplace have continued to impact Tellabs.  Service providers . . . are only buying equipment to meet the immediate needs of their customers.  'While we continue to see caution from our customers in the place of equipment deployment, our market position remains intact, and we are focused on ensuring the most profitable path through the current environment,' said Tellabs President and CEO Richard C. Notebaert.

*Id*.  Tellabs common stock fell from a high of $21.20 per share on June 19, 2001 to a low of $15.87 per share on June 20, 2001.  (*Id*. ¶ 135.)  The stock closed at $16.04 on June 20, 2001.  (*Id*. ¶ 135.)  The June 20, 2001 price reflected a decline of more than 75% "from the Class Period high of $67.125."  (*Id*. ¶ 135.)

## III.  Proposed Class

Plaintiffs seek to certify a nationwide class of:

> All persons who purchased the common stock of Defendant Tellabs during the period from December 11, 2000 through June 19, 2001, inclusive (the "Class Period").  Excluded from the Class are Defendants; the subsidiaries and affiliates of Tellabs; the officers and directors of Tellabs or its subsidiaries or affiliates, at all relevant times; members of the immediate family of any excluded person; the legal representatives, heirs, successors, and assigns of any excluded person; and any entity in which any excluded person has or had a controlling interest.

(the "Class").  (R. 218-1, Pls.' Mot. ¶ 1.)  As Tellabs had over 188 million shares of common

stock outstanding during the Class Period, Plaintiffs estimate the size of the putative class as in the thousands. (R. 63-1, SAC ¶ 175.) Plaintiffs request that the Court designate Milberg LLP as lead counsel for the Class and Miller Law LLC as liasion counsel for the Class. As class representatives, Plaintiffs propose Alan A. Mobley, Richard J. LeBrun, Nolan Howell, and lead plaintiff Makor Issues & Rights, Ltd. ("Makor").

Proposed class representative Alan A. Mobley recently admitted that he held Tellabs stock at the beginning of the Class Period. On December 20, 2000, during the Class Period, Mobley sold 1200 shares of Tellabs stock at a price of $62.44 per share. (R. 237-3, Defs.' Ex. 1 at TDA0473; *see also* R. 225-1, Corrected Certification of Proposed Pl. Mobley, at 4.) Mobley later purchased an additional 700 shares of Tellabs stock on January 4, 2001 at a price of $60.09. (R. 225-1 at 4.) Taken together with his December 20, 2000 trade, Mobley experienced a profit of approximately $32,000 during the Class Period. Mobley later sold these 700 shares on November 13, 2001, outside of the Class Period, at $14.25 per share. (R. 237-3, Defs.' Ex. 1 at TDA0522.)

Also within the Class Period, proposed class representative Richard LeBrun purchased 300 shares of Tellabs stock on February 2, 2001 for approximately $63.81 and sold these shares on March 12, 2001 at $41.06. (R. 40-1, Certification of Proposed Lead Pl. LeBrun at 77.)

Proposed class representative Nolan Howell purchased 600 shares of Tellabs stock on May 30, 2001 at a price of $33.85 and another 700 shares on June 11, 2001 at a price of $30.00. (R. 219-2, Certification of Proposed Representative Pl. Howell at 2.) As of the date of his deposition in this case, October 23, 2008, Mr. Howell still holds these 1300 shares. (R. 237-3, Defs.' Ex. 7 at 39 (under seal).)

Beginning on March 30, 2001, lead plaintiff and proposed class representative Makor engaged in a series of stock purchases and sales, many of which can be classified as "day trades." On March 30, 2001, Makor purchased 600 shares in three separate transactions, each at a price of $40.62, and 400 shares at $40.63—the highest price at which Makor purchased Tellabs stock during the Class Period. (R. 16, Ex. C, Certification of named plaintiff Makor Issues & Rights, Ltd.) Makor also sold all 1000 of these shares on March 30, 2001, in four separate transactions, for $40.69, representing a net gain of $66.00. (*Id.*) Between March 30, 2001 and June 19, 2001, Makor bought Tellabs stock approximately 375 times and sold Tellabs stock approximately 236 times. (*Id.*) The last transaction listed on Makor's certification is a June 15, 2001 transaction in which it sold 100 shares of Tellabs stock at a price of $24.40. (*Id.*)

## LEGAL STANDARD

Federal Rule of Civil Procedure 23(a) states that "[o]ne or more members of a class may sue or be sued as representative parties on behalf of all only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a); *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006). Failure to meet any of these Rule 23(a) requirements precludes class certification. *See id.*; *see also Pruitt v. City of Chicago*, 472 F.3d 925, 926–27 (7th Cir. 2006).

In addition to satisfying the requirements under Rule 23(a), a party seeking class certification must also establish that the proposed class satisfies one of the requirements set forth in Rule 23(b). *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614, 117 S. Ct. 2231, 138 L.

Ed.2d 689 (1997); *Oshana*, 472 F.3d at 513. In this case, Plaintiffs request certification of the proposed class pursuant to Rule 23(b)(3), which applies when "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3); *see also Amchem Prods.*, 521 U.S. at 615–16. Rule 23(b)(3) includes a list of factors for courts to consider regarding the predominance and superiority criteria:

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

*Amchem Prods., Inc.*, 521 U.S. at 615–16 (emphasis added); *see also Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 164, 94 S. Ct. 2140, 40 L. Ed.2d 732 (1974) (Rule 23(b)(3) manageability requirement "encompasses the whole range of practical problems that may render the class action format inappropriate for a particular suit.").

The party seeking class certification has the burden of establishing that certification is proper. *See Oshana*, 472 F.3d at 513; *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 596 (7th Cir. 1993). In determining whether a party has carried that burden, a court need not accept all of the complaint's allegations as true. *See Szabo v. Bridgeport Mach., Inc.*, 249 F.3d 672, 675 (7th Cir. 2001). Rather, in deciding whether to certify a class, the court "should make whatever factual and legal inquiries [that] are necessary under Rule 23." *Id*. at 676. District courts have broad discretion in determining motions for class certification. *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 345, 99 S. Ct. 2326, 2334, 60 L. Ed.2d 931 (1979); *Payton v.*

9

*County of Carroll*, 473 F.3d 845, 847 (7th Cir. 2007).  Nonetheless, on a motion for class

certification, the court's inquiry is limited to whether the requirements of Rule 23 have been

satisfied, and "a court may not refuse to certify a class on the ground that it thinks the class will

eventually lose on the merits."  *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 480 (7th Cir.

2002) (citing *Eisen*, 417 U.S. at 178, 94 S. Ct. at 2152; *Szabo*, 249 F.3d at 677).

## ANALYSIS

### I.      Class Scope

As an initial matter, Defendants raise a number of objections to the scope and definition

of the class that Plaintiffs seek to certify.  Defendants argue that:  (A) the class period should end

on April 18, 2001; and (B) the class should exclude (1) "in-and-out" purchasers; (2) members of

the *Brieger* class; and (2) Tellabs employees.

#### A.      Duration of Class Period

Defendants first assert that the duration of the Class Period conflicts with Plaintiffs'

strategy of proving reliance on a classwide basis by relying on the "fraud-on-the-market" theory

articulated by the Supreme Court in *Basic Inc. v. Levinson*, 485 U.S. 224, 247, 108 S. Ct. 978,

992, 99 L. Ed.2d 194 (1988).  According to this theory, "[b]ecause most publicly available

information is reflected in market price, an investor's reliance on any public material

misrepresentations, therefore, may be presumed for purposes of a Rule 10b-5 action."  *Id.*

Applied to securities fraud litigation, like the instant case, class members need not prove reliance

on an individualized basis—class reliance will be presumed—"if plaintiffs can show that the

alleged misrepresentation was material and publicly transmitted into a well-developed market."

*In re Salomon Analyst Metromedia Litig.*, 544 F.3d 474, 483 (2d Cir. 2008) (citing *Basic* at

244–45, 108 S. Ct. 978).  In turn, defendants can rebut this presumption by rebutting "proof of the elements giving rise to the presumption, or show[ing] that the misrepresentation in fact did not lead to a distortion of price...." *Id.* (citing *Basic* at 485 U.S. at 248, 108 S. Ct. 978).  "Any showing that severs the link between the alleged misrepresentation and . . . the price . . . will be sufficient to rebut the presumption of reliance."  *Id.* (emphasis added).

Defendants argue that Tellabs's "April 18, 2001 announcement 'severed the link' between the alleged misrepresentations and the stock price," and so "the fraud-on-the-market presumption of reliance cannot apply after that date and the class period should end on April 18, 2001."  (R. 237-1 at 39.)  This is a question of fact, resolution of which would benefit, at the very least, from expert testimony and analysis of Tellabs stock prices during the relevant period.  Fact discovery in this case is on-going, however, and neither Plaintiffs nor Defendants have offered such testimony in support of their respective positions.  In addition, Although the Seventh Circuit has held that "[b]efore deciding whether to allow a case to proceed as a class action, therefore, a judge should make whatever factual and legal inquiries are necessary under Rule 23," *Szabo*, 249 F.3d at 675, *Szabo* is limited to factual and legal inquiries **necessary** to determining whether Rule 23's requirements are met—neither *Szabo* nor more recent precedent permits the Court to decisively consider the merits and thus remove from the parties the benefit of summary judgment or trial.  *Id.* ("*Eisen* has not been interpreted so broadly . . . as to foreclose inquiry into whether plaintiff is asserting a claim which, assuming its merit, will satisfy the requirements of Rule 23 as distinguished from an inquiry into the merits of plaintiff's particular individual claim"); *see also West v. Prudential Sec., Inc.*, 282 F.3d 935, 938 (7th Cir. 2002) (On class certification, "[t]ough questions must be faced and squarely decided, if necessary by

holding evidentiary hearings and choosing between competing perspectives.").[2]

Shortening the duration of the Class Period to April 18, 2001 would exclude certain stockholders and thus affect numerosity, but the Court has no reason to doubt that a securities class with thousands of members would meet the numerosity requirement, regardless of whether the Class Period ends on April 18, 2001 or June 19, 2001. In addition, Defendants do not argue that shortening the class period will prevent class certification. Nor do Defendants seek to rebut the fraud-on-the-market presumption as to the whole class—which would impact the predominance inquiry and, potentially, class certification. *See, e.g., In re Salomon*, 544 F.3d at 485 ("a successful rebuttal defeats certification by defeating the Rule 23(b)(3) predominance requirement."). Instead, Defendants merely argue that if the Court ***does*** certify the class, the class period should end on April 18, 2001.

Because this issue goes to the merits and does not directly impact the propriety of class certification, the Court declines, at this time, to rule on the factual issue of whether the April 18, 2001 announcement "severed the link" or otherwise constitutes a curative disclosure. Whether, and to what extent, Tellabs's April 18 announcements "severed the link" between alleged misrepresentations and the stock price is a question of fact as to causation and thus appropriate to raise at summary judgment or trial. The Court may reconsider the scope of the Class Period, if necessary, once the parties have completed discovery and have had a full and fair opportunity to

---

[2] Other courts considering similar issues in securities cases have generally refused to decide such factual issues on the merits at the class certification stage. *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 291 (S.D.N.Y. 2008) ("given the inherently factual nature of these types of disputes, courts repeatedly have refused to shorten a class period based on alleged inquiry notice"); *In re Interpublic Sec. Litig.*, No. 02 Civ. 6527(DLC), 2003 WL 22509414, at *5 (S.D.N.Y. Nov. 6, 2003) ("Class certification of a broader class period is appropriate when questions of fact remain as to whether a purportedly curative press release effected a complete cure of the market or was itself fraudulent").

brief the issues on summary judgment.

### B.     Class Membership

#### 1.     "In-and-out" traders

Defendants next argue that the Court should exclude from the class "in-and-out" traders, who bought and sold their shares before allegedly corrective information became public.  Relying on the Supreme Court's decision in *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342, 125 S. Ct. 1627, 1631, 161 L. Ed.2d 577 (2005), Defendants argue that "[i]nvestors who sold before such a corrective event emerged have not suffered any loss as a matter of law, and therefore should not be part of a class."  (R. 237-1 at 41–2.)  In *Dura*, the Supreme Court held that to allege the necessary element of loss causation, investors must do more than allege an inflated share price due to misrepresentation.  Investors must plead that the alleged misrepresentations caused their loss.  (*Dura*, 544 U.S. at 345, 125 S. Ct. at 1633 ("if, say, the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss.").  Plaintiffs argue that it is premature to find that "in-and-out" traders cannot prove loss causation, (R. 250-1, Pls.' Reply at 36), because Plaintiffs have alleged a "series of partial disclosures" that slowly revealed Tellabs's true performance over a period of four months.  (*Id.* at 24.)

Although it is conceivable, as Defendants argue, that many "in-and-out" traders actually benefitted by selling Tellabs's shares before the end of the Class Period, it is also conceivable that the alleged series of misstatements caused a decline in stock prices that harmed "in-and-out" traders as well as other investors.  Defendants overstate the impact of price inflation by itself.  As other courts have recognized, the fact that certain class members sold at a time when the stock price was still allegedly inflated does not necessarily negate all loss, and regardless, it will not

generally defeat commonality or predominance:

> The chief role of price inflation remains its function in determining each plaintiff's damages. The common questions with respect to whether misleading statements or omissions were made, whether such statements were material, and whether they were made with scienter, bind class members with more force than the varying questions related to price inflation drive them apart.

*In re Gaming Lottery Sec. Litig.*, 58 F. Supp.2d 62, 70 (S.D.N.Y. 1999) (collecting cases); *see also In re Scientific-Atlanta, Inc. Sec. Litig.*, 571 F. Supp.2d 1315, 1334 (N.D. Ga. 2007) (citing *In re Gaming Lottery* with approval); *In re Baan Co. Sec. Litig.*, No. 1:98CV2465 (ESH), 2002 WL 32307825, at *7 (D.D.C. July 19, 2002) (rejecting similar seller/purchaser conflict theory); *In re Oxford Health Plans, Inc.*, 191 F.R.D. 369, 377 (S.D.N.Y. 2000) (citing *In re Gaming Lottery* with approval). Indeed, Defendants have recognized as much in their briefing. (R. 237-1 at 41.)

The Court is "mindful of the Supreme Court's admonishment in *Dura*: 'an inflated purchase price will not itself constitute or proximately cause the relevant economic loss.'" *Roth v. Aon Corp.*, 238 F.R.D. 603, 609 (N.D. Ill. 2006) (citing 125 S. Ct. at 1631). The Court recently addressed Defendants' argument regarding loss causation. (R. 240-1, 1/12/2009 Order.) Nonetheless, at this point in the litigation, the Court has insufficient evidence to conclude, as a matter of law, that a portion of putative class members cannot prove loss causation. Consequently, the Court will adopt the approach taken by the court in *Roth* and a number of other cases. The Court will include "in-and-out" traders in the proposed class but limit the class to those who suffered damage as a result of their purchase of Tellabs stock during the Class Period. *See, e.g.*, *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 245 F.R.D. 147, 168 (S.D.N.Y. 2007) ("Accordingly, in-and-out purchasers should not be excluded from the proposed class at this time,

particularly in light of the fact that discovery is still incomplete and plaintiffs intend to further develop their leakage theory"); *In re BearingPoint, Inc. Sec. Litig.*, 232 F.R.D. 534, 544 (E.D. Va. 2006) ("it is also conceivable that the inflationary effect of a misrepresentation might well diminish over time, even without a corrective disclosure, and thus in-and-out traders in this circumstance would be able to prove loss causation.").

### 2. *Brieger* class members

Defendants next argue that any certified class should exclude members of the class certified in the co-pending case *Brieger v. Tellabs, Inc.*, Case No. 06 C 1882, 245 F.R.D. 345, 350 (N.D. Ill. 2007). In *Brieger,* Judge Kennelly certified a class of "[a]ll persons who were participants in or beneficiaries of the Tellabs, Inc. Profit Sharing and Savings Plan at any time between December 11, 2000 and July 1, 2003 and whose accounts included investments in Tellabs stock." *Brieger,* 245 F.R.D. at 357. Defendants argue that since the scope of the *Brieger* class overlaps with the class in this case, and since each of the defendants in this suit is also named in the *Brieger* case, "[t]o allow those same plaintiffs to be class members in this case would allow those plaintiffs to impermissibly split their claims between the two lawsuits." (R. 237-1 at 45.)

Under the doctrine of "claim splitting," "a party cannot avoid the effects of res judicata by splitting her cause of action into separate grounds of recovery and then raising the separate grounds in successive lawsuits." *American Stock Exch., LLC v. Mopex, Inc.*, 215 F.R.D. 87, 91 (S.D.N.Y. 2002); *see* Restatement (Second) of Judgments § 24 (1982); *see also Civix-DDI, LLC v. Expedia, Inc.*, Case No. 04 C 8031, 2005 WL 1126906, at *4 (N.D. Ill. May 2, 2005). Setting aside that, unlike this case, the *Brieger* class alleges violations of ERISA, the doctrine of claim

splitting generally does not apply to class actions. 18 Moore's Federal Practice § 131.40[3][e][iii] (2002) (citing Restatement (Second) of Judgments § 26(1)(c) (1982)). As Moore's explains, the special nature of class actions—representation in absentia and often without notice—requires this exception:

> Generally, the request for certification as a class action and the order approving such certification will determine the nature of the claims subject to class treatment, and the resultant judgment will be limited to those claims . . . Thus, a class action can be thought of as an action in a court of limited jurisdiction in which only certain claims and certain forms of relief are available. This type of action, of course, is one of the recognized exceptions to the rule against claim splitting.

18 Moore's Federal Practice § 131.40[3][e][iii] (2002); *see also Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 432 (4th Cir. 2003) (rejecting claim splitting argument in context of Rule 23(b)(3) class). Similarly, in *Crowder v. Lash*, 687 F.2d 996, 1008 (7th Cir. 1982), for example, the Seventh Circuit refused to find prisoners' individual damages claims barred by res judicata arising from a previous class action brought against the same defendants and seeking equitable relief. "[I]t would be a harsh and improper application of res judicata to hold, on the basis of the notice sent out in (a previous class action suit) that prisoners forfeited their rights to personal redress for lack of knowledge that federal law . . . required that injunctive and monetary relief be sought in one action." *Id.* (citation omitted).

Defendants ignore this general exception for class actions, but the Court finds no reason to do so here. The *Brieger* class is a Rule 23(b)(1) class whose members had no opportunity to opt out, *see* Fed. R. Civ. P. 23(c)(2)(A)*; Crawford v. Equifax Payment Servs., Inc.*, 201 F.3d 877, 882 (7th Cir. 2000), and thus the logic of *Crowder* applies with even greater force here—barring the *Brieger* class from the instant action without evidence that the *Brieger* class had prior notice of the potential for res judicata and an opportunity to opt out would wreak unfair prejudice.

### 3.     Tellabs employees

Defendants also argue that all Tellabs employees should be excluded from the class because they potentially were privy to material nonpublic information and thus cannot claim the benefit of the fraud-on-the-market presumption of reliance.  (R. 237-1 at 46–7.)  Again, Defendants do not attempt to rebut the fraud-on-the-market presumption on a classwide basis, but rather argue that Tellabs employees cannot claim to have relied on the market price of Tellabs stock as an accurate measure of the shares' intrinsic value.  Defendants base their concerns on 27 confidential sources cited in Plaintiffs' SAC, 24 of whom were Tellabs employees during the Class Period.  (R. 237-1 at 46–7.)  The missing link in this argument is that the SAC does not allege that these former Tellabs employees are also members of the putative class.  (R. 63-1 at 3–6.)  The Court simply does not have sufficient evidence to conclude that these sources are class members, much less that they relied on "factors wholly extraneous to the market."  *In re VMS Sec. Litig.*, 136 F.R.D. 466, 476–77 (N.D. Ill. 1991).

Regardless of whether the 24 confidential sources are class members, it is speculative, at best, to assume that problems communicated to executive leadership reached each and every Tellabs employee—thousands in all—or that all employees possessed relevant inside information. Defendants would have this Court assume that Tellabs employees who purchased Tellabs stock during the Class Period did so based on inside information and not market reliance.  The fallacy in Defendants' logic in that Plaintiffs allege that the inside information to which their sources were allegedly privy counseled *against* purchasing Tellabs stock.  The fact that the class includes Tellabs employees who suffered losses analogous to other members of the class would suggest that these employees did *not* have sufficient inside information to influence their purchase and

instead relied on the market price as an accurate measure of share value.

Moreover, Defendants offer no precedent holding that all employees should be excluded at this point in the litigation based on potential access to inside information. Defendants cite to two cases, *In re VMS Sec. Litig.*, 136 F.R.D. 466, 476–477 (N.D. Ill. 1991) and *Endo v. Albertine*, 147 F.R.D. 164, 168 (N.D. Ill. 1993). Neither of these cases considered whether employees should be excluded from a stock purchaser class based on a speculative risk of access to inside information. Other courts considering this issue on class certification, however, have found the issue premature at the class certififcation stage. *See, e.g.*, *Weseley v. Spear, Leeds & Kellogg*, No. 88 C 397, 1988 WL 89434, at *2 (E.D.N.Y. Aug. 19, 1988) ("If, following discovery, defendant produces evidence that members of the class were on October 20, 1987 officers or employees of J.P. Morgan who purchased . . . on the basis of inside information, the court will consider altering or amending the scope of the class.").

In any event, this inquiry does not affect class certification. Should later developments during the course of discovery reveal additional relevant information, the Court may re-examine the propriety of class certification.

## II.     Class Certification Analysis

Defendants oppose class certification on only two grounds: typicality and adequacy. *See Steen v. Myers,* 486 F.3d 1017, 1020 (7th Cir. 2007) (absence of discussion in briefs amounts to abandonment of claim). Under Rule 23(a)(3), "the typicality requirement primarily directs the district court to focus on whether the named representatives' claims have the same essential characteristics as the claims of the class at large." *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 596–97 (7th Cir. 1993); *see also De La Fuente v. Stokely-Van Camp, Inc.*,

713 F.2d 225, 232 (7th Cir. 1983) ("plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory."). "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods.*, 521 U.S. at 625. To establish that they will fairly and adequately protect the interests of the class, class representatives must show that: (1) their claims are not antagonistic to or in conflict with those of the proposed class; (2) they have sufficient interest in the outcome of the case; and (3) experienced, competent counsel represents them. *See Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992).

### A. Mobley

Defendants argue that proposed class representative Mobley cannot establish typicality because he is subject to the unique defense of lack of standing. (R. 237-1 at 31.) Specifically, Defendants argue that since Mobley experienced a net profit during the Class Period, he did not suffer injury from the alleged fraud. (*Id.*) Plaintiffs argue that 1) Mobley's net gain does not subject him to a standing defense; and 2) since typicality is "determined with reference to the company's actions, not with respect to particularized defenses it might have against certain class members," *Wagner v. NutraSweet Co.*, 95 F.3d 527, 534 (7th Cir. 1996) (citing *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992)), any standing issues do not destroy typicality.

As to whether Mobley can prove standing, Plaintiffs correctly note that Defendants have not performed an explicit first-in-first-out ("FIFO") or last-in-last-out ("LIFO") analysis to determine Mobley's alleged loss. (R. 250-1 at 20.) Numerous courts that have held that LIFO analysis is the appropriate method for determining loss due to securities fraud. "[M]ore recently,

courts have preferred LIFO and have generally rejected FIFO as an appropriate means of

calculating losses in securities fraud cases," *In re eSpeed, Inc. Sec. Litig.*, 232 F.R.D. 95, 101

(S.D.N.Y. 2005), because LIFO methodology "unlike FIFO, . . . takes into account gains that

might have accrued to plaintiffs during the class period due to the inflation of the stock price."

*Id*. (Unlike FIFO, " LIFO . . . has been used not only for lead plaintiff calculations, but also to

determine compensation amounts for stockholders suffering losses due to securities fraud,")

(citing *SEC v. Bear, Stearns & Co., Inc.*, No. 03 Civ. 2937, 2005 WL 217018, at *7 (S.D.N.Y.

Jan. 31, 2005)); *see also Hill v. The Tribune Co.*, 2005 WL 3299144, at *2 (N.D. Ill. Oct. 13,

2005) ("Under [LIFO] methodology, a potential lead plaintiff which, during the class period, was

a net seller of the pertinent stock generally has a net gain and therefore generally will not have the

largest financial interest in the litigation"); *In re Comdisco*, 2004 WL 905938, at *3 (N.D. Ill.

2004) ("with every securities class action having to identify a class period, the focal point of

inquiry must begin (for standing purposes and otherwise) with purchases or sales—or both—

during that class period.  And in turn that focus calls for a primary concentration on class period

transactions, which is consistent with LIFO rather than FIFO treatment.").

     Although a last-in, first-out ("LIFO") analysis—without expert assistance—may be

prohibitively difficult where numerous transactions are at issue, LIFO analysis is relatively

straightforward where only three transactions are involved.  The Court in *eSpeed* described LIFO

analysis in detail:

> the Adib Group's utilization of LIFO reflects offsetting 'gains' that were attained
> through the sale of stock during the class period.  This method matches the last
> purchases made during the class period with the first sales made during the class
> period.  Subtracting the sales from the purchases, the Adib Group arrives at its
> base class period losses.  Then, shares that were bought during the class period but
> were not sold during the class period are accounted for as if they had been sold at

20

the average price of the shares in the 90 calendar days following the class period. Adding the losses incurred during the class period to the unrealized losses that would have been incurred had the Adib Group sold their remaining stock at the average price immediately following the class period, the Adib Group arrives at its final calculation. On this method of analysis, the Adib Group lost $166,743 without Weber (or $196,795 with him), and the Pension Fund lost $121,264. Because this method contemplates the offsetting gains the parties collected during the class period, it is a better measurement of the true damages sustained by the plaintiffs.

232 F.R.D. 95, 102. Applied to Mobley's transactions during the Class Period, Mobley held 1200 shares at the start of the Class Period that he sold on December 20, 2000, for a gain of $74,928. Mobley later purchased 700 shares of Tellabs stock on January 4, 2001 at a price of $60.09 and sold these 700 shares outside of the class period for $14.25 per share, at a loss of $32,088. Assuming that the average price of Tellabs shares in the 90 calendar days following the class period was $14.25 or higher, Mobley's gains collected during the Class Period may far and away offset his loss.

The Court does not hold, as a matter of law, that Mobley cannot establish loss. Rather, Defendants' standing defense, as it applies to Mobley, is non-frivolous and unique to Mobley. As it goes to the very heart of Mobley's claim, it is "likely to consume a significant portion of the litigant's time and energy and . . . there is a danger that preoccupation with defenses unique to the representative[] will cause absent class members to suffer." *See Muniz v. Rexnord Corp.*, Case No. 04 C 2405,2005 WL 1243428, at *3 (N.D. Ill. Feb. 10, 2005).[3] Accordingly, Mobley's

---

[3] Although Plaintiffs cite precedent holding that a "number of courts have rejected the argument that a net seller is *per se* atypical," (R. 250-1 at 20, n.37), these cases do not preclude a finding of atypicality where a representative is subject to a non-frivolous standing defense that is likely to distract the representative from his class duties and thus create conflict. The proposed plaintiff in *In re NTL, Inc. Sec. Litig.*, No. 02 Civ. 3013 LAK AJP, 2006 WL 330113, at *10 (S.D.N.Y. Feb. 14, 2006), for example, actually suffered a loss during the class period under LIFO analysis, unlike Mobley. *In re Credit Suisse-AOL Sec. Litig.*, 253 F.R.D. 17, 24 (D. Mass. 2008) did not reach an analysis of whether the plaintiff suffered loss.

claims are not typical of the proposed class. *See, e.g., In re Comdisco Sec. Litig.*, 150 F. Supp.2d 943, 945 (N.D. Ill. 2001) (rejecting lead plaintiff whose "Class Period sales at inflated prices caused it to derive unwitting benefits rather than true losses from the alleged securities fraud."). In addition, as the issue of standing is likely to consume Mobley's time, raising the potential for conflict with his duty to represent the class, Mobley is not an adequate class representative.

**B.      LeBrun**

As to proposed representative LeBrun, Defendants argue that LeBrun is not typical because he is an "in-and-out" trader who cannot establish loss causation. LeBrun purchased 300 shares on February 2, 2001 and sold all of these shares on March 12, 2001, before any alleged corrective statements. (R. 237-1 at 32.) Alternatively, Defendants argue that LeBrun is a "figurehead" plaintiff who is inadequate to serve as a class representative.

As to whether LeBrun, as an "in-and-out" trader, can establish loss causation, the Court has already found this question to be premature at this stage and not one that represents a valid reason for refusing to certify a class. *See In re Gaming Lottery Sec. Litig.*, 58 F. Supp.2d 62, 69–70 (S.D.N.Y. 1999) (collecting cases). LeBrun's situation is distinguishable from that of Mobley because under any analysis, LIFO or otherwise, LeBrun sold his 300 shares at a price $22.75 lower than the price at which he purchased shares—LeBrun suffered loss during the Class Period, and the question remains whether the alleged fraud caused that loss. Defendants have no unique defense to LeBrun's claims—LeBrun is in the same position as all other "in-and-out" traders who are putative class members (and, indeed, all class members). He is a proper member of the class so long as he can establish loss causation.

In addition, LeBrun is an adequate class representative. Defendants go to great lengths to

portray LeBrun as a passive "figurehead" who lacks a basic understanding of the litigation. Upon

reviewing the full deposition of Mr. LeBrun, however, the Court disagrees. Contrary to

Defendants' mischaracterization of LeBrun's deposition testimony, Mr. LeBrun willingly

submitted to deposition, competently described his role as a class representative, (R. 237-5 at

15:20-17:11 (under seal)); has kept in contact with Milberg attorneys for the first seven years of

this case, from 2002 to the present, (*Id.* at 32:15-33:1); and is familiar with the class allegations

and basic facts underlying the class claims. (*Id.* at 61:3-14.) Nevertheless, "[i]t is well

established that a named plaintiff's lack of knowledge and understanding of the case is

insufficient to deny class certification, unless his ignorance unduly impacts his ability to

vigorously prosecute the action." *Murray v. New Cingular Wireless Servs., Inc*., 232 F.R.D. 295,

300 (N.D. Ill. 2005) (citing *Surowitz v. Hilton Hotels Corp. et al.*, 383 U.S. 363, 86 S. Ct. 845, 15

L. Ed.2d 807 (1966)). LeBrun's testimony demonstrates that, far from being ignorant of the case,

as Defendants' suggest, he has a strong understanding of Plaintiffs' claims.

### C.      Howell & Makor

Defendants next argue that both proposed representatives Howell and Makor fail

typicality because they purchased Tellabs sock after April 18, 2001—the date on which

Defendants claim the Class Period should close. (R. 237-1 at 33–34.) As this Court has already

ruled, this factual inquiry is premature at this stage. Nor does this dispute over when allegedly

corrective statements were made public create unique defenses as to Howell and Makor—their

status as post-April 18 purchasers aligns them with all other class members who purchased after

April 18.

As to Howell's adequacy, "the burden in demonstrating that the class representative meets

this standard is not difficult . . . An understanding of the basic facts underlying the claims, some general knowledge, and a willingness and ability to participate in discovery are sufficient to meet this standard." *Murray*, 232 F.R.D. at 300 (citing *Weiner et al. v. The Quaker Oats Co.*, 98 C 3123, 1999 WL 1011381, *8 (N.D. Ill. Sept. 30, 1999)). Defendants' sole objection to Howell's adequacy is his reliance on counsel. But "it is well established that in complex actions such as securities actions, a plaintiff need not have expert knowledge of all aspects of the case to qualify as a class representative, and a great deal of reliance on the expertise of counsel is to be expected." *Wagner v. Barrick Gold Corp.*, 251 F.R.D. 112, 118 (S.D.N.Y. 2008) (collecting cases); *see In re Flag Telecom Holdings*, 245 F.R.D. at 168 (collecting cases).

As to Makor's adequacy, Defendants raise the same argument and add that Makor has failed to comply with discovery requests. Specifically, Defendants claim that David Myr, Makor's CEO, failed to produce certain emails responsive to Defendants' requests for production served in October 2006. (R. 237-1 at 18.) This failure came to light during Makor's deposition, and Mr. Makor produced the responsive documents the next day. Defendants have not claimed prejudice, and the deposition testimony does not suggest that Mr. Myr intentionally withheld these emails. Without more, the Court finds no conflict with the rest of the class and no reason to doubt that lead plaintiff Makor and its representative, David Myr—who traveled from Israel for deposition—will not vigorously pursue this case.

### D.      Adequate Representation

The Court previously appointed Plaintiffs' counsel, Milberg LLP and Miller Law LLC as lead counsel for the putative class, pursuant to the Private Securities Litigation Reform Act of

1995 ("PSLRA"). *See Johnson v. Tellabs, Inc.*, 214 F.R.D. 225, 229 (N.D. Ill. 2002).[4]

Defendants have not specifically objected to lead counsel, Milberg LLP or liaison counsel Miller Law LLC. Nonetheless, Plaintiffs request that the court reaffirm this selection of lead counsel for the certified class.

Rule 23(g) provides four criteria that a court must consider when determining whether counsel can adequately represent a class "[u]nless a statute provides otherwise." Fed. Rule Civ. P. 23(g)(1). The PSLRA provides that the "most adequate plaintiff, shall, subject to the approval of the court, select and retain counsel to represent the class." 15 U.S.C. 78u-4(a)(3)(B)(v). Although Rule 23(g) may not require the district court to apply Rule 23(g)'s criteria in securities class actions, many courts have held that "the requirements of both section 78u-4 and Rule 23 should be satisfied." *In re Luxoticca Group, S.p.A. Sec. Litig.*, No. 01-CV-3285, 2004 WL 2370650, *5 (E.D.N.Y. 2004) ("To ignore Rule 23 would be to waste judicial resources and ultimately probably delay disposition"); *see also Johnson v. Pozen Inc.,* No. 1:07CV599, 2008 WL 474334, at *3 (M.D.N.C. Feb. 15, 2008) (Rule 23(g) guides the district court's analysis); *Goplen v. 51JOB, Inc.*, 2005 WL 1773702, at * 2 (S.D.N.Y. July 26, 2005) (same); *In re Cree, Inc., Sec. Litig.*, 219 F.R.D. 369, 373 (M.D.N.C. 2003) (same).

Applying Rule 23(g)'s criteria to this case, the Court reaffirms its previous selection of Milberg LLP as lead counsel and Miller Law LLC as liaison counsel pursuant to the PSLRA. Since appointing Milberg as lead counsel for the putative class in 2002, Milberg has committed substantial time and effort to Plaintiffs' case, shepherding it through a Seventh Circuit and

---

[4] On March 26, 2008, Plaintiffs filed a notice with the Court informing the Court and all parties that lead counsel Milberg Weiss LLP, previously Milberg Weiss & Bershad LLP, (R. 127-1), changed its name to Milberg, LLP. (R. 167-1).

Supreme Court appeal. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 437 F.3d 588, 603-05

(7th Cir. 2006), *vacated in part by* 551 U.S. 308, ----, 127 S. Ct. 2499, 2509, 168 L. Ed.2d 179

(2007), *on remand at* 513 F.3d 702, 705 (7th Cir. 2008). Both Milberg and Miller have

competently and vigorously represented Plaintiffs and the putative class members, and

Defendants have not suggested that either firm is unqualified counsel. In addition, other courts

have noted that Milberg has perhaps "unrivaled experience in securities class actions." *In re Flag

Telecom Holdings*, 245 F.R.D. at 163. Milberg and Miller are thus appropriate lead counsel

under both Rule 23(g) and the PSLRA.

## CONCLUSION

Fore the foregoing reasons, the Court grants Plaintiffs' motion for class certification,

appointment of class representatives, and appointment of class counsel, but disqualifies Alan

Mobley from serving as a class representative. Pursuant to Rule 23, the Court certifies the

following class:

> All persons who purchased the common stock of Defendant Tellabs during the
> period from December 11, 2000 through June 19, 2001, inclusive (the "Class
> Period"). Excluded from the Class are Defendants; the subsidiaries and affiliates
> of Tellabs; the officers and directors of Tellabs or its subsidiaries or affiliates, at
> all relevant times; members of the immediate family of any excluded person; the
> legal representatives, heirs, successors, and assigns of any excluded person; and
> any entity in which any excluded person has or had a controlling interest.

In addition, the Court appoints Milberg LLP as lead class counsel, Miller Law LLC as liasion

counsel, and Richard J. LeBrun, Nolan Howell, and lead plaintiff Makor Issues & Rights, Ltd. as

class representatives.

DATED:  February 23, 2009    **ENTERED**

            AMY J. ST. EVE
            United States District Court Judge