**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| MAKOR ISSUES & RIGHTS, LTD., ) <br> CHRIS BROHOLM, RICHARD LEBRUN, ) <br> *et al.*, ) <br>             Plaintiffs, ) <br> ) <br>       v. ) <br> ) <br> TELLABS, INC., MICHAEL J. BIRCK, ) <br> RICHARD C. NOTEBAERT, *et al.,* ) <br> ) <br>             Defendants. ) | Case No. 02 C 4356 <br><br> Honorable Judge Amy J. St. Eve |

**MEMORANDUM OPINION AND ORDER**

AMY J. ST. EVE, District Court Judge:

Before the Court is Defendants' motion to exclude the expert testimony of Dr. Arthur Brody. Specifically, Defendants have moved to strike Dr. Brody's testimony regarding what conclusions Tellabs should have drawn from publicly available information regarding its sales forecasts and guidance because 1) he is not qualified to render such opinions; 2) he did not follow an appropriate methodology in reaching his opinions; and 3) he did not follow or apply his methodology in any reliable or scientific manner. As discussed in detail below, Defendants' motion is granted in significant part.

BACKGROUND

**I.    Background of Dr. Brody**

Dr. Brody has a Ph.D. in physics from Stony Brook University in 1978. From 1981 to 1985, Dr. Brody worked at AT&T Bell Laboratories as a Technical Manager where he was "lead engineer in R&D area where he was responsible for network Operations, Administration, Maintenance and Provisioning products and procedures for leased line service assurance." (R.

304-2, Curriculum Vitae ("CV"), at 11.) From 1985 to 1988, Dr. Brody worked at Technicom Systems, Inc. as Vice President of Marketing and Sales. (*Id.*) Technicom was a subsidiary of TIE/communications and provided network monitoring, cable pressurization and loop test products. From 1988 to 1990, he was the Director, New Products at ADK Pressure Equipment Corp., where he directed development and release of four new products resulting in several large contracts and entrance into new markets. (*Id.*) Starting in 1990 through the present, Dr. Brody was the Principal Consultant at A.T. Brody & Associates, Inc. ("A.T. Brody"), a "high tech consulting firm specializing in telecommunications, networking and multimedia issues, business and engineering management, and market analysis." (*Id.*) Dr. Brody is the sole owner and employee of A.T. Brody. (R. 310-2, Deposition of Dr. Brody ("Dep.") at 6-7.) Approximately 80%-90% of Dr. Brody's income over the past year has come from testifying and consulting in intellectual property cases.

In addition, Dr. Brody is a member of the Institute for Electrical and Electronics Engineers ("IEEE"), the IEEE Communications Society, the Product Development & Management Association, the American Physical Society, the American Association for the Advancement of Science, and the Sigma Chi Scientific Research Society. (R. 304-2, CV.)

Dr. Brody is not an expert in economics, did not train in economics, and has not taken any courses in company forecasting. (Dep. at 345.) While he has served as an expert witness in other cases, in each of these cases he was an expert in intellectual property issues. He has never served as an expert in the area of forecasting, and no court has qualified him as such. In addition, Dr. Brody has never rendered an opinion on the subject matter of company forecasting. (Dep. at 128-29.) Dr. Brody also conceded that he has never been involved in giving guidance

2

for a public company. (Dep. at 279.).

From approximately 2002 to 2005, Dr. Brody, along with another individual, taught classes at Sequent Learning Networks, a private training and consulting firm. Dr. Brody taught an introductory course to product management at Sequent Learning that lasted approximately three days. (Transcript of Hearing on Motion to Exclude Expert Testimony of Dr. Brody ("Tr."). at 16-20) He taught this course three or four times during the 2002 to 2005 time period. (Tr. at 52.) During this introductory course, he taught product forecasting for approximately two or three hours. (Tr. at 155.) Dr. Brody prepared the materials for this course based on his background. (Tr. at 156.)

## II. Dr. Brody's Opinions In this Case

Plaintiffs have disclosed Dr. Arthur Brody as their expert witness to opine on the reasonableness of Tellabs' financial forecasts given the publicly available information during the time Tellabs issued its forecasts. Plaintiffs contacted Dr. Brody on approximately May 18, 2009 to issue his report by June 30, 2009. Dr. Brody issued his report on June 30, 2009. As he testified, he had approximately six weeks to familiarize himself with the case, research his opinions, and issue his report. He also issued a supplement report on September 11, 2009[1].

As Dr. Brody notes in his report:

> I have been asked to provide in this report a description of the overall telecommunications market conditions that Tellabs, its customers and its competitors were subject to for the relevant time frame and I have also been asked to identify information publicly available to Tellabs during the relevant time frame, and to opine on what conclusions Tellabs should have drawn from this information with respect to its sales forecasts and guidance to the investing public.

---

[1] On October 6, 2009, the Court struck portions of Dr. Brody's rebuttal report.

(R. 304-1 at 1.) In his report, Dr. Brody summarized his conclusions as follows:

> Summary of Conclusions:
>
> As early as the third quarter of calendar year 2000, telecommunications market analysts were warning investors that CAPEX spending by TSPs and dot.com companies could not continue. The return on investment did not justify the continued expenditures. Moreover, the telecommunications regulatory environment of the late 1990s in the United States had increased competition in many market segments resulting in pricing pressures that would moderate revenue growth. In the second half of calendar year 2000 and continuing into 2001, many of Tellabs' TSP customers warned of slower revenue growth, shrinking earnings and reduced CAPEX spending. Tellabs' competitors, competing for the same customers with similar products, also issued downward guidance, many revising revenue and earnings estimates downward during this period, or missing analyst estimates in their quarterly reports. Tellabs was subject to the same deteriorating market conditions that were adversely affecting its competition (and its customers) in 2000 and 2001 despite Tellabs' statements to the contrary.
>
> On December 11, 2000, Tellabs reconfirmed its objectives of 30 percent revenue growth and 30 percent earnings per share ("EPS") growth (30/30) for 2001. From December through March 2001, Tellabs maintained its 30/30 guidance to the public as the telecommunications market collapse accelerated. On April 6, 2001, Tellabs lowered both its revenue and EPS guidance for the first quarter of 2001, but provided no guidance for the remainder of 2001. Following the first quarter, sales plummeted sequentially in the second and third quarters of 2001. On July 18, 2001, Tellabs reported a sequential quarterly revenue decrease of over 30 percent and a quarterly loss per share, while not providing any guidance for third quarter 2001.
>
> Based on the information publicly available, Tellabs should have known throughout the Class Period that revenue and earnings growth of 30 percent for 2001 were not achievable and had no realistic basis.

(R. 304-2 at 6.)

On May 20, 2010, the Court held a hearing on Defendants' motion. During that hearing, Dr. Brody testified for over three hours.

**III.     Rule 702 and *Daubert* Standards**

Federal Rule of Evidence 702 provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of opinion or otherwise." Fed. R. Evid. 702. Rule 702 "also requires that: (1) the testimony must be based upon sufficient facts or data; (2) it must be the product of reliable principles and methods; and (3) the witness must have applied the principles and methods reliably to the facts of the case." *Happel v. Walmart Stores, Inc.,* 602 F.3d 820, 824 (7th Cir. 2010). It requires that the district court serve as a "'gate-keeper' who determines whether proffered expert testimony is reliable and relevant before accepting a witness as an expert." *Winters v. Fru-Con Inc.*, 498 F.3d 734, 741-42 (7th Cir. 2007) (quoting *Autotech Tech. Ltd. P'ship v. Automationdirect.com*, 471 F.3d 745, 749 (7th Cir. 2006)). The purpose of the court's gate-keeping function is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999).

The parties dispute the appropriate standard to apply to experts whose opinions are non-scientific. Plaintiffs suggest that the Court's "admissibility analysis is more liberal when proposed expert testimony, such as Dr. Brody's proposed testimony, is based on judgments and assessments derived from professional experience and knowledge" rather than well-recognized scientific discipline. (R. 322, Pls.' Mem. at 4.) To the contrary, non-scientific expert testimony does not alter the Court's gatekeeping function. "*Daubert*, as extended to all expert testimony

including non-scientific expert testimony, requires the district court to perform the role of gatekeeper and to 'ensure the reliability and relevancy of expert testimony.'" *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 607 (7th Cir. 2006), quoting *Kumho*, 526 U.S. at 152, 119 S. Ct. 1167. Indeed, an expert's testimony must rest "on a reliable foundation" and be "relevant to the task at hand." *Kumho*, 526 U.S. at 141, 119 S. Ct. 1167 (citations and quotations omitted).

In assessing whether an expert's testimony is reliable, *Daubert* lists a number of considerations — including testing, peer review, error rates, and acceptability in the relevant scientific community. *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 593-94, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). The Supreme Court, however, has clearly stated that "the test of reliability is flexible, and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Kumho*, 526 U.S. at 141, 119 S. Ct. 1167 (internal quotation omitted). This is especially true when the expert's opinions are non-scientific in nature and do not follow traditional scientific testing. "[T]he test for reliability for nonscientific experts is 'flexible' and ... *Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *United States v. Romero*, 189 F.3d 576, 584 (7th Cir. 1999), quoting *Kumho Tire*, 536 U.S. at 141. "Rather the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Id.* at 142, 119 S. Ct. 1167 (emphasis in original).

In addition, the 2000 Advisory Committee's Notes to Rule 702 suggest additional criteria for gauging expert reliability, including whether: (1) "maintenance standards and controls" exist; (2) the testimony relates to "matters growing naturally and directly out of research they have conducted independent of the litigation," or developed "expressly for purposes of testifying"; (3)

"the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion"; (4) "the expert has adequately accounted for obvious alternative explanations"; (5) "the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting"; and (6) "the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give." *Fuesting v. Zimmer, Inc.*, 421 F.3d 528, 535 (7th Cir. 2005) (citations omitted), *vacated in part on other grounds*, 448 F.3d 936 (7th Cir. 2000) (quoting Fed. R. Evid. 702 advisory committee's note (2000)). *See also American Honda Motor Co., Inc. v. Allen*, 600 F.3d 813, 817 (7th Cir. 2010). "The proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard" by a preponderance of the evidence. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

An expert may be qualified to render opinions based on experience alone. "In certain fields, experience is the predominant, if not the sole basis for a great deal of reliable expert testimony." Advisory Committee Notes to Rule 702. The Seventh Circuit has repeatedly stated that "genuine expertise may be based on experience or training." *United States v. Conn,* 297 F.3d 548, 556 (7th Cir. 2002), quoting *Tyus v. Urban Search Mgmt.,* 102 F.3d 256, 263 (7th Cir. 1996). "[W]hile extensive academic and practical expertise in an area is certainly sufficient to qualify a potential witness as an expert, Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience." *Trustees of Chicago Painters and Decorators Pension, Health and Welfare, and Deferred Sav. Plan Trust Funds v. Royal Intern. Drywall and Decorating, Inc.*, 493 F.3d 782, 787-88 (7th Cir. 2007) (citations and quotations omitted). As such, courts "consider a proposed expert's full range of practical

experience as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area." *Id.,* quoting *Smith v. Ford Motor Co.,* 215 F.3d 713, 718 (7th Cir. 2000).

Furthermore, "possessing requisite credentials alone is not enough to render expert testimony admissible." *Fuesting v. Zimmer, Inc.*, 421 F.3d 528, 535 (7th Cir. 2005) (citations omitted), *vacated in part on other grounds*, 448 F.3d 936 (7th Cir. 2006). A district court must "assess the reliability of the methodology the expert has employed in arriving at his opinion." *Id.*

## ANALYSIS

**I.     Dr. Brody's Methodology Was Unreliable**

Defendants contend that Dr. Brody's methodology is flawed.[2] The Court agrees. In reaching his opinions, Dr. Brody relied on his "background and experience-based knowledge." (R. 304-2 at 6.) In order to determine the reasonableness of Tellabs' forecasts**,** Dr. Brody "searched the Internet using 'Google' and 'Bing' search engines for background articles on the state of the telecommunications and related dot.com industries to determine what information was publicly available during the relevant time period." (Tr. at 25-26.) His search focused on the second half of 2000 and the first half of 2001. In addition, he "searched for similar publicly available information from Tellabs' customers and competitors, and relied on publicly available information regarding them in reaching his opinions." (R. 304-2 at 7.) While Dr. Brody had access to "all documents and discovery obtained in discovery," (*id.* at 6), he made clear during

---

[2] Because the Court is striking Dr. Brody's opinions based on his unreliable methodology, the Court need not address whether Dr. Brody is qualified to render such opinions in this case.

his deposition and the *Daubert* hearing that he did not review the majority of the documents provided to him from the discovery materials. (R. 310-2 at 47.) He only "scanned through" the depositions of Mr. Notebaert and Ms. Ryan (Tellabs' CFO), and conceded that he did not read them. (*Id.* at 49.) He did not look at the other 21 depositions in this case to which he had access. (Tr. at 46-47.) Significantly, Dr. Brody testified that he did not find anything Mr. Notebaert or Ms. Ryan had to say relevant to his opinions. In addition, Dr. Brody did not even read the deposition transcript of Chris Pfefferle, the head of Tellabs' Global Forecasting Organization. (*Id.* at 52.) He conceded that he did not read any testimony about how Tellabs prepared its forecast. (Tr. at 124.) Furthermore, Dr. Brody did not read any of the deposition exhibits from the discovery in this case in reaching his opinions. (Dep. at 52.)

Dr. Brody admitted during his deposition that he "frankly didn't have time to read most" of the documents produced from the *Brieger* case, a related ERISA case, which raised issues regarding the reasonableness of Tellabs' projections. (*Id.;* Tr. at 103.) He did not read the analysts reports provided during discovery, and could not recall if he read the newspaper articles regarding Tellabs provided during discovery, although he may have found the articles independently. (*Id.* at 58-59.)

During his deposition, Dr. Brody explained that he "was looking for articles that showed that there was turmoil both in the dot-com and telecom industries, even as early as the beginning of 2000." (R. 310-2 at 70.) Significantly, he conceded that while he may have reviewed articles that contained positive statements about the industry at the time, he did not cite to any such articles in his report. (*Id.* at 70-71.) Dr. Brody only relied on articles with some negative component regarding the industry. (Tr. at 124.) During the *Daubert* hearing, Dr. Brody

9

conceded that he did not cite any positive articles from one of Tellabs' closest competitors, Alcatel. (Tr. at 129-31.) During the same time period, Alcatel officials said its telecom units would post sales growth of 35 to 40 percent in 2000 and 25 percent in 2001. (Tr. at 132-36.) Yet, Dr. Brody did not include this positive information in reaching his opinions. Neither did he include other positive information from the telecom industry. (Tr. at 161-62.) Dr. Brody failed to adequately explain why he ignored these positive articles and press release. *Cummins v. Lyle Indus.*, 93 F.3d 362, 368 (7th Cir. 1996) ("An expert scientific opinion ... must consist of more than simply subjective belief or unsupported speculation.") (citations and quotations omitted). He admitted that he was looking simply for articles to support his opinion – which included only negative articles about the industry.

Furthermore, although he opined on the reasonableness of Tellabs' financial forecasts, Dr. Brody neither knew the process that Tellabs followed in making its forecasts, nor reviewed any aspects of that process in connection with his opinions. (Dep. at 152-54, 302-03.) He is not aware of what information Ms. Pfefferle had, what she looked at in the public marketplace, or how she rendered the forecasts. (Dep. at 302.) In reaching his opinions, Dr. Brody also did not rely on any internal Tellabs' documents describing how Tellabs put its forecasts together. (Dep. at 154.)

In addition, Dr. Brody offered nothing to support this methodology, other than his rather limited experience and training in the area.[3] Yet as addressed below, even Dr. Brody did not follow the methodology that he employs when teaching forecasting and creating his own

---

[3] As Defendants point out, Dr. Brody did not record what articles he reviewed or what search terms he used during his review. He failed to keep track of the documentation that he reviewed and could not remember precisely what he looked at. As a result, Defendants cannot replicate his methodology. *Lang v. Kohl's Food Stores, Inc.*, 217 F.3d 919, 924 (7th Cir. 2000).

forecasts. In essence, there is nothing to support Dr. Brody's methodology of looking only to publicly-available information to determine the reasonableness of a company's public guidance. Plaintiffs – who bear the burden of establishing the admissibility of Dr. Brody's testimony – have not identified any evidence that Dr. Brody's methodology of looking only to publicly-available information to determine the reasonableness of a company's public guidance is generally accepted and employed by experts in the field. *See Deimer v. Cincinnati Sub-Zero Prods.*, 58 F.3d 341, 344-345 (7th Cir. 1995) (district court properly held that expert's opinion was unreliable where there was "no supporting methodology or protocol of any kind to render his opinion reasonable or credible"). Even Dr. Brody did not know whether market participants used similar sources in preparing their forecasts. (Dep. at 75-76.) Plaintiffs also failed to submit any evidence to support simply focusing on negative publicly available information when applying this methodology.

Furthermore, Plaintiffs have not offered any articles, texts, studies, literature, or other published writings to support this one-sided methodology. Dr. Brody conceded that he is not aware of any literature or treatises in the field of forecasting that recommend evaluating the reasonableness of a company's sales forecasts for existing products based solely on public information, much less only negative publicly available information. (Tr. at 109.) There is no evidence that Dr. Brody's methodology has ever been used, much less recognized as appropriate.

Plaintiffs contend that the Court should let the jury assess Dr. Brody's credibility and his potential bias. This argument, however, ignores the gatekeeper function of the Court under *Daubert*. Dr. Brody's one-sided methodology does not meet the mandates of *Daubert*. Because Dr. Brody's methodology is fundamentally flawed and his opinions in this area are inherently

11

unreliable, he may not opine at trial regarding the state of the telecom industry during the 2000-2001 time period or the reasonableness of Tellabs' forecasts during that period.

**II.     Dr. Brody Did Not Follow His Own Methodology**

Significantly, Dr. Brody relied solely on his experience and knowledge in giving his opinions in this case. He testified about his teaching experience at Sequent Learning. Dr. Brody, however, did not even follow the methodology in this case that he teaches. Dr. Brody testified that he teaches a "best of breed" methodology for developing and evaluating company-specific forecasts at Sequent Learning Networks. The best of breed methodology relies on an overall assessment of numerous data points, including market data as well as internal sales data. Dr. Brody teaches "several different approaches to sizing a market and determining your sales. So that's bottom up where you take your forecast from your salespeople and then you're top down when you look at the market as a whole and try to derive sales for products based on general economic factors, technology factors and other issues." (Dep. at 141-42.) Dr. Brody has never recommended to his class that they perform only top down sales forecasts without conducting a "bottoms-up" forecast. Instead, he "said that you should be relying on what's called a cross-functional team approach where marketing has a dual function. Marketing should both be looking at the market information in general, providing you – and this is inbound marketing - providing you information in general from the marketplace, and going in and actually talking to customers themselves, separate from the salespeople, asking them about what their problems are and what issues can be solved as opposed to trying to sell them products." (Dep. at 147-48). As he explained, he teaches that proper sales forecasting techniques rely "on the quality of the data you're getting in and the ability of the product manager themselves to put

it together properly." (Dep. at 151.) Furthermore, Dr. Brody admitted that he would never tell one of his students to just look at publicly available market data when putting together sales forecasts. (*Id.*) It is important, according to Dr. Brody, to take all available information into account. (Tr. at 136-37.) Yet, he failed to follow that process here.

Similarly, when at Technicom and at ADK in the 1980s, Dr. Brody prepared some forecasts for specific products. He did not prepare or evaluate these forecasts, however, using the method he employed here. When he reviewed the business plan for MSI in 2002, including the forecasts, he did not employ the methodology he used here. In fact, Dr. Brody did not identify a single instance where he followed the methodology he applied in this case, even though he claims that the methodology he employed here is based on his experience. Dr. Brody admitted that he has never written an objective report for a client that only contained negative market information. (Tr. at 71-72.)

Dr. Brody further admitted that he has never taught his students that forecasts can be challenged solely on the basis of publicly available information. (Tr. at 137.) Nonetheless, Dr. Brody did precisely that in reaching his opinions on Tellabs' forecasting. He simply looked at publicly available information – almost exclusively negative information – and rendered his opinions. He did not look at or rely on any data from Tellabs' salespeople or any other internal Tellabs' data, even though he testified that Tellabs should have taken its internal information into account when making its forecasts. (Tr. at 138.) Dr. Brody did not rely on any internal documents that described how Tellabs put its forecasts together. (Dep. at 154.) In sum, he certainly has not "employed in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Cov.*, 526 U.S. at 152.

13

*See Winters v. Fru-Con* Inc., 498 F.3d 734, 742 (7th Cir. 2007). *See also In re Fosamax Products Liability Litig.*, 645 F.Supp.2d 164, 187-88 (S.D.N.Y. 2009) (excluding expert opinions on causation where expert failed to apply "the same level of intellectual rigor that characterizes his work ... in the field"). Indeed, "[t]he *Daubert* standard and Rule 702 are designed to ensure that, when expert witnesses testify in court, they adhere to the same standards of intellectual rigor that are demanded in their professional work." *Chapman v. Maytag Corp.*, 297 F.3d 682, 688 (7th Cir. 2002). Accordingly, the Court excludes his opinions.

**III.    Dr. Brody's "Other" Opinions**

Plaintiffs claim that Dr. Brody should be permitted to testify about his remaining opinions. These opinions amount to general background information regarding how the telecommunications industry works. Plaintiffs, however, have failed to identify precisely what disclosed opinions fall within this category. Plaintiffs must submit their proposal as to these disclosed opinions with the final pre-trial order in this case.

## CONCLUSION

For the foregoing reasons, the Court grants in significant part Defendants' motion to strike the expert report of Dr. Brody.

Dated: June 23, 2010

_____
AMY J. ST. EVE
U.S. District Court Judge

14