**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MAKOR ISSUES & RIGHTS, LTD., | ) | |
| CHRIS BROHOLM, RICHARD LEBRUN, | ) | |
| *et al.*, | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 02 C 4356 |
| v. | ) | |
| | ) | Honorable Judge Amy J. St. Eve |
| TELLABS, INC., MICHAEL J. BIRCK, | ) | |
| RICHARD C. NOTEBAERT, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

AMY J. ST. EVE, District Court Judge:

Before the Court is Defendants Tellabs, Inc. ("Tellabs"), Michael J. Birck, Brian J.
Jackman, Richard C. Notebaert, and Joan A. Ryan's (collectively "Defendants") Motion for
Summary Judgment. Defendants seek summary judgment on each of the remaining claims set
forth in Plaintiffs Makor Issues & Rights, Ltd., Chris Broholm, and Richard Lebrun, *et al.*'s
(collectively "Plaintiffs") Second Amended Consolidated Class Action Complaint
("Complaint"). For the following reasons, the Court grants in large part and denies in part
Defendants' motion for summary judgment and grants in part and denies in part Defendants'
Motion to Strike.

## BACKGROUND

### I.      Procedural History

This case has a long procedural history. In June 2002, Plaintiffs filed a putative class
action lawsuit on behalf of various individuals and persons who purchased common stock of
Defendant Tellabs between December 11, 2000 and June 19, 2001 pursuant to § 10(b) of the

Securities and Exchange Act of 1934 ("Section 10(b)") and SEC Rule 10b-5, 17 C.F.R. §

240.10b-5 ("Rule 10b-5"). The Court has jurisdiction over this matter pursuant to 15 U.S.C. §

78aa and 28 U.S.C. §§ 1331 and 1337, and venue is proper in this district pursuant to 28 U.S.C.

§ 1391(b). (R. 336-1, ¶ 4.)

Initially, the Court granted Defendants' motion to dismiss Plaintiffs' complaint in its

entirety, but permitted Plaintiffs to amend. *See Johnson v. Tellabs, Inc.*, 262 F. Supp. 2d 937,

939 (N.D. Ill. 2003) (*Johnson I*). Shortly thereafter, Plaintiffs filed the operative Complaint,

which contained additional factual allegations. (*See* R. 63-1; *see also Johnson v. Tellabs, Inc.*,

303 F. Supp. 2d 941, 945 (N.D. Ill. 2004) (*Johnson II*)). After determining that the Complaint

failed to properly plead an underlying 10b-5 violation, and reasoning that the remaining

allegations were dependent on an underlying 10b-5 violation, the Court granted Defendants'

motion to dismiss each count of the Complaint, with prejudice. *Johnson II*, 303 F. Supp. 2d at

971. On appeal, the Seventh Circuit affirmed in part and reversed in part, holding that Plaintiffs

sufficiently had pled claims under § 10(b) against Defendants Tellabs and Notebaert and

properly had pled control person liability claims under § 20(a) against both Notebaert and Birck.

*See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 437 F.3d 588, 603-05 (7th Cir. 2006) (*Makor I*).

The Court of Appeals took no position on Plaintiffs' § 20(a) insider trading claim against

Defendant Birck. *Id.* at 605 ("No party in this litigation has provided more than cursory briefing

of this issue, and therefore we take no position on its resolution, leaving it for further factual and

legal development during the course of the litigation."), *modified by* 2006 U.S. App. LEXIS

17252 (7th Cir. 2006). The Supreme Court reversed the Seventh Circuit's interpretation of the

*scienter* requirement of a § 10(b) claim and remanded the case for further review consistent with

2

the Supreme Court's clarifications. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499,

2509 (2007) (*Makor II*). On remand from the Supreme Court, the Seventh Circuit adhered to its

prior decision in *Makor I* and remanded the case to this Court. *Makor Issues & Rights, Ltd. v.

Tellabs Inc.*, 513 F.3d 702, 705 (7th Cir. 2008) (*Makor III*).

On February 25, 2008, the parties filed a Joint Status Report identifying their positions

regarding the remaining claims and defenses in the case. The parties reported that, as it currently

stood, the Complaint alleged: (i) Section 10(b) and Rule 10b-5 claims against Notebaert and

Tellabs, (ii) Section 20(a) control person liability claims against Notebaert, Birck, Jackman, and

Ryan, and (iii) Section 20(a) insider trading claims against Birck. The parties agreed that the

four categories of alleged misrepresentations that remained at issue in the lawsuit were: (i)

statements regarding Tellabs's financial results for fourth quarter 2000 and full year 2000, (ii)

statements regarding the TITAN 5500, (iii) statements regarding the TITAN 6500 system, and

(iv) Tellabs's projections of earnings and revenues during 2001. (R. 149-1, Joint Status Report

at 2-4.)

On May 23, 2008, after Defendants filed a renewed motion to dismiss, the Court

dismissed Plaintiffs' § 20(a) claim for insider trading against Birck for failure to state a claim

under 15 U.S.C. § 78t-1(a). *See Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 2008 WL 2178150,

2008 U.S. Dist. LEXIS 41539, *7 (N.D. Ill. May 23, 2008). On June 17, 2008, Defendants filed

their answer and defenses to the Complaint. (R. 195-1.) On February 23, 2009, the Court

granted Plaintiffs' motion for class certification, appointment of class representatives, and

appointment of class counsel. (R. 256-1, Memorandum Opinion and Order.) The Court entered

an order certifying a class consisting of: "All persons who purchased the common stock of

Defendant Tellabs during the period from December 11, 2000 through June 19, 2001, inclusive

(the 'Class Period').  Excluded from the Class are Defendants; the subsidiaries and affiliates of

Tellabs; the officers and directors of Tellabs or its subsidiaries or affiliates, at all relevant times;

members of the immediate family of any excluded person; the legal representatives, heirs,

successors, and assigns of any excluded person; and any entity in which any excluded person has

or had a controlling interest." *Id.* at 26.  The Court also appointed Makor Issues & Rights, Ltd.

Lead Plaintiff pursuant to 15 U.S.C. § 78(u)-4.  Chris Broholm, Richard LeBrun, David Leehey

and Patricia Morris (now deceased) are additional named Plaintiffs.  The named Defendants are

Tellabs, Michael J. Birck, Richard C. Notebaert, Brian Jackman and Joan Ryan.

On October 16, 2009, Plaintiffs filed a Notice of Intent Not to Pursue Certain Allegations

Further in this Action ("Notice of Intent").  (R. 284-1, Notice of Intent.)  Plaintiffs indicated their

intention not to pursue certain allegations of misrepresentation based on statements concerning

the TITAN 6500 under § 10(b) and Rule 10b-5 promulgated thereunder.  *Id.* at 1-2.  On October

22, 2009, Defendants moved the Court to dismiss all allegations concerning allegedly false or

misleading statements regarding the TITAN 6500 and to enter judgment in their favor.  (R. 288-

1, Motion to Dismiss.)  The Court found that Defendants failed to establish that dismissal and

judgment were warranted on the TITAN 6500 claims, but held that Plaintiffs were barred from

pursuing the § 10(b) allegations of misrepresentation concerning the TITAN 6500.  (R. 311-1,

Minute Entry, p. 3.)

As a result of this procedural history, three categories of alleged misrepresentations

remain at issue in this lawsuit:  (i) statements regarding Tellabs's financial results for fourth

quarter 2000 and full year 2000, (ii) statements regarding the TITAN 5500, and (iii) Tellabs's

4

projections of earnings and revenues during 2001. Defendants now seek summary judgment on each of these claims contained in the Complaint.

## II.      Northern District of Illinois Local Rule 56.1

When determining summary judgment motions, the Court derives the background facts from the parties' Local Rule 56.1 statements. Specifically, Local Rule 56.1 assists the Court by "organizing the evidence, identifying undisputed facts, and demonstrating precisely how each side propose[s] to prove a disputed fact with admissible evidence." *Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 527 (7th Cir. 2000). Local Rule 56.1(a)(3) requires the moving party to provide "a statement of material facts as to which the moving party contends there is no genuine issue." *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009). "The opposing party is required to file 'a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon.'" *Id.* (citing N.D. Ill. R. 56.1(b)(3)(B)). In addition, Local Rule 56.1(b)(3)(C) requires the nonmoving party to present a separate statement of additional facts that require the denial of summary judgment. *See Ciomber v. Cooperative Plus, Inc.*, 527 F.3d 635, 643-44 (7th Cir. 2008). Pursuant to the Local Rules, the Court will not consider any additional facts proposed in the nonmoving party's Local Rule 56.1(b)(3)(B) Response, but instead must rely on the nonmovant's Local Rule 56.1(b)(3)(C) statement of additional facts when making factual determinations. *See id.* at 643; *Cichon v. Exelon Generation Co., L.L.C.*, 401 F.3d 803, 809 (7th Cir. 2005) ("Local Rule 56.1 requires specifically that a litigant seeking to oppose a motion for summary judgment file a response that

contains a separate 'statement … of any additional facts that require the denial of summary judgment.'") (internal citation omitted).

Moreover, the purpose of Rule 56.1 statements is to identify the relevant evidence supporting the material facts, not to make factual or legal arguments, *see Cady v. Sheahan*, 467 F.3d 1057, 1060 (7th Cir. 2006), and thus the Court will not address the parties' arguments made in their Rule 56.1 statements and responses. Also, the requirements for responses under Local Rule 56.1 are "not satisfied by evasive denials that do not fairly meet the substance of the material facts asserted." *Bordelon*, 233 F.3d at 528. Further, the Court may disregard statements and responses that do not properly cite to the record. *See Cichon*, 401 F.3d at 809-10. Finally, "hearsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial." *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997). With these standards in mind, the Court turns to the parties' Local Rule 56.1 statements.

## III.   Evidentiary Objections

Both Plaintiffs and Defendants contend that portions of the opposing parties' statements of material facts are deficient and fail to comply with Local Rule 56.1 The Court will address each of these arguments in turn.

### A.   Defendants' Motion to Strike Portions of Plaintiffs' Response to Their Statement of Facts

In their Motion to Strike Portions of Plaintiffs' Response to Defendants' Statement of Facts and to Deem Certain Facts Admitted ("Motion to Strike"), Defendants first argue that Plaintiffs have provided evasive answers to paragraphs, or portions of paragraphs, 7-8, 14-15, 20-21, 29, 31-33, 35, 37, 38-41, 43, 47-48, 53-55, 64, 66, 68, 70, 73, 79-80, 82, 92 and 102 of Defendants' Rule 56.1 Statement.  (R. 342-1, Defendants' Motion to Strike, pp. 3-5, Ex. A.)

6

Specifically, Defendants argue that in each of these instances, Plaintiffs fail to admit or deny the facts alleged, and instead provide evasive responses or fail to respond entirely to the facts at issue. Defendants are correct that, in many instances, Plaintiffs have failed to respond to the facts alleged, but instead improperly dispute characterizations in the statement of facts. In response to paragraphs 7-8, for example, in which Defendants assert facts regarding the alleged "bottoms-up" process, Plaintiffs dispute that Tellabs based its guidance on a "bottoms-up" process. Plaintiffs cite facts that they assert demonstrate that Tellabs followed, at least in part, a top-down process and deny that Tellabs employed a "bottoms-up" process. Plaintiffs, however, fail to admit or deny the facts that support Defendants' contentions regarding the "bottoms-up" process. (R. 336-1, ¶¶ 7-8). While it is clear that Plaintiffs are disputing that Tellabs followed a "bottoms-up" process, Plaintiffs' response to Defendants' Rule 56.1 statement is not the proper forum for presenting arguments or additional facts. *See Ciomber*, 527 F.3d at 643-44 (a court will not consider any additional facts proposed in a nonmoving party's Local Rule 56.1(b)(3)(B) Response, but instead must rely on the nonmovant's Local Rule 56.1(b)(3)(C) Statement of Additional Facts when making factual determinations). Although the Court will not belabor a point by point analysis of each of Defendants' objections, where Plaintiffs failed to specifically admit or deny a particular fact, the Court has deemed the fact admitted.

Defendants also argue that in each instance where Plaintiffs responded to Defendants' statement of facts without a corresponding record cite, the facts should be deemed admitted. Specifically, in response to a large number of facts, *see* ¶¶ 13, 28-29, 34, 37-38, 40, 42-44, 46, 48-49, 53-56, 82, 84-85, 88-89 and 102-104, Plaintiffs, rather than providing a cite to the record in order to dispute a particular fact, instead cite to paragraphs contained in their statement of

additional facts.  This is contrary to both the letter and spirit of Local Rule 56.1.  As the Seventh

Circuit has explained:

> The requirements of such rules are not onerous, but they are exacting.  Local Rule
> 56.1 makes explicit the responding party's burden of controverting the movant's
> position with adequate citations to the record. . . . [W]e have often repeated, that a
> party contesting summary judgment has a responsibility under such rules to "highlight
> which factual averments are in conflict as well as what record evidence there is to
> confirm the dispute."  It is reasonable to assume that just as a district court is not
> required to "scour the record looking for factual disputes," it is not required to scour
> the party's various submissions to piece together appropriate arguments.  A court
> need not make the lawyer's case.

*Little v. Cox's Supermarkets*, 71 F.3d 637, 641 (7th Cir. 1995) (internal citations omitted).  Here,

directly contrary to Local Rule 56.1's requirement that a party make "specific references to the

affidavits, parts of the record, and other supporting materials relied upon," Plaintiffs' response

requires the Court to turn to its statement of facts and take the further step of verifying the

citations contained therein.  Most problematic, in many instances, Plaintiffs have cited as many

as **ninety** paragraphs of their statement of facts to support a denial of a fact proffered by

Defendants.  *See, e.g.,* R. 354-1, Pls.' Resp. to ¶ 55 (citing 75 paragraphs), ¶ 56 (same), ¶ 84

(citing 33 paragraphs), ¶ 85 (same), ¶ 103 (citing 90 paragraphs).  Due to the large volume of

citations to Plaintiffs' statement of facts, many of the cited facts do not in fact contradict the

facts posed by Defendants.  Indeed, it is unclear why Plaintiffs chose not to cite to the

evidentiary materials and other parts of the record in support of some of their denials given that,

in many instances throughout their response to Defendants' statement of facts, Plaintiffs

appropriately complied with the strictures of Local Rule 56.1.  While Plaintiffs argue that

Defendants have cited no case law prohibiting a party from cross-referencing its statement of

additional facts, the text of Local Rule 56.1(b)(3)(C) is exceedingly clear and requires "specific

8

references to the affidavits, parts of the record, and other supporting materials relied upon." Plaintiffs have failed to adhere to this Rule. Again, the Court will not belabor a point by point analysis of Plaintiffs' 104 responses, but has deemed admitted any statements to which Plaintiffs have not appropriately responded with citation to supporting evidentiary materials.

Additionally, Plaintiffs have cited to their own statement of facts where they present improper legal arguments. In paragraph 55 of their statement of facts, for example, Defendants present evidence that as a result of a forecast review, Tellabs's finance department recommended to Notebaert that Tellabs revise its public guidance downward for 2001. (R. 354-1, Pl.'s Resp. to ¶ 55.) In response, Plaintiffs argue that the revised guidance was unachievable and unrealistic despite the fact that Defendants do not make any assertions regarding the content of the guidance in ¶ 55 of their statement of facts. Accordingly, in this and many other instances, Plaintiffs' responses citing to their statement of facts are improper for the further reason that the responses contain improper legal arguments. *See Cady*, 467 F.3d at 1060.

Finally, while the deficiencies in Plaintiffs' response to Defendants' statement of facts required admission of many of the facts proffered by Defendants, "the court did not turn a blind eye to the facts elsewhere available, though it is permitted to do so by non-compliance with the local rule." *Little v. Cox's Supermarkets*, 71 F.3d 637, 641 (7th Cir. 1995). Indeed, in many instances it appears that while Plaintiffs failed to provide evidence that would specifically contradict a *fact* proposed by Defendants, in their own statement of additional facts Plaintiffs have presented facts that must be considered in conjunction with the facts presented by Defendants. Though while the Court need "not scour the record . . . to make [Plaintiffs] arguments," *Jackson v. Xerox Corp.*, 349 F. Supp. 2d 1119, 1123 (N.D. Ill. 2004), Plaintiffs have

cured some of their deficient responses by presenting evidence in their statement of additional facts which is supported by proper evidentiary citations. In addition, while Defendants criticize Plaintiffs' citations subsequent to multiple sentences, where Plaintiffs' intention for a single citation to apply to multiple preceding sentences is clear, the Court has not deemed the facts admitted for Plaintiffs' failure to use string citations.

For the foregoing reasons, the Court grants in part and denies in part Defendants' Motion to Strike.

### B.    Plaintiffs' Evidentiary Objections

Plaintiffs similarly raise a series of objections to the evidence submitted by Defendants in support of their motion for summary judgment. Plaintiffs contend that certain documents relied on by Defendants are inadmissible as business records, Defendants' Exhibits 95-97 are inadmissible hearsay, and portions of the affidavits of both Pfefferele and Notebaert are inadmissible. Because Defendants have demonstrated that each of these materials is proper evidence in support of their motion for summary judgment, the Court will not strike the evidence.

### 1.    Business Records

Plaintiffs first argue that the Court should strike the documents listed in the appendices to the declarations of Charles W.L. Kennedy and Todd Camm because they are not proper business records. Plaintiffs specifically object to the following exhibits as inadmissible as business records: Exs. 2, 3, 12, 18, 20-22, 36-38, 40, 46, 49-50, 55-57, 59-62, 64-67, 69, 75-77, 82-86, 89, 99 and 117. (R. 354-1.)

The Federal Rules of Evidence prohibit the admission of hearsay evidence – statements made out of court that are offered to prove the truth of the matter asserted. Fed. R. Evid. 801-802. Federal Rule of Evidence 803(6) sets out an exception to the rule against hearsay for business records. Under Rule 803(6), the following is excepted from the bar on hearsay:

> A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness . . . , unless the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

Fed. R. Evid. 803(6); *United States v. Given*, 164 F.3d 389, 394 (7th Cir. 1999) ("A party establishes a foundation for admission of business records when it demonstrates through the testimony of a qualified witness that the records were kept in the course of regularly conducted business activity, and that it was the regular practice of that business to make such records.").

Plaintiff argues that the Kennedy and Camm declarations fail to demonstrate the procedures under which any of the documents referenced in their affidavits were created. (R. 329-1, Pls.' Opp'n at 32-34.) "While Rule 803(6) does not require that the qualified witness be the person who prepared the record, *see United States v. Moore*, 923 F.2d 910, 915 (1st Cir. 1991), or that the witness have personal knowledge of the entries in the records, *see United States v. Lawrence*, 934 F.2d 868, 870 (7th Cir. 1991), the business records exception does require that the witness have knowledge of the procedure under which the records were created." *Collins v. Kibort*, 143 F.3d 331, 337-338 (7th Cir. 1998). Plaintiffs are correct that the Kennedy and Camm declarations fail to include any detail regarding the procedure under which the records referenced in the appendices to their declarations were created. (R. 301-1, Exs. 4, 5.)

11

Defendants, however, have supplemented their evidentiary submissions with the affidavits of the individuals who authored the documents in question or have personal knowledge of the creation of the documents and the job responsibilities of the author(s) of the document. (R. 351-1, Exs. 131, 150-58.) The declarations of Christine Pfefferle, Brian Jackman, Michael Birck, Maryangela Daum, Robert Pullen, James Roche, Joan Ryan, Tom Scottino, George Stenitzer, and Mark Striepling contain sufficient information from knowledgeable witnesses regarding the procedures under which the exhibits referenced in the Kennedy and Camm declarations -- with the exception of Exhibit 137 -- were created.[1] Specifically, the following affidavits submitted by Defendants establish that the vast majority of exhibits objected to by Plaintiffs are admissible as business records: (i) Pfefferle: Exs. 20, 24, 27-29, 41, 46-50, 53, 55-56, 59-61, 66, 75-77, 83, 85, 88-90, 128 and 147-148; (ii) Birck: Exs. 30 and 36; (iii) Daum: Ex. 84; (iv) Pullen: Exs. 31, 52 and 99; (v) Roche: Ex. 117; (vi) Ryan: Exs. 12, 21, 37, 39-40, 42, 65, 67 and 82; (vii) Scottino: Exs. 105-107, and various transcripts of Tellabs's investor relations teleconferences, including Exs. 22 and 64; (viii) Stenitzer: Tellabs's press releases and annual reports, including Exs. 2-3, 38, 62 and 69; and (ix) Striepling: Ex. 86.

Defendants, however, have failed to establish that Exhibit 137 is admissible as a business record. Exhibit 137, a document produced by Terra Nova Financial in response to a subpoena, is a third-party document. Defendants have not demonstrated that Exhibit 37 is a business record, including failing to establish that the document was incorporated into Defendants' business

---

[1] Plaintiffs also "note" that Exhibit 57 is not admissible, but admit the facts supported by Exhibit 57. Given that Exhibit 58 provides support for the same facts and Plaintiffs do not challenge the admissibility of Exhibit 58, the Court need not address Plaintiffs' objection to the admissibility of Exhibit 57

records, and therefore Defendants have not demonstrated that it is admissible under Rule

803(6).[2]

## 2. Hearsay Objections to Exhibits 95-97 and 99

Plaintiffs assert that Defendants' Exhibits 95-97 and 99 are not admissible evidence. *See*

R. 354-1, Resp. to ¶ 91. Exhibits 95 and 96 are reports prepared by industry analysts regarding

Tellabs's reported results. (R. 301-15, Exs. 95-96.) Because Plaintiffs fail to offer any argument

or cite any legal authority to demonstrate the inadmissability of these documents, it is unclear

why Plaintiffs claim these exhibits are inadmissible. Moreover, if Plaintiffs claim the documents

are inadmissible hearsay, Defendants offer the documents not for the truth of the matters

asserted, but instead to show how industry analysts used and understood the term "end user."

Exhibit 97 is a March 14, 2001 email from Cathie Kozik to a group of Tellabs's employees

---

[2] A document prepared by a third party may qualify as another business entity's business record under Rule 803(6) if that entity integrated the third-party record into its records and relied upon it in its day-to-day operations. The proponent also must satisfy the other requirements of Rule 803(6). *See, e.g., Brawner v. Allstate Indem. Co.*, 591 F.3d 984, 987 (8th Cir. 2010) ("Several other courts have held that a record created by a third party and integrated into another entity's records is admissible as the record of the custodian entity, so long as the custodian entity relied upon the accuracy of the record and the other requirements of Rule 803(6) are satisfied. . . . We agree with these courts. . . ."); *United States v. Adefehinti*, 510 F.3d 319, 326 (D.C. Cir. 2007) ("[A] record of which a firm takes custody is thereby 'made' by the firm within the meaning of the rule (and thus is admissible if all the other requirements are satisfied)."); *Air Land Forwarders, Inc. v. United States*, 172 F.3d 1338, 1342-44 (Fed. Cir. 1999) ("This court has not previously addressed the question of the foundation testimony necessary to admit documents produced by third parties not before the court under Rule 803(6) where those documents have been incorporated into another business entity's records. Other courts of appeal have addressed this situation in a number of cases and have generally held that a document prepared by a third party is properly admitted as part of the business entity's records if the business integrated the document into its records and relied upon it."); *United States v. Duncan,* 919 F.2d 981, 986 (5th Cir. 1990) (holding that medical records from hospital were the business records of the insurance company and explicitly recognizing that "there is no requirement that the [business] records be created by the business having custody of them"); *see also Columbia First Bank, F.S.B. v. United States*, 58 Fed. Cl. 333, 339 (Fed. Cl. 2003) (third-party documents can be admitted as business records if they meet the other Rule 803(6) requirements and are "shown to have been received and incorporated, to have been relied upon, and to have indicia of trustworthiness"). Satisfaction of those requirements supplies sufficient indicia of reliability to permit admission of documents prepared by third parties pursuant to Rule 803(6).

regarding statements made by Sprint executives regarding growth in demand for certain Sprint services. (R. 351-15, Ex. 97.) Plaintiffs claim that Exhibit 97 is inadmissible hearsay. (R. 354-1, Resp. to ¶ 92.) Defendants offer Exhibit 97, however, not for the truth of the matters asserted, but instead for the effect those statements had on Tellabs. *Jewett v. Anders*, 521 F.3d 818, 827 (7th Cir. 2008) (statements "offered to demonstrate the effect of [the] information on person who heard statement to explain person's actions are not inadmissible hearsay")

Plaintiffs also contend that Exhibit 99 is inadmissible hearsay because Defendants did not properly demonstrate that the document is a business record pursuant to Rule 803(6). (R. 354-1, Resp. to ¶ 46; R. 329-1, pp. 32-34.) Exhibit 99 is a presentation prepared by Robert W. Pullen entitled "The Optical Networking Group." (R. 301-16, Ex. 99.) As of the date the document was created, Pullen was the Senior Vice President of the Optical Networking Group at Tellabs. (R. 351-1, Ex. 152, ¶ 2.) While Plaintiffs contend that the relevant statement in the slide is unsubstantiated and conclusory, Pullen averred that he created the document and had direct personal knowledge of its contents, and asserted that it was the regular practice of Tellabs to create and maintain such documents in the course of its regularly conducted business. Exhibit 99 is therefore admissible. *See* Fed. R. Evid. 803(6); *United States v. Given*, 164 F.3d 389, 394 (7th Cir. 1999) ("A party establishes a foundation for admission of business records when it demonstrates through the testimony of a qualified witness that the records were kept in the course of regularly conducted business activity, and that it was the regular practice of that business to make such records.").

### 3. Pfefferle and Notebaert Declarations

In a footnote, Plaintiffs argue that the supporting declarations submitted by Pfefferle and

Notebaert are self-serving, conclusory and fail to cite to supporting deposition testimony or documentary evidence, and that the Court should therefore disregard them. Rule 56(e)(1) of the Federal Rules of Civil Procedure sets forth requirements for affidavits submitted at the summary judgment stage:

> A supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated. If a paper or part of a paper is referred to in an affidavit, a sworn or certified copy must be attached to or served with the affidavit. The court may permit an affidavit to be supplemented or opposed by depositions, answers to interrogatories, or additional affidavits.

Fed.R.Civ.P. 56(e)(1). "While personal knowledge may include inferences and opinions, those inferences must be substantiated by specific facts." *Vakharia v. Little Co. of Mary Hosp. & Health Care Ctrs.*, 62 Fed. Appx. 122, 125 (7th Cir. 2003); *Drake v. 3M*, 134 F.3d 878, 887 (7th Cir. 1998) ("Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter, rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.").

Contrary to Plaintiffs' assertions, neither Pfefferle's nor Notebaert's affidavit contains conclusory, unsubstantiated claims. In Pfefferle's affidavit, she averred that during the relevant time period she was Director of Product Management and Quality of the Optical Networking Group and, beginning in 2001, Director of Global Forecasting. (R. 301-1, Ex. 8, ¶¶ 3-4.) Pfefferle provided detailed information regarding Tellabs's "bottoms-up" process for collecting information on expected revenues and expenses in 2001. *Id.* at ¶¶ 6-8. Indeed, she specifically explained that the various product units supplied information to her or the finance department after speaking directly with Tellabs's sales force and its customers, and that the finance department and employees responsible for forecasting spoke directly with operating unit heads

and sales personnel to better understand the bases for the "bottoms-up" projections. *Id.* at ¶ 9. Because the process she describes is directly within her duties as head of forecasting, Pfefferle has made statements within her personal knowledge and there is no requirement that she cite to other portions of the record to support her affidavit. *See* Fed. R. Civ. P. 56(e). Notebaert's declaration is also directly based on his own personal knowledge. (R. 301-1, Ex. 9) Specific cites to evidentiary materials are therefore not mandated.

Finally, Plaintiffs' argument that the Court should strike the declarations of Pfefferle and Notebaert because they are "self-serving" is without merit. While the Court may strike self-serving affidavits not supported by the record in the context of a motion for summary judgment, *Ozlowski v. Henderson*, 237 F.3d 837, 840 (7th Cir. 2001), here the record reflects that both Pfefferele's and Notebaert's affidavits are based on their personal knowledge. Due to their personal knowledge of the issues, these affidavits are properly before the Court. *See Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003).

## IV. Relevant Facts

### A. Background

Tellabs is a global supplier of optical networking, broadband access, and voice-quality enhancement solutions to telecommunications carriers and internet service providers. (R. 324-1, ¶ 1.) Throughout the Class Period, Tellabs's common shares were actively traded on the NASDAQ National Market under the symbol "TLAB." *Id.* In 2000, Tellabs's Optical Networking Group accounted for approximately 64% of sales. *Id.* Statements regarding the sales of the Optical Networking Group form the basis for the majority of the allegations

contained in the Complaint. The TITAN 5500, Tellabs's principal seller in this category, was the Company's "flagship" product. *Id.*

Richard C. Notebaert was Chief Executive Officer, President, and a member of Tellabs's Board of Directors throughout the Class Period. (R. 324-1, ¶ 2.) Defendants Joan Ryan, Chief Financial Officer, Brian Jackman, President of Global Systems and Technology, and other senior executives reported directly to Notebaert on a regular basis. *Id.* Notebaert kept himself informed about Tellabs's performance, products, sales, operations, inventory levels, and industry and market conditions. *Id.* at ¶ 3. Notebaert also attended meetings at which the participants looked at Tellabs's revenue forecasts, reviewed Tellabs's press releases prior to their release, reviewed and signed the 2000 Annual Report to shareholders, spoke on behalf of the company at its investor relations teleconferences, and dealt directly with Tellabs's customers. *Id.* Notebaert left Tellabs in June 2002. *Id*. at ¶ 2. A co-founder of Tellabs, Michael J. Birck was President and CEO from 1975 until September 2000, when he became Chairman of the Board of Directors. (R. 324-1, ¶ 4.) Throughout his tenure as Chairman, Birck remained actively involved in the company's management. *Id.* After Notebaert resigned, Birck resumed his role as President and CEO. *Id.* Currently, he is Executive Chairman of Tellabs. Brian Jackman joined Tellabs as Director of Marketing in 1982. (R. 324-1, ¶ 5). During the Class Period, he was President of Global Systems and Technology and was responsible for all product planning, product management, and research and development worldwide. *Id.* He also was a member of Tellabs's Board of Directors. *Id.* Jackman left Tellabs in August 2001, shortly after the end of the Class Period. *Id*. Joan E. Ryan was Chief Financial Officer of Tellabs during the Class Period until

she left the Company in February 2003.  (R. 324-1, ¶ 6.)  According to Notebaert, he and Ryan "talked a lot . . . [a]bout everything."  *Id.*

The Court appointed Makor Issues & Rights, Ltd. ("Makor Issues"), Richard LeBrun and Nolan Howell as class representatives in this lawsuit.[3]  (R. 324-1, ¶ 7.)  LeBrun purchased 300 Tellabs shares on February 2, 2001 and sold those shares on March 12, 2001.  (R. 330-22, Ex. 1161.)  Howell purchased 600 shares on May 30, 2001 and 700 shares on June 11, 2001.  *Id.* Makor Issues bought 1000 shares on March 30, 2001 and sold those shares that same day.  The remainder of Makor Issues' trades in Tellabs stock during the class period occurred after April 18, 2001.  *Id.*

### B.  Tellabs's Forecast and Planning Process

Tellabs employed a series of internal methods for forecasting quarterly and yearly sales revenue and tracking Tellabs's actual sales as compared to those forecasts.  Tellabs engaged in an annual budgeting and planning process.  (R. 336-1, ¶ 7.)  As the first step in the process, product houses, sales teams, marketing, finance, and senior executives participated in a strategic planning exercise during which the company set preliminary targets for revenue, margins, and spending for the upcoming year.  *Id.*  Following the strategic exercise, each operating unit conducted a "bottoms-up" forecasting process.  (R. 301-1, Ex. 8, ¶ 8; R. 301-1, Ex. 10; pp. 123-28.)  During the "bottoms-up" process, each operating unit gathered information about expected demand for Tellabs's products by talking directly to the members of Tellabs's sales

---

[2]  Plaintiffs also assert in their statement of facts that the stock that the class representatives purchased was "artificially inflated by Defendants' wrongdoing."  (R. 324-1, ¶ 7.)  This type of legal argument is not proper in a Rule 56 statement and the Court will accordingly not address it.  *See Cady*, 467 F.3d at 1060.  For the same reason, the Court will also not consider the legal arguments Plaintiffs make in ¶¶ 11, 12, 17, 48, 59 and 61 of the statement of facts.  The Court will consider, however, properly supported factual assertions contained in those paragraphs.

force about what they had heard from their customers regarding impending sales. (R. 336-1, ¶ 8.) After gathering this information, each operating unit totaled the data and supplied the information regarding expected revenues and expenses to the finance department. *Id.*

To facilitate this process, in January 2001, Tellabs reorganized its marketing department and appointed Christine Pfefferle, previously responsible for forecasting for the Optical Networking Group for two years, Director of Global Forecasting. (R. 336-1, ¶ 9.) As part of the reorganization, Pfefferle became responsible for the newly formed Global Forecasting Organization. *Id.* Prior to the formation of this organization, the Tellabs employees responsible for forecasting had reported their results to the individual product houses. *Id.* Under the reorganized group, these employees reported their results directly to Pfefferle. *Id.*

After the operating units provided the expected sales information to the finance department, the finance department aggregated and reviewed the information. (R. 336-1, ¶ 10.) The finance department and employees responsible for forecasting also had discussions with and made factual inquires of operating unit heads or sales personnel as needed to better understand the "bottoms-up" projection. *Id.* at ¶ 11. To confirm the accuracy of the projections, the finance department and employees responsible for forecasting also compared the "bottoms-up" information to the historical information, market data, and other available sources of information in order to identify any potential issues and to see whether additional follow up was needed. *Id.* When new or additional data became available, the employees revised the draft operating plan accordingly. *Id.* The information provided by the operating units became the foundation for a draft operating plan submitted to the executive leadership team. *Id.* at ¶ 10. After several drafts,

the executive leadership team agreed to a final operating plan and presented the final operating

plan to the Board of Directors. *Id.* at ¶ 10.

In addition to this "bottoms-up" forecasting process, Tellabs employed a series of

internal checks called forecast sanity checks to track Tellabs's actual sales as compared to its

forecasts derived from the "bottoms-up" process. Since the mid-1990s, Tellabs's finance

department has issued forecast sanity checks at least weekly. (R. 301-1, ¶ 12.) During the last

week of the quarter, updated reports are issued and distributed daily. (R. 301-1, ¶ 12.) Joan

Ryan, head of finance, testified that she was responsible for ensuring the accuracy of the checks.

*Id.* The weekly forecast sanity checks, *inter alia,* tracked bookings to date for each product line

and calculated what percentage of the quarter's forecasted total bookings needed to be made in

order for Tellabs to meet its forecast. (R. 336-1, ¶ 77; R. 301-6, Ex. 48; R. 354-1, Resp. to ¶ 77.)

The forecast sanity checks compared the "percent yet to book" with an historical average of the

"percent yet to book" for the same week in the quarter over the previous five years. (R. 336-1, ¶

77; R. 301-1, Ex. 7, p. 76.) Tellabs calculated the historical average based on its performance

during the previous three to five years. (R. 301-1, ¶ 12.)

The parties dispute the usefulness of the forecast sanity checks in predicting sales figures

for each quarter. (R. 324-1, ¶ 105; R. 345-1, Resp. ¶ 105.) Notebaert, Jackman, Ryan and other

senior management personnel regularly received and reviewed the reports. (R. 301-1, ¶ 12.)

Jackman testified that it was his "standard practice" to review the weekly forecast sanity checks

and that he "found the document to be useful in looking at historical trends . . . ." *Id.* Ryan

testified that the forecast sanity checks were only one data point that Tellabs considered when

addressing sales, and that, during the Class Period, historical trends were becoming less and less

20

predictive of the forecast.  (R. 301-3, Ex. 18, p. 318; R. 324-1, ¶ 103.)  Rich Tatara, Marketing,

testified that his group would rely more heavily on information that they received directly from

the sales team and that, as of 2001, Tellabs was seeing its customers holding their business until

the end of the quarter.  (R. 301-2, Ex. 16, p. 191.)  The forecast sanity checks were also

presented and discussed at management team meetings in connection with the forecast.  (R. 301-

1, ¶ 13.)  One Tellabs employee explained: "So it was kind of a progress report, if you will, an

indicator of where the company stood versus the goal."  *Id.*  According to Birck, the Forecast

Sanity Check "was done along the way to make sure that there was a correlation between reality

and forecast."  *Id.*

Forecast sanity checks had some limitations.  With respect to sales, forecast sanity checks

only included information regarding orders that Tellabs had already received.  (R. 336-1, ¶ 78;

R. 554-1, Resp. to ¶ 78.)  Forecast sanity checks did not include any "bottoms-up" information

on possible orders that the sales force believed would come in later in the quarter.  (R. 336-1, ¶

78.)  In addition, Pfefferle testified that the historical averages reported by the forecast sanity

checks did not fully reflect the "hockey stick" trend, discussed in more detail below, which was

more pronounced in fourth quarter 2000, and which Ryan testified was becoming more

pronounced from the first to the third quarter as well.  (R. 336-1, ¶ 79; R. 354-1, Resp. to ¶ 79;

R. 301-3, Ex. 18, p. 82.)  Because the forecast sanity checks averaged bookings over a five-year

period, they did not capture this change in the bookings trend.  (R. 336-1, ¶ 79.)

### C.    Pre-Class Period Events

A number of Tellabs's employees raised concerns regarding slow sales of the TITAN

5500, the company's flagship product, prior to the commencement of the Class Period.  An

internal October 9, 2000 report showed that, "Titan 5500 demand was weak going into the last

few weeks of the quarter . . . ."  (R. 301-1, Ex. 1056, TEL 291602.)  While revenues for the

TITAN 5500 for the third quarter 2000 -- $482.9 million -- exceeded the July 13, 2000 forecast

of $470 million, they did not meet the September 13, 2000 or September 22, 2000 revised

forecasts of $490 million or 487.6 million.  *Id.* at TEL 291601.  In an October 16, 2000 email,

John Brots, Vice President, Global Manufacturing, wrote that, "532L revenues look terrible and

the 5500 revenue is not much better."  (R. 301-1, Ex. 1057, TEL 291637.)  Brots testified during

his deposition that he was referring to first quarter of 2000 and that he was concerned that

Tellabs would be back-end loaded that quarter, a strain on manufacturing capacity.  (R. 351-1,

Ex. 127, p. 115.)  In a November 1, 2000 memorandum to the North American Sales

organization, Pferrerle also highlighted slow TITAN 5000 sales and stated that, "We had

originally forecasted that we would need a large number of 5514DD's and 5517A's for the

3Q00.  Unfortunately, demand was low and left us with a large inventory position on these key

TITAN 5000 modules.  It would be good for the corporation if we could move these before year

end."  (R. 301-1, Ex. 1058, TEL 346263.)  In an email dated December 9, 2000 to Ryan and

Jackman, John Kohler, Tellabs's Senior Vice President, Global Business Operations, stated,

"[t]he 4th quarter continues to present significant challenges to our team.  As of today . . . we

need $142.5 million in TITAN 5500 Bookings to reach our goal."  (R. 324-1, ¶ 11.)  Finally,

Tatara testified that, "in late 2000, 2001 we started to see the start-up telephone operating

companies, largely

known as competitive local exchange carriers, CLECs, start to run into financial problems,

leading us to be concerned about their creditworthiness."  *Id.*

22

Despite these various concerns, overall sales of optical networking products, which included the TITAN 5500, were up 62.5% over the prior year for third quarter 2000, and up 49% over the prior year for fourth quarter 2000. (R. 301-5, Ex. 38, TEL 657032, R. 301-1, Ex. 2, 671554.) The forecast sanity check for the week ending December 8, 2000, just prior to the beginning of the Class Period, showed the percentage of TITAN 5500 sales yet to book for the quarter was 15.4% below the historical average (25.4% vs. 10.0%). (R. 324-1, ¶ 13.) The percentage of total product sales yet to book was 9.8% below the historical average (19.6% vs. 9.8%). *Id.*

### D. Industry Players and Market Conditions in 2000-2001

Some of Tellabs's customers were experiencing lessened demand for Tellabs's products in mid-late 2000. SBC was one of Tellabs's largest customers during the Class Period. (R. 324-1, ¶ 9.) Jim Joling, the Tellabs's employee responsible for managing the SBC account, testified that SBC's planning organization advised him that SBC intended to reduce spending at the end of 2000 and into first quarter 2001. *Id.* When asked which individual he notified at Tellabs's of this reduction, Joling responded, "I can't recall, but I – my history would've been to generate an email or memo" to the respective heads of divisions at Tellabs. (R. 301-1, Ex. 1008, p. 142.) Joling also testified that he had conversations with SBC representatives regarding overcapacity concerns on their network during first quarter 2001 and that those discussions "always centered around what particular project would have to be delayed or canceled, what long-term plans would have to be changed because of the lack of funding." *Id.* at p. 144. In addition, Nancy Sayer of Verizon, Tellabs's largest customer, also recounted that Verizon's demand started leveling out from mid-2000 to the end of 2000. (R. 301-1, Ex. 38, p. 38.) Sayer did not recall if

she relayed this information to Tellabs. *Id.* In fact, for three weeks in fourth quarter 2000 and eleven weeks in first quarter 2001, the forecast sanity checks showed that the percentage of TITAN 5500 sales yet to be booked for the quarter was greater than Tellabs's historical average. (R. 301-1, Exs. 1214. 1171-1211.)

### E. Tellabs's December 11, 2000 Guidance

On the first day of the Class Period, December 11, 2000, Tellabs hosted an analyst conference. (R. 336-1, ¶ 5.) During that conference, Tellabs provided a forecast of 30% growth in revenue and earnings per share for 2001. *Id.* Notebaert does not recall the meeting or making a statement regarding 30% growth at the meeting. (R. 301-1, Ex. 1156, Resp. to Interrogatory No. 3, p. 19.) Tellabs based this guidance on data that Tellabs had begun assembling in the early fall of 2000 during its annual budgeting and planning process. The guidance was the result of the "bottoms-up" forecasting process. (R. 336-1, ¶¶ 8-13.)

When Notebaert joined Tellabs as its CEO in September 2000, the process for developing the 2001 operating plan was already under way. (R. 336-1, ¶ 14.) At that time, Tellabs's finance department had the responsibility for coordinating the preparation of the "bottoms-up" forecasts and working with the operating units to consolidate that information. *Id.* Tellabs employees, however, did keep Notebaert informed as to the progress of the operating plan. Furthermore, once the heads of each of the operating units and the finance department had come to an agreement on the plan for 2001, they presented the plan to Notebaert as the consensus of the other executives.[4] *Id.* The December 7, 2000 iteration of the 2001 operating plan forecasted

---

[4] Plaintiffs dispute the allegations regarding Notebaert's involvement in the forecasting process and dispute that the forecasting process was a "bottoms-up" process. (R. 324-1, ¶ 100.) In each instance where Plaintiffs make this allegation, however, they rely on deposition testimony from sales personnel who testified that more senior employees or executives pushed them to make sales. LaDuca testified that Tellabs would tell him what "his number" or quota was and that Tellabs based this number on his prior year's performance. (R. 330-1,

36% revenue growth. *Id.* at ¶ 12. Accordingly, the guidance figures Tellabs presented on December 11, 2000 were the result of a consensus recommendation presented to Notebaert by his CFO, the finance department, the employees responsible for revenue forecasting for each product line, and his executive team. *Id.* at ¶ 15. Notebaert testified that he personally believed that the build-up of the operating plan as of December 2000 supported Tellabs's public guidance for 2001 of 30% growth. *Id.* Joan Ryan, Tellabs's CFO, also testified that as of December 11, 2001, based on the result of the planning process, she believed that Tellabs would achieve at least 30% growth in both earnings and revenue in 2001. *Id.* at ¶ 13.

When distributing the 2001 operating plan targets, Notebaert expressed that the targets were "'expected', if not minimum," requirements for the 2001 operating plan. (R. 301-2, Ex.12.) Indeed, several Tellabs sales personnel testified that executives informed them of their revenue targets. (R. 325-1, Ex. 1010, p. 234-35; R. 325-1, Ex. 1008, p. 125.)

### F.    Tellabs's January 23, 2001 Guidance

Plaintiffs only identify one piece of evidence between Tellabs's December 11, 2000 guidance and the reiteration of that guidance on January 23, 2001. On January 11, 2001, Birck forwarded to Notebaert, Jackman, and Ryan a UBS Warburg analysis lowering estimates for the telecom equipment sector, commenting: "In our case, I believe they have a reasonable viewpoint -- for now. While we may not see as much diminished demand as some of our contemporaries, this is going to be a trying year -- for a while, anyway." (R. 301-1, ¶ 17.)

---

Ex. 1010, pp. 234-25). Joling testified that Notebaert pulled him into his office and told him what kinds of numbers he wanted Joling to deliver. (R. 330-1, Ex. 1008, p. 125.) The cited testimony, however, does not contradict the existence of a "bottoms-up" forecasting process. Instead, the sales personnel merely assert that Tellabs provided them with a sales quota or revenue goal. *Id.; see also* R. 354-1, Resp. to ¶¶ 8, 14-15, 21, 38 and 53.

Tellabs announced its fourth quarter and full year 2000 results in a January 23, 2001 press release, issued before the market opened, and an accompanying analyst call later that morning. (R. 336-1, ¶ 16; R. 324-1, ¶ 18.) The earnings release stated that Tellabs had 38 consecutive quarters of year-over-year growth, including fourth quarter 2000, and 30% annual growth in sales and earnings from 1995-1999. (R. 336-1, ¶ 6.) According to the press release: "Strength in Tellabs's core business drove record sales and earnings in the fourth quarter of 2000." (R. 324-1, ¶ 18.) For fourth quarter 2000, Tellabs achieved sales of $1.018 billion, which represented year-over-year growth of 42%. (R. 336-1, ¶ 16.) Tellabs also achieved earnings per share of 56 cents for the quarter, or growth of 44% year-over-year. *Id.* Tellabs's Optical Networking Group, which housed the TITAN 5500 product line, reported sales of $641 million during the fourth quarter, an increase of 49% year-over year. *Id.* In total, Tellabs's fourth quarter 2000 represented its best quarter in history. *Id.* For the full fiscal year 2000, Tellabs posted net sales of $3.3 billion, an increase of 43% over 1999. *Id.* Tellabs's new income grew by 33% to $669 million and its earnings per share also grew by 33%. *Id.* Optical networking products, including the TITAN 5500, accounted for about 63% of all fourth quarter sales. (R. 324-1 ¶ 18.)

At the January 23, 2001 teleconference, during which Notebaert, Jackman, and Ryan spoke, Tellabs reiterated the 30/30 (revenue/earnings per share) guidance. (R. 336-1, ¶ 17; R. 324-1,¶ 18.) Such teleconferences were open to the public and also could be heard through a simultaneous live webcast at www.tellabs.com, or through a taped replay. (R. 324-1, ¶ 18.) The guidance presented on January 23, 2001 was lower than Tellabs's 2001 internal operating plan, finalized on January 11, 2001, which forecasted 35% revenue and 31% earnings growth for full

26

year 2001. (R. 336-1, ¶ 17.) Tellabs also reported that it began 2001 with a backlog, orders or

letters of intent that had been placed with Tellabs but scheduled to ship in 2001, of $439 million.

(R. 336-1, ¶ 18.) The backlog was Tellabs's largest year-end backlog ever and 70% higher than

its backlog entering 2000. *Id.* In reiterating Tellabs's previous forecast of 30% growth in

revenues and earnings, Ryan stated: "We are targeting revenue growth slightly higher than our

30/30 financial mantra or approximately $4.4 billion with full year growth by our product

group," "[f]rom an earnings perspective, we expect to deliver another 30% increase in 2001 . . .

," and "Tellabs's 30/30 model is very much intact and we are comfortable with these targets."

*Id.* Birck also testified that the 30/30 forecast was "realistic, yet aggressive" and that 30 percent

growth over the prior year "is a fairly challenging thing to do." (R. 301-1, Ex. 1003, p. 87.)

Plaintiffs' expert, Professor Linda Allen, found that "[t]hese optimistic statements propped up

[Tellabs's] stock price." (R. 324-1, ¶ 18.) On January 23, 2001, the price of Tellabs shares rose

$5.375 to close at $58.875. *Id.*

### G. Tellabs's March 7, 2001 Revised Guidance

The day after Tellabs issued its January 23, 2001 guidance, Tellabs's Board of Directors

met. (R. 324-1, ¶ 19.) Notebaert, Birck, Jackman, and Ryan were all present. *Id.* The Audit

Committee reported: "There are . . . a number of items to watch carefully on a going-forward

basis as the economy slows. Specifically, the accounts receivables, inventory levels and

customer financing arrangements merit special focus." (R. 301-1, Ex 1063.) Indeed, Birck

testified that as early as January 24, 2001, the Board discussed "industry concerns." (R. 301-1,

Ex. 1152, p. 1203, 1209.) Also on January 24, 2001, in an email to Notebaert, Birck, Jackman,

and Ryan, among others, attaching the most recent weekly forecast sanity check (for the week

ending January 19, 2001), Stephanie Glowacki of the finance department reported: "The achievement of the Q1 '01 forecast is dependent on an additional book & ship of $294.0M for TITAN 5500, $56.6M for MAS, $28.0M for Cablespan, and $28.0M for Echo/Coherent OEM. The scheduled shipments as of Week 3 for these products areas are below the historical averages . . . ." (R. 301-1, ¶ 19.) The same day, Kohler wrote to Jackman, Ryan, Gustafsson, and McCarthy: "Sales in the current quarter are extremely slow." *Id.*

As they had in prior quarters, Tellabs executives tracked the progress of sales in first quarter 2001. (R. 336-1, ¶ 19.) Throughout January, Tellabs's forecasting organization continued to forecast more than 30% year-over-year growth for the quarter, as well as the full year. *Id.* at ¶ 20. In response to an inquiry from Kohler regarding slow sales, on January 25, 2001, Steve McCarthy, Tellabs's Senior Vice President of Global Marketing, requested that Tellabs's Global Forecasting Organization update their first quarter forecast. *Id.* at ¶ 20. In response, Pfefferle provided him with an updated forecast using the most recently available information from the product houses.[5] *Id.* Like the process for developing the initial operating plan, the process for updating the forecast was primarily a "bottoms-up" process. The forecasting group worked with the sales force and product houses, who in turn worked with customers to identify and track potential sales opportunities. *Id.* Once a sales opportunity was identified, an employee placed the opportunity into a tracking system, referred to as the "pipeline." *Id.* For each sales opportunity, the pipeline listed the name of the customer,

---

[5] Plaintiffs dispute that Pfefferle provided McCarthy with an updated forecast based on an email in which Pfefferle stated that she was providing McCarthy with a "first cut" for potential first quarter revenue changes based solely on conversations with the products groups. (R. 301-4, Ex. 24.) While the email states that Pfefferle and her team have not reviewed the entire 2001 year forecast, nothing in the email suggests that Pfefferle did not subsequently provide McCarthy with an updated forecast as she asserts in her affidavit. (R. 301-1, Ex. 8, ¶ 13.)

anticipated product, revenue amount, estimated date for purchase order, and responsible salesperson. *Id.* The salesperson would also classify the opportunity based on his or her confidence that the opportunity would turn into an actual order by assigning it a confidence level of 80%-100%, 60%-79%, or less than 60%. *Id.* As additional information became available throughout the quarter, Tellabs's employees would make changes to the pipeline figures. *Id.*

At the end of January, it was clear that January sales were slower than Tellabs had hoped. (R. 336-1, ¶ 23.) January, however, was traditionally a slow sales month as Tellabs held its annual meeting which took much of the sales force away from their work and Tellabs's customers were typically still setting their budgets. *Id.* On February 6, 2001, commenting to Notebaert, Birck, Jackman, and others on the forecast sanity check for the week ending February 2, 2001, which showed the percentage of TITAN 5500 sales yet to book was 13.6% below Tellabs's historical average (52.6% vs. 39.0%) and the percentage of all product sales yet to book was 13.1% below the historical average (48.4% vs. 35.3%), Ryan stated:

> For your information, bookings to date that will translate into revenue for Q1 are alarmingly slow, and slower than for any quarter in recent memory. The scheduled bookings rate for Q1 comes closest to that of 4Q 1998, but is still lower than for that period. That means we are booking at a rate below any of the quarters in 2000, and we know how difficult and hair-raising all those periods were for making our revenue target. I suppose I don't need to say it (but I will anyway), WE NEED BOOKINGS NOW!!!!

(R. 324-1, ¶ 21.) Notebaert acknowledged "[i]t was a concern" to him, as well, that Tellabs was performing below historical levels. *Id.* Three days later, on February 9, 2001, Ryan wrote Notebaert:

> January results will be available late Monday. First read is that they are not good -- slow revenue, high cost of goods. We may have even lost money for the month. There is a formal meeting which you are invited to on Thursday to discuss January

> results and revised Q1 forecast. At this point, the forecast for revenue looks to be
> below our Board forecast by about $20-$30M, with various upsides/downsides.

(R. 324-1, ¶ 22.)

While sales were slow in January, Tellabs's quarterly sales were typically more heavily

concentrated in the last month or few weeks of each quarter. (R. 336-1, ¶ 24.) Tellabs's

employees referred to this trend as the "hockey-stick" effect, referring to the picture created

graphically by the timing of sales. *Id.* Jackman testified that the "hockey stick" trend varied in

its severity and timing from quarter to quarter. (R. 330-22, Ex. 1152; R. 324-1, ¶ 103.) In

addition to being an intra-quarter phenomenon, the "hockey stick" effect was also a seasonal

phenomenon, as sales were slower in first quarter and significantly higher in the fourth quarter.

(R. 336-1, ¶ 25.) The "hockey stick" trend had become more pronounced in the periods leading

up to fourth quarter 2000. (R. 301-3, Ex. 18.) Nine days before the end of the third quarter

2000, for example, Tellabs had not brought in sufficient sales to meet its sales forecast for the

quarter. (R. 336-1, ¶ 26.) Ultimately, however, Tellabs reached record-breaking sales for the

quarter. *Id.* Similarly, in fourth quarter 2000, midway through the quarter Birck noted that

making the fourth quarter's guidance would require "a scramble" and John Kohler, Senior Vice

President of Global Operations, noted that the fourth quarter "presented significant challenges to

out team." *Id.* Ultimately, however, Tellabs exceeded its fourth quarter forecast with its largest

quarter for revenues in its history. *Id.*

In early 2001, Tellabs scheduled a meeting for February 15 to review January results and

the first quarter forecast to "formally discuss how we get back on track." (R. 336-1, ¶ 27.) At

the February 15, 2001 forecast review meeting, which Notebaert attended, the participants

discussed several "action items." *Id.* The participants tasked Pfefferle and Don Jones, head of

North American Sales, to "[o]utline all opportunities for 1Q for TITAN 5500." *Id.* Notebaert and other Tellabs executives directed the Tellabs forecasting organization to determine whether Tellabs's current forecast remained achievable and realistic. *Id.* at ¶ 28. Notebaert made this request because if the forecast needed to be revised, he wanted to let the market know sooner rather than later, thereby defusing any build up of expectations. *Id.*

Also on February 15, 2001, Notebaert instituted a hiring freeze as a "preventive action relative to the overall economy." (R. 336-1, ¶ 29; R. 324-1, ¶ 23.) A "Suggested Spending Optimization Plan," dated February 19, 2001 assigned "immediate" action tasks to Notebaert, Ryan, Jackman, and others, including: "[f]reeze hiring," "[s]everely restrict temporary employees," "[s]tretch merit increase from 12 months to 15 months," "[e]liminate all overtime," "[m]andate 3% cut across the board," "[d]ismiss all special-project consultants," "[s]everely reduce travel and entertainment," "[n]o seminars, non-essential internal training," "[r]estrict new orders for supplies," "[r]e-evaluate 'all-expenses-paid' cellular phone and pager programs," "[n]o new PCs or upgrades," "[r]eview advertising timing and extent," "STC only critical lab equipment," and "[c]ritically review, then re-justify necessity of $167M facility additions in 2001." (R. 324-1, ¶ 23.) Notebaert referred to these actions as "preventive costs constraints" and a "triage on the costs." (R. 301-1, Ex. 1014, p. 218-19.) Furthermore, the forecast sanity check for the week ending February 16, 2001 indicated that the percentage of all product sales yet to book for the quarter had fallen to 21.6% below the historical average (42.9% vs. 21.3%). (R. 324-1, ¶ 24.) The percentage of TITAN 5500 sales yet to book was 21.5% below the historical average (46.0% vs. 24.5%). *Id.*

31

During this time period, certain portions of the telecommunications industry and the economy in general were beginning to exhibit signs of a slow down.[6]  *Id.*  While they paid attention to the economy and reacted with caution to developments in the economy, Tellabs executives also believed that Tellabs was in a product niche that would better protect it from economic difficulties.  (R. 336-1, ¶ 29.)

Typically, Tellabs's finance organization, headed by CFO Ryan, distributed a Monthly Executive Financial Summary to senior management, including Notebaert, Birck, Jackman and Ryan about two weeks after the end of the first and second months of each quarter.  (R. 324-1, ¶ 25.)  McCarthy confirmed that, "[i]t's one of the documents that we used in the course of doing business."  *Id.*  Among other things, the Monthly Executive Financial Summaries regularly reported inventory turns.  *Id.*  Jackman testified that lower inventory turns could have one of several meanings, including ramping up inventories in anticipation of later orders or slow sales. (R. 301-1, Ex. 1007, p. 114.).  The January 2001 Financial Summary, which was distributed in mid-February and which Jackman recalled receiving, reported: "Monthly results fall short of forecasts: Soft orders prevented level-loading[] of TITAN 5500 . . . ," "[r]evenues below plan due primarily to lower than expected optical networking sales," "January revenue below forecast due to soft bookings (5500) and credit/demand issues," "78% of revenue required to ship and meet revenue recognition guidelines in February and March -- significantly higher than historical levels," and "TITAN 5500 bookings were at the lowest level since July, 2000."  (R. 324-1, ¶ 25.) Ballatine testified that it was a regular practice to review the results of the period at a meeting

---

[6] Plaintiffs dispute that the slowdown was only just beginning citing to Dr. Brody's report in support of their denial.  (R. 354-1, Resp. to ¶ 29.)  The Court, however, has stricken Dr. Brody's opinion in this regard.

with Birck or Notebaert, and that Ryan typically attended those meetings as well.  (R. 301-1, Ex. 1002, p. 282.)

On February 19, 2001, Notebaert informed the Tellabs's Board of Directors, in a letter to Birck, of the disappointing January results.  (R. 336-1, ¶ 30.)  The letter stated:

> Attached to this letter are the financials for January.  As you look at them you will note that revenues were very soft, at 58% of plan.  This is the whole story for the month and does not portend well for the quarter.  Making our revenue plan in the current environment will be a challenge.

> Revenues came in at 176 million, down 136 million against our plan of 312 million. Of additional concern is that our product bookings and product backlog are down 142 million and 67 million respectively compared to October of 2000.  The area of biggest concern is ONG [Optical Networking Group] with a 97.5 million shortfall against plan. Sales of our Titan 5500 and 532L have been very slow so far in the quarter. . . .

> Operating expenses were about on.  Of course with revenues off and expenses on, our margin was lower than plan by 3.4% or 34.6 million.  We broke even for the month.  We have taken aggressive preventative action on expenses in case our sales efforts fall short.  Headcount and all discretionary expenses are being constrained.

(R. 324-1, ¶ 26.)  Birck testified that, even prior to receiving the letter, he was generally aware that revenues for January were very soft and that the figures did not portend well for the quarter. (R. 324-1, ¶ 26.)

The forecast sanity check for the week ending February 23, 2001 reported that the percentage of total forecasted sales yet to book for the quarter was 18.7% behind Tellabs's historical average (34.7% vs. 16.0%), while the percentage of forecasted 5500 sales yet to book was 20.2% below the historical average (40.6% vs. 20.4%).  (R. 324-1, ¶ 27.)  These forecast sanity checks were a catalyst for the "deep" dive into the forecast during late February and early March 2001.  (R. 336-1, ¶ 80.)  On February 23, 2001 Bro Ballantine, Vice President of Financial Planning and Analysis, wrote to Richard Tatara, Vice President of Product Marketing,

Pfefferle, Ryan and others: "As we discussed in today's meeting there have been many changes in the economic climate, our industry and our business since we completed the . . . three year planning exercise last October.  In fact there has been so much change that the 3 year projections are in many cases obsolete and require some updating."  (R. 324-1, ¶ 28; R. 351-1, Ex. 142, p. 31.)  According to Tatara: "[T]he industry was starting to experience results being reported by various organizations that were shaking the confidence that growth would continue to be as robust as we had expected."  (R. 324-1, ¶ 28.)  He also said, "There was, you know, a climate that was suggesting that the robust growth we had seen in the three years prior to this time perhaps wasn't going to continue with the same vigor that it -- that it had in the previous year."  (R. 324-1, ¶ 103.)  Three days later, on February 26, 2001, in an email to Don Jones, Vice President, North American Sales, Pfefferle wrote: "We really need to work on trying to get some orders in asap . . . .  We have to book $8.2M a day for the next 25 days and ship $12.1M.  It's looking real tight."  (R. 324-1, ¶ 29.)  The next day, February 27, 2001, Anders Gustafsson, President, Global Sales, expressed similar concern: "We are now 2 months into our first quarter and our bookings have not ramped up as expected . . . .  I am getting increasingly concerned that we are going to be cutting it very tight."  *Id.*  In that same email, he also stated that, "I believe we can still make our forecast and further strengthen our credibility with investors."  (R. 330-17, Ex. 1073.)

        In connection with Notebaert's request for a reexamination of the existing forecast, on February 26, 2001, Pfefferle prepared a "gap report" to show how first quarter sales were performing compared to the forecast.  (R. 336-1, ¶ 32.)  The Global Forecasting Organization typically prepared gap reports on at least a monthly basis to identify bookings that Tellabs had

achieved to date in the quarter and to calculate the "gap" to achieving the forecast. *Id.*[7] The "gap" represented the revenue that Tellabs needed to book in order for the quarter to meet the forecast. *Id.* The gap reports also aggregated the sales opportunities reported by the sales force as in the "pipeline" and listed this amount as an "upside" to the quarter. *Id.* The February 26, 2001 gap report showed that Tellabs still needed to achieve approximately $205 million in TITAN 5500 sales to meet its internal forecast of $500 million for the quarter. *Id.* The report also showed that the sales force had identified more than $207 million in sales opportunities to "close the gap." *Id.*[8] These opportunities included those with a confidence level lower than 60%, and the report did not weigh opportunities with a level as low as 60% any differently than an opportunity with a confidence level of 80%-100%. (R. 301-6, Ex. 46; R. 324-1, ¶ 99.) Indeed, $51 million of the identified sales opportunities were assigned a confidence level of less than 60%. *Id.*

Pfefferle and her team also calculated an "adjusted gap" which derived from adding actual bookings only to those sales opportunities assigned a confidence level of at least 60%. (R. 336-1, ¶ 33.) The adjusted gap also included $10 million in "pull-ins" from future quarters. (R. 301-6, Ex. 46; R. 324-1, ¶ 99.) The adjusted gap report reflected that Tellabs's "tactical plan to close the gap" included "[a]ggressively canvassing sales & marketing for upside opportunities" and "[a]ctively pursuing customer permission to pull in orders from 2Q w/o impacting customer sat [sic]." *Id.*; R. 324-1, ¶ 99. Ryan testified that the adjusted gap for the TITAN 5500 "looked

---

[7] Some gap reports contained distribution lists, but others did not. (R. 324-1, ¶ 104; R. 351-1, Exs. 147-48.)

[8] Quoting Pfefferle's testimony from the *Brieger* trial, Plaintiffs respond that the gap reports were based on nothing more than a "gut feel." (R. 354-1, Resp. to p. 32; R. 324-1, ¶ 99). Pferrerle, however, only testified that the assignment of a confidence level to a potential sale was based on a "gut feel," and did not testify that the entire gap report was derived on this basis. (R. 330-22, Ex. 1152, p. 1480.)

very reasonable" compared to fourth quarter 2000 and that "looking at what we had achieved in the past, talking with sales, talking with sales management, and talking with marketing, we all felt that the gap would be closed." (R. 301-3, Ex. 18, p. 340; Ex. 17, p. 1480.)

On February 27, 2001, Birck publicly stated at a Goldman Sachs investors conference that Tellabs "[wa]sn't immune to the overall spending slowdown and that January had been a soft month for orders . . . ." Birck's statement promptly hit the news wires and Tellabs's stock price dropped 9% over the next three days. (R. 336-1, ¶ 31.) After this announcement, Tellabs continued to track its sales. At the end of February 2001, Brian Jackman contacted sales and marketing personnel and inquired whether they had seen any slowness in demand. (R. 301- 2, Ex. 14, p. 386.) Notebaert testified that Jackman went through Don Jones and Anders Gustafsson, sales and marketing executives. (R. 301-3, Ex. 19, p. 968.) The sales personnel told Jackman that they were not experiencing any slowness in demand (R. 301-2, Ex. 14, p. 386), and Jackman passed this information on to Notebaert. (R. 301-3, Ex. 19, p. 481.) In addition to tracking potential future sales, Tellabs also continued to track actual sales booked to date per quarter in the forecast sanity check reports prepared by the finance department. (R. 336-1, ¶ 35.) The March 2, 2001 forecast sanity check indicated that Tellabs had yet to book 30% of its first quarter forecast, 19.4% below the historical average of 10.6%. *Id.*; R. 324-1, ¶ 30. The percentage of projected TITAN 5500 sales yet to book for the quarter was 37.9%, 23.5% below Tellabs's historical average of 14.4%. *Id.* As a point of comparison, the December 1, 2001 forecast sanity check indicated that Tellabs had yet to book 27.2% of its fourth quarter forecast, a quarter in which Tellabs ultimately exceeded its fourth quarter bookings necessary to meet its fourth quarter plan. *Id.*

36

On March 2, 2001, Tellabs's finance department asked Pfefferle to prepare yet another updated forecast for the quarter to give to Notebaert and Ryan on Monday, March 5, 2001 for "decision-making" purposes. (R. 301-2, Ex. 17, p. 1485-86.) Notebaert testified that the executives wanted the forecast "to see where we were on accomplishing the goals for the quarter." (R. 301-3, Ex. 18, p. 980-81.) Pfefferle accordingly prepared another gap report which identified a gap to forecast for the TITAN 5500 of approximately $183 million, with identified sales opportunities of $194 million. *Id.* The adjusted gap for the TITAN 5500, which only included potential sales assigned a confidence lever higher than 60%, was $31 million. (R. 301-6, Ex. 50.) The adjusted gap again contained $10 million in "pull-ins" from future quarters. *Id.* The March 5, 2001 gap report also reflected that Tellabs's "tactical plan to close [the] gap" still included "[a]ggressively canvassing sales & marketing for upside opportunities" and "[a]ctively pursuing customer permission to pull in orders from 2Q w/o impacting customer sat [sic]." *Id.*

From February 26, 2001 to March 5, 2001 the adjusted gap for the TITAN 5500 had been reduced $8.4 million. (R. 301-6, Exs. 46, 50.) Due to the reduction in the TITAN 5500 gap in that time period, Pfefferle testified that she was even more confident that, consistent with past experience, all signs indicated that Tellabs would close the remaining gap. (R. 336-1, ¶ 37.) Accordingly, Pfefferle and her team continued to forecast that Tellabs would achieve 30% growth in TITAN 5500 sales in the first quarter of 2001 over the prior year. *Id.*

With regard to other products, however, with input from the finance department, Pfefferle concluded that the products were not on track to hit their forecasted revenue targets for first quarter 2001. (R. 336-1, ¶ 38.) It was clear, for example, that Tellabs would not recognize expected revenue from sales of the TITAN 6500 due to Sprint's requirement for a longer testing

period and that sales opportunities for the Cablespan product were not materializing at the expected rate. *Id.* Nonetheless, as result of the feedback Pfefferle received from speaking with the sales force and others, Pfefferle believed that, as of March 5, 2001, Tellabs would still achieve at least 30% revenue and earnings growth for the full year. *Id.* Overall, however, because the recognizable revenue for the TITAN 6500 and the Cablespan product were not tracking to plan, the forecasting organization concluded that the overall first quarter revenue projections should be lowered slightly. (R. 336-1, ¶ 39.) The forecasting organization communicated this information to senior management. *Id.*

Subsequent to this re-analysis, and in order to account for the change in the Cablespan forecast and deferred revenue recognition of TITAN 6500 shipments, Notebaert and his senior executive team decided to hold an analyst call on March 7, 2001 for the purpose of lowering the Company's guidance for the quarter. (R. 336-1, ¶ 40.) On March 5, 2001, Brian Jackman, Joan Ryan, Anders Gustafsson, Vice President of Global Sales, and John Kohler attended a forecast review meeting. (R. 336-1, ¶ 41.) The same day, Notebaert held a staff meeting for all of the senior executives. *Id.* Also prior to the March 7, 2001 call, Notebaert went to Pfefferle's office to review the March 5, 2001 gap report with her and to gauge her confidence in the data and in Tellabs's ability to hit the revised forecast. (R. 336-1, ¶ 42.) Pfefferle told Notebaert that, based on her analysis and "conversations with the salespeople, the marketing people, the product house, all of us felt comfortable we could achieve the objective." *Id.* Then, on March 7, 2001, prior to the conference call, Notebaert held a meeting with Joan Ryan, Brian Jackman, and John Springer, Tellabs's Director of Investor Relations, to discuss the upcoming press release and conference call. (R. 336-1, ¶ 43.) During the meeting, Notebaert confirmed that everyone felt

comfortable that Tellabs would achieve the revised guidance figures that Tellabs planned to announce later that day. *Id.* Based on the thorough re-examination of the forecast conducted by Pfefferle and his conversations with Pfefferle, Jackman, Ryan and others, Notebaert believed that the guidance issued on March 7, 2001 was reasonable and based on the best available information. *Id.* Birck testified that, by March 7, 2001, he was "less confident than I had been at the beginning of the year" that Tellabs could meet the 30% growth target, but that he "wouldn't say that by any means it was an impossible sort of thing." (R. 330-1, Ex. 1003, p. 218.) He also testified that he believed that "everybody realized that [the guidance] represented the best information that we had at that time, but it . . . involved some -- some forecasting or judgment with regard to the future . . . . I don't know of anyone who thought this wasn't, at that time, a fair appraisal of prospects of the company." (R. 351-1, Ex. 125, p. 357.)

On March 7, 2001, Tellabs lowered its guidance for first quarter revenue from a range of $865 million to $890 million to a range of $830 million to $865 million, and also projected full year guidance in a range of $4.35 billion to $4.4 billion. (R. 301-7 , Ex. 51, TEL 669439.) In addition, Tellabs projected earnings per share in the range of 35 cents to 38 cents, compared with prior guidance of 39 cents per share. (R. 324-1, ¶ 31.) According to Tellabs, the new guidance stemmed from continuing below-trend growth in its Cablespan business and a delay in recognizing revenue from the TITAN 6500 series. (R. 330-3, Ex. 1022, TEL 668682.) In the March 7, 2001 press release, Tellabs asserted that, "[g]rowth in Tellabs' core optical networking business [i.e., the 5500] remains strong." (R. 324-1, ¶ 31.) The press release quoted Notebaert as stating: "[W]e continue to target 30 percent growth in revenue and earnings for the year." *Id.*

That same day, after the close of trading, Tellabs hosted a teleconference regarding the

first-quarter guidance. (R. 324-1, ¶ 32.) Notebaert, Jackman, and Ryan met before the call to discuss what they were going to say. *Id.* Notebaert, Jackman, and Ryan presented jointly on behalf of Tellabs. Notebaert opened the call by stating: "Let me start by saying that our business is quite healthy and, in fact, most of the fundamental trends we talked about on our January call are intact. That is, let me be more detailed, demand for our core optical products or core networking products remains strong. . . . [W]e still expect revenue and EPS growth for the quarter to exceed 30%. . . . We now project revenue for the year in the $4.3 billion or $4.35 billion to $4.4 billion range and EPS of $2.13 to $2.17. In summary, demand for our products remains strong. . . . Tellabs will meet the adjusted revenue and earnings targets." *Id.* Ryan stated: "We expect optical networking to grow 35-40% [in the first quarter compared to the previous year]." *Id.* In addition, reflecting Notebaert's comments, Ryan projected for the full year: "Hence, our new range for 2001 EPS is $2.13 to $2.17 on revenue of $4.35 billion to $4.4 billion." *Id.*

During the question and answer session of the call, an analyst asked if Tellabs was seeing "any weakness" in the TITAN 5500. (R. 336-1, ¶ 44.) Brian Jackman, Tellabs's President of Global Operations, responded by saying: "We are not. We're still seeing that product continue to maintain its growth rate; it's still experiencing strong acceptance. We are in the process of turning [up] a large number of frames we shipped in the fourth quarter and this is continuing to grow as usual. I think that is pretty much on plan." (R. 336-1, ¶ 44.) Jackman testified that he based this response on the fact that Tellabs had forecasts from the sales organization that Tellabs would still make the plan for the 5500. (R. 301-2, Ex. 13, p. 147.) Another analyst asked, "Any concerns relative to the market place in general? We see companies like Nortel and Cisco

lowering their expectations. I am assuming you guys are not seeing any of those factors impacting your business that might be impacting those guys." (R. 330-3, Ex. 1023, TEL 669442.) Notebaert responded that: "We just lowered our expectations. With our customer base and the product niche we have our problems may be different. . . . We haven't gotten any indication from any of our major customers of a downturn in this segment we are in and in our niche." *Id.*

The next day, March 8, 2001, Tellabs shares rose $2.75 to close at $48.4375. (R. 324-1, ¶ 34.) Dr. Allen opined that the stock price reaction on March 8, 2001 demonstrated "that the market interpreted the net effect of the March 7th news release to be positive information." (R. 330-14, Ex. 1053, p. 16.) Dr. Lehn, however, opined that the stock price reaction did not demonstrate that the market interpreted the net effect of the March 7, 2001 news release to be positive information. (R. 301-11, Ex. 70, pp. 5, 22-23.) Also on March 8, in a company-wide email, Notebaert announced the company was delaying salary increases scheduled for April 1, 2001 by three months. (R. 324-1, ¶ 35.)[9]

**H.      April 6, 2001 Revised Guidance**

After the March 7, 2001 announcement, Tellabs continued to track its sales and revenue. On March 9, 2001, in an email designated "Importance: High" sent to Steve McCarthy, Senior

---

[9] Plaintiffs also assert that from the forecast sanity checks, Notebaert and the other Defendants knew that "in the remaining weeks of the first quarter 2001, they had much more to sell to meet their forecast, in a dramatically slowing market, than they had to do in previous years when the economy was booming. They also knew the fourth quarter 2000 goals had been met only by offering 'unnatural' pricing deals and pulling forward tens of millions of dollars of sales from subsequent quarters." (R. 324-1, ¶ 103.) In support of these statements, however, Plaintiffs point to Exhibits 1171-1198, all of the forecast sanity checks, and Exhibit 1214, the summary of the forecast sanity checks. Standing alone, these documents do not support Plaintiffs' contentions. The Court will also not consider Plaintiffs' statement that "Defendants simply had no basis to believe the Company would continue to enjoy the same 30% growth it had experienced when the telecommunications industry was expanding," for which Plaintiffs provided no evidentiary support. (R. 324-1, ¶ 103.)

Vice President, Global Marketing, regarding TITAN 5500 sales Pfefferle wrote: "Here is my most important issue in Global Forecasting - need to rapidly increase orders coming in-house from NA for TITAN 5500. We have identified (as of today) $161M in unbooked opportunities for 1Q01. This business needs to happen for us to meet our revised expectations to Wall Street!" (R. 324-1, ¶ 36.) That same day, at an internal corporate overview meeting with employees, Notebaert, focusing on Tellabs's CABLESPAN product, explained:

> The economy, in general, is not doing as well as it was six months ago. "Hello." All you have to do is read the paper. Now that means that cable companies are not going to expand into other cities. They are going to flush out what they have. What does that translate to Tellabs? It translates that we will do about 60 percent of what we expected just in January. In the first quarter, if you look at what customers are saying, that is what is happening. As an organization, we expected to build a certain amount of product, and now the customer is saying about 60 percent, in that range. That is some softness.

(R. 330-17, Ex. 1076, TEL 081954.) The forecast sanity check for the week ending March 9, 2001 showed that the percentage of the total forecast yet to book was above Tellabs's historical average notwithstanding that Tellabs had just reduced first quarter guidance. (R. 324-1, ¶ 38.) Thus, the percentage of all products yet to book was 20.1% above the historical average (27.0% yet to book vs. 6.9%), while the percentage of the TITAN 5500 yet to book was 22.5% above the historical average (33.5% yet to book vs. 11.0%). *Id.* Indeed, Tellabs's March 5, 2001 gap report showed an adjusted gap for the TITAN 5500 of more than $31.6 million, while the March 12, 2001 gap report showed an even larger adjusted gap of almost $41.1 million. (R. 324-1, ¶ 40.)

In a March 13, 2001 email to all Tellabs employees, Marc Ugol, Senior Vice President, Human Resources, wrote: "While demand for our new and existing products remains strong, revenue is not developing at the levels we had planned this year. Accordingly, we need to focus

on reducing our costs in order to maintain our financial strength." (R. 324-1, ¶ 39.) Ryan

responded: "I was surprised to see in your memo to employees that you included the forward

looking statement below: '. . . Revenue is not developing at the levels we had planned this year.'

This is at odds with the external message that was communicated last week on our pre-

announcement call, in which we basically re-iterated our 30/30 guidance for the full year. In

fact, Dick [Notebaert] opened the call by saying that our 'business remains quite healthy.'" *Id.*

The Monthly Executive Financial Summary for February 2001, distributed on

March 15, 2001 to Notebaert, Birck, Jackman, Ryan, and other senior management

revealed, *inter alia*: "56% of additional revenues need to meet Q1 forecast," "P2 [February

2001] revenue shortfall due to across the board weakness in ONG [Optical Networking Group]

and BA product sales," "February revenue continues to be below forecast due to soft bookings

(5500/532L) and credit/demand issues for DXX/Cablespan," "56% of revenue required to ship

and meet revenue recognition guidelines in March," "TITAN 5500 bookings for the 2nd

consecutive period continue to be at the lowest level since July, 2000," "February revenue falls

short in NA forecast due to soft orders (TITAN 5500) . . . ," and "[forecast] reductions due to:

5500 & 532L - slow bookings." By mid-March 2001, McCarthy testified that there were

frequent internal discussions regarding Tellabs's "soft bookings." (R. 324-1, ¶ 44.)

While overall sales for the Optical Networking Group increased in first quarter 2001,

demand for the TITAN 5500 remained low. For first quarter 2001, Tellabs reported year-over-

year growth for the Optical Networking Group, which included the TITAN 5500, of 22%. (R.

330-31, Ex. 1214.) For the week ending March 9, 2001 (Week 10 of the quarter), TITAN 5500

sales were 27% less than they were for the same week in 2000 ($19.2 million vs. $26.5 million).

(R. 324-1, ¶ 41.)  For the week ending March 16, 2001 (Week 11 of the quarter), TITAN 5500 sales were 21% less than they were for the same week in 2000 ($24.1 million vs. $30.5 million). *Id.*  The March 16, 2001 forecast sanity check also showed that the percentage of all sales yet to book (15.3%) remained 11.8% above the historical average and the TITAN 5500 sales yet to book to achieve the forecast (20.4%) were 13.3% above the historical average.  (R. 324-1, ¶ 45.)

On March 16, 2001, Anders Gustafsson, Vice President of Global Sales, wrote an email to Notebaert, Ryan, Jackman, Birck, and others giving a "positive update" on first quarter sales and stating, "I am very encouraged with this progress, and I believe we will make the adjusted revenue target."  (R. 336-1, ¶ 45.)  Also on March 16, 2001, Don Jones emailed the North American sales force and stated that recent "big wins . . .  have really put us in the hunt" to meet the first quarter forecast.  *Id.*  On March 19, 2001, Notebaert held a staff meeting during which Don Jones presented an updated sales forecast, $835 to $845 million, which was in line with Tellabs's revised guidance.  (R. 301-9, Ex. 58, p. 1678.)  At the same meeting, Joan Ryan presented an updated forecast from Tellabs's finance department predicting that the first quarter's total revenue would come in at between $830 and $860 million, almost precisely the range of the revised guidance provided on March 7, 2001.  *Id.*

There was some evidence in early 2001 that customer demand was decreasing.  Rick LaDuca, Vice President for the Verizon account, in an email dated March 21, 2001 with the subject "Revenue Alert" sent to various persons in sales and marketing and copied to Notebaert, reported on a conversation he had had with a representative of Verizon: "When I told him what our expectations were of business from Verizon this year, he laughed and said we'd be lucky to

44

see half of that." (R. 324-1, ¶ 46; R. 351-1, Ex. 120, pp. 146-47). LaDuca also testified that this response may have been nothing more than the representative's "gut opinion" and that he did not recall what number he gave to the representative that resulted in this comment. *Id.* Nancy Sayer of Verizon also testified: "[I]n 2000, our demand started leveling out. So, it was decreased from what it had been previously." (R. 330-2, Ex. 1017, p. 38.)

Soon thereafter, the picture changed and it became clear that customer demand was decreasing. In the last two weeks of the first quarter, customers began to request that Tellabs push out the shipping dates of approximately $83 million in firm or expected orders for the TITAN 5500 that were originally scheduled to ship in the quarter. (R. 336-1, ¶ 47.) Notebaert, referring to the requests to push out orders, stated that, "it was like somebody threw a switch. Totally unexpected." *Id.* Ryan testified that the "push-out" "was more substantial that we'd seen before in the past." (R. 301-3, Ex. 18, p. 246.) If the $83 million of orders or letters of intent had shipped as expected, Tellabs would have achieved its revised guidance for the quarter. (R. 336-1, ¶ 47.) As first quarter 2001 closed, it became apparent to Tellabs that although revenue had increased significantly year-over-year from the first quarter of 2000, Tellabs would not meet the March 7, 2001 revised guidance. (R. 336-1, ¶ 48.)

Tellabs's "Period 3, 2001 Close Highlights," prepared in early April after the period closed at the end of March, reported, for the last four weeks of first quarter 2001, *inter alia*: "Total revenue is $380.9M which is $68.9M below forecast/$222.5M below P12 [December 2000]. Revenues are down due to slow down in customer spending specifically for the 5500, revenue deferrals for TITAN 5500 & Echo, and delayed Cablespan sales" and that "ONG [Optical Networking Group] is below forecast by $63.4M ($68.8M TITAN 5500 offset by

45

$5.4M 53X/532L) primarily due to soft orders and install revenue deferrals." (R. 324-1, ¶ 47.)
As a result, on April 4, 2001, Notebaert's direct reports met to discuss the steps necessary to
align expenses with revenues. (R. 336-1, ¶ 53.) At the meeting, Steve McCarthy was assigned
to oversee the compilation of a new "2Q and Full Year Product-Level Revenue Plan" upon
which all direct reports to the CEO would agree. *Id.* Pfefferle and other members of the
forecasting organization, under the direction of McCarthy, assembled the updated revenue plan.
*Id.* Similar to the process that took place in the fall of 2000, the team based the updated revenue
plan on information gathered from the sales teams, product houses, and other operating units, all
of which provided the most up-to-date information on expected demand based on what they were
hearing from Tellabs's customers. *Id.*

Tellabs held a forecast meeting on April 5, 2001 to discuss updating the second quarter
and full year forecasts. (R. 336-1, ¶ 82.) As of that date, Tellabs had not settled on a revised
forecast for the full year 2001. *Id.* As a result of the meeting, Tellabs developed a series of
forecast scenarios with the most pessimistic scenario forecasting total revenues of $3.6 billion
for the year, with $834.8 million in revenues for second quarter 2001. *Id.* Using a process
similar to the one used to develop the original 2001 Operating Plan, Pfefferle and her team then
gathered "bottoms-up" information from Tellabs's sales force concerning expected demand for
Tellabs's products in order to determine the most realistic scenario. *Id.*

Pfefferle and her organization also conducted a "post-mortem" on the first quarter
forecast "to say what happened and what we need to do differently." (R. 336-1, ¶ 54.) Pfefferle
identified that TITAN 5500 revenue had grown 22% year-over-year and that "[a]necdotal
information from key accounts indicates that fundamental drivers are still strong." *Id.* Pfefferle

46

also noted that Tellabs had shipped a large number of TITAN 5500s in the first quarter and that these systems represented a "great annuity program in 2001 and beyond." *Id.* The TITAN 5500s were a "great annuity plan" because an important source of TITAN 5500 revenue was orders of additional port cards from customers who already had purchased the TITAN 5500 system from Tellabs. *Id.* Shipments of the TITAN 5500 thus created not only revenue from immediate sales, but future revenue streams as well due to customer demand for additional port cards. *Id.*

As a result of this updated forecast review, and subsequent to approval from each of the officers who were direct reports to the CEO, the finance department recommended to Notebaert that Tellabs revise its public guidance to a range of $3.6 to $3.7 billion for 2001. (R. 336-1, ¶ 55.) Internally, marketing and product houses had set a "stretch target" of $3.9 billion. (R. 301-11, Ex. 67, TEL 804903.) During the time leading up to April 18, 2001, no one expressed any doubts to Notebaert that Tellabs would not achieve its revised guidance or that the revised guidance was based on incorrect of faulty information.[10] (R. 336-1, ¶ 55.)

Recognizing that Tellabs would not make its guidance, Notebaert wanted to inform the public of the development as soon as possible, rather than waiting for the scheduled announcement of actual first quarter results. *Id.* (R. 301-1, Ex. 9, ¶ 9.) Notebaert therefore directed that an investors conference be scheduled for April 6, 2001 in order to pre-announce Tellabs's estimated first quarter results. *Id.* On the April 6, 2001 call, Tellabs reduced its guidance for the first quarter to $772 million. (R. 336-1, ¶ 49; R. 324-1, ¶ 48.) According to

---

[10] Plaintiffs improperly dispute this fact with citation to over 70 paragraphs from their statement of additional facts. (R. 354-1, Resp. to ¶ 55.) The Court may disregard statements and responses that do not properly cite to the record. *See Cichon*, 401 F.3d at 809-10.

Tellabs: "The revised guidance stems from reduced and deferred spending by major communications carriers late in the quarter." (R. 324-1, ¶ 48.) During an analyst teleconference call that Tellabs hosted that same morning, Notebaert also stated: "Clearly, the environment has resulted in near term caution in the pace at which customers are deploying equipment. Our customers are exercising a high degree of prudence over every dollar spent. Let me balance this a bit and say that everything we hear from the customers indicates that our end user demand for services continues to grow." *Id.* Notebaert also stated: "The good news there is that the orders weren't cancelled. It was just do it after the end of the quarter." *Id.* During the April 6, 2001 call, Tellabs did not offer any guidance for the second quarter or full year. (R. 336-1, ¶ 50.) In response to a question regarding guidance for future quarters, Ryan responded, "We are currently evaluating that. We just closed the books last night and what we are giving today are flash results but we will be discussing that and full year guidance when we talk on the 18th." *Id.*

Also on April 6, 2001, Tellabs shares fell $7 to close at $33.75. (R. 324-1, ¶ 49.) Dr. Allen opines that previously unrevealed information disclosed on April 6, 2001 constituted a partial disclosure. (R. 330-14, Ex. 1053, p. 19.) Dr. Lehn disputes this characterization and opines that Dr. Allen has not established that Plaintiffs suffered any economic loss. (R. 301-11, Ex. 70, pp. 4-5, 16-20.)

## I.     Tellabs's April 18, 2001 Revised Guidance

Soon thereafter, in an April 18, 2001 teleconference and press release, Tellabs announced its actual first quarter results, as well as a plan for a reduction in force. (R. 336-1, ¶ 51.) Tellabs also announced first quarter total revenue of $772 million, which matched the April 6, 2001 revised guidance. *Id.* Tellabs missed its original goal of 30% growth, and the results

48

demonstrated year-over-year revenue growth of 21%. *Id.* Tellabs's Optical Networking Group, which housed the TITAN 5500, brought in $482 million worth of revenue in the first quarter, which represented 22% year-over-year growth with respect to that product line. *Id.*

In its April 18, 2001 press release, Tellabs also announced that it was lowering its guidance for the full year 2001. (R. 336-1, ¶ 52.) Tellabs forecasted that revenue for the year would fall between $3.6 billion and $3.7 billion, instead of its original expectations for the year of $4.4 billion. *Id.* Tellabs's new guidance represented a 6% to 9% increase of the full year 2001 revenues. (R. 345-1, Resp. to ¶ 51.) This revised guidance was the result of another "bottoms-up" review of Tellabs's quarterly and full year forecasts. (R. 336-1, ¶ 53.)[11] In the press release, Tellabs stated that, "[i]n light of reduced and deferred spending by major telecommunications carriers," the company was eliminating salary increases for the year, instituting a pay-cut for all corporate officers, "align[ing] manufacturing capability with demand expectations," terminating the SALIX next-generation-switching product effort, and consolidating "excess" facilities. (R. 324-1, ¶ 50.) Tellabs also announced that it would reduce its workforce by about 550 people, or 6% of its total workforce, that it had eliminated 450 temporary or contract positions, and that it would not fill 1,100 open positions. *Id.* Tellabs also indicated that it planned to restructure and make other one-time charges in the second quarter in the range of $150 million to $225 million for costs associated with reducing its workforce, consolidation of excess facilities, related fixed asset disposals, asset impairment, and excess inventory. *Id.* The actual charges Tellabs eventually recorded in second quarter 2001 were

---

[11] Plaintiffs dispute this proffered fact, but fail to offer any evidentiary support for their denial. *See* R. 354-1, Resp. to ¶ 53. The Court may disregard statements and responses that do not properly cite to the record. *See Cichon*, 401 F.3d at 809-10.

larger, totaling approximately $262 million, an amount Ryan characterized as "huge." *Id.* Also during the analyst teleconference, with regard to sales of the TITAN 5500, Jackman stated: "What we did see was in the absolute number of brand new systems a slight decrease against the comparable quarter. We are also seeing another kind of mix because of the fact that we now have these 2000 and 3000 port systems available. We are seeing a very, very large increase on a comparable basis in the number of what we refer to as core expansions, which is almost like selling a new system." (R. 330-3, Ex. 1027, TEL 669464.)

### J.  Period After April 18, 2001 Revised Guidance

During the period after April 18, 2001, Tellabs's sales showed more pronounced weaknesses. (R. 301-11, Ex. 68, TEL 655218-19.) The April 2001 Monthly Executive Financial Summary, which circulated among Tellabs's executives in mid-May, reported, *inter alia*: "[m]onthly results fall short of forecast," "[c]ontinued soft bookings," "84% of revenues left to go to achieve Q2 expectations," "P4 [April 2001] Revenue shortfall due to across the board weakness in all product groups," "Titan 5500 sales only 35% of plan," "April revenue below forecast due to continued soft bookings," "[l]owest revenues since October 1998," "[l]owest bookings since May 1998," and "75% of revenue required to ship and meet revenue recognition guidelines in May and June - significantly higher than historical levels." (R. 324-1, ¶ 52.) Moreover, in a May 17, 2001 letter to Birck, Notebaert reported:

> Revenues are 33% below January and the lowest first month of a quarter since October 1998. We are seeing further revenue softness halfway through May. At this point we will not attain our quarter guidance for revenue or earnings. Revenues are $50 million off forecast and 41% of plan. Bookings are at the lowest level since May of 1998. The primary driver of this shortfall was slow Titan 5500 sales.
>
> * * *
>
> Inventory turns at 2.5 were the lowest since the company started. This resulted from low sales and fulfillment of prior parts orders. We are currently running our builds

at 30% below forecast to try to burn off inventory. Cash flow and investment
income were positive.

* * *

All in all, this quarter is extremely tough for us, however, there is light at the end of
the tunnel. Titan 6500 stays strong and Titan 6100 has had a second major customer
select it. These revenues will ramp towards the end of the year. Our challenge is the
second and third quarter.

(R. 301-1, Ex. 1081, TEL 661353.)

The May 2001 Monthly Executive Summary reported: "[m]onthly results continue to be
below forecast," "[s]oft bookings continue," "P5 [May 2001] Sales 66% below plan due to
reduced spending by major communication carriers and customer returns," "Optical Networking
sales were main driver, down 90% from plan," "Titan 5500 only 9% of plan," "[w]eekly
bookings of $17.7M for 5500/532L needed to meet revised Q2 forecast (avg. is $12.7M)," "[a]ll
regions experienced weakness in May," and "[forecast] reductions due to: 5500/532L -
continued soft bookings and a gap in identified opportunities . . . ." (R. 324-1, ¶ 54.)

By the middle of June, Tellabs's executives realized that Tellabs would not achieve the
revised revenue guidance issued during the April 18, 2001 call for the second quarter or the full
year. (R. 301-1, Ex. 68, TEL 655218-19.) On June 19, 2001, following a special meeting of
Tellabs's Board of Directors, Tellabs announced that it now expected second quarter revenue to
be around $500 million and refrained from giving any guidance beyond the second quarter
because of the unpredictability that Tellabs was encountering. *Id.*; R. 324-1, ¶ 87. This revenue
reflected a reduction of approximately $300 million. (R. 324-1, ¶ 87.) Tellabs also reduced
projected earnings per share from $0.29 to breakeven (before restructuring and other charges).
*Id.* Tellabs further announced that, "[t]he dramatic changes affecting the landscape of the

51

telecommunications marketplace have continued to impact Tellabs." (R. 324-1, ¶ 87.)[12] In an analyst call that same day, Notebaert stated, in part: "While it is clear that the entire telecom equipment industry has been dealing with the impact of dramatic cutbacks in carrier spending and general economic uncertainty throughout 2001, the impact of these forces on orders for our products has become more pronounced during the second quarter. We have dealt with these issues in the access portion of our product portfolio since late last year." (R. 330-3, Ex. 1030, TEL 655218.) With respect to the TITAN 5500, Notebaert acknowledged: "there have been a lot of products in our . . . industry . . . -- great products like the 5500 where things have just slowed." *Id.* at TEL 655224.

The next day, June 20, 2001, Tellabs shares fell $5.16 to close at $16.04, almost 36 million shares. (R. 324-1, ¶ 89.) According to Dr. Allen:

> Analyst reports show the contemporaneous adverse market reaction to the TLAB disclosures. For example, the Raymond James June 20th equity analyst report (on page 1) noted, "The weakness in the quarter can be attributed to the company's Optical Networking segment performance, driven primarily by disappointing Titan 5500 sales and slower-than-expected rollout of its next generation 6000 series product." Further, WR Hambrecht's June 20th report (page 1) stated: "Tellabs's major revenue and earnings shortfall announced yesterday after the market close reflects our well chronicled concerns regarding the erosion of the company's core Titan 5500 in advance of any new product traction from the company's acquisitions or internally developed Titan 6000 family of products. While the current carrier-spending environment certainly hastened this transition, we continue to believe this dynamic is central to Tellabs's long-term prospects." These material disclosures were new revelations to the market, as evidenced by the Salomon Smith Barney June 19th analyst report (page 1): "Opinion: While the Preannouncement Was Not Shocking, The Severity of Tellabs Business Erosion Was[.] After the market close, Tellabs pre[-]announced significantly weaker than expected 2Q01 results. . . . Thus, the news does not come at a complete surprise. What was shocking for us, however,

---

[12] Plaintiffs also contend that Tellabs made these announcements "having known the truth for months" and that its statement regarding the telecommunications market was contrary to previous statements. Plaintiffs, however, provide no evidentiary support for these contentions and the Court will therefore not consider these statements. *See Cichon*, 401 F.3d at 809-10.

was the degree of the shortfall. We did not anticipate the severity of the fall-off in Tellabs's business."

*Id.*

On July 18, 2001, Tellabs announced its second quarter 2001 results:

Tellabs today announced second-quarter sales of $516 million . . . Revenues were $801 million in the second quarter 2000. Before restructuring and other charges, diluted earnings per share were 2 cents . . . Second-quarter net income amounted to $10 million. In the year-ago quarter, diluted earnings per share were 39 cents, and net income was $163 million. . . . Including restructuring and other charges, Tellabs reported a loss of 43 cents per share for the quarter.

\* \* \*

**Optical Networking** – For the second quarter 2001, sales of optical networking equipment were $221 million. . . . Last year, second-quarter optical networking sales were $528 million.

(R. 324-1, ¶ 90.) TITAN 5500 sales in second quarter 2001 were only $188.1 million as compared with $467.7 million the previous year -- a drop of almost 60%. As a result of second quarter 2001 results, Tellabs changed its forecasting analysis. (R. 330-2, Ex. 1015, p. 348.)

For the full year 2001, Tellabs reported net sales of $2,199.7 million and a net loss of $182 million as compared to net sales of $3,387.4 million and net earnings of $730.8 million for 2000 -- a decline of more than 35% in net sales and about 125% in net earnings. (R. 324-1, ¶ 91.) In 2002, Tellabs reported an even larger net loss of $313.1 million. *Id.* Tellabs's 2001 Annual Report, released in early 2002, confirmed that, in April 2001, Tellabs had begun a series of layoffs, ultimately reducing its worldwide workforce by about 27%. *Id.* Tellabs closed manufacturing plants in Ireland and Texas, consolidated product development and other functions from 30 facilities into 20, and cut expenses dramatically. *Id.* Notebaert and Birck's

53

letter to stockholders stated: "Early in 2001, as our customers reduced capital spending and expressed caution about the future, Tellabs began a deep process of self-examination." *Id*.[13]

### K.      Tellabs's Inventory

Inventory turns measure the rate of turnaround of Tellabs's inventory, with a lower number signifying slower turnaround. (R. 324-1, ¶ 55.) Notebaert testified that "[i]nventory turns are an important facet of the financials of the company" and that in May 2001 he was concerned that inventory turns were low. (*Id*.; R. 345-1, Resp. ¶ 55.) Tellabs's Senior Vice President, Global Business Operations, John Kohler explained: "Consume the inventory, the inventory turns go up. If the inventory is not consumed, the inventory turns will go down." (R. 324-1, ¶ 55.) Inventory turns were among the "Trended Key Management Ratios" that the Monthly Executive Financial Summary, circulated among senior management, regularly reported. (R. 324-1, ¶ 56.) In addition to declining sales, however, inventory turns may decrease due to a variety of factors. Jackman testified that lower inventory turn numbers could mean that the company is "ramping up inventories in anticipation of later orders" or that sales are low. (R. 330-1, Ex. 1007, p. 114.) Ryan testified that declining inventory turns could be a good or bad sign, and that declining inventory turns in late 2000 and early 2001 were due to "new product introduction" and "field trial activities," as well as build up of TITAN 6500 and 6100 inventory (R. 351-1, Ex. 119, p. 71-72, 133-34). Ryan also testified that Tellabs increased its supply of certain parts due to shortages in first quarter 2000. *Id.*

Total inventory turns for the TITAN 5500 were lower in fourth quarter 2000 than they were in earlier periods. (R. 330-31, Ex. 1215.) Inventory turns for both the TITAN 5500 and

---

[13] Plaintiffs allege that this statement was "belated," but offer no evidentiary support for that contention. The Court will accordingly disregard this characterization. *See Cichon*, 401 F.3d at 809-10.

total worldwide inventory turns decreased from first quarter 2001 through third quarter 2001.  *Id.*

In addition, inventory turns for the TITAN 5500 dropped during the Class Period.  Specifically,

inventory turns for the TITAN 5500 were as follows in 2000 and 2001: second quarter 2000 (6.9,

7.3, and 8.5), third quarter 2000 (7.0, 6.4, and 6.7), fourth quarter 2000 (4.9, 4.1, and 6.7), first

quarter 2001 (5.4, 5.2, and 4.8), second quarter 2001 (3.5, 2.6, and 1.7), third quarter 2001 (1.5,

1.8 and 1.9), and October of fourth quarter 2001 (1.9).  (R. 330-17, Ex. 1084, Ex. 1213).

According to Tellabs, a "more normal level" of inventory turns is six.  (R. 324-1, ¶ 56.)

 In a report to the Audit Committee dated January 19, 2001, Tellabs's auditor Ernst &

Young stated:

> During fiscal 2000, the inventory balance increased approximately 130% over the
> 1999 inventory balance.  While this increase is partially due to required stockpiling
> of certain parts that are in short supply, inventory buildup for new product
> introductions and planned increased sales levels, it appears the Company is carrying
> higher levels of inventory than may be required which increases the risk of inventory
> obsolescence.
>
> We recommend the Company perform a detailed analysis of its inventory balances
> by product line against projected sales levels and adjust inventory levels accordingly.

(R. 330-18, Ex. 1085, TEL 011008.)  Tellabs management responded:

> We have compared inventory levels against projected sales forecast by product as
> recommended.  We have incorporated this analysis into our monthly reporting
> process.  The recent analysis revealed three areas that need closer review.  Formal
> teams have been created to review Cablespan, SALIX, and Titan 5500 inventory
> levels. . . .  Recently we have experienced long lead times on certain parts that create
> a supply pipeline which can be difficult to turn off given actual demand is lower than
> expected.

*Id.*

 On January 20, 2001, Ryan wrote John Kohler: "[T]here has been such a

continuous sharp increase in inventories (and decrease in turnover) in each quarter this year [i.e.,

2000]." (R. 324-1, ¶ 58.) On March 4, 2001, Ryan wrote Notebaert, Jackman, and others, referring to "higher 'investments' in inventories (which increased by 500% in 2000, and 300% in January 2001)." And, in an April 22, 2001 email to McCarthy, Pfefferle, Tatara, Kohler, and others, Ryan commented: "our inventory has multiplied faster than rabbits" and "we are potentially facing a $90-160M excess inventory write-off." *Id.* In a May 17, 2001 letter to Birck regarding April 2001 financial results, Notebaert wrote, "[i]nventory turns at 2.5 [for April 2001] were the lowest since the company started. This resulted from low sales and fulfillment of prior parts orders." *Id.*

### L.     Fourth Quarter and Full Year 2000 Financial Statements

With regard to Tellabs's fourth quarter 2000 and full year 2000 financial statements, Plaintiffs point to a number of transactions to argue that Tellabs engaged in "unnatural" deals and channel stuffing.[14] As general support for these practices, Plaintiffs first point to a November 21, 2000 memorandum from Pfefferle to Tatara, Vice President Product Marketing, regarding "Potential Opportunities to Increase 4Q Revenue" in which Pfefferle made "some suggestions for you to consider to increase 4Q revenue opportunities." (R. 324-1, ¶ 60.) Pfefferle specifically suggested that marketing personnel offer to help sales push particular products due to abundant supply, offer extended terms to customers facing budgetary constraints as a last resort offer, and offer sales discounts to incentive sales. *Id.* Plaintiffs also point to the deposition testimony of various Tellabs employees. Edy Norek, Tellabs's Associate Marketing Manager, testified there was "an edict" from "[u]pper management" "to try to push modules on

---

[13]   As discussed in more detail below, the Court has not addressed facts regarding some of Tellabs's customers -- specifically, Pacific Bell, Sprint, Qwest and Walker -- because the Seventh Circuit previously affirmed the district court's dismissal of Plaintiffs' channel stuffing claims based on allegations of fictitious sales, back-dated orders, and "creative" incentives.

the customer, whether they needed it or not." (R. 330-1, Ex. 1013, pp. 91-92.) Joling also

testified that Notebaert suggested selling some of the equipment that SBC was expected to

purchase in first quarter 2001 to Telcobuy in fourth quarter 2000 (R. 330-1, Ex. 1008, pp. 114-

15.)

A number of Tellabs employees testified that Tellabs did not ship unordered products to

customers. Richard LaDuca testified that Verizon would provide a purchase order to Tellabs for

every system Verizon purchased before Tellabs shipped the product. (R. 301-4, Ex. 26, p. 104.)

John Kohler testified that Tellabs did not ship or invoice any goods that had not yet been

ordered. (R. 301-5, Ex. 33, pp. 72-73; *see also* R. 301-3, Ex. 18, p. 509.) Indeed, Tellabs's

guidelines on revenue recognition required a "[p]roperly approved purchase order" or a signed

contract before Tellabs could recognize revenue on a sale. (R. 336-1, ¶ 62; R. 301-12, Ex. 75,

TEL 362171.) Specifically, Tellabs's standard revenue recognition policy, issued on February

28, 2001, stated: "Revenue recognition is not dependent upon Customer Acceptance, as the

Demonstrated acceptance criteria have been satisfied. Product revenue is recognized upon

transfer of title (other than a security interest) and risk of loss to the customer. This usually

occurs upon shipment or delivery, depending upon the shipping terms of the contract. Revenue

for services is recorded upon completion of the services." (R. 330-18, Ex. 1090.) Tellabs's

2000 Annual Report also explains: "Product revenue is recognized when all significant

contractual obligations have been met, including the terms of the shipment, and collection of the

resulting receivable is reasonably assured." (R. 324-1, ¶ 62.)

Plaintiffs also highlight that, in first quarter 2001, returns of all products totaled $3.4

million, including $2.158 million returns of the TITAN 5500. (R. 336-1, ¶ 63.) These returns

totaled less than the returns in the same quarter during 2000, even though revenue in fourth quarter 2000 was 42% higher than in fourth quarter 1999. *Id.* Returns of the TITAN 5500 in first quarter 2001 were also lower than returns in the previous two quarters. *Id.*

Plaintiffs also highlight a series of specific transactions, detailed in the following sections, which they contend reflect "channel stuffing" or unnatural deals. Despite the returns Tellabs accepted and the transactions detailed below, Tellabs's CFO signed off on its 2000 financial statements. In addition, an independent auditor, Ernst & Young, LLP, issued an opinion that Tellabs's balance sheets as of December 29, 2000 presented fairly, in all material respects, the consolidated financial position of Tellabs as of December 29, 2000. (R. 301-1, Ex. 3, TEL 258062.)

### 1. Telcobuy

Telcobuy was a "value added reseller" during the Class Period. (R. 336-1, ¶ 66.) As such, Telcobuy would purchase products from Tellabs and then resell those products to its customer, SBC. *Id.*

An un-executed letter dated October 16, 2000 documents a draft agreement under which Tellabs would agreed to extend payment terms for Telcobuy on orders that Telcobuy placed on behalf of SBC during fourth quarter 2000. (R. 330-18, Ex. 1094.) Denise Feigh, who supervised sales to value added resellers such as Telcobuy, testified that the draft agreement was a proposal from Tellabs to Telcobuy to purchase TITAN 5500 *systems* for resale to SBC, not port modules ("PICS"). (R. 351-1, Ex. 122, pp. 181-84, 195-96, 209.) One of the terms of the proposed agreement was that "Telcobuy.com must have a valid purchase order from SBC." (R. 330-18, Ex. 1094.) Feigh explained that while agreements for TITAN 5500 *systems* generally required a

purchase order from the end-customer (because a large piece of equipment such as a TITAN 5500 system could not be delivered without, for example, specifications as to size, location, and timing of installation), agreements for PICs did not. (R. 351-1, Ex. 122, pp. 181-84, 195-96, 209.)

In addition, on December 19, 2000, Telcobuy placed an order for $50.4 million of TITAN 5500 PICS from Tellabs. (R. 324-1, ¶ 65; R. 336-1, ¶ 68.) As part of that deal, Tellabs gave Telcobuy price discounts totaling 8% and 80-day payment terms. (R. 324-1, ¶ 65; R. 301-14, Ex. 83, TEL 817019.) Telcobuy issued a purchase order for the $50.4 million in products. (R. 301-14, Ex. 83.) The amount ordered by Telcobuy in December 2000, which was intended to fill SBC's requirements during first quarter 2001, was based on an historical analysis of the amount and mix of modules ordered by SBC in previous years. (R. 336-1, ¶ 68.) Joling testified that he considered "the size of the discounts unusual in the normal course of business." (R. 324-1, ¶ 65.) He also stated that this was "a major purchase" "that would have been several months worth of product that SBC may have used." *Id.*[15] He further explained that "Tellabs gave them [Telcobuy] enticements to take a large amount of inventory based on historical usage patterns from SBC under the hope that it would be sold." (R. 324-1, ¶ 65.) According to Joling, Notebaert personally "directed" him to proceed with the order so that Tellabs could recognize additional revenue in 2000. *Id.* At the time it made the deal, Tellabs was aware that SBC was deferring spending until 2001. (R. 330-18, Ex. 1099.)

---

[15] Plaintiffs also assert that Joling testified that Tellabs was aware that Telcobuy did not have a valid purchase order, but the deposition testimony Plaintiffs rely on refers to the sale of TITAN 5500 systems, not TITAN PICS. (R. 330-1, Ex. 1008, p. 71; R. 351-1, Ex. 122, pp. 181-84.)

In 2001, however, the "Southwestern Bell" segment of SBC did not place orders for the modules at the expected rate. (R. 336-1, ¶ 68; R. 324-1, ¶ 69.) Although Tellabs shipped the $51 million order to Telcobuy in December, by February 2001, Telcobuy had shipped less than $2 million of inventory to SBC. (R. 324-1, ¶ 66.) On February 23, 2001, Denise Feigh, Manager Global Sales Operations, wrote Gustafsson, urging him to assist Telcobuy: "Please support our cause on delivering on a promise (we will help Telcobuy move the port modules) that was made to a partner when they helped us at a critical time." *Id*. Tellabs attempted to assist Telcobuy to sell these modules, including by working with other geographic portions of SBC that were purchasing the TITAN 5500, in an effort to clean up the accounts receivables. (R. 336-1, ¶ 68.) In May 2001, Tellabs agreed to allow Telcobuy to return $12 million of the $50 million order of mostly TITAN 5500 equipment, despite the fact that Telcobuy's credit did not allow a right of return. *Id.*; R. 324-1, ¶ 66, 69. In an email prior to the return, Joling stated that "[i]t is my opinion that we should take back the Telcobuy 6.1 deal. SBC did not come through on this earlier commitment and we should no longer hold Telcobuy to this. Under normal situations we would not have run this through Telcobuy without a firm SBC [purchase] order." (R. 330-18, Ex. 1097, TEL 654604.) There is no indication in Joling's email, however, that Tellabs violated any contractual provision relating to purchase orders. On May 18, Tellabs accepted return of $12 million of port modules "that were shipped out in December of 2000 that a) [do] not have an SBC purchase order for, or b) [are] outside the SBC forecast through November 2001." (R. 324-1, ¶ 69.) In addition, on June 1, 2001, Tellabs recorded returns from Telcobuy for full credit, totaling $28,632,968 (one return for $23,338,398 and another for

$5,294,570). *Id.* These returns related to the product shipped to Telcobuy in fourth quarter 2000 (on December 21, 2000) and first and second quarters 2001 (on March 30 and April 4, 2001). *Id.*

Feigh testified that Tellabs always had a purchase order before shipping product and that the agreements between Telcobuy and Tellabs did not provide Telcobuy a right of return. (R. 336-1, ¶ 69.) Joling testified that Telcobuy did not tell him that Tellabs had shipped Telcobuy product that Telcobuy did not want and that Tellabs gave Telcobuy "enticements," or discounts, to buy TITAN 5500 modules which Telcobuy intended to resell to SBC. (R. 336-1, ¶ 70.)

In addition, Tellabs gave Telcobuy discounts of 1% and 3% on certain orders in first quarter 2001 that had the effect of causing revenue that Tellabs had expected from SBC in later quarters of 2001 to be booked in first quarter 2001. (R. 324-1, ¶ 67.) Moreover, on March 27, 2001, Steve McCarthy wrote to Mike Mayszak, Group Manager, Business Management, Regional Bell Operating Companies, about a deal with Telcobuy for a $7 million TITAN modules order. He cautioned:

> My opinion is that we are setting a dangerous precedent by cutting another end of quarter deal with Telcobuy. By doing this 2 quarters in a row we now have established a pattern of behavior that will be used against us in the future. Ultimately, if we need this as the last $7M to make the quarter then we go as far as we did last quarter for the $50M which was an additional 6% discount over their contract discount of 2%.

(R. 324-1, ¶ 68.) The same day, during a phone conversation with Mayszak and Jim Roche, Manager of the Telcobuy account, Joling stated he "didn't think it was appropriate to add an additional 7 million to an inventory that was already swollen . . . ." *Id.*[16]

---

[16] Plaintiffs contend that this deal closed at the end of March 2001, but the evidence cited only reflects that Tellabs was "trying" to get the opportunity to close at that time. (R. 330-18, Ex. 1106.)

61

Dawn Pawlowski, Tellabs's revenue recognition manager, reviewed the December 2000 Telcobuy transaction and found that it was in conformance revenue recognition requirements. She conditioned her approval on a series of statements including that Telcobuy did not have a contractual right to return equipment. (R. 301-14, Ex. 86.) Pawlowski did, however, indicate that a net ninety day payment "seems a little long," but left the issue to the judgment of Andrea Rebmann and Mark Striepling, Tellabs's credit managers. *Id.* Pawlowski was aware that Telcobuy was relying on SBC for resources to pay for the product. *Id.* Pawlowski and Striepling were responsible for making the determination about revenue recognition, and Notebaert was not involved in any respect in making this determination. *Id.*

## 2. Verizon

During a strike at Verizon in the summer of 2000, Verizon asked Tellabs to lend employees to Verizon to help fill out planning documents. (R. 336-1, ¶ 64.) Joling, a former Tellabs employee who was the head of sales for SBC, testified that Tellabs used channel stuffing as a strategy and that a co-worker who worked under LaDuca on the Verizon account told him that Tellabs employees "went into Verizon and actually wrote the engineering documents and the purchase orders for the Tellabs equipment while they were on strike." (R. 336-1, ¶ 65; R. 330-1, Ex. 1008, p. 103.) Joling, however, also testified that he had no connection to the Verizon sales account and that he has no personal knowledge of Tellabs employees writing purchase orders for Verizon. *Id.* He further testified that he did not necessarily believe that purchase orders were sent to Verizon that Verizon never signed off on. (R. 301-1, Ex. 1008, p. 189.) Indeed, Verizon had authorized the activities of the Tellabs employees assisting Verizon

and had approved all purchase orders within Verizon before Verizon sent them to Tellabs to fill.
(R. 336-1, ¶ 64.)

In addition, in October 2000, with Notebaert's knowledge, Tellabs concluded an
arrangement with Verizon that allowed Verizon to resubmit as turnkey orders, which were not to
be invoiced until 2001, up to $10 million of orders that Verizon had already placed. (R. 324-1, ¶
72.) Rick LaDuca, Verizon Account Manager, explained that turnkey "is a contract amendment
that states that we will not invoice them until 2001." *Id.* In other words, turnkey is simply an
extended payment term. *Id.* In exchange, Verizon committed to place an additional $75 million
to $100 million in new, non-turnkey orders, which were to be invoiced in late December 2000
"SO THAT VERIZON ISN'T REQUIRED TO PAY UNTIL NEXT YEAR," although Tellabs
would recognize the revenue in fourth quarter 2000. *Id.* In an October 23, 2000 email, LaDuca
acknowledged: "THE AGREEMENT TO INVOICE LATE IN DECEMBER WAS A VERBAL
AGREEMENT BETWEEN MYSELF AND CHUCK DUNSEY [Verizon] AS A VEHICLE TO
GET ADDITIONAL BUSINESS IN 4Q. OTHERWISE VERIZON WOULD WAIT UNTIL
2001 TO PLACE THE ORDERS!!" *Id.* Tellabs sought to avoid pushing out sales slated for
shipment in September to fourth quarter 2000 to avoid those sales becoming part of the turnkey
deal. (R. 330-19, Ex. 1113.) Tellabs and Verizon also discussed a November 2000 deal, but
there is no evidence that the deal ever occurred. (R. 330-19, Ex. 1119.)

In March 2001, Tellabs made a commitment to Verizon to provide a $3 million credit for
future services in exchange for Verizon's placing $20 million of purchase orders for TITAN
5500 products for shipment in first quarter 2001, rather than second or third quarter 2001. (R.
324-1, ¶ 75.) Ultimately, Verizon purchased only $11 million of equipment, and Tellabs reduced

the credit to $2 million. *Id.* This caused revenue that Tellabs had expected from Verizon in later quarters of 2001 to be booked in first quarter 2001. (R. 345-1, Resp. ¶ 75.) Tatara wrote: "the actual equipment that was associated with the $11M in 1Q orders will now not be installed until 2002 …" (R. 330-19, Ex. 1125.) In addition, a Special Deal, Credit and Revenue Recognition Authorization Summary for first quarter 2001 listed a $13 million "approved special deal" with Verizon. (R. 330-19, Ex. 1126.) It is unclear whether the special deal, however, is associated with the March 2001 agreement, and McCarthy testified that the document was a list of deals that did not materialize during first quarter 2001, though some materialized later. (R. 351-1, Ex. 118, pp. 151-52.)

Notes from an April 27, 2001 meeting reveal Verizon's concerns regarding the fact that Tellabs had shipped products to Verizon well before Verizon's installation dates. (R. 330-19, Ex. 1129.) The meeting notes indicate that Tellabs shipped products to Verizon when there was no connection between the installation date and the ship date, and that in some cases the site was not ready for installation or installation crews were not available. *Id.* Verizon thus informed Tellabs that it would not accept equipment deliveries without a firm delivery date. *Id.* In order to rectify the problem, meeting notes reflect that Tellabs intended to discuss speeding up the installation process with Verizon and that Tellabs would develop an internal process to manage Verizon orders and installations.[17] On April 30, 2001, LaDuca emailed a summary of issues impacting Tellabs's "ability to generate revenue at Verizon." (R. 324-1, ¶ 78.) LaDuca indicated that one of Verizon's concerns was Tellabs's track record of installing systems. (R. 330-19, Ex. 1130, TEL 387546.) Another issue was Tellabs's strategy of shipping systems in

---

[17] In addition, in two instances, Tellabs also mistakenly shipped products to two other customers who had put holds on their orders. (R. 330-19, Exs. 1127-1128.)

third and fourth quarter 2000 because Verizon "believe[d] that [Tellabs was] too aggressive in shipping systems well in advance of our installation start date. They are reviewing their position on this, but I suspect that in the absence of a compelling win-win deal, we will not be able to duplicate our 4Q00 heroics." *Id.*

## V.    TITAN 5500 Statements

During the March 7, 2001 analyst call, an analyst asked Tellabs: "The TITAN 5500, can you give us an update on how that flagship product is doing? I am assuming based on the size of number cuts that you are not seeing any weakness there at all." Brian Jackman responded: "We are not. We are still seeing the product continue to maintain its growth rate and is still experiencing strong acceptance. We are in the process of turning [up] a large number of frames we shipped in the fourth quarter and this is continuing to grow as usual. I think that is pretty much on plan." (R. 336-1, ¶ 84.) Jackman testified that he based his statement on forecasts from the sales organization which revealed that Tellabs still expected to make the plan for the TITAN 5500 and "customer's expectations that they were still to take a fair number of frames." *Id.* Indeed, during the second half of February 2001, Jackman approached the sales and marketing executives to ask if they were seeing any weakness in demand and they responded that they were not. (R. 301-2, Ex. 14, p. 386; R. 301-3, Ex. 19, p. 967-68.) Based on this information, Jackman testified that he believed that the slowdown in the industry was not affecting Tellabs in the same way as some of its competitors, either because it was in a protected niche or because it was taking market share from competitors. (R. 336-1, ¶ 85.)

Two weeks later, on March 14, 2001, Tellabs distributed its Annual Report to investors (R. 336-1, ¶ 87.) In the Annual Report, Tellabs included a "Q&A" section in which Birck and

Notebaert answered questions that were frequently asked by investors and that Tellabs believed

would be of interest to investors. *Id.* One of the questions asked was, "Your core business is

built on the TITAN 5500 – are you worried that this product has peaked?" The Annual Report

stated in response:

> No. In 2000, TITAN 5500 revenues grew 56%, its best year so far. Although we
> introduced this product nearly 10 years ago, it's still going strong because we keep
> adding new capabilities so it can do more and more for our customers. For example,
> last year we introduced a new TITAN 5500 system with 50% more capacity – enough
> to handle 1 million simultaneous Internet sessions. Now customers want an even
> larger TITAN 5500 system. That's why we believe there are many years of life ahead
> for this highly successful product.

*Id*; R. 324-1, ¶ 43. Pfefferle asserts that while sales of the TITAN 5500 were slower than hoped

for in January, as of mid-February 2001, no one was forecasting a decline in TITAN 5500 sales

in 2001 due to the January results alone. (R. 301-1, Ex. 8, ¶ 14.) As of April 18, 2001, when

Tellabs revised downward its full year guidance, it was still predicting 10%-15% year-over-year

growth for all optical networking products. (R. 301-10, Ex. 64, TEL 669457.)

> Finally, on the April 6, 2001 conference call, Notebaert stated:

> In just the last few weeks, however, we experienced a more controlled order flow
> from our larger customers than we originally anticipated. Clearly the environment
> has resulted in near term caution in the pace at which customers are deploying
> equipment. Our customers are exercising a high degree of prudence over every
> dollar spent. Let me balance this a bit and say that everything we hear from the
> customers indicates that our end user demand for services continues to grow.
> Fortunately for Tellabs, our TITAN family of products helps our carrier customers
> meet this demand in a cost effective way, which is the major reason we are still able
> to grow total revenue 20% year-over-year even in this environment.

(R. 336-1, ¶ 90.) Industry analysts used the term "end user" to refer to customers of Tellabs's

service providers, its core customer base. (R. 301-15, Ex. 95, TEL 660322, Ex. 696, TEL

766103.) In mid-March 2001, the Senior Vice President of Large Business Sales reported to

Tellabs's Chief Information Officer that he expected frame relay services provided by Sprint to its customers, *i.e.* end users, to grow by 25% in 2001, IP by 40%, ATM by 50%, and private line by 5%. (R. 301-15, Ex. 97, TEL 803364-65.) On March 28, 2001, Worldcom filed a Form 8-K in which it also stated that it was continuing to predict growth in its provision of local and long distance private lines, frame relay, ATM, and Internet services, including dial-up. (R. 301-15, Ex. 98, pp. 6-12.) Worldcom did not provide forecasts regarding the portion of the market share it could capture with respect to each of these sectors. *Id.* An Optical Networking Group report dated March 5, 2001 reflects that these services "fuel the growth for Tellabs's optical networking products." (R. 301-16, Ex. 99, TEL 017486.)

In addition, several major service providers reported in their first quarter results at the end of April that end user demand for their services grew over the prior year. (R. 336-1, ¶ 93.) SBC, for example, reported that its "core data transport products, including SONET, DS3s, and ATM, also showed strong first-quarter growth that was driven by enterprise customers whose increased use of sophisticated applications requires significantly more bandwidth." *Id.* AT&T reported that its Frame Relay, ATM, and IP services grew approximately 40% in the first quarter over the prior year. *Id.* Verizon reported that it, "ended the quarter with data circuits in service equivalent [DS0 equivalent] to 49.1 million voice-grade access lines, up 58.7 percent from first quarter 2000. These data circuits combined with 62.9 million voice-grade access lines to give Verizon 112 million total access line equivalents in service at the end of the quarter, 19.8 percent more than at the end of the first quarter 2000." *Id.* Qwest stated that demand for its services "remains robust." *Id.* Tartara also testified that, as of July 2001, "we believed at that time that the end-user use of the Internet and growth in data would continue in an unrestricted

manner, and therefore, the TITAN 5500 revenues would continue in an unrestricted manner."
(R. 301-17, Ex. 104, p. 1119.)

Furthermore, analysts also observed at that time that service providers were indicating that end user demand was continuing to grow. (R. 336-1, ¶ 94.) On January 23, 2001, AG Edwards reported that demand for high-speed T1 and DS3 circuits continued to grow at 30-40%. *Id.* As of April 6, 2001, according to AG Edwards, those growth indications had not changed: "Carriers have indicated that they are still experiencing strong growth for T1 services." *Id.* Similarly, on March 8, 2001, Gruntal & Co. noted the existence of "strong end user demand for communications services, namely data networking." *Id.*

At the time that Mr. Notebaert made the challenged statements contained in the 2000 Annual Report and on April 6, 2001, he asserts that he fully believed they were entirely accurate, not misleading in any way, and accurately reflected the best information and advice available to him. (R. 301-1, Ex. 9, ¶¶ 8, 10.) Other Tellabs executives prepared the statements in the Annual Report, and other senior executives reviewed and vetted both statements in advance. None of these executives raised any issues with Notebaert regarding these statements. *Id.*[18]

## VI. Statements Not at Issue

Pursuant to the Court's December 9, 2009 minute order, Plaintiffs are "barred from pursuing the allegations of misrepresentation relating to the following statements concerning the TITAN 6500 under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder":

---

[18] Plaintiffs improperly dispute this fact with citation to 84 paragraphs from their statement of additional facts. (R. 354-1, Resp. to ¶ 102.) The Court may disregard statements and responses that do not properly cite to the record. *See Cichon*, 401 F.3d at 809-10.

a.      Tellabs's December 11, 2000 press release: "The TITAN 6500 system is available now."

b.      Defendant Notebaert's statement during the March 7, 2001 analyst conference call: "Interest and demand in the 6500 continues to grow. . . . We continue to ship . . . 6500 through the first quarter. We are satisfying very strong demand and growing customer demand."

c.      Defendant Notebaert's statement during the April 6, 2001 analyst conference call in response to a question whether Tellabs was still on track to recognize 6500 revenue in the second quarter: "[T]he 6500 is showing strength . . . we should hit our full manufacturing capacity in May or June to accommodate the demand we are seeing. Everything we can build, we are building and shipping. The demand is very strong."

(R. 311-1, 12/09/2009 Minute Entry, p. 3.)

## VII.   Loss Causation

Plaintiffs have retained Professor Linda Allen to render her opinion regarding, in part, loss causation. (R. 336-1, ¶ 58.) Professor Allen opined that the evidence demonstrates loss causation in connection with Tellabs's disclosures on April 6, 2001 and June 19, 2001. (R. 330-14, Ex. 1053, p. 12.) Defendants' damages expert, Professor Kenneth Lehn, opined that Plaintiffs' expert did not established loss causation. (R. 301-11, Ex. 70, ¶ 26.) In formulating his opinion, the materials Professor Lehn relied upon included publicly available information compiled by staff at Cornerstone Research. (R. 330-18, Ex. 1101, p. 34.) Professor Lehn found no indication that it ever became known to the market that Tellabs's fourth quarter financial statements were misstated or that Tellabs's stock price declined as a result of such market knowledge. (R. 336-1, ¶ 57.) In addition, Tellabs never restated its fourth quarter or full year 2000 financial statements, or otherwise indicated that its reported financial results were materially misleading. *Id.*

69

In forming her opinions regarding loss causation, Professor Allen identified "at least three components to the alleged misstatements," including statements regarding the TITAN 5500, statements regarding the TITAN 6500, and Tellabs's 2001 forecasts. (R. 301-12, Ex. 72, pp. 12-13.) Professor Allen also stated that, "[p]art of the alleged misstatements involve inflation of sales figures and forecasts through illegitimate sales practices and 'channel stuffing' of [the TITAN 5500]." *Id.* at p. 13, n.15. Professor Allen does not explicitly assert in her report whether she has taken a fraud-on-the market or a materialization of risk approach to her analysis. (R. 330-14, Ex. 1053.) In her deposition, Professor Allen testified that she was not aware whether Plaintiffs had alleged that any public disclosure would have revealed that there was any accounting issues with respect to Tellabs's reported financial results. (R. 301-12, Ex. 73, p. 131.) Professor Allen opined that, with respect to Tellabs's June 19, 2001 guidance, "the previously undisclosed information released by Tellabs on June 19, 2001 involved both [Tellabs's] sales revenue shortfalls in its existing product line (*e.g.*, the TITAN 5500 flagship product) and delays in sales of new products such as the TITAN 6500." (R. 330-14, Ex. 1053, p. 20.)

Professor Lehn contends that he did not find any corrective disclosure related to the shipping of unordered goods in fourth quarter 2000 on April 6, 2001 or June 19, 2001, or any other date and that Professor Allen failed to connect the April 6, 2001 and June 19, 2001 disclosures to the allegations before the triers of fact. (R. 301-11, Ex. 70, ¶¶ 29, 49.) He also asserts that Professor Allen's statements regarding Tellabs's January 23, 2001 statements, including that the fourth quarter financial results "propped up" Tellabs's stock price, are without merit because she fails to demonstrate that the fourth quarter 2000 financials were incorrect and

she fails to distinguish between analysts' reactions to Tellabs exceeding expectations in fourth quarter 2000 and reactions to affirmation of the 2001 forecast. *Id.* at ¶ 55.

## VIII. Facts Relating to the *Brieger* Case

In *Brieger v. Tellabs, Inc.,* 629 F. Supp. 2d 848 (N.D. Ill. 2009) (Kennelly, J.), plaintiffs Don Brieger, Harry Schultz, Robert Becker, and Alan Burstin, on behalf of themselves and a certified class, sued defendants Tellabs, Inc., Tellabs Operations, Inc., Richard C. Notebaert, Michael J. Birck, Brian J. Jackman, Debra Ragusa, Michael C. Smiley, and Joan E. Ryan for alleged breaches of fiduciary duties under the Employee Retirement Income Security Act, 29 U.S.C. §§ 1109 & 1132 ("ERISA"). *Id.* at 851. The *Brieger* named plaintiffs are different than the named Plaintiffs in the case before this Court. *See id.*; R. 256-1, 2/23/2009 Memorandum Opinion and Order. The *Brieger* class, however, involved "[a]ll persons who were participants or beneficiaries of the Tellabs, Inc. Profit Sharing and Savings Plan at any time between December 11, 2000 and July 1, 2003 and whose accounts included investments in Tellabs stock." *Id.* While the defendants in the cases are not identical (R. 324-1, ¶ 92), all of the Defendants in the present case were also defendants in the *Brieger* action. *Id.;* 629 F. Supp. 2d 848, 851 (N.D. Ill. 2009).

One of the plaintiffs' claims in the *Brieger* action was that Tellabs "engaged in troubling, improper practices in an attempt to conceal the problems with the TITAN 5500," including "overloading customers with shipments of unwanted products and falsifying purchase orders." (R. 336-1, ¶ 96) (citing *Brieger v. Tellabs, Inc.*, Case No. 06-1882 (N.D. Ill.), Answer, Docket Entry 82, Ex. 109 at ¶ 129). In a Rule 30(b)(6) deposition, which was later designated for admission at trial, but not admitted, the *Brieger* plaintiffs questioned Verizon regarding whether

71

the company was aware of Tellabs ever "shipping product without having a proper order for that product." The witness responded: "No, I'm not." (R. 336-1, ¶ 97) (citing Tyd Dep., Ex. 110 at 57-58.) The *Brieger* plaintiffs argued at trial, based on certain internal Tellabs emails, that Tellabs's fourth quarter 2000 financial statements were misstated because Tellabs had shipped unordered product to Verizon during the fourth quarter. (R. 336-1, ¶ 97) (citing Defendants' Proposed Findings of Fact and Conclusions of Law, Ex. 111, ¶ 96 and *Brieger* Trial Tr., Ex. 112 at 1900-01 (arguing that emails established that Tellabs's fourth quarter financial statements were falsely inflated)). In this regard, the *Brieger* plaintiffs relied upon one of the very same emails that Plaintiffs rely upon in this case to support their contention that Tellabs shipped unordered product to customers—namely, the October 17, 2000 email from Rick LaDuca to Notebaert stating that during a strike at Verizon, Verizon asked Tellabs employees to generate planning documents. (R. 336-1, ¶ 97) (citing *Brieger* Trial Tr., Ex. 112 at 1900; Notebaert *Brieger* Trial Test., Ex. 19 at 859-60).

Plaintiffs admit that the plaintiffs in *Brieger*, like Plaintiffs in this case, also challenged Tellabs's 2001 guidance as having been false, starting with the guidance given at the analysts conference on December 11, 2000, and continuing through at least June 19, 2001. (R. 336-1, ¶ 98) (citing *Brieger v. Tellabs, Inc.*, Case No. 06-1882 (N.D. Ill.), Docket Entry 82, Ex. 109 at ¶¶ 124-25, 141-42; Defendants' Proposed Findings of Fact and Conclusions of Law, Ex. 111 at ¶¶ 92-128, 132; *Brieger* Trial Tr., Ex. 112 at 1903-08).

Finally, the *Brieger* plaintiffs, again like Plaintiffs in this case, specifically challenged as having been false: (1) Brian Jackman's March 7, 2001 statement regarding the TITAN 5500 product sales that, "We're still seeing that product continue to maintain its growth rate; it's still

experiencing strong acceptance," and (2) the statement in Tellabs's 2000 Annual Report, in which Notebaert and Birck responded to a frequently asked question, "Are you worried that [the TITAN 5500] has peaked," by stating, "No…. Although we introduced the product nearly 10 years ago, it's still going strong." (R. 336-1, ¶ 99) (citing *Brieger v. Tellabs,* Inc., Case No. 06-1882 (N.D. Ill.), Docket Entry 82, Ex. 109 at ¶¶ 131, 141; Plaintiffs' Amended Proposed Findings of Fact and Conclusions of Law, Ex. 113 at ¶¶ 110, 112).

In their second amended consolidated complaint, the *Brieger* plaintiffs did not specifically challenged Notebaert's April 6, 2001 statement regarding "end user demand." (R. 330-21, Ex. 1151.) At trial, however, counsel for the *Brieger* plaintiffs asked Notebaert whether he made the April 6, 2001 statement, "Everything we hear from our customers indicates that our end user demand for services continues to grow." (R. 301-3, Ex. 19, pp. 914-15.) In addition, the *Brieger* plaintiffs alleged that the defendants concealed decreasing demand for the TITAN 5500. (R. 330-21, Ex. 1151, ¶¶ 123-32.)

## LEGAL STANDARD

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Knight v. Wiseman*, 590 F.3d 458 (7th Cir. 2009). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). In determining summary judgment motions, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S.

372, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007). The party seeking summary judgment has

the burden of establishing the lack of any genuine issue of material fact. *Celotex Corp. v.

Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). "Thus, to survive

summary judgment, the nonmoving party must present evidence sufficient to establish a triable

issue of fact on all essential elements of its case." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d

698, 702 (7th Cir. 2009); *see Rozskowiak v. Vill. of Arlington Heights*, 415 F.3d 608, 612 (7th

Cir. 2005) (the nonmoving party must present "evidence on which the jury could reasonably find

for the nonmoving party.").

## ANALYSIS

There are three remaining § 10(b) claims against Notebaert based on three categories of

alleged misrepresentations remaining at issue in this lawsuit: (i) statements regarding Tellabs's

financial results for fourth quarter 2000 and full year 2000, (ii) Tellabs's projections of earnings

and revenues during 2001, and (iii) statements regarding the TITAN 5500. There are also §

10(b) claims against Tellabs which are vicariously based on Notebaert and Jackman's § 10(b)

liability. *Makor II*, 513 F.3d 702, 708 (7th Cir. 2008.) Defendants seek summary judgment on

each of these claims.

Section 10(b) of the Securities Exchange Act makes it "unlawful for any person, directly

or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails,

or of any facility of any national securities exchange . . . [t]o use or employ, in connection with

the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in

contravention of such rules and regulations as the Commission may prescribe as necessary or

appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b).

Pursuant to Rule 10b-5, promulgated by the SEC, it is unlawful:

> (a)  To employ any device, scheme, or artifice to defraud,
>
> (b)  To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c)  To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 CFR § 240.10b-5.  "In a typical § 10(b) private action a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008) (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-342, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005)); *Pugh v. Tribune Co.* 521 F.3d 686, 693 (7th Cir. 2008.)[19]  The Court will address each category of misrepresentations in turn.

## I.  Fourth Quarter and Full Year 2000 Financial Statements

Plaintiffs' claims regarding Defendants' fourth quarter and full year 2000 financial statements derive from allegations that Defendants inflated their revenue by engaging in channel stuffing.  The parties dispute, however, which of Plaintiffs' claims regarding channel stuffing survived Defendants' initial motion to dismiss.  This dispute is easily resolved because the

---

[18]  Defendants are not challenging the materiality of any of the statements in the case and admit that the market for Tellabs's common stock was efficient during the Class Period.  (R. 324-1, ¶ 97; R. 345-1, Resp. ¶ 97.)

Seventh Circuit made explicit that only Plaintiffs' channel stuffing claims regarding unordered

product survived the motion to dismiss:

> Although the amended complaint alleges that Tellabs inflated its fourth quarter numbers through the use of fictitious sales, back-dated orders, and "creative" incentives, **the only allegation that the plaintiffs pleaded with sufficient particularity is the charge that Tellabs flooded its downstream customers with unordered TITAN 5500s.** This practice, known as channel stuffing, creates a short-term illusion of increased demand between the time when the company sends the extra product down the line and the time when the distributors return the unwanted excess. According to the plaintiffs' confidential sources, Tellabs had to lease extra storage space in January and February 2001 to accommodate the large number of returns.
>
> While there maybe legitimate reasons for attempting to achieve sales earlier via channel stuffing, providing excess supply to distributors in order to create a misleading impression in the market of the company's financial health is not one of them. The complaint relies on several confidential sources to support the channel stuffing allegation. For example, one source informed class counsel that Verizon's chairman had asked Tellabs to stop providing Verizon, Tellabs's largest customer, with products that Verizon did not request or require. Given the consistency and specificity of the plaintiffs' channel stuffing allegations, the district court found, and we agree, that the amended complaint provided sufficient detail of channel stuffing to overcome the PSLRA's material falsity hurdle.

*Makor I*, 437 F.3d at 598 (7th Cir. 2006) (emphasis added). This ruling is the law of the case.

*See Marseilles Hydro Power LLC v. Marseilles Land & Water Co.*, 481 F.3d 1002, 1004 (7th

Cir. 2007).

Plaintiffs attempt to draw a distinction between statements in the Court's ruling on the

motion to dismiss referring to Tellabs's "over-inventorying" of customers and the Seventh

Circuit's pronouncement that the only allegations that survived are that Tellabs flooded its

customers with "unordered" products. This is a distinction without a difference. The Court

made clear that when "Tellabs over-inventoried it[s] customers" it "provided customers with

products that the customers did not want." *Johnson v. Tellabs, Inc.*, 303 F. Supp. 2d 941, 959

76

(N.D. Ill. 2004).  The Court also noted that Plaintiffs had sufficiently alleged that Tellabs engaged in channel stuffing activities when the company "did not even have an agreement with the ultimate purchaser of the product" and nonetheless shipped products "although customers did not need the products."  *Id.*  Plaintiffs misconstrue both courts' rulings and contend that Tellabs inflated fourth quarter revenues by "pulling forward at least $130 million of sales . . . before Tellabs's customers would have otherwise made such purchases in the ordinary course."  (R. 329-1, Pls.' Opp'n., p. 38.)  Plaintiffs further assert that "[b]ecause such accelerated sales were induced by Tellabs, and not by the customer in the ordinary course, they were tantamount to shipping unordered product" and that there is much evidence that Tellabs "shipped product before the customer needed or expected it."  *Id.*

Both the Seventh Circuit and this Court's opinion make clear, however, that the allegations regarding pulling sales forward, accelerating sales, or incentivizing sales did not withstand the motion to dismiss.  The only claims that survived are the detailed claims regarding Tellabs shipping unordered products or products that the customers did not want.  With respect to these narrow channel stuffing claims, the Court grants summary judgment for two independent reasons.  First, there is no evidence in the record to create a genuine issue of material fact as to whether Tellabs ever shipped "unwanted" or "unordered" product to its customers.  Second, Plaintiffs have failed to create a genuine issue of material fact with respect to loss causation.

### A.    Evidence of Channel Stuffing

Plaintiffs have presented no evidence sufficient to create a genuine issue of material fact as to whether Tellabs was shipping "unwanted" or "unordered" products to its customers.

Specifically, Plaintiffs have also failed to point to any evidence supporting that Tellabs shipped unordered or unwanted product to Verizon or Telcobuy.[20]

### 1.    Verizon

With regard to Verizon, Plaintiffs highlight a series of incidents to support their channel stuffing claims:  (i) Tellabs's involvement with Verizon during a Verizon strike in the summer of 2000, (ii) an October 2000 turnkey agreement between Tellabs and Verizon, (iii) a March 2001 deal regarding credit for future services to Verizon in exchange for purchase orders, and (iv) communications between Tellabs and Verizon regarding the timing of Tellabs's shipping and installation dates.  The Court will address each transaction in turn.

First, Plaintiffs point to a former Tellabs employee who testified that Tellabs used channel stuffing as a strategy.  The employee's testimony derived from his interactions with Verizon during a strike at Verizon in the summer of 2000.  Tellabs assisted Verizon during this strike by lending employees to Verizon.  While the former Tellabs employee testified that Tellabs used channel stuffing as a strategy, he also testified that he had no connection to the Verizon sales account and that he has no personal knowledge of Tellabs employees writing purchase orders for Verizon.  In fact, he testified that he did not necessarily believe that Tellabs sent purchase orders to Verizon that Verizon did not approve.  Moreover, the undisputed record reflects that Verizon had authorized the activities of the Tellabs employees assisting Verizon and had approved all purchase orders within Verizon before Verizon sent them to Tellabs to fill.

---

[19]  Plaintiffs rely heavily on evidence regarding sales to Pacific Bell, Sprint, Quest and Walker.  The evidence regarding these customers -- when viewed in the light most favorable to Plaintiffs -- shows that Tellabs merely offered Pacific Bell extended payment terms, pulled-in Sprint orders in fourth quarter 2000, offered discounts to Qwest, and accepted a large return from Walker.  Based on the Seventh Circuit's ruling in this regard and the fact that Plaintiffs do not even argue that Tellabs ever shipped unordered product to these customers, the Court need not address the transactions with these customers.

Second, in October 2000, Tellabs made an agreement with Verizon involving turnkey orders to bring in additional business in fourth quarter 2000. Specifically, Tellabs allowed Verizon to resubmit up to $10 million of orders it had already placed as turnkey orders. The record shows that these turnkey orders, however, were simply an extended payment term which provided that Tellabs would not invoice Verizon until 2001. In return for this payment term, Verizon committed to placing additional orders with Tellabs. With regard to these turnkey orders, there is no evidence in the record that Tellabs shipped unordered product to Verizon.

Third, Plaintiffs point to a March 2001 deal in which Tellabs made a commitment to Verizon to provide a $3 million credit for future services. In exchange, Verizon placed $20 million of purchase orders for TITAN 5500 products for shipment in first quarter 2001, rather than the second or third quarter 2001. The evidence regarding this transaction again merely shows that this agreement caused revenue that Tellabs expected from Verizon in later quarters of 2001 to be booked in first quarter 2001, not that Tellabs shipped unordered product to Verizon.

Finally, Plaintiffs highlight correspondence between Tellabs and Verizon showing that Verizon was dissatisfied with the timing of Tellabs's shipping and installation dates. The evidence relied on by Plaintiffs does show that Tellabs had shipped products to Verizon well before the date Verizon intended to install the products and that, as a result, Verizon informed Tellabs that it would not accept equipment deliveries without a firm delivery date. Once again, however, there is no indication in the record that Tellabs shipped unordered product to Verizon, and instead the record reflects that Verizon was dissatisfied with Tellabs's actions in shipping products that Verizon had ordered from Tellabs prior to Verizon's installation dates.

In sum, the Verizon transactions referenced by Plaintiffs -- even when viewed in the light most favorable to Plaintiffs -- merely highlight a series of sales techniques employed by Tellabs during the Class Period that Tellabs hoped would increase sales or move sales forward into earlier quarters. Additionally, and critical to Defendants' motion, none of the facts presented by Plaintiff with respect to these customers indicate any evidence of Tellabs shipping "unwanted" or "unordered" products to Verizon.

### 2. Telcobuy

With respect to Telcobuy, Plaintiffs highlight two transactions to support their channel stuffing claims. With respect to the first transaction, there is no evidence in the record that the October 2000 transaction ever occurred. While one of the terms of the proposed October 2000, agreement was that Telcobuy must have a valid purchase order from SBC, Feigh, who supervised sales to Telcobuy, explained that the draft October 2000 agreement was a proposal from Tellabs to Telcobuy to purchase TITAN 5500 *systems*, not PICS. Indeed, Plaintiffs point to only one *executed* transaction with Telcobuy, in an attempt to demonstrate that "Defendants actually did ship unordered product." (R. 329-1, Pls.' Opp'n, p. 39.) Plaintiffs contend that the evidence in the record demonstrates that Tellabs shipped product to Telcobuy intended for an end-consumer, SBC, even though Telcobuy had no valid purchase order with SBC. The only executed agreement to which Plaintiffs point, however, demonstrates that Defendants offered Telcobuy a series of discounts and extended payment terms to induce sales, and that Tellabs permitted Telcobuy to return software after it learned that, contrary to a verbal representation that it had received from SBC, that SBC would not be upgrading its TITAN 5500 systems with a

new feature package. This evidence does not raise an issue of fact regarding the channel stuffing allegations remaining in the case.

Specifically, on December 19, 2000, Telcobuy placed an order for $50.4 million of TITAN 5500 PICS from Tellabs. The evidence shows that Tellabs gave Telcobuy price discounts and extended payment terms as part of that deal. While testimony from Tellabs's employees reveals that the discounts were "unusual in the normal course of business" (R. 324-1, ¶ 65), there is no evidence that Tellabs shipped unordered or unwanted products to Telcobuy. Instead, the uncontested evidence in the record reflects that after SBC failed to place orders with Telcobuy for the modules at the expected rate in 2001, Tellabs agreed to assist Telcobuy to sell the modules and also to allow Telcobuy to return $12 million of the $50 million order of mostly TITAN 5500 equipment. Telcobuy's agreement with Tellabs did not allow it a right of return, but Tellabs accepted the products nonetheless. In sum, the evidence merely demonstrates that Defendants offered Telcobuy a series of discounts and extended payment terms to induce sales and that Tellabs permitted Telcobuy to return software after it learned, contrary to a verbal representation that it had received from SBC, that SBC would not be upgrading its TITAN 5500 systems with a new feature package.

Thus, there is simply no evidence in the record that would allow a reasonable jury to conclude that Tellabs ever shipped "unwanted" or "unordered" products to its customers. No one at either Verizon or Telcobuy supported Plaintiffs' allegations in this regard. This reason alone is sufficient to grant summary judgment on Plaintiffs' fourth quarter and full year 2000 claims, but there is a further reason as well.

### B.     Loss Causation

In order to survive summary judgment on their fourth quarter and full year 2000 claims, Plaintiffs also must demonstrate loss causation. *Dura Pharms.,* 544 U.S. at 341-342, 125 S.Ct. at 1631.  The Supreme Court has defined loss causation in the § 10(b) context as "a causal connection between the material misrepresentation and the loss." *Id.*  In order to succeed on a § 10(b) claim, Plaintiffs must allege and prove that Defendants' alleged misrepresentations proximately caused Plaintiffs' losses. *See Ray v. Citigroup Global Mkts., Inc.*, 482 F.3d 991, 994 (7th Cir. 2007).  The Seventh Circuit has recognized "several ways in which a plaintiff might go about proving loss causation." *Ray*, 482 F.3d at 995.  "The first is sometimes called the materialization of risk standard. *Caremark* takes that approach, requiring the plaintiff to prove that it was the very facts about which the defendant lied which caused its injuries.  The second approach is the 'fraud-on-the-market' scenario, which the Supreme Court discussed in *Dura.* Under that theory, plaintiffs must show both that the defendants' alleged misrepresentations artificially inflated the price of the stock and that the value of the stock declined once the market learned of the deception." *Id.*  (quotations omitted).

Plaintiffs argue that they can demonstrate loss causation via the materialization of risk standard.  Plaintiffs contend that Defendants' channel stuffing activities masked declining demand and artificially inflated sales at the expense of later reporting periods and that, eventually, Tellabs's problems were so pronounced that it was not able to hide them.  In support, Plaintiffs point to Dr. Allen's opinion that Tellabs's disclosures on April 6, 2001 and June 19, 2001 released information to the market about Defendants' fraudulent activity.  Plaintiffs further contend that "[i]t does not matter that Tellabs' [April 2001 and June 2001] corrective

announcements . . . did not admit the Company's fourth quarter 2000 financial statements were misstated, or that Tellabs never formally restated its financial statements." (R. 329-1, Pls.' Opp'n, p. 36.) Relying primarily on a non-controlling case -- *In re Motorola Sec. Litig.*, 505 F. Supp. 2d 501, 538 (N.D. Ill. 2007) -- Plaintiffs argue that the risk Defendants sought to conceal materialized causing Tellabs's stock to decline in price.

Courts applying the Supreme Court's analysis in *Dura* at the summary judgment stage have stated that the *Dura* analysis provides "that a disclosure sufficient to satisfy loss causation can occur in ways other than an announcement that points directly to a previous representation and proclaims its falsity." *Id.* at 540. Plaintiffs, however, misleadingly quote only a portion of the *Motorola* court's ruling. The *Motorola* court held:

> [A] securities fraud plaintiff is not necessarily precluded from establishing loss causation where a corrective disclosure does not, on its face, specifically identify or explicitly correct a previous representation, or expressly disclose the particular fraudulent scheme the plaintiff alleges. In this case, the fact that Motorola's February 23 Warning did not mention Telsim, or refer on its face to Telsim or vendor financing, is not necessarily fatal. The court acknowledges that the standard cannot be so lax that every announcement of negative news becomes a potential "corrective disclosure." As Defendants correctly point out, courts have held that an earnings warning, standing alone, is not a "corrective disclosure" because the resulting share price decline does not necessarily dissipate the particular price inflation caused by the alleged fraud. . . . Nevertheless, if a plaintiff shows, as Lead Plaintiff claims to have done here, that significant aspects of the still-concealed fraud in fact provided the catalyst for an anticipated failure to meet earnings forecasts, then the share price decline following an earnings warning might indeed dissipate the fraudulent price inflation; in such circumstances, there is no good reason why the earnings warning should not serve as a disclosure in which "the relevant truth begins to leak out." *See Dura Pharm.*, 544 U.S. at 342.

*Motorola*, 505 F. Supp. at 546. Significantly, however, the *Motorola* court continued:

> In the court's view, this evidence does not link the still-concealed Telsim information to the earnings warning and thus to the decline in Motorola share prices on February 23, 2001. The evidence Lead Plaintiff cites shows that Defendants were aware of significant problems with Telsim on February 23. . . . But absent from the

record is any evidence that these concerns actually motivated the February 23 Warning. At most, the evidence indicates that Motorola issued the earnings warning at the same time that Defendants were aware of problems with Telsim that might impact its earnings; there is no evidence suggesting that the earnings warning was issued because of those concerns. The latter is required; mere temporal proximity does not establish causation. *See Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410, 415 (7th Cir. 1992) (to prove damages, "[p]ost hoc ergo propter hoc will not do"). Despite extensive discovery in this action, Lead Plaintiff has offered no e-mail correspondence, document, or testimony indicating that Motorola or its senior executives issued the earnings warning on February 23, 2001 in anticipation of an earnings shortfall that was due in particular to an expected loss of Telsim-related income, rather than to Motorola's stated reasons: economic conditions, business weakness, and inventory corrections. Without such evidence, the causal link between the concealed Telsim information and the share price decline on February 23 is simply too tenuous to satisfy loss causation.

*Id.* at 547. As in *Motorola*, Plaintiffs have not pointed to any evidence that Tellabs issued the April 6, 2001 and June 19, 2001 announcements regarding revenue concerns due to the company's alleged channel stuffing activities.

The court's analysis in *In re Oracle Corp. Secs. Litig.,* 2009 WL 1709050, 2009 U.S. Dist. LEXIS 50995 (N.D. Cal. June 16, 2009), is also instructive. In *Oracle*, the plaintiffs argued that Oracle's representation that one of its products was fully functional led to "unrealistically high earnings expectations, which were corrected when the market recognized the true state of Oracle's flagship product on March 1, 2001." *Id.* at *37-*38. The court, however, found that there was no evidence that on March 1, 2001 Oracle "revealed previously concealed information about [the product] or that analyst reports about the March 1 announcement linked the miss in Oracle's applications earnings to previously concealed deficiencies with [the product.]" *Id.* at *52. Accordingly, the Court found that the "[p]laintiffs' only possible theory for loss causation is that the earnings miss itself revealed the truth about [the product] to the market, but plaintiffs cite no case in which an earnings miss alone was

sufficient to prove loss causation." *Id.* The court therefore concluded that "plaintiffs have not

identified evidence that could lead a juror to conclude that defendants' alleged

misrepresentations about [the product] were a 'substantial cause' of the decline in value of

Oracle's stock" and accordingly granted summary judgment for the defendants on the issue of

loss causation. *Id.*

Similarly, Plaintiffs have pointed to no evidence, either in Dr. Allen's report or

otherwise, to demonstrate that there is a causal connection between the channel stuffing

allegations and the decline in share value after Tellabs's April 6, 2001 and June 19, 2001

announcements. The portions of Dr. Allen's report cited by Plaintiffs merely express Dr. Allen's

opinion that Tellabs's April 6, 2001 and June 19, 2001 disclosures released previously

undisclosed information regarding declining sales. (R. 330-14, Ex. 1053, pp. 17-21.) Dr. Allen

does not connect Tellabs's alleged channel stuffing activities as related to fourth quarter 2000

revenues with these disclosures. While the Court agrees that Plaintiffs need not demonstrate that

the corrective disclosures specifically corrected a previous representation or disclosed the

alleged fraudulent scheme, in order to demonstrate loss causation Plaintiffs must show a "link"

between the concealed information and the motivation to make the disclosure. *Motorola*, 505 F.

Supp. at 546-47; *see also, In re Dell Inc., Securities Litig.*, 591 F. Supp. 2d 877, 909 (W.D. Tex.

2008) ("The disappointing earnings or expected earnings statements identified by the Plaintiffs

fail to reveal the falsity of any of Dell's prior representations, and therefore do not qualify as a

corrective disclosure"); *In re Rhodia S.A. Sec. Litig.*, 531 F. Supp. 2d 527, 545 (S.D.N.Y. 2007)

("disclosure of financial losses generally - even if those financial losses are a result of the

specific concealed fact - is not sufficient" to demonstrate loss causation).

Viewing the evidence in the light most favorable to Plaintiffs, Plaintiffs have not produced evidence from which a reasonable jury could conclude that Defendants' misrepresentations and omissions regarding its channel stuffing practices caused Plaintiffs' losses. The Court accordingly grants Defendants' motion for summary judgment with respect to Plaintiffs' fourth quarter and full year 2000 claims.

## II.     Tellabs's 2001 Guidance

Plaintiffs also challenge the forward-looking guidance that Tellabs issued on December 11, 2000, March 7, 2001, and April 18, 2001. With respect to liability for "forward-looking statements -- predictions or speculations about the future" -- the Private Securities Litigation Reform Act ("PSLRA") requires a party to show "'actual knowledge' of falsity," "not merely indifference to the danger that a statement is false." 15 U.S.C. § 78u-5(c)(1)(B)(ii); *Makor II*, 513 F.3d 702, 705 (7th Cir. 2008); *see also Slayton v. Am. Express Co.*, 604 F.3d 758, 773 (2d Cir. 2010) (plaintiffs must show that a forward-looking statement "was . . . made or approved by [an executive officer] with actual knowledge by that officer that the statement was false or misleading"); *Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 274 (3d Cir. 2009) ("Since [§ 78u-5] specifies an 'actual knowledge' standard, the scienter requirement for forward-looking statements is stricter than that for statements of current fact. Whereas liability for the latter requires a showing of either knowing falsity or recklessness, liability for the former attaches only upon proof of knowing falsity."); *Emplrs. Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Clorox Co.*, 353 F.3d 1125, 1133 (9th Cir. 2004) (holding that actual knowledge is required to impose liability for forward-looking statements); *Theoharous v. Fong*, 256 F.3d 1219, 1225 (11th Cir. 2001) (With respect to forward-looking statements, "the plaintiff

must prove that the defendant made the statement with 'actual knowledge' that it was 'false or misleading.'").[21]

While Plaintiffs refer to both Notebaert and "other senior management" when discussing Tellabs's liability for its 2000 and 2001 guidance, the PSLRA makes clear that, "there is no liability if the plaintiff fails to prove that the statement (i) if made by a natural person, was made with actual knowledge that the statement was false or misleading, or (ii) if made by a business entity, was made by or with the approval of an executive officer of that entity with actual knowledge by that officer that the statement was false or misleading." *Southland Sec. Corp. v. INSpire Ins. Solutions Inc.*, 365 F.3d 353, 372 (5th Cir. 2004); *see also Makor II*, 513 F.3d at 708 ("[t]o establish corporate liability for a violation of Rule 10b-5 requires 'look[ing] to the state of mind of the individual corporate official or officials who make or issue the statement.'") As noted above, Notebaert is the only corporate officer whose § 10(b) liability has not been determined in this litigation. Indeed, Plaintiffs do not argue that any other executive officers made or approved Tellabs's guidance with actual knowledge that the guidance was false or misleading. The relevant inquiry is accordingly whether Notebaert had actual knowledge at the time Tellabs issued the guidance that the statements were false or misleading. *See Emplrs. Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Clorox Co.*, 353 F.3d 1125, 1134 (9th Cir. 2004) ("[I]f the challenged statement is forward-looking, 'the plaintiffs must have alleged

---

[21] Plaintiffs appear to question the actual knowledge requirement set forth by the PSLRA. To support this argument, however, Plaintiffs misleadingly quote a portion of this Court's decision in *Tellabs I*. Contrary to Plaintiffs' representation, the Court's decision also made clear that "[u]nder the PSLRA, a forward-looking statement is actionable against a person only where it 'was made with actual knowledge by that person that the statement was false or misleading.'" *Tellabs I*, 303 F. Supp. 2d 941, 954 (N.D. Ill. 2004) (quoting 15 U.S.C. § 78u-5(c)(1)(B)(i)). Moreover, at oral argument on the motion for summary judgment, Plaintiffs agreed that actual knowledge is the appropriate standard under the PSLRA.

facts that would create a strong inference that the defendants made the forecasts with "actual knowledge . . . that the statements [were] false or misleading" at the time made.'") (internal citations omitted); *cf. Lorillard Tobacco Co. v. A&E Oil, Inc.*, 503 F.3d 588, 592 (7th Cir. 2007) (highlighting distinction between "actual knowledge" and "willful blindness or failure to investigate" which constitute mere knowledge under federal counterfeiting statute*); Culver v. McRoberts*, 192 F.3d 1095, 1098-1100 (7th Cir. 1999) (in a suit for negligence brought pursuant to state statute and common law, "[i]n order to establish actual knowledge by [an individual], Plaintiff must prove [individual's] knowledge under a subjective standard, not an objective one"); *Martin v. Consultants & Admrs.*, 966 F.2d 1078, 1086 (7th Cir. 1992) (noting that, with regarding to knowledge of an ERISA violation, "actual knowledge must be distinguished from constructive knowledge").  While Plaintiffs failed to specifically address Notebaert's knowledge on each date on which Tellabs issued the relevant guidance, the Court will address the evidence regarding whether Notebaert had actual knowledge of the truth of Tellabs's forecasts on December 11, 2000, January 23, 2001, March 7, 2001, and April 18, 2001 in turn.

A.      **December 11, 2000 Guidance**

On the first day of the Class Period, December 11, 2000, Tellabs provided a forecast of 30% growth in revenue and earnings per share for 2001.  The Court has stricken the expert report of Dr. Arthur Brody who opined on what conclusions Tellabs should have drawn regarding its guidance based on publicly available information at the time.  (R. 373, Memorandum Opinion and Order.)  Plaintiffs therefore must rely on other evidence such as Tellabs's internal documents and communications to establish that Notebaert had actual knowledge that the guidance issued on December 11, 2000 was false or misleading.  Plaintiffs, however, do not

88

identify any communications, written or oral, to Notebaert prior to December 11, 2000.  Instead, Plaintiffs make broad statements without citing any supporting evidence and argue that Tellabs's forecasting process was not a true "bottoms-up" process and that therefore, by implication, Notebaert knew that the December 11, 2000 guidance, which Tellabs based on this forecasting process, was false or misleading.  Plaintiffs have failed to raise a genuine issue of material fact regarding Notebaert's actual knowledge.

The uncontroverted testimony from a variety of Tellabs's employees detailed Tellabs's "bottoms-up" forecasting process which resulted in Tellabs's December 11, 2000 guidance. During the "bottoms-up" process, each operating unit gathered information about expected demand for Tellabs's products by talking directly to both Tellabs's sales force and to some of Tellabs's major customers.  The sales force provided direct information from customers.  After gathering this information, each operating unit totaled the data and supplied the information regarding expected revenues and expenses to the finance department or Christine Pfefferle.

Plaintiffs' objection to the existence of a "true" "bottoms-up" process rests on the deposition testimony of two sales persons and an October 26, 2000 memorandum from Notebaert.  One of these employees testified that Tellabs would provide him a sales quota based on his prior year's performance.  The other sales employee, Jim Joling, testified that on one occasion Notebaert pulled him into his office and told him the kinds of numbers he wanted Joling to deliver.  Viewing this evidence in the light most favorable to Plaintiffs, the testimony reveals that executives stressed the importance of meeting sales targets to sales personnel but still does not contradict the "bottoms-up" manner in which Tellabs forecasted sales.  Rather than testifying regarding Tellabs's revenue or sales forecast, the sales employees merely testified

89

regarding sales quotas. Indeed, there is no evidence demonstrating any correlation between the sales personnel's testimony and the December 11, 2000 guidance. Moreover, Notebaert's statement in an October 26, 2000 memorandum that the targets were "'expected,' if not minimum, requirements for the 2001 operating plan" is besides the point of whether Tellabs used its "bottoms-up" forecasting process to create its guidance. Even more significantly, the uncontroverted evidence shows that Notebaert relied on the "bottoms-up" forecast when issuing the December 11, 2000 guidance and that the guidance figures Tellabs presented on December 11, 2000 were the result of a consensus recommendation presented to Notebaert by his CFO, the finance department, the employees responsible for revenue forecasting for each product line, and his executive team. Plaintiffs have not made any argument to the Court regarding how the sales personnel's testimony or the October 26, 2000 memorandum reflect any actual knowledge on the part of Notebaert that the December 11, 2000 guidance was false. Indeed, even if Plaintiffs could demonstrate that Notebaert did not rely on the "bottoms-up forecast," which they have not, there is no issue of fact regarding Notebaert's actual knowledge of falsity. Plaintiffs have presented no evidence to raise a question of material fact regarding the PSLRA's burden of showing that Notebaert actually knew that the December 11, 2000 statements were false or misleading. *See Makor II*, 513 F.3d at 705 (7th Cir. 2008); *see also Eisenstadt v. Allen,* 113 F.3d 1240, 1997 WL 211313, *4 (9th Cir. 1997) (granting summary judgment on a § 10(b) securities claim where the record established that company's internal forecasts had accurately predicted its earnings and revenues for quarters prior to the start of the class period and "[s]uch historical accuracy gave [the company] a reasonable basis to rely on its fourth and first quarter predictions" despite other internal forecasts that were less optimistic). There is simply no

90

evidence in the record by which a reasonable jury could find that Notebaert actually knew that the December 11, 2000 guidance was false or misleading. The Court accordingly grants Defendants' motion for summary judgment with regard to the December 11, 2000 guidance.

**B.     January 23, 2001**

During a January 23, 2001 teleconference, Tellabs announced its fourth quarter and full year 2000 results and reiterated its 30/30 guidance for 2001. In their response to the motion for summary judgment, Plaintiffs argue that Defendants' repetition of its 30/30 guidance on January 23, 2001 is at issue in this case. Plaintiffs, however, conceded at oral argument that the Complaint does not refer to the January 23, 2001 forecast. Plaintiffs cannot raise a claim regarding Tellabs's January 23, 2001 guidance more than eight years since they instituted this lawsuit. Plaintiffs' claim as to the January 23, 2001 guidance is therefore waived. *Warren v. Solo Cup Co.*, 516 F.3d 627, 629 (7th Cir. 2008) (holding that a plaintiff waived a claim raised in response to defendant's motion for summary judgment where plaintiff failed to raise the claim in her complaint).

Even if the Court were to reach Plaintiffs' claim premised on Tellabs's January 23, 2001 guidance, it fails on the merits as well. Plaintiffs only identify one piece of evidence between Tellabs's December 11, 2000 guidance and the reiteration of that guidance on January 23, 2001 in support of the actual knowledge requirement. Specifically, on January 11, 2001, Birck forwarded to Notebaert, Jackman, and Ryan a UBS Warburg analysis lowering estimates for the telecom equipment sector, commenting: "In our case, I believe they have a reasonable viewpoint -- for now. While we may not see as much diminished demand as some of our contemporaries, this is going to be a trying year -- for a while, anyway." (R. 301-1, ¶ 17.) The addition of this

single email alone to the arguments regarding Tellabs's December 11, 2000 guidance does not

result in a triable issue of fact as to whether the January 23, 2001 guidance is actionable. While

Birck's email expresses his awareness of general economic concerns in the telecommunications

industry and that he shared this concern with Notebaert, this email alone does not suggest that

Birck was implying that Tellabs would not reach its guidance. Nor does the email create an

issue of fact as to whether Notebaert actually knew that Tellabs could not achieve the guidance it

announced on January 23, 2001. Indeed, the 2001 Operating Plan finalized on January 11, 2001,

forecasted 35% revenue and 31% earnings growth for full year 2001, figures higher than the

30/30 guidance presented on January 23, 2001. In short, even if the Court were to reach the

merits of this claim, Plaintiffs have failed to raise a triable issue as to whether Tellabs's January

23, 2001 guidance is actionable.

##### C.       March 7, 2001

On March 7, 2001, Tellabs announced downward revised guidance for first quarter 2001,

but reiterated its full year 30% growth rate guidance. With regard to this guidance, both parties

have adduced significant evidence pertaining to the state of Tellabs's projections and sales and

Notebaert's knowledge of these figures. Even viewing all of the evidence in the light most

favorable to Plaintiffs, as the Court must, the evidence at most demonstrates that there were

competing forecasts and figures known by Notebaert at the time that Tellabs issued the March 7,

2001 guidance. The Court first turns to the relevant evidence in the record.

As of January 2001, Tellabs was aware that it needed to consider the impact of the

economic downturn on its own performance. Indeed, Tellabs and Notebaert were aware of slow

sales in January 2001 and Notebaert acknowledge that these figures were concerning to him. In

a February 19, 2001 letter regarding January sales, Notebaert informed Birck that making the revenue plan would be a "challenge." In the face of slow sales, however, the undisputed evidence also shows that Notebaert tasked the forecasting organization with determining whether Tellabs's current forecast was achievable and realistic. In connection with Notebaert's request for a reexamination of the existing forecast, on February 26, 2001, Pfefferle prepared an "adjusted gap report" to show how first quarter sales were performing compared to the forecast. The gap report showed that Tellabs had identified sales sufficient to "close the gap" and meet its forecast, though those opportunities included sales with confidence levels as low as 60% and included "pull-ins" from later quarters. While a number of Tellabs employees testified that some of these deals were "unnatural," the record also demonstrates that such sales tactics were a routine practice for Tellabs.

After Notebaert assigned the forecasting task, throughout February and into early March, the weekly forecast sanity checks continued to demonstrate that "sales yet to book" percentages were often significantly lower than historical averages. The uncontroverted evidence also shows, however, that these forecast sanity checks did not account for the "hockey-stick" effect Tellabs historically experienced at the end of each quarter. Thus, on March 2, 2001, Pfefferle prepared another updated forecast for the quarter. Plaintiffs have failed to offer any evidence suggesting that Notebaert did not expect to have the hockey stick benefit. Due to the reduction in the TITAN 5500 gap that Tellabs had made at that point in the quarter and their "bottoms-up" forecasting, Pfefferle and her team continued to forecast that Tellabs would achieve 30% growth in the first quarter of 2001 over the prior year. As a result of her updated forecast, however, Pfefferle also concluded that other products, including the TITAN 6500 and Cablespan products,

were not on track to hit their forecasted revenue targets for first quarter 2001. Nonetheless, as a result of the feedback Pfefferle received from speaking with the sales force and others, Pfefferle informed Notebaert that she believed based on her thorough review of the numbers and her discussions with the sales force that, as of March 5, 2001, Tellabs would still achieve at least 30% revenue and earnings growth for the full year. In light of their findings, the forecasting organization concluded that Tellabs should lower only the overall first quarter revenue projections slightly. They provided these conclusions to Notebaert and Ryan. In sum, there is no evidence or even suggestion that Pfefferle was told what results to reach. Instead, the evidence shows that she developed her own views based on a detailed analysis and communicated those views to management.

On March 7, 2001, prior to announcing these results, Notebaert reviewed the gap report with Pfefferle and gauged her confidence in Tellabs's ability to hit the revised forecast. It is undisputed that Pfefferle told Notebaert that based on her analysis and contact with the sales teams, her department felt confident that Tellabs could reach the forecast. Notebaert also confirmed on March 7, 2001 that Joan Ryan, Brian Jackman, and John Springer all felt comfortable that Tellabs would achieve the revised guidance. Notebaert himself has averred that he believed that the guidance issued on March 7, 2001 was reasonable and based on the best available information.

Viewing the evidence in the light most favorable to Plaintiffs, it is clear that Notebaert was aware that sales of some products, including the TITAN 5500, were slow and that the forecast sanity checks indicated that Tellabs was not performing as well as it had historically. The uncontroverted evidence, however, also shows that these data indicators were among many

considerations Tellabs reviewed in revising the forecast. Merely adducing evidence of information contradictory to the statements at issue does not demonstrate that the corporate officer actually knew that the statements were false or misleading. In *In re Bristol-Myers Squibb Sec. Litig.*, 2005 WL 2007004, 2005 U.S. Dist. LEXIS 18448 (D.N.J. Aug. 17, 2005), for example, the plaintiffs challenged a series of forward-looking statements by the defendants that the defendant company would succeed in advancing the drug Vanlev as a "blockbuster" drug to treat heart failure. *Id.* at *50-*51. To support their claim that the defendants had actual knowledge that their statements were false, the plaintiffs pointed to, *inter alia*, evidence demonstrating that some employees did not believe that Vanlev would succeed as a blockbuster drug for heart failure and that at least one form of internal forecast showed that the drug would not achieve "blockbuster" status. *Id.* at *59-*61. The defendants, however, produced evidence that a different internal projection demonstrated that Vanlev did have the potential for "blockbuster" status. *Id.* at *59. Addressing the impact of conflicting internal views, the court noted:

> Viewing this evidence at its most damaging to Defendants, the most that it proves is that there were individuals at BMS who did not think that Vanlev could be a blockbuster for the treatment of heart failure. When considered in context, alongside Defendants' evidence that *others* at BMS thought that Vanlev *could* be a blockbuster for the treatment of heart failure, this e-mail does not permit the inference that speakers believing one side over the other were reckless in relying upon that belief.

*Id.* at *60. Despite the fact that internal forecasts reflected both the possibility that Vanlev may or may not achieve blockbuster status, ultimately the court granted the defendants' motion for summary judgment on those claims. The Court concluded that the "[d]efendants have produced evidence sufficient to show that they reasonably believed that Vanlev could be a blockbuster for

the treatment of heart failure alone.  Plaintiff has failed to show that Defendants had actual

knowledge to the contrary."  *Id.* at *63.

Similarly, as described above, Plaintiffs have been unable to demonstrate that Tellabs did

not routinely rely on its "bottoms-up" forecasting process or that Tellabs had no reason to rely on

the historical "hockey-stick" effect that occurred at the end of most quarters.  While the evidence

demonstrates that Notebaert was aware of conflicting indicators, these conflicting indicators are

not enough alone to raise a genuine issue of material fact.  The relevant inquiry is not whether

Notebaert reasonably assessed these indicators, or even whether Notebaert was reckless in his

assessment.  The sole question before the Court is whether there is a genuine issue of material

fact as to whether Notebaert actually knew that the March 7, 2001 guidance was false.  *Makor II*,

513 F.3d at 705.  Because the record is replete with forecasts and documents that support the

March 7, 2001 revised guidance, the uncontroverted evidence shows that Notebaert relied on

these indicators, and Plaintiffs have pointed to no evidence that establishes that Notebaert knew

that these indicators were false, Plaintiffs cannot create a genuine issue of material fact regarding

the March 7, 2001 guidance.

Additionally, while not decided under the "actual knowledge" standard, the court's

analysis in *In re Oracle Corp. Sec. Litig.*, 2009 WL 1709050, *29 -*30 (N.D. Cal. 2009), is also

instructive.  In *Oracle*, at the summary judgment stage, the parties disputed whether figures

contained in a series of "flash reports" "confirmed or undermined [Oracle's] 3Q01 public

guidance concerning anticipated revenues."  The court noted that while the flash reports

indicated negative growth in two of three divisions, the plaintiffs did not explain why this

negative growth necessarily should have alerted Oracle that it would miss its third quarter 2001

guidance, particularly in light of positive information regarding a third division's growth. *Id.* at *29. In addition, the court stated that, "[m]ore fundamentally, plaintiffs' focus on the flash reports does not take into account the hockey-stick effect. Given that Oracle was known to earn the vast majority of its quarterly revenue in the final weeks of a given quarter, it is not apparent that the results from the first or second months of the quarter are good indicators of how the quarter would turn out." *Id.* at *29-30. The court accordingly held that there was "no factual dispute as to whether the reports of Oracle's performance in December 2000 and January 2001 contained information that seriously undermined the 3Q01 forecast." *Id.* at *30; *see also Stavros v. Exelon Corp.*, 266 F. Supp. 2d 833, 849 (N.D. Ill. 2003) (dismissing claim for failure to demonstrate defendant's actual knowledge of falsity where "allegations of adverse market conditions, economic weakness and declining energy prices" did not permit the court to "infer from these facts that Defendants actually knew that the projection would not be met" because the company performed well in 2001, its second quarter earnings exceeded projections, and third quarter results were disappointing due to a constellation of factors). Likewise, in the present case, it is mere speculation on the part of Plaintiffs to contend that Notebaert should have second-guessed the forecasting projections made by other employees or doubted the assurances of his senior management. There is no evidence in the record regarding his actual knowledge in this respect.

Indeed, in a district court case where the court denied summary judgment on a forward-looking statement subject to the actual knowledge standard, the evidence the plaintiffs presented was far more damaging than the evidence cited by Plaintiffs in this case. In *Weiss v. Mentor Graphics Corp.*, 1999 WL 985141, 1999 U.S. Dist. LEXIS 17026 (D. Or. 1999), the plaintiff

contended that the defendant company's announcements by two corporate officers between June 30, 1996 and August 25, 1996 that it would meet its sales projections in third quarter 1996 in part because it had a large backlog of orders entering the quarter was misleading. The plaintiff argued "that it is false to represent that Mentor Graphics would meet its Q3 1996 projections because of backlog since no amount of backlog will guarantee meeting projections." *Id.* at *10. Notwithstanding the question of the impact of the backlog, the court explained that the evidence showed that, "[f]rom June 30 to August 25, the time period in which [the corporate officers] assured [plaintiff] that Mentor would make its Q3 1996 Plan, Mentor Graphics' internal documents showed that the company would be materially below plan. The earnings per share forecasts in July and August 1996 were not optimistic and senior management told the Board of Directors in early August in the Executive Summary that Mentor Graphics was unlikely to reach plan in Q3 1996." *Id.* at *17. The defendant argued that the internal earnings per share forecasts were not reliable, in part, due to the "hockey-stick" trend that the company's sales typically followed and instead pointed the court to an econometric forecast. *Id.* The evidence showed, however, that the company did not issue that forecast until August 1, 1996, one day after the company confirmed to analysts that third quarter 1996 results would be close to second quarter 1996 results. *Id.* In addition, internal documents showed that for the four quarters preceding third quarter 1996, the forecasts were above actual results. *Id.* Thus, the court held that, "Plaintiffs have presented sufficient circumstantial evidence to raise a factual issue as to the significance to attach to Mentor Graphics internal documents and whether [the corporate officers] actually knew of information that undermined their blanket assurance that Mentor Graphics would achieve its numbers." *Id.* at *19.

The evidence in this case is more similar to that in *Oracle* and *Bristol-Myers Squibb* than *Weiss*. Like in *Bristol-Myers Squibb* and *Oracle*, in the face of competing internal forecasts, including forecast sanity checks, "bottoms-up" forecasting, and gap reports, Defendants chose to rely more heavily on the "bottoms-up" forecasts and gap reports. Plaintiffs have pointed to no evidence that indicates that Notebaert knew that his reliance on the gap reports and "bottoms-up" forecasting would lead to misleading or false guidance. Indeed, unlike *Weiss*, Defendants have presented significant evidence regarding Notebaert's consideration of the relevant information. In *Weiss*, the defendant merely made a "blanket assurance" regarding its projections and only pointed to a forecast that the company issued after it had already confirmed its results to analysts. Unlike *Weiss*, Plaintiffs have pointed to no such evidence to undermine Defendants' business decisions. Plaintiffs attempt to discredit the evidence relied on by the forecasting team by claiming that the hockey-stick effect varied from year to year, that there was an economic slowdown in the telecommunications industry, and that internal gap reports included sales with a confidence level as low as 60%. Defendants, however, do not deny these facts. Instead, the evidence demonstrates that Pfefferle and Notebaert considered these factors and still reached the conclusion that Tellabs would meet its 30% forecast. Given that Plaintiffs have not demonstrated that the indicators on which Notebaert based his projections were false or unreliable, Plaintiffs have not presented sufficient evidence from which a reasonable jury could conclude that Notebaert knew that the March 7, 2001 guidance was false. *See also Emplrs. Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Clorox Co.*, 353 F.3d 1125, 1134 (9th Cir. 2004) (dismissing complaint under the PSLRA regarding where declarations failed to set forth facts "that strongly imply that [corporate officer] made the statement in deliberate or

conscious disregard of information that the transaction would not immediately add earnings per share to [company's] results").  The Court accordingly grants summary judgment for Defendants on this claim.

### D.      April 18, 2001 Guidance

On April 18, 2001, Tellabs revised its full year 2001 guidance downward.  Plaintiffs conclusorily assert that, "[t]here is also much proof from which a jury could find Notebaert and the others knew, by April 18, 2001, even 9% to 12% growth could not be achieved."  (R. 329-1, Defs.' Opp'n, p. 49).  Although Defendants addressed the April 18, 2001 guidance in their opening memorandum, Plaintiffs fail to cite to any evidence in the record or develop any arguments regarding the April 18, 2001 guidance in their response in opposition to the motion for summary judgment.  (R. 329-1, Pls.' Opp'n, pp. 49-52.)  Plaintiffs have accordingly waived this argument and the Court grants summary judgment for Defendants on this claim.  *See Bryant v. Gardner*, 587 F. Supp. 2d 951, 965 (N.D. Ill. 2008) (citing *De La Rama v. Ill. Dep't of Human Servs.*, 541 F.3d 681, 688 (7th Cir 2008) ("[u]nsupported and undeveloped arguments are waived")).

Moreover, even if the Court were to reach the merits of this claim, Plaintiffs have not created a genuine issue of material fact with respect to the April 18, 2001 guidance.  The uncontroverted evidence shows that Tellabs's downward revised April 18, 2001 guidance was the result of an in-depth, "bottoms-up" review of its forecasts.  Internal documents subsequent to the March 7, 2001 announcement demonstrate that, as in prior quarters, Tellabs continued to track its sales and revenue.  The record also shows that Tellabs was aware of the slowing economy and that revenue was not developing as Tellabs expected during this time period.

100

Indeed, while overall sales for the Optical Networking Group increased in first quarter 2001, demand for the TITAN 5500 remained low. In fact, while sales forecasts in mid-March 2001 demonstrated that Tellabs could potentially meet the first quarter forecast, there was some evidence in early 2001 that customer demand was decreasing. Moreover, at the end of the quarter, customers requested that Tellabs push out the shipping dates of approximately $83 million in firm or expected orders for the TITAN 5500 that were originally scheduled to ship in the quarter. The record shows that as first quarter 2001 closed, it became apparent to Tellabs that although revenue had increased significantly year-over-year from first quarter 2000, Tellabs would not meet the March 7, 2001 revised guidance.

Once again, however, prior to issuing revised guidance, Pfefferle and other members of the forecasting organization assembled an updated revenue plan. The uncontroverted evidence shows that the team based the updated revenue plan on information gathered from the sales team, product houses, and other operating units, all of which provided the most up-to-date information on expected demand based on what they were hearing from Tellabs's customers. As a result of this updated forecast review, and subsequent to approval from each of the officers who were direct reports to the CEO, the finance department recommended to Notebaert that Tellabs revise its public guidance to a range of $3.6 to $3.7 billion for 2001. Plaintiffs have not identified any evidence to contradict Notebaert's testimony that, during the time leading up to April 18, 2001, no one expressed any doubts to him that Tellabs would not achieve its revised guidance or that the revised guidance was based on incorrect or faulty information.

In short, even if the Court were to reach the merits of Plaintiffs' claim with respect to Tellabs's April 18, 2001 guidance, Plaintiffs have failed to present any evidence that Notebaert

had any actual knowledge that the downward revised guidance was false or misleading. *See In re Bristol-Myers Squibb Sec. Litig.*, 2005 WL 2007004, 2005 U.S. Dist. LEXIS 18448, *60. Once again, Plaintiffs have pointed to no evidence in the record to indicate that Notebaert knew that his reliance on the "bottoms-up" forecasting would lead to misleading or false guidance. Indeed, unlike *Weiss*, 1999 WL 985141, 1999 U.S. Dist. LEXIS 17026, Defendants have presented significant evidence regarding Notebaert's consideration of available and relevant information prior to the issuance of the April 18, 2001 guidance. Given that Plaintiffs have not demonstrated that the information on which Notebaert based his projections was false or unreliable, Plaintiffs have not presented sufficient evidence from which a reasonable jury could conclude that Notebaert knew that the April 18, 2001 guidance was false. This is an independent reason to grant summary judgment regarding Plaintiffs' claim in this respect.

## III.    TITAN 5500 Statements

Defendants also seek summary judgment on Plaintiffs' claims that Defendants made three false or misleading statements regarding the TITAN 5500 during the Class Period. "In a typical § 10(b) private action, a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Pugh,* 521 F.3d at 693. In *Makor II*, the Seventh Circuit explained:

> Rule 10b-5 forbids a company or an individual "to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). But liability requires proof of the defendant's "scienter," which is to say proof that he either knew the statement was false or was reckless in disregarding a substantial risk that it was false. A popular

102

definition of recklessness in this context is "an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." This looks like two criteria--knowledge of the risk and how big the risk is--but as a practical matter it is only one because knowledge is inferable from gravity ("the danger was either known to the defendant or so obvious that the defendant must have been aware of it"). When the facts known to a person place him on notice of a risk, he cannot ignore the facts and plead ignorance of the risk.

*Makor II*, 513 F.3d at 704 (internal citations omitted).

Pursuant to the Seventh Circuit's ruling in *Makor I*, 437 F.3d 597, 603, the following three statements remain at issue:

1. Brian Jackman's March 7, 2001 response to an analyst's question about whether Tellabs was seeing "any weakness" with the TITAN 5500: "We are not. We are still seeing the product continue to maintain its growth rate and is still experiencing strong acceptance. We are in the process of turning [up] a large number of frames we shipped in the fourth quarter and this is continuing to grow as usual. I think that is pretty much on plan." (R. 336-1, ¶ 84.)

2. Notebaert and Birck's March 14, 2010 response in Tellabs's Annual Report to a question about whether the TITAN 5500 "had peaked": "No . . . it's still going strong." (R. 324-1, ¶ 43.)

3. Notebaert's statement on the April 6, 2001 conference call: "[E]verything we hear from the customers indicates that our end user demand for services continues to grow." *Id.*

Defendants argue that the first statement is not actionable and further that none of the three statements were false or misleading or made with the requisite scienter. The Court will address the disputed elements of Plaintiffs' § 10(b) claims with respect to each of the three statements in turn.

### A.    March 7, 2001 Statement that the TITAN 5550 Was Not Experiencing Any Weakness

Plaintiffs first challenge Jackman's response during a March 7, 2001 teleconference to an analyst's question about whether Tellabs was seeing "any weakness" with the TITAN 5500 that:

"We are not. We are still seeing the product continue to maintain its growth rate and is still experiencing strong acceptance." (R. 336-1, ¶ 84.) In their briefs, the parties dispute whether this statement is actionable. In their Complaint, Plaintiffs inaccurately attributed this statement to Notebaert. After the appeal of the Court's ruling on the initial motion to dismiss, the Seventh Circuit held that Plaintiffs had sufficiently pled their § 10(b) claim in this context because Plaintiffs had sufficiently alleged that *Notebaert* acted with the requisite scienter. *Makor II*, 513 F.3d at 711. Plaintiffs now assert that they can proceed with their claim based on this statement by Jackman because: (i) the statement is attributable to Notebaert as a primary violator because the teleconference was a "joint official presentation on behalf of Tellabs by Notebaert, Jackman, and Ryan," and/or (ii) Tellabs is liable for official statements made by Jackman. (R. 329-1, Pls. Opp'n, p. 42.) Plaintiffs, however, cannot proceed with this claim as attributable to Notebaert because the Supreme Court has made clear that aiding and abetting is not actionable under Rule 10b-5. As Defendants concede, however, Plaintiffs can proceed against Tellabs for official statements made by Jackman. The Court will address Plaintiffs' arguments regarding liability for the March 7, 2001 statement in turn.

### 1. Notebaert's Liability for Jackman's March 7, 2001 Statement

With regard to the claim against Notebaert based on Jackman's statement, the Third Circuit's recent opinion in *Schiff* is persuasive. In that ruling, the Third Circuit highlighted that numerous courts have concluded that in order for an officer to be liable for an official statement, the statement must have been actually made by that officer:

> [T]he plain language of § 10(b) and corresponding Rule 10b-5 do not contemplate the general failure to rectify misstatements of others. *See, e.g., SEC v. Tambone*, 597 F.3d 436, [445] (1st Cir. 2010) (en banc) ("Reading 'make' to include the use of a false statement by one other than the maker would extend primary liability beyond

the scope of conduct prohibited by the text of Rule 10b-5(b)."); *Wright v. Ernst & Young LLP*, 152 F.3d 169, 175 (2d Cir. 1998) ("[A] secondary actor cannot incur primary liability under [§ 10(b)] for a statement not attributed to that actor at the time of its dissemination."); *Shapiro*, 123 F.3d at 720, 123 F.3d at 720 ("[A] defendant must actually make a false or misleading statement in order to be held liable under Section 10(b). Anything short of such conduct is merely aiding and abetting, and no matter how substantial that aid may be, it is not enough to trigger liability under Section 10(b)."); *see also In re Rent-Way Sec. Litig.*, 209 F. Supp. 2d 493, 504 (W.D. Pa. 2002) (relying on the text of Rule 10b-5(b) to conclude that a defendant that "was not the maker of the . . . statements . . . cannot be responsible for omissions in statements that it itself did not make"); *Wafra Leasing Corp. v. Prime Capital Corp.*, 192 F. Supp. 2d 852, 867 (N.D. Ill. 2002) (explaining that 10b-5(b)'s text "demonstrates that a defendant is liable only for those omissions that make his own statements misleading") (emphasis in original)). Moreover, in *Central Bank*, the Supreme Court determined that the scope of § 10(b) does not encompass aiding and abetting liability because the statute "prohibits only the making of a material misstatement (or omission) or the commission of a manipulative act." *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 177, 114 S. Ct. 1439, 128 L. Ed. 2d 119 (1994). Consequently, incorporating into the statute an obligation to rectify others' misstatements (though lacking even the aiding and abetting *mens rea* requirement of the initial statement made) would be illogical in light of the Supreme Court's holding.

*U.S. v. Schiff*, 602 F.3d 152, 167 (3rd Cir. 2010).

The First Circuit's opinion in *S.E.C. v. Tambone*, 597 F.3d 436, 447 (1st Cir. 2010), is also instructive and consistent with the Supreme Court's holding in *Central Bank*, 511 U.S. 164. In *Tambone*, the plaintiff SEC argued that individual defendants "made" false statements of material fact within the meaning of Rule 10b-5 by using prospectuses to sell mutual funds, allowing the prospectuses to be disseminated, and referring clients to them for information. *Id.* at 440. The First Circuit, however, found that the SEC's interpretation of the word "make" was in tension with the Supreme Court's holding in *Central Bank* and that a securities professional cannot be said to "make" a statement in violation of Rule 10b-5 by using statements to sell securities. The court noted that its ruling comported with the "the distinction between primary and secondary violators" made in *Central Bank* and that "[r]eading 'make' to include the use of a

105

false statement by one other than the maker would extend primary liability beyond the scope of

conduct prohibited by the text of Rule 10b-5(b)." *Id.* at 445-46. Specifically, the court held that,

"[i]f *Central Bank* is to have any real meaning, a defendant must actually make a false or

misleading statement in order to be held liable [as a primary violator] under section 10(b).

Anything short of such conduct is merely aiding and abetting." *Id.* at 447 (citing *Shapiro v.*

*Cantor,* 123 F.3d 717, 720 (2d Cir. 1997)); *see also Boim v. Quranic Literacy Inst.*, 291 F.3d

1000, 1018 (7th Cir. 2002) (noting that the Supreme Court in *Central Bank* "found that the

statute prohibited only the making of a material misstatement (or omission) or the commission of

a manipulative act" and "[b]ecause the statute did not proscribe giving aid to a person who

commits a manipulation or deceptive act, the Court declined to extend liability to aiders and

abettors").

      Conversely, Plaintiffs rely on *In re SmarTalk Teleservices, Inc. Sec. Litig.*, 124 F.Supp.2d

527 (S.D. Ohio 2000). In that case, the plaintiffs alleged in their complaint that the four

defendants "made numerous false statements in press releases and in conference calls with

analysts during the relevant time frame." *Id.* at 543. The defendants argued that the plaintiffs

did not allege which of the four defendants made the statements. *Id.* The court, however,

concluded that "the [p]laintiffs' allegations are sufficient to put the alleged speakers on notice of

the statements attributed to them." *Id.* The court also stated, in dicta and without citation to

legal authority that, "[i]n any case, a high ranking company official cannot sit quietly at a

conference with analysts, knowing that another official is making false statements and hope to

escape liability for those statements. If nothing else, the former official is at fault for a material

omission in failing to correct such statements in that context." *Id.* Plaintiffs also rely on *Barrie*

*v. Intervoice-Brite, Inc.*, in which the Fifth Circuit cited to the reasoning of *In re SmarTalk* and held:

> Where it is pled that one defendant knowingly uttered a false statement and the other defendant knowingly failed to correct it, even if it is not alleged which defendant made the statement and which defendant did not correct it, the fraud is sufficiently pleaded as to each defendant. This is not inconsistent with the plain language of subsection (1) of 15 U.S.C. § 78u-4(b), and accords with common sense and the policy considerations underlying the heightened pleading requirements.

409 F.3d 653, 656 (5th Cir. 2005).

The First Circuit's detailed analysis in *Tambone*, 597 F.3d at 447, is more persuasive than the cases relied on by Plaintiffs for several reasons. First, the decisions in *In re SmarTalk* and *Barrie* held that the plaintiffs sufficiently pled their § 10(b) claims notwithstanding that the plaintiffs failed to attribute the relevant statements to a particular defendant. Indeed, neither court addressed the viability of such a claim past the pleading stage. As the Third Circuit recently recognized, *Barrie* and *In re SmarTalk* "dealt only with the heightened notice pleading standard for fraud in a civil case under the [PSLRA]" and concluded "that sufficient facts were pled with particularity in the complaint 'to put the alleged speakers on notice of the statements attributed to them.'" *Schiff*, 602 F.3d at 163. More significantly, as the court in *Tambone* concluded, permitting Plaintiffs to proceed on a claim against Notebaert for a statement made by Jackman would be in tension with the Supreme Court's holding in *Central Bank*, 511 U.S. 164, and the plain language of § 10(b). Accordingly, Plaintiffs cannot proceed on their Section 10(b) claim that Notebaert is responsible for Jackman's alleged false and misleading statement.

## 2. Tellabs's Liability for Jackman's March 7, 2001 Statement

Plaintiffs also contend that Tellabs may be liable for the March 7, 2001 official statements that

Jackman made on its behalf.[22]  At oral argument on the motion for summary judgment, counsel

for Defendants withdrew their argument that a § 10(b) claim could not go forward against

Tellabs on the basis of Jackman's statement and conceded that, pursuant to principles of agency

law, if Jackman made the statement with scienter then Tellabs could be liable for the statement.

Indeed, the Seventh Circuit has held that agency law applies in the context of a § 10(b) claim.

*See Makor I*, 437 F.3d at 603 ("Since Notebaert was acting within the scope of his position as

CEO, his alleged knowledge of the falsity of his statements can be imputed to the corporate

entity Tellabs.")  Considering the evidence in the light most favorable to Plaintiffs, there is a

genuine issue of material fact regarding Jackman's March 7, 2001 statement in response to an

analyst's question about whether Tellabs was seeing "any weakness" with the TITAN 5500 that:

"We are not.  We are still seeing the product continue to maintain its growth rate and is still

experiencing strong acceptance."  (R. 336-1, ¶ 84.)

     Highlighting conflicting internal forecasts, financial summaries and forecast sanity

checks, the parties dispute whether Jackman's March 7, 2001 was misleading.  Jackman testified

that he based the March 7, 2001 statement on the "bottoms-up" sales forecast that he received

from the sales organization.  At this time, Pfefferle and the forecasting organization were

forecasting that Tellabs would achieve 30% growth in TITAN 5500 sales in first quarter 2001.

Plaintiffs, however, assert that Jackman's statement was misleading because Jackman knew that

demand for the TITAN 5500 was slowing.  Indeed, the forecast sanity checks for the period

leading up to March 7, 2001, which Jackman testified he regularly reviewed, showed that for

eleven weeks in first quarter 2001 the percentage of TITAN 5500 sales yet to be booked for the

---

[21]  The specific statement made by Jackman on March 7, 2001 subject to Plaintiffs' § 10(b) claim is different than the statements contained in Tellabs' March 7, 2001 forward-looking guidance.

quarter was greater than Tellabs's historical average. In addition, the monthly executive financial summary distributed in February, which Jackman recalled receiving, reported that monthly January results fell short of forecasts and that there were soft bookings of the TITAN 5500. The monthly executive financial summary also showed that bookings for the TITAN 5500 were at the lowest levels since July of 2000 and that sales had been slow for two periods. While Tellabs's forecasting group was not forecasting a decline in TITAN 5500 sales at this time, viewing the evidence known to Jackman relating to slow sales of the TITAN 5500 in the light most favorable to Plaintiffs, there is genuine question of material fact regarding whether, in light of this information, Jackman's March 7, 2001 statement was misleading. *See, e.g, In re Bristol-Myers Squibb Sec. Litig.*, 2005 WL 2007004, 2005 U.S. Dist. LEXIS 18448, at *109-10 (D.N.J. Aug. 17, 2005) (holding that a jury could infer that defendants' statements identifying commonly reported side-effects associated with a new drug without mentioning a side effect that was the "subject of substantial attention and concern at [defendant]" were materially misleading).

### B. March 14, 2010 Statement that the TITAN 5500 Business "Was Still Going Strong"

In Tellabs's Annual report, issued March 14, 2001, one of the questions that Tellabs responded to was: "Your core business is built on the TITAN 5500 – are you worried that this product has peaked?" Notebaert and Birck answered:

> No. In 2000, TITAN 5500 revenues grew 56%, its best year so far. Although we introduced this product nearly 10 years ago, it's still going strong because we keep adding new capabilities so it can do more and more for our customers. For example, last year we introduced a new TITAN 5500 system with 50% more capacity – enough to handle 1 million simultaneous Internet sessions. Now customers want an even larger TITAN 5500 system. That's why we believe there are many years of life ahead for this highly successful product.

*Id*; R. 324-1, ¶ 43.  Plaintiffs contend that in light of internal documents showing slow sales early in the quarter as compared to sales predicted by Tellabs's forecasts, the statement that sales were "still going strong" was misleading.  Indeed, in a February 19, 2001 report to Birck, Notebaert acknowledged that sales of the TITAN 5550 had been very slow in the quarter.  In addition, the monthly executive financial summary circulated on March 15, 2001 showed that bookings for the TITAN 5500 were at the lowest levels since July of 2000, and that sales had been slow for two periods.  Moreover, the forecast sanity checks showed that for eleven weeks in first quarter 2001 the percentage of TITAN 5500 sales yet to be booked for the quarter was greater than Tellabs's historical average.  Defendants maintain that the statement was not misleading because the question was focused on the TITAN 5500's potential for negative growth rate, and not whether sales were "going strong" relative to Tellabs's forecast.  Pfefferle asserts in her affidavit that while sales of the TITAN 5500 were slower than hoped for in January, as of mid-February 2001, no one was forecasting a decline in TITAN 5500 sales in 2001 due to the January results alone.

While the Court agrees that it is important to consider the context of the answer, the fact that the question asked whether the product had "peaked" necessarily implicates both historical and future sales of the TITAN 5500.  There is a genuine issue of material fact, however, as to how much information the question called for, and whether Notebaert acted with scienter in responding that the product was "still going strong."  In other words, while the answer may have addressed the broader issue of whether the TITAN 5500 would see a negative growth rate, there is a question of material fact as to whether Defendants' failure to disclose recent slow sales of

the TITAN 5500 rendered the answer misleading.[23]  *See Kaufman v. Motorola, Inc.*, 1999 WL 688780, 1999 U.S. Dist. LEXIS 6303 (N.D. Ill. Apr. 7, 1999) (holding that, with respect to statements that the defendant was experiencing a significant increase in demand for its products, plaintiffs established a genuine issue of material fact because they presented "evidence tending to show that Motorola employees actually knew and were concerned about rising inventory levels at the time the 10-Q Form was submitted").

Defendants' reliance on *Backman v. Polaroid Corp.*, 910 F.2d 10, 16 (1st Cir. 1990), is not persuasive.  In *Backman*, the plaintiffs challenged statements in the defendants' annual report as misleading because although the defendants disclosed that a particular product's effect on earnings was negative, the defendants did not disclose that the product was a "commercial failure."  *Id.* at 16.  The court stated that while a voluntary disclosure must be complete and accurate, "[t]his . . . does not mean that by revealing one fact about a product, one must reveal all others that, too, would be interesting, market-wise, but means only such others, if any, that are needed so that what was revealed would not be 'so incomplete as to mislead.'"  *Id.*  "Disclosing that Polavision was being sold below cost was not misleading by reason of not saying how much below.  Nor was it misleading not to report the number of sales, or that they were below expectations."  Contrary to the facts in *Backman*, there were indicators available to Defendants

---

[22] Indeed, the parties' contrary characterizations of the context of the question reaffirm that resolution of this issue is not proper at the summary judgment stage.  Defendants assert that the question implicated "whether the company expected an absolute decline in sales going forward" and that the response "focused on the fact that sales continued to grow despite the product being ten years old."  (R. 299-1, Defs.' Mot., p. 46.) Plaintiffs contend that the response was an "assurance[] as to the Company's then-current circumstances." (R. 329-1, Pls.' Opp'n, p. 47.)  Indeed, Defendants' assertion that the question concerned "not whether sales of the TITAN 5500 were 'going strong' relative to Tellabs' first quarter 2001 forecast, but rather whether they were 'going strong' despite the fact that the TITAN 5000 was a ten-year old product" is not supported by the record.  (R. 351-1, Defs.' Reply, p. 42.)  Instead, given the somewhat ambiguous nature of the question, there is a material question of fact as to the extent of information that the answer to the question required in order not to be misleading.

showing that sales of the TITAN 5500 were slow, but Defendants did not disclose that fact in response to a question regarding whether the product had "peaked." As the court in *Backman* stated, "[w]e could agree that if management knew at the time of the report that Polavision was a commercial failure, to say simply that its earnings were negative might well be found to be a material misrepresentation by half-truth and incompleteness." *Id.* Plaintiffs have therefore established that there is a question of fact regarding whether TITAN 5500 slow sales were relevant to the question of whether the product had "peaked." The Court therefore denies Defendants' motion for summary judgment with regard to this statement.

### C.      April 6, 2001 Statement That "End-User" Demand Continued to Grow

On the April 6, 2001 conference call, Notebaert stated:

> Last month we talked and we highlighted the issues we were seeing in the cable access market. There we saw our MSO customers shifting their focus from expanding their addressable market by building new infrastructure to increase profitability by signing up more customers in the places where they have the infrastructure in place. That trend continued during the whole quarter right down to the end. In just the last few weeks, however, we experienced a more controlled order flow from our larger customers than we originally anticipated.

> Clearly the environment has resulted in near term caution in the pace at which customers are deploying equipment. Our customers are exercising a high degree of prudence over every dollar spent. Let me balance this a bit and say that everything we hear from the customers indicates that our end user demand for services continues to grow. Fortunately for Tellabs, our TITAN family of products helps our carrier customers meet this demand in a cost effective way, which is the major reason we are still able to grow total revenue 20% year-over-year even in this environment. While the US market has been challenging we continue to see pockets of strength globally, particularly in Latin America.

(R. 336-1, ¶ 90; R. 301-12, Ex. 73, TEL 669446-47.) Plaintiffs contend that the statement about end user demand "clearly was intended to give cause for optimism" about Tellabs's performance and that the statement was therefore misleading in light of all that Notebaert knew regarding

Tellabs's performance. Plaintiffs, however, have failed to establish a genuine issue of material fact regarding whether this statement was misleading or made with the requisite scienter.

The undisputed evidence shows that the term "end user" refers to customers of service providers, Tellabs's core customer base, and that end user demand was in fact growing at the time Tellabs made the statement. Plaintiffs maintain that "even if Internet, telephone, and wireless users' demand was still growing, it was deceptive for Notebaert to suggest that it would mean additional business for Tellabs." (R. 329-1, Pls.' Opp'n, p. 48.) There is no indication in Notebaert's answer, however, that he intended his comment to reflect the demand of Tellabs's direct customers. Indeed, the full context of his answer reveals that Notebaert expressly disclosed that Tellabs was experiencing weakened demand from its own customers. There is accordingly no evidence from which a reasonable jury could conclude that Notebaert's statement was misleading. The Court accordingly grants summary judgment for Defendants with respect to this statement.

## IV.  Collateral Estoppel With Respect to the *Brieger* Class

Defendants seek summary judgment on the claims of the members of the class in the companion ERISA case against Tellabs, *Brieger v. Tellabs, Inc.*, Case No. 06-cv-1882 (N.D. Ill.).[24] "Collateral estoppel (also called 'issue preclusion') refers to the simple principle that 'later courts should honor the first actual decision of a matter that has been actually litigated.'" *Chicago Truck Drivers, Helpers & Warehouse Union Pension Fund v. Century Motor Freight*, 125 F.3d 526, 530 (7th Cir. 1997) (internal citations omitted). Collateral estoppel ensures that

---

[23] While the Court need not add address Defendants' collateral estoppel argument as it applies to the claims on which the Court has granted summary judgment, collateral estoppel provides an independent basis for granting summary judgment against the *Brieger* plaintiffs with respect to certain claims.

"once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation." *Id.* For a ruling to have collateral estoppel effect, "four elements must be met: '(1) the issue sought to be precluded must be the same as that involved in the prior litigation, (2) the issue must have been actually litigated, (3) the determination of the issue must have been essential to the final judgment, and (4) the party against whom estoppel is invoked must be fully represented in the prior action.'" *H-D Mich., Inc. v. Top Quality Serv.*, 496 F.3d 755, 760 (7th Cir. 2007) (citing *Meyer v. Rigdon*, 36 F.3d 1375, 1379 (7th Cir. 1994)). "Although the party asserting estoppel has the burden of showing that the claim was actually litigated and decided, 'proof is not limited to the formal record of the prior action, and may involve elaborate processes of inference in order to determine whether a particular issue has been decided.'" *Gilldorn Sav. Ass'n v. Commerce Sav. Ass'n*, 804 F.2d 390, 394-395 (7th Cir. 1986).

### A. Claims Regarding Shipment of Unordered Products

With respect to Plaintiffs' fourth quarter and full year 2000 channel stuffing claims, Plaintiffs contend that collateral estoppel is not applicable because (i) Judge Kennelly did not make any express findings with respect to the channel stuffing allegations present in this case that Tellabs over-inventoried customers to falsely portray growing revenues, and (ii) Defendants have not shown that the issue was fully litigated in *Brieger*. The record from the *Brieger* case, however, demonstrates that the issue is the same as that involved in the present litigation and that the issue was fully litigated during the *Brieger* trial.

The *Brieger* complaint, as well as the guidance and arguments presented at trial, establish that the issues are the same and were actually litigated. The *Brieger* complaint alleged that

Tellabs "engaged in troubling, improper practices in an attempt to conceal the problems with the

TITAN 5500" including "overloading customers with shipments of unwanted products and

falsifying purchase orders." (R. 336-1, ¶ 96) (citing *Brieger v. Tellabs, Inc.*, Case No. 06-1882

(N.D. Ill.), Answer, Docket Entry 82, Ex. 109 at ¶ 129). Indeed, the evidence adduced during

discovery in *Brieger* demonstrates that the plaintiffs relied on some of the same evidence

presented by Plaintiffs in the present case, namely internal Tellabs emails regarding Tellabs

shipping allegedly unordered products to Verizon, to show that the defendants breached their

fiduciary duties by making material misrepresentations and omissions. Moreover, the *Brieger*

plaintiffs argued at trial, based on these emails, that Tellabs's fourth quarter 2000 financial

statements were misstated because Tellabs had shipped unordered product to Verizon during the

fourth quarter. Thus, Defendants have demonstrated that the issue is the same as in the prior

action and that the issue was actually litigated. While Plaintiffs have presented evidence of

additional transactions in the present case to support their channel stuffing claim, this does not

preclude the application of collateral estoppel. *See Perry v. Sheahan*, 222 F.3d 309, 318 (7th

Cir. 2000) ("Only facts arising after the complaint was dismissed--or at least after the final

opportunity to present the facts to the court--can operate to defeat the bar of issue preclusion.")

Moreover, while the *Brieger* opinion did not specifically address whether Tellabs had

shipped unordered product, Defendants have demonstrated that the determination of the issue

was essential to the final judgment. In his written opinion after trial, Judge Kennelly addressed

"[plaintiffs' contentions] that defendants made misrepresentations to them and to the public in

general regarding Tellabs's business and that they failed to disclose information that plaintiffs

needed in order to make informed decisions about the allocation of their contributions to the

Plan." *Brieger v. Tellabs, Inc.*, 629 F. Supp. 2d 848, 857 (N.D. Ill. 2009). Judge Kennelly specifically held that, "defendants did not make any material misrepresentations to plaintiffs. Defendants certainly made a number of predictions about Tellabs and the telecommunications industry that turned out to be wrong. But the evidence does not demonstrate that defendants misrepresented either the facts or their expectations when they made those statements." *Id.* at 865. Given that the *Brieger* plaintiffs put allegations regarding misstatements about unordered products at issue in their complaint and the parties addressed the issue at trial, Judge Kennelly necessarily determined that defendants had not made any material misrepresentations in this regard. *See La Preferida, Inc. v. Cerveceria Modelo, S.A. de C.V.*, 914 F.2d 900, 907 (7th Cir. 1990) ("[T]he court in the second action may look beyond the earlier judgment and may 'examine the pleadings and the evidence in the prior action. And if the rendering court made no express findings on issues raised by the pleadings or the evidence, the court may infer that in the prior action a determination appropriate to the judgment rendered was made as to each issue that was so raised and the determination of which was necessary to support the judgment.'"). As the Seventh Circuit explained in *Gilldorn*:

> Although the party asserting estoppel has the burden of showing that the claim was actually litigated and decided, "proof is not limited to the formal record of the prior action, and may involve elaborate processes of inference in order to determine whether a particular issue has been decided." 18 C. Wright, supra, § 4405, at 38. Although the Texas court did not make findings of fact in support of its decision nor explicitly consider each of the bases for the motion, the court implicitly rejected all four grounds in denying the motion. Had any one of the grounds been sufficient, a contrary result would have been unavoidable. Thus, by denying the dismissal motion the Texas court necessarily decided all four issues in Commerce's favor.

804 F.2d at 394-395. Similarly, because the alleged misrepresentations regarding Tellabs shipping unordered product were at issue, the *Brieger* court necessarily determined that issue in

116

Tellabs's favor in granting judgment for the defendants.  Defendants have accordingly demonstrated that, even if Plaintiffs' channel-stuffing claims survived summary judgment, which they do not, collateral estoppel is applicable to the unordered products claims with respect to the members of the *Brieger* class.

### B.        Claims Regarding Tellabs's 2001 Guidance

Plaintiffs argue that collateral estoppel is not applicable with respect to the claims relating to Tellabs's 2001 guidance because the *Brieger* complaint did not specifically address the 30% forecast.  Plaintiffs admitted in their response to Defendants' statement of materials facts that the plaintiffs in *Brieger* challenged Tellabs's 2001 guidance as having been false, starting with the guidance given at the analysts conference on December 11, 2000, and continuing through at least June 19, 2001.  The Court, however, has reviewed the evidentiary support for Defendants' contention and Defendants have not met their burden of demonstrating that the issue of Tellabs's 2001 guidance issued on December 11, 2001, January 23, 2001, March 7, 2001, and April 18, 2001 was actually litigated in *Brieger*.

Indeed, while the *Brieger* complaint refers to specific examples of statements made by Tellabs when issuing its guidance on some of these dates, the *Brieger* complaint does not specifically address the overall guidance provided by Tellabs on any of these particular dates. While the trial record reflects that the *Brieger* defendants adduced some evidence regarding Tellabs's 30/30 guidance on December 11, 2001 and January 23, 2001, given that the *Brieger* plaintiffs failed to identify these representations in their complaint, the Court cannot conclude that the *Brieger* court's ruling necessarily determined that the guidance issued on those dates did not constitute misrepresentations.  See *Gilldorn*, 804 F.2d at 394-395.  Indeed, while Judge

117

Kennelly's opinion addressed the March 7, 2001 guidance, there is no evidence before the Court

demonstrating that the *Brieger* court addressed the issue of the full year 2001 guidance issued on

March 7, 2001 that is at issue in this case:

> More generally, plaintiffs point to a number of statements about Tellabs' prospects
> that they claim gave employees a false sense of optimism about Tellabs' future. One
> example is the revised earnings guidance Tellabs provided on March 7, 2001,
> lowering the first quarter 2001 revenue forecast, but stating that the company would
> still do well that quarter. This was supported with further statements about growth
> in 5500 sales. Plaintiffs compare that announcement to the February 19, 2001 letter
> from Notebaert to Birck, which appeared to paint a gloomier picture, including slow
> 5500 sales in the early part of 2001, as well as sanity check reports that showed
> slower sales. Defendants' statements were not misrepresentations. Though their
> predictions eventually proved wrong, at the time defendants made them, they were
> based on a significant backlog of orders, forecasts made by Pfefferle's department,
> and communications with customers. These facts, as well as the nature of Tellabs'
> products, led defendants to believe that Tellabs was in a unique position to weather
> the storm and even grow despite general industry and market conditions.

*Brieger*, 629 F. Supp. 2d at 859 (N.D. Ill. 2009). Thus, while the Court need not reach the issue

because Plaintiffs' claims relating to Tellabs's 2001 guidance do not survive summary judgment,

Defendants have failed to demonstrate that collateral estoppel bars the *Brieger* plaintiffs' claims

with respect to Tellabs's 2001 guidance.

### C.    March 7 and March 14 Statements Regarding the TITAN 5500

The *Brieger* plaintiffs, again like the plaintiffs in this case, specifically challenged as

having been false: (1) Brian Jackman's March 7, 2001 statement in response to an analyst

question about whether Tellabs was experiencing any weakness in TITAN 5500 product sales

that, "We're still seeing that product continue to maintain its growth rate; it's still experiencing

strong acceptance"; and (2) the March 14, 2001 statement in Tellabs's 2000 Annual Report, in

which Notebaert and Birck responded to a frequently asked question "Are you worried that [the

TITAN 5500] has peaked," by stating, "No…. Although we introduced the product nearly 10

118

years ago, it's still going strong."  (R. 336-1, ¶ 99) (citing *Brieger v. Tellabs, Inc.*, Case No. 06-1882 (N.D. Ill.), Docket Entry 82, Ex. 109 at ¶¶ 131, 141; Plaintiffs' Amended Proposed Findings of Fact and Conclusions of Law, Ex. 113 at ¶¶ 110, 112)).  Once again, Judge Kennelly's ruling after weighing the evidence from both sides that "defendants did not make any material misrepresentations to plaintiffs" established that the *Brieger* court necessarily determined whether these statements constituted misrepresentations.  *Brieger*, 629 F. Supp. 2d at 865.

Indeed, the only objection Plaintiffs have to Defendants' argument is that collateral estoppel should not apply because, during the *Brieger* trial, the parties mistakenly proceeded under the assumption that Tellabs's 2000 Annual Report was issued in mid-February 2001 when it was actually issued in mid-March 2001.  Plaintiffs contend that this mistake is significant because Tellabs's situation grew worse over time.  In *Montana v. United States*, the Supreme Court held that "changes in facts essential to a judgment will render collateral estoppel inapplicable in a subsequent action raising the same issues."  440 U.S. 147, 159 (1979).  While there is conflicting evidence in the *Brieger* trial record regarding the date that Tellabs issued its 2000 Annual Report, the date on which Tellabs issued its 2000 Annual Report has not changed since the date of the *Brieger* trial.  Accordingly, although Plaintiffs' claims premised on the March 7, 2001 and March 14, 2001 statements survive summary judgment, collateral estoppel bars the *Brieger* plaintiffs from pursuing the claims regarding the statement made by Jackman on March 7, 2001 or the statement made by Notebaert and Birck on March 14, 2001.

## V.    Section 20(a) Control Person Liability

Claims under § 20(a) of the Securities Exchange Act of 1934 are "derivative, requiring

119

proof of a separate underlying violation of the Exchange Act." *Tellabs I*, 437 F.3d at 605

(citations omitted); *see* 15 U.S.C. § 78t(a). Plaintiffs' claims based on Tellabs's fourth quarter

and full year 2000 financial statements, Tellabs's 2001 guidance, and Notebaert's April 6, 2001

statement regarding end user demand do not survive summary judgment. Therefore, Plaintiffs' §

20(a) claims against Notebaert, Ryan, Jackman, and Birck based on those claims must also be

dismissed. *See Pugh*, 521 F.3d at 698 (dismissal of § 10(b) and Rule 10b-5 claim mandates

dismissal of § 20(a) claim). Because Plaintiffs' claims premised on Jackman's March 7, 2001

statement that the TITAN 5500 "was continuing to maintain its growth rate" and the Notebaert

and Birck's March 14, 2001 statement in Tellabs's Annual Report that the TITAN 5500 was

"still going strong" survive summary judgment, however, Plaintiffs' § 20(a) claims deriving

from those statements also survive. *Id.*

## CONCLUSION

For the foregoing reasons, the Court grants in large part and denies in part Defendants'

motion for summary judgment and grants in part and denies in part Defendants' Motion to

Strike. DATED:  August 13, 2010

ENTERED

_____

AMY J. ST. EVE

United States District Court Judge